## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | Case No. 16-32202 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF GARLAND R. SHAW
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Garland R. Shaw, Senior Vice President and Chief Financial Officer of Ultra Petroleum Corp. ("Ultra Petroleum," and, together with its affiliates, the "Company"), one of the above-captioned debtors and debtors-in-possession, declare under penalty of perjury as follows:

### I.      Introduction.

1.      On April 29, 2016 (the "Petition Date"), Ultra Petroleum and its wholly-owned subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). In connection therewith, Ultra Petroleum plans to seek recognition of these proceedings in Yukon, Canada pursuant to Part IV of the Canadian *Companies' Creditors Arrangement Act*. The Debtors' First Day Motions (as defined below) include a motion for entry of an order appointing Ultra Petroleum as the foreign representative with respect to its planned foreign recognition proceeding.

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are:  Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158). The Debtors' service address is: 400 North Sam Houston Parkway East, Suite 1200, Houston, Texas 77060.

2.      To minimize any disruption resulting from the filing of these chapter 11 cases as well as other possible adverse effects on their businesses, the Debtors have filed various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions").  I have reviewed and am familiar with the content of each of the First Day Motions.  Based on my knowledge, after reasonable inquiry, I believe approval of the relief sought therein: is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value; is critical to the Debtors' achieving a successful restructuring, and is in the best interest of the Debtors' estates and their stakeholders.

3.      I joined Ultra Petroleum in 2006 as Corporate Controller, and I have served as Senior Vice President and Chief Financial Officer since August 2014.  I have over 30 years of experience in the oil and natural gas industry, including accounting, financial analysis, and economic evaluation for large multinational energy companies.  I am a Certified Public Accountant in the state of Texas.  I earned an undergraduate degree in Accounting from Oklahoma State University and a Masters of Business Administration from the University of Dallas.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon:  my personal knowledge of the Debtors' employees, operations, and finances; information learned from my review of relevant documents; information supplied to me by other members of the Debtors' management and third-party advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

KE 39782691

5.     To familiarize the Court with the Company and its business, this declaration is organized as follows:  **Part I** provides background information on the Company and its business, including its history, organizational structure, properties and operations; **Part II** explains the Company's capital structure and other significant obligations;[2] **Part III** details the circumstances surrounding the commencement of these chapter 11 cases and describes the Company's prepetition restructuring efforts; and **Part IV**, including **Exhibit A**, summarizes the relief requested in, and the factual bases supporting, the First Day Motions.

**II.     The Company's History, Organizational Structure, Properties, and Operations.**

6.     Ultra Petroleum is a publicly-traded, independent oil and natural gas exploration and production company.  The Company and all of its subsidiaries are engaged in the oil and gas business.  The Company has 159 full-time employees, none of whom are subject to a collective bargaining agreement.

7.     The Company's principal assets are its Pinedale Field properties in Wyoming, which produce primarily natural gas.  The Company also owns properties in Utah, which produce primarily crude oil, and Pennsylvania, which produce natural gas.

8.     The Company is headquartered in Houston, Texas.  It manages its operations from an operations office in Denver, Colorado and field offices in Pinedale, Wyoming and Vernal, Utah.

---

[2]   Many of the financial figures presented in this declaration, which reflect the Debtors' most recent review of their businesses, are unaudited and potentially subject to change.  The Debtors reserve all rights to revise and supplement the figures presented herein.

3



A.     **History.**

9.     Ultra Petroleum was originally incorporated in 1979 as Starmark Resources Ltd. under the laws of British Columbia, Canada.   Until 1990, the Company engaged in the acquisition and development of real estate ventures unrelated to the oil and gas industry.   In 1990, the Company began to acquire oil and gas properties, initially in Texas, New Mexico, and Louisiana and, in 1996, in Wyoming.  The Company changed its name to Ultra Petroleum Corp. in 1993, and it became a Yukon corporation, by continuance from British Columbia, in 2000.

10.     Since 2007, Ultra Petroleum's common stock has traded on the New York Stock Exchange under the ticker "UPL."  It previously traded on the Vancouver Stock Exchange, the Toronto Stock Exchange, and the American Stock Exchange.

4

**B.     The Company's Organizational Structure.**

11.     The Company's organizational structure is set forth below:



12.     UP Energy Corporation ("UP Energy") is incorporated in Nevada; its primary asset is its ownership of the common stock of Ultra Resources, Inc. ("Ultra Resources.").

13.     Ultra Resources is incorporated in Wyoming and conducts all of the Company's oil and gas operations.  Its primary assets are its ownership of the equity of its subsidiaries, as shown in the chart above, and its ownership of the Company's Pennsylvania oil and gas properties.

14.     UPL Three Rivers Holdings, LLC ("Three Rivers"), a Delaware limited liability company, owns the Company's oil and gas properties in Utah.

15.     UPL Pinedale, LLC ("UPL Pinedale") is a Delaware limited liability company. Ultra Wyoming, Inc. ("Ultra Wyoming") is a Wyoming corporation.  UPL Pinedale and Ultra Wyoming own, collectively, the Company's oil and gas properties in the Pinedale and Jonah fields in Wyoming.

5

16.     Ultra Wyoming LGS, LLC, a Delaware limited liability company, is a special-purpose entity whose sole business is acting as the tenant under a long-term lease of a liquids gathering pipeline system serving some of the Company's wells in the Pinedale field in Wyoming.[3]

17.     Keystone Gas Gathering, LLC, a Delaware limited liability company, owns the Company's interest in a natural gas pipeline system serving some of the Company's wells in Pennsylvania.

### C.     The Company's Properties.

18.     The Company owns oil and gas properties in Wyoming, Utah, and Pennsylvania. All of its properties and operations are in the continental United States.  The Company is focused on natural gas in the western United States; over 90% of its 2016 production will come from its western basin, long-life, low-cost natural gas reserves.

19.     The table below summarizes, by asset, the Company's oil and gas acreage, well count, annual production, and proved oil and gas reserves, as of December 31, 2015.

| Asset | Location | Net Acres | 12/31/15 Net Producing Wells | | 2015 Production | | 12/31/2015 Proved Reserves | |
|---|---|---|---|---|---|---|---|---|
| | | | Count | % of total | Bcfe | % of total | Bcfe | % of total |
| Pinedale/Jonah | Sublette Co., WY | 68,000 | 1,803 | 91% | 265 | 91% | 2,390 | 95% |
| Three Rivers | Uintah Co., UT | 9,000 | 124 | 6% | 11 | 4% | 34 | 1% |
| Marcellus | Pennsylvania | 74,000 | 52 | 3% | 14 | 5% | 104 | 4% |
| | Totals | 151,000 | 1,979 | 100% | 290 | 100% | 2,528 | 100% |

20.     The Company's Wyoming properties are located in the Green River Basin in the western part of the state, and include acreage in the Pinedale and the Jonah fields. The Company has the largest acreage position in Pinedale field.  It acquired most of its interests in these

---

3     During 2012, the Company elected to raise capital in response to the then low gas prices.  In connection herewith, the Company entered into a sale-leaseback transaction involving a liquids gathering pipeline system it owned and operated in Pinedale field.  The transaction raised approximately $225.0 million, and obligates the Company to pay an estimated $300.0 million through 2027.

properties during the 1990s, and it acquired the remainder of its Wyoming holdings in September 2014 from SWEPI LP, a wholly-owned subsidiary of Royal Dutch Shell, plc.

21.     The map below shows the location of Pinedale field and Jonah field relative to the Green River Basin and the state of Wyoming.



22.     The Pinedale field is one of the top ten natural gas fields in the United States. It covers nearly 200,000 acres of land and is estimated to contain nearly 60.0 trillion cubic feet of original gas in place (38.2 trillion cubic feet ("Tcf") of which is estimated to be recoverable natural gas). The field has been a target of oil and gas exploration efforts since at least the 1930s. The Pinedale field is a conventional tight gas play, not an unconventional shale play.

23.     Beginning in the mid-1990s, the Company's exploration and development efforts in the Pinedale field have targeted a stacked sequence of over-pressured sandstones in the Cretaceous-aged Lance and Mesaverde formations having a gross reservoir thickness of up to 5,700 feet and located at subsurface depths of up to 14,000 feet. Although the Company's production from the Pinedale field is primarily natural gas, its wells in the field also produce condensate (a light, sweet grade of crude oil).

7

24.     The Pinedale field is named after the Pinedale anticline, which covers an area up to five miles wide and approximately thirty-five miles long.   (Anticline is a term used in structural geology to refer to a subsurface landmass that is folded in an arch-like shape with its oldest rock formations and, in the case of Pinedale field, its oil and gas resources, at its core. The image below is a simplified representation of an oil and gas bearing anticline formation.)



25.     The Jonah field is also a substantial natural gas field, estimated to contain over 10.5 trillion cubic feet of natural gas.  It is located to the south and west of the southeastern end of the Pinedale field.  Similar to its Pinedale production, the Company's production from the Jonah field consists primarily of natural gas and, to a lesser extent, condensate.

26.     The Company's Utah properties produce primarily black wax crude oil and are located in the Uinta Basin in Uintah County in the northeast part of the state.  The Company refers to its acreage in Utah as Three Rivers Field.  The Company acquired its Utah properties in December 2013.

27.     The Company's exploration and development efforts in the Three Rivers Field target primarily the Eocene-aged Lower Green River Formation.  Due to its capital constraints and low oil prices, the Company suspended its drilling operations in May 2015 and elected to defer completion of over twenty wells drilled during the first few months of 2015.

8

28.     The map below shows the location of the Company's Utah properties relative to the Utah and Colorado border and certain nearby oil and gas fields.



29.     The Company's Pennsylvania properties produce natural gas and are located in the Appalachian Basin in several counties in the northcentral part of the state.  The Company acquired its current Pennsylvania properties in February 2010.  The Company previously owned, until September 2014, certain other operated and non-operated properties in Pennsylvania, which it sold to SWEPI LP in connection with the September 2014 transaction referenced above.

30.     The Company's exploration and development efforts in Pennsylvania have targeted primarily the Devonian-aged Marcellus Shale and, to a lesser extent, the Geneseo Shale. Due to its capital constraints and low natural gas prices, the Company has not drilled or completed any wells in Pennsylvania in the last three years.

31.     The map below shows the location of the Company's Pennsylvania properties in the northcentral part of the state.

9



### D.      The Company's Operations.

32.     The Company operates the vast majority of its properties, including over 90% of its productive acreage in Pinedale and Jonah fields in Wyoming and 100% of its productive acreage in Utah.  All of the Company's acreage in Pennsylvania is operated by third parties.

33.     The Company has historically been one of the lowest-cost operators in the domestic U.S. oil and gas industry, particularly with regard to the cash costs components of its drilling, completion, and production operations.  The diagram below shows the Company's cash costs on a per unit of production basis, including interest expense, relative to several of its peers.



34.    It has demonstrated its ability to consistently improve its operating efficiencies, particularly in Pinedale field, over many years.  As illustrated by the graphics below, since 2006, the Company has reduced its average total Pinedale well cost by 57% (from approximately $7.0 million in 2006 to approximately $3.0 million in 2015) and its average cycle time—from rig release on one well to rig release on the next well—by 71% (from nearly 80 days in 2006 to just over 10 days in 2015).



11



35.     The Company has also significantly improved its use of advanced drilling technologies, including directional drilling to as dense as five-acre spacing from its well pads in Pinedale field.  The Company's Pinedale wells are oriented as vertical wells while the wellbore is encountering the target formation, but the wellbores are S-shaped and directional between the surface of the earth and the beginning of the vertical section of the well.  This allows the Company to access a large subsurface area from a relatively small surface location.  The diagram below depicts a typical Ultra well pad.  This diagram includes 32 directionally-drilled wells, reaching at least 160 acres of oil and gas resource from a 12 acre surface location.



160 acres developed with 32 wells on
5 acre spacing from one 12 acre pad

12

36.     Because the Company operates the vast majority of its properties, it has the opportunity to continue to realize the significant benefits of being a low-cost operator, including the ability to control the timing and amount of its capital expenditures, the nature and scope of its development activities, and, to a far greater extent than if it were primarily a non-operator, the costs of its drilling, completion, and production operations.

## III.    The Debtors' Prepetition Capital Structure.

37.     As illustrated in the capitalization table below, and as discussed in detail herein, the Debtors' funded indebtedness—***all of which is unsecured***—consists of:  (a) approximately $1.3 billion in principal amount of unsecured senior notes issued by Ultra Petroleum which are contractually and structurally subordinated to Ultra Resources' funded indebtedness and which lack recourse to any other Debtor or entity; (b) approximately $999.0 million in unsecured bank debt borrowed by Ultra Resources (and guaranteed by UP Energy and Ultra Petroleum); and (c) approximately $1.46 billion in principal amount of unsecured senior notes issued by Ultra Resources (and guaranteed by UP Energy and Ultra Petroleum).

| ($ in millions) | Issuance Year | Maturity Date | Interest Rate | Principal Amount |
|---|---|---|---|---|
| **Ultra Resources, Inc.** | | | | |
| $1 Billion Revolving Credit Facility | 2011 | Oct-16 | Libor + 2.5% | $   999.0 |
| 7.31% Senior Notes | 2009 | Mar-16 | 7.31% | 62.0 |
| 4.98% Senior Notes | 2010 | Jan-17 | 4.98% | 116.0 |
| 5.92% Senior Notes | 2008 | Mar-18 | 5.92% | 200.0 |
| 7.77% Senior Notes | 2009 | Mar-19 | 7.70% | 173.0 |
| 5.50% Senior Notes | 2010 | Jan-20 | 5.50% | 207.0 |
| 4.51% Senior Notes | 2010 | Oct-20 | 4.51% | 315.0 |
| 5.60% Senior Notes | 2010 | Jan-22 | 5.60% | 87.0 |
| 4.66% Senior Notes | 2010 | Oct-22 | 4.66% | 35.0 |
| 5.85% Senior Notes | 2010 | Jan-25 | 5.85% | 90.0 |
| 4.91% Senior Notes | 2010 | Oct-25 | 4.91% | 175.0 |
| **Total Subsidiary Debt** | | | **$** | **2,459.0** |
| | | | | |
| **Ultra Petroleum Corp.** | | | | |
| 5.75% Senior Notes | 2013 | Dec-18 | 5.75% | $   450.0 |
| 6.125% Senior Notes | 2014 | Oct-24 | 6.13% | 850.0 |
| **Total Parent Company Debt** | | | **$** | **1,300.0** |
| | | | | |
| **Total Approximate Debt Outstanding** | | | **$** | **3,759.0** |

13

38.     Please also see **Exhibit B** attached hereto, which depicts the Company's funded debt obligations on its organizational structure chart.

### A.     Ultra Resources Credit Agreement.

39.     Ultra Resources is the borrower of approximately $999.0 million of ***unsecured*** bank indebtedness under the Credit Agreement, dated as of October 6, 2011 (as amended, modified, or supplemented in accordance with the terms thereof, the "Ultra Resources Credit Agreement"), by and among Ultra Resources, as borrower, the lenders party thereto from time to time (collectively, the "Ultra Resources Lenders"), JPMorgan Chase Bank, N.A., as administrative agent, and certain other parties thereto.  The Ultra Resources Credit Agreement provides the Company with a senior, unsecured revolving credit facility.

40.     All obligations under the Ultra Resources Credit Agreement are guaranteed, on an unsecured basis, by Ultra Petroleum and UP Energy.  The obligations under the Ultra Resources Credit Agreement are not guaranteed by any subsidiaries of Ultra Resources.  As of the Petition Date, the outstanding principal obligations under the Ultra Resources Credit Agreement total approximately $999.0 million.  As of the Petition Date, there is no further borrowing availability under the Ultra Resources Credit Agreement, which matures in October 2016.

### B.     Ultra Resources Notes.

41.     Ultra Resources is also the primary obligor with respect to approximately $1.46 billion of ***unsecured*** private placement notes issued under the Master Note Purchase Agreement, dated as of March 6, 2008 (as amended, modified, or supplemented in accordance with the terms thereof, the "Ultra Resources MNPA"), by and among Ultra Resources, as issuer, and the purchasers party thereto from time to time (the "Ultra Resources Noteholders").  The Ultra Resources MNPA provides for the issuance of the ten tranches of unsecured senior notes summarized in the capitalization table above (collectively, the "Ultra Resources Notes").

14

42.     All obligations under the Ultra Resources Notes are guaranteed, on an unsecured basis, by Ultra Petroleum and UP Energy.  The obligations under the Ultra Resources Notes are not guaranteed by any subsidiaries of Ultra Resources.  The outstanding principal obligations under the Ultra Resources Notes totaled approximately $1.46 billion as of the Petition Date.  The maturity dates of the Ultra Resources Notes range from March 2016 to October 2025.

C.     **Ultra Petroleum Notes.**

43.     Ultra Petroleum is the obligor with respect to approximately $1.3 billion of ***unsecured*** notes (collectively, the "Ultra Petroleum Notes").  The Ultra Petroleum Notes are not guaranteed by, and do not have recourse against, any other Debtor entity.  The Ultra Petroleum Notes were issued in two transactions:  ***first***, in December 2013, as to $450.0 million in principal amount; and, ***second***, in September 2014, as to $850.0 million in principal amount.

44.     The Ultra Petroleum Notes issued in December 2013 were issued pursuant to the Indenture, dated as of December 12, 2013 (as amended, modified, or supplemented in accordance with the terms thereof, the "2013 Ultra Petroleum Indenture"), by and between Ultra Petroleum, as issuer, and Delaware Trust Company, as successor trustee to U.S. Bank National Association, which provides for the issuance of Ultra Petroleum's 5.750% senior unsecured notes due 2018 (collectively, the "2018 Notes").  As of the Petition Date, the outstanding principal obligations under the 2018 Notes totaled approximately $450.0 million.

45.     The Ultra Petroleum Notes issued in September 2014 were issued pursuant to the Indenture, dated as of September 18, 2014 (as amended, modified, or supplemented in accordance with the terms thereof, and, together with the 2013 Ultra Petroleum Indenture, the "Ultra Petroleum Indentures"), by and between Ultra Petroleum, as issuer, and Delaware Trust Company, as successor trustee to U.S. Bank National Association, which provides for the issuance of Ultra Petroleum's 6.125% senior unsecured notes due 2024 (collectively, the "2024

KE 39782691

Notes"). As of the Petition Date, the outstanding principal obligations under the 2024 Notes totaled approximately $850.0 million.

**D.     Ultra Petroleum Common Stock.**

46.     Ultra Petroleum is a publicly-held company listed on the New York Stock Exchange (the "NYSE").  It has traded on the NYSE, under the symbol "UPL," since 2007.  For most of 2016, the Company's common stock has traded at less than $1.00 per share.  On March 15, 2016, the Company received a deficiency notice from the NYSE notifying the Company that the average closing price of its common stock over the consecutive 30-trading-day period ended March 11, 2016 was $0.96, which violated one of the NYSE's continued listing standards.  If the Company does not regain compliance with the NYSE's continued listing standard, or violates other NYSE continued listing standards, the Company's stock may be delisted from the NYSE.

47.     As of the Petition Date, Ultra Petroleum has 153,388,832 outstanding shares of common stock, having no par value.

**IV.     Events Leading to These Chapter 11 Proceedings.**

**A.     Introduction.**

48.     Between 2008, when the Company issued the first of the Ultra Resources Notes, and continuing through 2014, when the Company issued the last of the Ultra Petroleum Notes, the Company and its lenders created a capital structure that was designed to support the Company in pursuing the profitable growth business model it had successfully employed since 1999.[4]

---

[4]     The Company increased the PV-10 value of its proved reserves more than 17,000% between year-end 1999, when its proved reserves had a PV-10 value of less than $50.0 million, and 2014, when its proved reserves had a PV-10 value of $7.1 billion.

16

49.     The bulk of the Ultra Resources Notes and Ultra Petroleum Notes were issued under favorable and supportive market conditions with respect to both commodity prices, which typically anticipated a significant increase in the short and long-term, and capital markets, as evidenced by the attractive interest rates agreed to by the Company's lenders.[5]

50.     The graphic below highlights the timing of the Company's debt issuances against the past ten years' historical monthly average Henry Hub natural gas prices and West Texas Intermediate Crude Oil monthly average spot prices.  The latest monthly average natural gas spot price print on the graphic is the lowest point on the line.



---

5      The weighted average interest rate of the Ultra Resources Notes and the Ultra Petroleum Notes is 5.8%.

51.    The Debtors have also historically had in place financial hedges with respect to a portion of their expected oil and gas production.  Since 2008, the Debtors have realized nearly $1.0 billion in gains from their hedging transactions.  The Debtors do not have any financial hedges in place during 2016, as commodity prices have not yet recovered to levels at which the Debtors desire to hedge their production.

**B.**    **Commodity Price Collapse.**

52.    The low commodity prices, and especially the low natural gas prices,[6] that prevailed throughout 2015 and have continued through the first four months of 2016 have had a devastating impact on the Debtors' financial condition, causing their capital structure to become unstable and unsustainable.  The adverse market conditions that have harmed the Debtors have also affected nearly every company involved in the oil and gas business, including other exploration and production companies.   More specifically, according to consulting firm Gavin/Solmonese, sixty-seven oil and gas exploration and production companies filed bankruptcy proceedings during 2015, a nearly 380% increase from 2014.



---

6    During 2015, approximately 93% of the Company's production was natural gas and 86% of its revenues was attributable to its natural gas production.

KE 39782691

53.     As a consequence of the unstable energy markets, many oil and gas companies have also dramatically reduced their capital investments.   For example, a collection of approximately 50 oil and gas companies identified by energy investment boutique Howard Weil reduced their capital budgets for 2016 by approximately 37%, compared to 2015.[7]  Many other oil and gas companies have substantially reduced or ceased drilling or completion operations altogether.  For example, according to Baker Hughes, one of the world's largest oil field services companies, there were 1,931 drilling rigs active in the United States in September 2014, and there were only 420 drilling rigs active in the United States as of the Petition Date, a 78.2% decline.[8]   Still others made tough decisions to modify the terms of their debt agreements, sometimes on onerous terms, or to divest assets at severe discounts to preferred valuations, often without returning to a sustainable capital structure because of continued low or falling prices.

54.     Regrettably, this period of low prices harmed the Debtors at a time when the Debtors were also delivering on the operational ambitions of their business plan and achieving some of the best operating results in company history.  For example, despite prudently and substantially reducing their capital budget for the year in response to the worsening marketing conditions, the Debtors produced 290.1 Bcfe[9] of natural gas and oil during 2015, their highest-ever annual production and an increase of more than 17% compared to their 2014 production of 249.0 Bcfe.

---

[7]   Scotia Howard Weil E&P Group, *Morning Commentary*, Mar. 16, 2016.  A copy of this report is available upon request to the Debtors' proposed counsel.

[8]   Baker Hughes, *Baker Hughes North American Rotary Rig Count*, Apr. 29, 2016, available online at http://bit.ly/1XZ2w66 (last accessed on April 30, 2016).

[9]   A "Bcfe" means a quantity of hydrocarbons equal to one billion cubic feet of natural gas equivalent. Because the Company produces primarily natural gas (93% of its production during 2015 was natural gas), the Company generally describes its production results in Bcfe or Mcfe ("million cubic feet of natural gas equivalent").

55.     However, despite the Debtors' proactive efforts, detailed below, to deleverage their capital structure and increase their liquidity in response to the falling commodity markets, the pricing collapse has severely impacted the Debtors' financial results.  Despite the record production noted above, the Debtors' consolidated EBITDA for 2015 was only $610.0 million, nearly 25% lower than the Debtors' reported 2014 EBITDA of $810.0 million (and over 35% lower than the Debtors' 2014 pro forma EBITDA of $950.0 million, including the full-year effects of the SWEPI LP acquisition).  Moreover, although the Debtors expect to produce up to 280.0 Bcfe of natural gas and oil this year (nearly equaling last year's record production), based on the commodity prices of a few months ago, the Debtors expected to generate less than $300.0 million of EBITDA in 2016, which is less than half the EBITDA that the Debtors generated in 2015, and less than one-third of their pro forma 2014 EBITDA.  If the oil and natural gas markets can maintain the somewhat higher prices of recent weeks, the Debtors may generate more than $300.0 million of EBITDA in 2016.

**C.     The Company's Efforts to Deleverage Its Capital Structure and Increase Liquidity.**

56.     In response to the decline in commodity prices, the Company undertook a series of operational and financial actions in 2014 and 2015 in an attempt to improve its liquidity position and stabilize its capital structure.  These actions included the items referenced below.

57.     *First*, the Company reduced its capital spending and negotiated material cost reductions from key vendors.  After investing over $1.4 billion in 2014 (including acquisition capital expenditures), the Company made less than $500.0 million in capital investments in 2015.  Due to continued low prices and the Debtors' financial distress, the Company plans to make less than $300.0 million in capital investments this year.

58.     *Second*, the Company considered issuing debt or equity securities or selling assets.  The Company engaged financial and legal advisors in connection with various capital raise transactions, prepared offering materials with respect to a proposed sale of common shares of Ultra Petroleum, and evaluated the capital markets for acceptable conditions.  The Company also engaged financial and legal advisors in connection with its attempts to sell a portion of its assets, prepared proposed transaction documents, and engaged in various negotiations with proposed counterparties for acceptable terms.  Ultimately, due to the continued deterioration of oil and gas prices, the Company was unable to consummate any of the contemplated transactions on acceptable terms.

59.     *Third*, the Company sought specifically to incentivize its management and employees to reduce debt by incorporating specific debt reduction goals and targets into its 2015 incentive compensation programs.

**D.     Hiring Advisors and Creditor Negotiations.**

60.     Notwithstanding these initiatives, given the continued low commodity prices it became clear that the Company's capital structure was not sustainable without, minimally, modifications to the terms of its debt agreements.  Accordingly, the Company retained financial and legal advisors to assist it in discussions and negotiations with its creditors.

61.     More specifically, beginning in October 2015, the Company began negotiations with the Ultra Resources Lenders, including the Ultra Resources Credit Agreement lenders and the Ultra Resources Noteholders.  The Company's initial objective during these discussions— which ultimately continued over the next several months—was to negotiate an amendment to the Ultra Resources MNPA that would alleviate the constraints of the consolidated leverage ratio financial covenant.  The Company also sought to negotiate a replacement credit facility to the Ultra Resources Credit Agreement, which matures October 2016.

21

62.     Although many meetings were convened, negotiations conducted, and drafts of term sheets and proposals prepared and exchanged, conditions in the oil and gas business continued to be very poor, and the Company's financial condition continued to deteriorate through the end of 2015, and, as a result, no changes were agreed to Debtors' capital structure.

63.     As 2016 began, the Company and its lenders continued their efforts to reach a consensual out-of-court restructuring of the Company's balance sheet.  More specifically, in early January 2016, the Company delivered an updated proposal to the Ultra Resources Noteholders and, separately, to JPMorgan Chase Bank, N.A., on behalf of the Ultra Resources Lenders.  The Company's proposal contemplated a comprehensive restructuring of the Debtors' capital structure, including the Ultra Petroleum Notes.  After receiving the proposal, the Ultra Resources Noteholders engaged a financial advisor, who began a comprehensive diligence process.  Although there was some discussion of the proposal, it did not result in an agreement.

64.     By the beginning of February 2016, the Ultra Resources Lenders engaged a financial advisor, and the Ultra Resources Lenders began to focus on negotiating forbearance agreements to address the near-term interest and maturity payments under the Ultra Resources Notes instead of the Company's overall restructuring proposal.  These discussions continued throughout the month, and the Company, each of the Ultra Resources Lenders and Ultra Resources Noteholders signed waiver and amendment agreements on March 1, 2016.

65.     These agreements—which were intended to provide time to attempt to negotiate an out-of-court restructuring transaction—allowed the Debtors to defer approximately $102.0 million in principal and interest payments due March 1, 2016 under the Ultra Resources Notes as well as $2.7 million in interest payments payable between March 1, 2016 and April 30, 2016 under the Ultra Resources Credit Agreement.  The agreements also conditioned the waivers on

22

the Company's electing not to make an April 1, 2016 interest payment due on certain Ultra Petroleum Notes.

66.     On March 8, 2016, the Company invited the Ultra Resources Lenders and Ultra Resources Noteholders to a meeting in New York City.  At the meeting, the Company presented the groups with another, different proposal to restructure all of the Company's debt on an out-of-court basis.

67.     On April 1, 2016, as contemplated by the waiver and amendment agreements, Ultra Petroleum elected to defer the approximately $26.0 million interest payment on the 2024 Notes, entering a 30-day grace period.

68.     On April 4, 2016, the Ultra Resources Lenders and Ultra Resources Noteholders provided a joint counterproposal to the Company.  Thereafter, the Debtors realized the parties would struggle to reach an agreement prior to the April 30, 2016 expiration of the forbearance and waiver agreements and that a comprehensive restructuring of the Debtors' obligations could only be achieved through the chapter 11 process.

69.     Over the course of their lengthy discussions with the Ultra Resources Lenders, the Company and its advisors also engaged in several constructive discussions with certain holders of the Ultra Petroleum Notes and their advisors.  However, no agreement could be reached with the holders of the Ultra Petroleum Notes prior to the Company's chapter 11 filing.

**E.      Chapter 11 Filing.**

70.     In light of the April 30, 2016 expiration of the forbearance agreements between the Company and the Ultra Resources Lenders and the May 1, 2016 expiration of the grace period under the 2014 Ultra Petroleum Indenture, the Debtors commenced these chapter 11 cases.  During the coming weeks and months, the Debtors plan to engage all of their constituencies, including the to-be-formed official committee of unsecured creditors, in a

23

productive dialogue regarding restructuring alternatives designed to maximize value for all of the Company's stakeholders.   The Debtors also plan to carefully evaluate their contractual obligations and identify opportunities to renegotiate or reject those that are no longer beneficial to the estate.

**V.      First Day Motions.**

71.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions.  I have reviewed and am familiar with the content of each of the First Day Motions, and I believe that the relief requested therein is necessary to allow the Debtors to operate with minimal disruption while these chapter 11 cases are pending.

72.      I understand the Debtors intend to seek the entry of Court orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.  If the Court does not grant the relief requested by the Debtors in their First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

73.      The relief requested and the facts supporting each of the First Day Motions is set forth in detail in **<u>Exhibit A</u>** attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 30, 2016                    */s/ Garland R. Shaw*
_____
                                          Garland R. Shaw
                                          Senior Vice President and Chief Financial Officer
                                          ULTRA PETROLEUM CORP.

KE 39782691

## Exhibit A

**Evidentiary Support for the First Day Motions**

**Evidentiary Support for First-Day Motions[1]**

---

**Administrative First-Day Motions**

I.  **Debtors' Emergency Motion Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9007 Seeking Authority to Implement Certain Notice Procedures (the "Hearing Schedule and Notice Procedures Motion").**

1.   It is my understanding that the Debtors have identified potentially thousands of parties in interest to whom notice must be given under the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules.  I expect there will be numerous parties in interest in these chapter 11 cases and anticipate that a significant number of parties will file requests for service of filings.  I also expect that numerous motions and applications will be filed in these chapter 11 cases.  The costs and burdens that might arise absent adoption of the proposed procedures—such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise serving paper copies of all such documents—could impose significant economic and administrative burdens on the Debtors' estates and the Court.

2.   Given the size and scope of the chapter 11 cases, I believe that the proposed Hearing Schedule and Notice Procedures Motion will facilitate service of court papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases.

3.   I believe that the relief requested in the Hearing Schedule and Notice Procedures Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Hearing

Schedule and Notice Procedures Motion should be approved

**II.      Debtors' Emergency Motion for Entry of an Order Directing Joint Administration**
**of Related Chapter 11 Cases (the "Joint Administration Motion").**

4.      The Debtors seek entry of an order directing joint administration and procedural

consolidation of their related chapter 11 cases.  Specifically, the Debtors request that the Court

maintain one file and one docket for all of the jointly administered cases under the case of Ultra

Petroleum Corp., and that the Court administer the cases under a consolidated caption.  Further,

the Debtors request that entry be made on the docket of Ultra Petroleum Corp. to reflect the joint

administration of these chapter 11 cases.

5.      Given the integrated nature of the Debtors' operations, joint administration of

these chapter 11 cases will provide significant administrative convenience.  Many of the

motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.

The entry of an order directing joint administration of these chapter 11 cases will reduce fees and

costs by avoiding duplicative filings and objections.  Joint administration will also allow the

Office of the United States Trustee for the Southern District of Texas, the Court, and all parties

in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint

administration will not adversely affect the Debtors' respective constituencies because the Joint

Administration Motion seeks only administrative, not substantive, consolidation of the Debtors'

estates.  The relief requested will benefit, and not harm, parties in interest through the cost

reductions associated with the joint administration of these chapter 11 cases.

6.      I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and will enable

KE 41482318

the Debtors to continue to operate in the ordinary course without disruption. Accordingly, I respectfully believe that the Court should approve the Joint Administration Motion.

III. **Debtors' Emergency Application for Appointment of Epiq Bankruptcy Solutions, LLC as Claims, Noticing and Solicitation Agent (the "Epiq Application").**

7.      The Debtors seek entry of an order appointing Epiq Bankruptcy Solutions, LLC ("Epiq") as the Debtors' claims, noticing, and solicitation agent in connection with these chapter 11 cases, in accordance with the terms and conditions set forth in the engagement letter between Epiq and the Debtors (the "Engagement Agreement").

8.      The Debtors anticipate that there will be thousands of persons and entities to whom the Debtors must provide notice of developments related to these chapter 11 cases. With such a significant number of parties involved in these chapter 11 cases, it is likely that heavy administrative burdens will be imposed upon the Court and the Office of the Clerk of the United States Bankruptcy Court for the Southern District of Texas (the "Clerk").

9.      I understand that Epiq is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services including noticing, claims processing, solicitation, balloting, and other related services critical to the effective administration of chapter 11 cases. I understand and believe that Epiq has developed efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing, claims processing, solicitation, and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders, and all parties in interest.

10.     Further, I understand Epiq will work with the Clerk to ensure that its methodology conforms to all of the Court's procedures, the Bankruptcy Local Rules, and the provisions of any Court orders. I believe that such assistance will expedite the distribution of notices and relieve the Clerk of administrative burdens caused by these chapter 11 cases.

KE 41482318

11.     I believe that the proposed retention of Epiq is the most effective and efficient manner of noticing the thousands of creditors and parties in interest of the commencement of these chapter 11 cases and other developments.  Thus, I believe that the relief requested in the Epiq Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors and their professionals to focus on key aspects of the Debtors' restructuring efforts.  Accordingly, I believe that the Court should approve the Epiq Application.

**IV.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File A Consolidated List of Creditors and A Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Creditor Matrix Motion").**

12.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

13.     Because requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that the permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.

4

**V.      Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Waiving the Requirements to File A List of and Provide Notices Directly to Equity Security Holders (the "Schedules Motion").**

14.      The Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 26 days, for a total of 40 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown.

15.      I believe that the Court's grant of an extension of time to file the Schedules and Statements is appropriate under the circumstances of these chapter 11 cases.  *First*, to prepare their Statements and Schedules, the Debtors will have to compile information from books, records, and documents relating to a large number of claims, assets, and contracts.   This information is voluminous and not centrally located in the Debtors' organization.  Accordingly, collecting the necessary information would require an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors.  *Second*, no party in interest will experience prejudice by the Court granting the Debtors' request for an extension.

16.      I therefore believe that the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will preserve the assets of the Debtors' estates during the chapter 11 process without prejudice to any party in interest.  Accordingly, I believe that the Court should approve the Schedules Motion.

KE 41482318

**<u>Operational First-Day Motions</u>**

I.     **Debtors' Emergency Motion for Entry an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, and (E) Maintain Existing Investment Practices and (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances (the "<u>Cash Management Motion</u>").**

17.     The Debtors seek entry of interim and final orders (a) continue to operate the Cash Management System (as defined below), (b) honor certain prepetition obligations related thereto, (c) maintain their existing business forms, and (d) continue to perform Intercompany Transactions.

18.     To facilitate the efficient operation of their business, the Debtors maintain one integrated cash management system (the "<u>Cash Management System</u>").  The Cash Management System is comparable to the centralized cash management systems used by similar companies to manage the cash of multiple operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' financial personnel and members of their accounting department manage the Cash Management System, which the Debtors designed to, among other things:  meet their operating needs; enable management to centrally control and monitor corporate funds; ensure cash availability and liquidity; reduce administrative expenses by facilitating the movement of funds; and enhance the development of accurate account balances.  These controls are crucial given the volume of cash transactions processed through the Cash Management System each day.  Importantly, the Debtors' business requires prompt access to cash to operate, and any disruption to the Cash Management System would be detrimental to the Debtors' operations.

19.     The Cash Management System includes eight (8) bank accounts (collectively, the "Bank Accounts").   Six Bank Accounts reside at JPMorgan Chase Bank, N.A. ("Chase Bank") and two Bank Accounts reside at Bank of America Merrill Lynch ("Bank of America," and together with Chase Bank, the "Cash Management Banks").

20.     Each Bank Account that is a depository account is maintained at an entity that is insured by the Federal Deposit Insurance Corporation (the "FDIC") and, therefore, complies with section 345(b) of the Bankruptcy Code.

21.     As part of the Cash Management System, the Debtors maintain their excess cash in conservative investments that satisfy certain prudent investment guidelines (the "Investment Practices").   The Investment Practices have a primary goal of protecting principal and a secondary goal of maximizing yield and liquidity.   More specifically, the Debtors invest cash pursuant to the Investment Practices in the Investment Account, an investment-grade money market fund with Bank of America that invests such cash only in assets, securities, or other instruments insured, guaranteed, or collateralized by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States.   Additionally, funds in the Operating Account residing at Chase Bank are swept overnight and invested in overnight investment-grade money market funds not controlled by the Debtors. Such investments permit the Debtors to balance their need to access liquidity on a daily basis with protections that are substantially similar to those contemplated by section 345(b) of the Bankruptcy Code.   Requiring the Debtors to bond these accounts, as required by section 345(b) of the Bankruptcy Code, would impose considerable costs to these estates.   Accordingly, the Debtors respectfully request that the Court waive the investment and deposit guidelines of

7

section 345(b) of the Bankruptcy Code and authorize the Debtors to continue to manage their investments pursuant to the Investment Practices

22.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses related to the Cash Management System (collectively, the "Bank Fees"). Historically, the Debtors estimate that they pay approximately $5,000 in Bank Fees each month, depending on transaction volume.  The Debtors estimate that there is approximately $1,250 in prepetition Bank Fees outstanding as of the Petition Date.

23.     The Debtors utilize numerous preprinted business forms and digitally generated and bank-certified graphic overlays in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.

24.     The Debtors maintain business relationships with each other (collectively, the "Intercompany Transactions") that may periodically result in intercompany receivables and payables in the ordinary course of business (the "Intercompany Claims").  The Intercompany Transactions (if any) are all entered into in the ordinary course of business, and are on standard and customary market terms.  In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted among the Debtors, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor.

25.     The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors have also established monitoring systems to be able to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the

8

Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors and their creditors and other stakeholders.

26.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Cash Management Motion.

**II.    Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, Reimbursable Expenses, and Director Obligations and (II) Continue Employee Benefits Programs (the "Wages and Benefits Motion").**

27.    The Debtors seek entry of interim and final orders to (a) pay certain prepetition wages, salaries, other compensation, reimbursable expenses, and director obligations and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

28.    As of the Petition Date, the Debtors employ approximately 159 individuals on a full-time basis (collectively, the "Employees"). None of the Employees are represented by a union or collective bargaining unit.  The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Debtors' Employees include highly trained personnel who are not easily replaced.  Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted.

29.    The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and

KE 41482318

other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees (collectively, the "Employee Compensation and Benefits"). The Debtors also seek to pay all costs incident to the Employee Compensation and Benefits.

30.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay prepetition amounts (if any) related thereto. To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

31.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, I believe that the Court should approve the Wages and Benefits Motion.

**III.     Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees (the "Taxes and Fees Motion").**

32.     The Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay (or use tax credits to offset) certain Taxes and Fees (as defined herein) in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date.

33.     In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, income, withholding, severance, and property taxes, as well as other business,

environmental, and regulatory taxes (collectively, the "Taxes and Fees").[2]  The Debtors remit the

Taxes and Fees to various federal, state, and local governments, including taxing and licensing

authorities (collectively, the "Authorities").  Taxes and Fees are remitted and paid by the Debtors

through checks and electronic transfers that are processed through their banks and other financial

institutions or service providers.  The Debtors pay the Taxes and Fees to the Authorities as they

accrue or on a periodic basis, remitting them monthly, quarterly, semiannually, or annually

depending on the nature and incurrence of each of the Taxes and Fees.

34.     It is my understanding that any failure by the Debtors to pay the Taxes and Fees

as and when due could have a material adverse impact on their ability to operate.  As of the

Petition Date, the Debtors estimate that approximately $62 million in Taxes and Fees relating to

the prepetition period have accrued and remain unpaid.   Of this amount, approximately

$4.0 million is expected to become payable during the first 30 days following the Petition Date.

35.     I believe that the relief requested is in the best interests of the Debtors' estates,

their creditors, and all other parties in interest and will enable the Debtors to continue to operate

in the ordinary course without disruption. Accordingly, I believe that the Court should approve

the Taxes and Fees Motion.

**IV.     Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies (the "Insurance Motion").**

36.     The Debtors request an entry of an order authorizing the Debtors to (a) continue

prepetition practices regarding the Insurance Policies (as defined below), satisfy payment of

---

[2]   I understand that the Debtors do not seek the authority to collect and remit state and federal employee-related withholding taxes.  Such relief is instead requested in the Wages and Benefits Motion.

prepetition obligations related thereto, and (b) renew, supplement, or enter into new insurance coverage in the ordinary course of business.

37.     In the ordinary course of business, the Debtors maintain approximately fifteen insurance policies that are administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers").  These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, energy liability, trip travel liability, umbrella coverage, excess liability, directors' and officers' liability, commercial crime, and fiduciary liability (collectively, the "Insurance Policies").

38.     Over the past twelve months, the Debtors have paid an aggregate amount of approximately $1.75 million on account of annual premiums under the Insurance Policies.  Most Insurance Policies renew annually.  The Debtors currently do not finance any of their premium obligations through a premium financing agreement.  As of the Petition Date, the Debtors do not believe there are any accrued but unpaid obligations, including premium obligations, on account of the Insurance Policies.  Continuation of the Insurance Policies and entry into new Insurance Policies are essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee.

39.     The Debtors typically obtain the Insurance Policies through their insurance broker, Lockton Company, Inc. (the "Insurance Broker").  The Insurance Broker assists the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms at competitive rates and in a cost-effective manner.  In connection with the Insurance Policies, the Insurance Broker is compensated through

12

an annual fee (collectively, the "Brokerage Fees").  The Brokerage Fees are typically paid at the time of placement or renewal of an Insurance Policy.  As of the Petition Date, the Debtors do not believe that there are any unpaid obligations due and owing to the Insurance Broker on account of Brokerage Fees or any other prepetition obligations.

40.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Insurance Motion.

**V.     Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests (the "Utilities Motion").**

41.     The Debtors request the entry of an order (a) approving the Proposed Adequate Assurance of payment for future utility services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing services, and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

42.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications, data service, water, waste disposal, and other similar services (collectively, "Utility Services") from approximately 13 utility companies (collectively, the "Utility Companies").

43.     I believe that the uninterrupted provision of Utility Services is essential to the Debtors' ongoing operations and, therefore, the overall success of these chapter 11 cases.  The Debtors' businesses involve exploring, developing, producing, and marketing oil and natural gas. The Debtors employ directional drilling techniques from the ground and the Debtors must maintain the ability to run their exploration and production equipment in a near-constant state.

The Debtors' operations also require electricity for lighting, heating, and air conditioning.  In addition to the exploration and production processes conducted in the field, the Debtors operate corporate offices, as well as several regional and field offices, responsible for ensuring the smooth operation of the Debtors' businesses.   These offices require electricity, telecommunications, and internet services to operate in each of their respective locations. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.   Accordingly, it is essential that the Debtors maintain uninterrupted access to Utility Services during these chapter 11 cases.

44.     To the best of the Debtors' knowledge, the Debtors do not have a history of defaults with respect to their Utility Services, and there are no defaults with respect to the Debtors' undisputed invoices for prepetition Utility Services.  The Debtors have historically made payments on a regular and timely basis to the Utility Companies.  During the 12 month period prior to March 31, 2016, the Debtors paid approximately $360,000 per month on account of the Utility Services.

45.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect that cash generated from operations, together with the Debtors' cash collateral and proposed debtor-in-possession financing, will provide sufficient liquidity to pay obligations related to Utility Services in accordance with prepetition practice.

46.     Nevertheless, to provide additional assurance of payment, the Debtors propose to deposit approximately $185,000 (the "Adequate Assurance Deposit") into a segregated account (the "Adequate Assurance Account") within ten business days of the Petition Date for the benefit of the Utility Companies, pending further order of the Court.   The amount of the Adequate

14

Assurance Deposit equals approximately one-half of the Debtors' average monthly cost of Utility Services during a 12-month period preceding the Petition Date.   The Adequate Assurance Deposit will be held in the segregated account for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies.

47.      I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with prepetition practice, provides more than adequate assurance of payment to the Utility Companies.   I further believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm, is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, I believe that the Court should approve the Utilities Motion.

**VI.      Debtors' Emergency Motion for Entry of (I) an Interim Order Authorizing the Debtors to Engage in Discussions with Possible Critical Vendors and (II) a Final Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors (the "Critical Vendors Motion").**

48.      The Debtors seek entry of (a) an interim order authorizing the Debtors, in consultation with the official committee of unsecured creditors, to engage in discussions with certain counterparties that may qualify as Critical Vendors (as defined below) regarding the validity and amount of their respective claims to determine whether any such counterparties qualify for Critical Vendor status (the "Critical Vendor Claim") and (b) a final order authorizing the Debtors to pay the Critical Vendor Claims.   To the extent that the Debtors identify any counterparties qualify as Critical Vendors pending entry of the Final Order, the Debtors will supplement this Motion and seek authority to pay prepetition claims held by such Critical Vendors (the "Critical Vendor Claims") in accordance with the *Procedures for Complex Chapter 11 Cases* promulgated by this Court.

49.     The Debtors' oil and gas exploration and production operations require the Debtors to satisfy certain specific requirements and standards that require the Debtors to obtain a variety of specialty chemicals, gas, metals, plastics, and other raw materials.  The Debtors obtain such materials and services from a limited number of highly specialized vendors, service providers, and other businesses (collectively, the "**Critical Vendors**"), often on an order-by-order basis and without long-term contracts, that would likely be impossible to replace and/or would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 cases.  Finally, the Debtors currently enjoy favorable trade terms with many of their Critical Vendors.  I believe many of these vendors may be unfamiliar with the chapter 11 process and unwilling to do business on existing terms—even assuming such parties will continue to supply the Debtors.  Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates.

50.     I believe that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise while also providing the Debtors with flexibility to engage in settlement discussions with such parties regarding the validity, amount, and extent of their claims. Furthermore, to the extent that the Debtors determine that any such parties qualify for Critical Vendor status, the Debtors plan to supplement this pleading with the identities and amounts of claims held by any such parties prior to the Final Hearing and to seek approval of further relief in accordance with the Bankruptcy Code and the Bankruptcy Rules.

51.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable

the Debtors to continue to operate in the ordinary course without disruption.   Accordingly, I

believe that the Court should approve the Critical Vendors Motion.

**VII.    Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Payment of Mineral Payments, Working Interest Disbursements, Non-Operated Working Interest Expenses, and Gathering, Processing, and Transport Expenses (the "Royalty Payments Motion").**

52.    The Debtors seek entry of interim and final orders authorizing the Debtors to pay

or apply in the ordinary course of business, as applicable, any and all prepetition and postpetition

mineral payments, working interest disbursements, non-operated working interest expenses, and

gathering, processing, and transport expenses.

**A.    Royalty Interest Holders and Other Mineral Payees.**

53.    I understand that a mineral interest generally consists of an interest in oil, gas, and

other minerals in place under a parcel of land, typically in the nature of a fee simple interest in

real property, that entitles its owner to the exclusive right to, among other things, enter the land

to explore for, drill and produce (generally, "Capture") such minerals from the land.   I

understand that a through a written agreement (an "Oil and Gas Lease"), owners of mineral

interests convey to a third party (a "Working Interest Owner") a property interest in such

minerals that entitles the Working Interest Owner to the exclusive right to Capture minerals from

the relevant parcel of land for a term of years "and so long thereafter" as minerals are produced

in paying quantities (a "Working Interest"), in exchange for either a share of production or

payments in lieu of a share of production (a "Royalty Interest").

54.    I understand that a Working Interest may be subject to or burdened by various

other interests in minerals, production, or profits, which may have been created before or after

the applicable parties entered into the Oil and Gas Lease or which may exist in the absence of an

Oil and Gas Lease.   I understand that such interests (collectively, with Royalty Interests, the

"Interest Burdens") can take many forms, including:  (a) overriding royalty interests, which are nonpossessory interests in oil and gas produced at the surface, free of the expense of production and in addition to the usual landowner's royalty reserved to the lessor/mineral owner in an Oil and Gas Lease; (b) nonparticipating royalty interests, which are expense-free interests in oil and gas as, if, and when produced that do not share in lease bonuses or delay rentals or in the rights to execute Oil and Gas Leases or to explore and develop land for oil and gas; (c) net profits interests, which are shares of gross production from a property, measured by net profits from operation of that property; (d) production payments, which are interests usually created out of Working Interests that are shares of the minerals produced from the described premises, up to a specified quantum of such production or dollar amount from the sale of such production, free of the costs of production at the services.

55.     I understand that as of the Petition Date, the Debtors held approximately 479 Working Interests in various oil and gas properties (the "Oil and Gas Properties"), substantially all of which are subject to various types of Interest Burdens.  I understand that failure to make payments on account of the Interest Burdens (collectively, the "Mineral Payments") would have a material adverse effect on the Debtors and their interests in the Oil and Gas Properties.  I understand that state statutory frameworks typically set strict payment deadlines and contain enforcement mechanisms with respect to Mineral Payments, including interest, fines, recovery of costs and attorneys' fees, and treble damages.  Thus, failure to pay Mineral Payments could expose the Debtors to such enforcement actions and as well as actions by the owners of the Interest Burdens for conversion or otherwise seeking damages for breach of the relevant Oil and Gas Lease or other document creating such Interest Burden.  I understand that, particularly with respect to Oil and Gas Leases granted by the United States or agencies of individual states, as

18

well as other Oil and Gas Leases as to which lease termination is established, either contractually or by applicable state law, as a remedy for such a breach, failure to pay Mineral Payments could also expose the Debtors to the forfeiture, cancellation, or termination of Oil and Gas Leases.

56.     I understand that though the Mineral Payments are subject to variation due to many factors such as specific terms of underlying agreements, changes in ownership, and changes in the amount or type of minerals Captured, for the 12-month period ending March 31, 2016, the Debtors made on average approximately 445 Mineral Payments each month, totaling approximately $14.4 million per month.  I understand that the Debtors generally remit these payments to the Interest Burden holders (collectively, the "Mineral Payees") during the last week of each month.  I understand that as a result of the time required to market and sell the production and the significant accounting process required each month to accurately disburse the resulting proceeds, the Debtors generally make Mineral Payments between 30 and 60 days after the month in which production of the underlying oil and gas occurred.

57.     I understand that Mineral Payments of approximately $17.1 million remain outstanding as of the Petition Date, of which approximately $12.0 million will become payable in the next 30 days.  Accordingly, the Debtors request approval to continue making such payments in the ordinary course of business on a postpetition basis.  I believe that granting the requested relief will merely affect the timing of the Mineral Payments; the holders of Interest Burdens will not receive more than they would otherwise be entitled to under state laws or the Bankruptcy Code.

**B.     Working Interest Disbursements.**

58.     I understand that the efficient Capture of minerals from an area of land and/or depths (the "Contract Area") often involves the sharing of the economic risk of development amount multiple Working Interest Owners who own, or who, by their participation in such

development, earn the right to own Working Interests in more than one Oil and Gas Lease. I understand that the rights and responsibilities associated with the Capture of minerals (including each of the Working Interest Owners entitled to production from the Contract Area) are allocated by and between the Working Interest Owners according to their respective Working Interests subject, in most cases, to a contractual arrangement governing operations on the Contract Area ordinarily referred to as a joint operating agreement (a "<u>JOA</u>") or, absent a JOA or similar arrangement, subject to the application of well-established real property and contractual precedents.

59.     I understand that Working Interest Owners commonly enter into a JOA to govern the parties' relationship in a Contract Area. Each JOA designates one Working Interest Owner as the operator of the Contract Area (an "<u>Operator</u>"). I understand that the Operator generally conducts the day-to-day business associated with Capturing minerals in the Contract Area on behalf of the other Working Interest Owners (collectively, the "<u>Non-Op Working Interest Owners</u>"). I understand that, as of the Petition Date, the Debtors acted as Operators for approximately 1,950 oil and gas production sites.

60.     I understand that, in many instances, the Operator markets and sells the minerals Captured in the Contract Area and administers the payment of Mineral Payments on behalf of itself and Non-Op Working Interest Owners prior to disbursing the remaining proceeds to the Non-Op Working Interest Owners in accordance with the JOA (generally, the "<u>Working Interest Disbursements</u>").

61.     I understand that Non-Op Working Interest Owners often have the same statutory protections as Mineral Payees. As a result, failure to pay Working Interest Disbursements could

result in a material adverse effect on the Debtors and their interests in the Oil and Gas Properties, which could expose the Debtors to statutory enforcement mechanisms.

62.    I understand that Non-Op Working Interest Owners may assert additional remedies, including the right to commence an action for damages against the Operator, the grant a lien and security interest thereon, and the Operator's share of oil and gas production therefrom, to secure amounts owed by the Operator, the right to remove the Operator, the right to suspend the Operator's rights in the Contract Area, and the right to interest on amounts owed.

63.    I understand that in situations where the Debtors are Non-Op Working Interest Owners, the Operators typically make Mineral Payments on behalf of the Debtors 60 days after production, after which the Operators will administer Working Interest Disbursements to the Debtors net of such Mineral Payments.

64.    I understand that in situations where a Debtor is an Operator pursuant to a JOA with a Non-Op Working Interest Owner, the Debtors historically remitted payment on account of the Working Interest Disbursements on the second-to-last day of each month and typically remit the checks to Working Interest Owners on the last day of each month.  In the ordinary course of business, the Debtors set off Working Interest Disbursements owed to certain Working Interest Owners against the *pro rata* portion of operating expenses (collectively, the "Joint Interest Billings") owed by such owners.  I understand that though Working Interest Disbursements typically are not uniform and are not entirely predictable on a month-to-month basis, in the 12-month period ending March 31, 2016, the Debtors remitted approximately $112.4 million in Working Interest Disbursements to the applicable Working Interest Owners.

65.    I understand that the Debtors seek to remit or apply prepetition Working Interest Disbursements in the Debtors' ordinary course of business.  I understand that, as of the Petition

Date, the Debtors estimate that Working Interest Disbursements of approximately $3.4 million remain outstanding, all of which will become payable in the next 30 days.  I understand that the Debtors further request approval to continue remitting the Working Interest Disbursements in the ordinary course of business on a postpetition basis, including by setting off such Working Interest Disbursements in the ordinary course of business against Joint Interest Billings owed to the Debtors by third parties.  I understand that granting the requested relief will merely affect the timing of payments to the Working Interest Owners; these Working Interest Owners will not receive more than they would otherwise be entitled to under state laws or the Bankruptcy Code.

### C.    Non-Operated Working Interest Expenses.

66.    I understand that the Debtors operate the vast majority of wells in which they own an interest. However, there are certain instances in which the Debtors hold non-operating working interests in oil and gas properties subject to various JOAs. I understand that, in such instances, the operator of such properties incurs expenses, including exploration, development and production costs, on behalf of Debtors, to the extent of their working interest in the properties (such expenses, the "Non-Operated Working Interest Expenses").  I understand that the Debtors are required to reimburse such operator for Debtors' share of Non-Operated Working Interest Expenses.  I understand that under a typical JOA, the operator's right to payment of Non-Operated Working Interest Expenses is secured under contractual lien rights or statutory lien rights in favor of the operator against the Debtors' interest in the applicable oil and gas property.  I understand that the Debtors believe that approximately $2.7 million in prepetition Non-Operated Working Interest Expenses remain outstanding, substantially all of which will become payable during the first 21 days of these chapter 11 cases.

**D.      Other Gathering, Transportation, Processing and Related Costs and Expenses.**

67.      I understand that the Debtors may, from time to time, sell some of their production for delivery at the wellhead.  I understand that, as to production not so sold, the Debtors are obligated to third parties under various gathering, processing and related agreements for, among other things, costs associated with gathering, treating, dehydrating, transporting, processing, compressing and similar services (the "GPT Expenses").  I understand that in some circumstances, the Debtors pay the GPT Expenses from funds otherwise belonging to working interest owners, and the Debtors' failure to forward all required amounts could have a material adverse effect upon the Debtors, including penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the estate, litigation, and, in some instances, removal as Operator.  I understand that, as of the Petition Date, the Debtors estimate that they owe approximately $8.5 million in GPT Expenses that are paid directly by the Debtors.  I understand that the Debtors believe that approximately $3.5 million in GPT Expenses will become payable during the first 21 days of these chapter 11 cases.

68.      In light of the foregoing, I believe that the relief requested in the Royalty Payments Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Royalty Payments Motion.

KE 41482318

**VIII.  Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Claims of Certain Lien Claimants and Section 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Orders (the "Shippers, Lienholders, and 503(b)(9) Motion").**

69.     The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay certain undisputed, liquidated, prepetition claims of certain third-party contractors, repairmen, manufacturers, and other parties that perform labor or furnish or transport materials, equipment or supplies in connection with the Debtors' oil and gas exploration and production businesses (collectively, the "Third Party Contractors"), common carriers, movers, shippers, truckers, and logistics management companies (collectively, the "Shippers"), and warehousemen (collectively, the "Warehousemen," and, together with Shippers and Third Party Contractors, the "Lien Claimants"), in each case who may assert or may seek to assert mechanics' and other possessory liens against the Debtors' property, as well as claims arising under section 503(b)(9) of the Bankruptcy Code and (b) confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and services and authorizing payment of such obligations in the ordinary course of business.

**A.      Payment of Third-Party Contractor Claims.**

70.     The Debtors routinely transact business with a number of Third-Party Contractors in the ordinary course of business.  More specifically, the Third-Party Contractors include certain third parties that perform labor or furnish or transport materials, equipment or supplies in connection with drilling, producing, repairing, operating or maintaining the Debtors' oil and gas wells.  The Third-Party Contractors provide services that are essential to the Debtors' daily operations. Further, the work being performed by the Third-Party Contractors is, in many instances, technical and requires specialized expertise that only a limited number of service providers may have.  Absent payment of the accrued prepetition claims of these Third-Party

24

Contractors, the Debtors may have no alternative service providers, or no service providers that will be able to perform the required services in a reasonable time period.

71.    As of the Petition Date, the Debtors estimate that approximately $9.0 million in accrued prepetition Third-Party Contractor claims (the "Third-Party Contractor Claims") remain outstanding, substantially all of which are expected to become payable within the first 21 days after the Petition Date.

72.    I understand that the Third-Party Contractors may have a right to assert and perfect certain liens on account of unpaid goods or services, including mechanics' liens under applicable non-bankruptcy law, against the Debtors' relevant equipment or goods, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  I have been advised that, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, or to the extent the act is accomplished within the 30-day period set forth in section 547(e)(2)(A) of the Bankruptcy Code, is expressly excluded from the automatic stay.  I have been advised by counsel that these statutory liens often allow such parties to retain possession of equipment, machinery, supplies, and other materials (or impair title to the equipment, machinery, supplies, and other materials, by filing a security interest) until the debtor satisfies the outstanding amounts owed.  I have been advised by counsel that acts to perfect these statutory liens are not subject to the automatic stay under section 362 of the Bankruptcy Code.  Accordingly, I believe that, absent payment of any outstanding prepetition amounts, Third-Party Contractors may refuse or attempt to refuse to provide services for, and/or honor obligations under their existing agreements with, the Debtors on a going-forward basis, including essential installation, maintenance, and warranty obligations, or may refuse to release certain goods in their possession.

25

**B.**     **Payment of Shipping and Warehousing Claims.**

73.     In the ordinary course of their business, the Debtors depend on the Shippers to transport or deliver goods, materials, equipment, and other property related to the Debtors' operations (collectively, the "Materials").  Furthermore, while the Debtors store most of their materials on their properties, they have historically relied on certain Warehousemen in the ordinary course of business to store Materials and equipment from time to time.

74.     The Debtors have historically paid the Shippers and the Warehousemen in arrears and, therefore, may be liable to the Shippers and Warehousemen, as applicable, for certain prepetition amounts.  I believe that the Debtors' possible failure to pay any such fees may entitle the Shippers to assert a lien, attempt to maintain possession of the Debtors' property, and/or fail to deliver the Debtors' property as and when payable in the ordinary course of business. Likewise, the Debtors' possible failure to pay any such amounts may entitle the Warehousemen to assert a lien, attempt to take possession of the Debtors' property, and/or bar the Debtors' access to Materials and equipment stored by the Warehousemen.  Furthermore, I have been advised by counsel that applicable non-bankruptcy law may permit a Shipper or a Warehouseman under certain circumstances to seek to attach a lien on the goods in its possession to secure the charges or expenses incurred in connection with the transportation or storage of such goods.  As a result, certain Shippers and Warehousemen may refuse to deliver or release estate property in their possession or control before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims," and, together with the Third-Party Contractor Claims, the "Lien Claims") have been satisfied and their liens redeemed.

75.     As of the Petition Date, the Debtors estimate that approximately $1 million in accrued prepetition Shipping and Warehousing Claims remain outstanding, substantially all of which will become payable within the first 21 days of these chapter 11 cases.  To continue using

the Shippers' and Warehousemen's transportation and storage services, and to continue to have access to the Materials and other property held or controlled thereby, I believe that it is appropriate to pay any such Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

        **C.**      **Payment of 503(b)(9) Claims.**

      76.      I understand that the Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the 20 days before the Petition Date.  I understand that many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  I understand that the Debtors often obtain supplies on an order-by-order basis.  As a result, I have been advised by counsel that a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.  I understand that approximately $10 million in goods entitled to priority treatment under section 503(b)(9) of the Bankruptcy Code were delivered during the 20-day period before the Petition Date.

      77.      The Debtors request authorization to pay those undisputed claims arising from the value of such goods received by the Debtors within 20 days before the Petition Date that were sold to the Debtors in the ordinary course of business (each, a "503(b)(9) Claim," and, together with the Lien Claims, the "Obligations").  Rather, the Debtors will pay the 503(b)(9) Claims as they come payable in the ordinary course of business.  In return for paying any 503(b)(9) Claim, the Debtors may require the applicable 503(b)(9) creditor to provide favorable terms in line with historical practice for the postpetition delivery of goods and services or otherwise continue supplying the Debtors with essential goods and services for the duration of these chapter 11 cases.

### D.      Payment of Outstanding Orders.

1.      Prior to the Petition Date and in the ordinary course of business, I understand that the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  I understand that, to avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  I understand that, to prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business.

78.      In light of the foregoing, I believe that the relief requested in the Shippers, Lienholders, and 503(b)(9) Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Shippers, Lienholders, and 503(b)(9) Motion.

### IX.      Debtors' Emergency Motion for Entry of an Order Approving Continuation of Surety Bond Program (the "Surety Bond Motion").

79.      In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations (the "Surety Bond Program").  These

obligations include, among others, plugging and abandonment obligations, environmental obligations, litigation liability, and road damage obligations.

80.    I understand that certain statutes or ordinances require the Debtors to post surety bonds to secure these obligations.  Similarly, I understand that, prior to commencing drilling on oil and gas leases on federal lands, an operator must obtain a surety bond in favor of the Bureau of Land Management.  As such, failing to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.

81.    I understand that Liberty Mutual Insurance Company (the "Surety") issued the Debtors' outstanding surety bonds.  As of the Petition Date, the Debtors have approximately 91 surety bonds totaling $12,626,250 outstanding.  I understand that the premiums for the surety bonds generally are determined on an annual basis and are paid by the Debtors when the bonds are issued and annually upon renewal.  In 2015, the annual premiums for the Debtors' surety bonds totaled approximately $215,000.

82.    To continue their business operations during this restructuring, the Debtors must provide financial assurance to state governments, regulatory agencies, and certain other third parties.  This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying prepetition and postpetition bond premiums as they come due, providing the Sureties with collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, executing other agreements, as needed, in connection with the Surety Bond Program.

83.    In light of the foregoing, I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in

interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Surety Bond Motion.

X.      **Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Customer Programs and Honor Related Obligations and (II) Assume Customer Agreements (the "<u>Customer Programs Motion</u>").**

84.     The Debtors request an entry of an order authorizing them to maintain and administer their existing customer-related programs (collectively, the "<u>Customer Programs</u>") in the ordinary course of business and in a manner consistent with past practice and honor prepetition and postpetition obligations related thereto and, subject to entry of the Final Order, assume any executory contract with certain customers.

85.     I understand the Debtors are party to approximately 116 base agreements (such contracts, collectively, the "<u>Customer Agreements</u>") for the purchase and sale and transportation of natural gas with various customers, including major energy companies, natural gas utilities, oil refiners, pipeline companies, local distribution companies, financial institutions, and end-users in various industries (collectively, the "<u>Customers</u>").  I understand the Debtors have determined that the amount necessary to cure unpaid monetary obligations arising under each Customer Agreement is $0.

86.     Continuing to administer their Customer Programs without interruption during the pendency of these chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors.  If the Debtors are unable to continue their Customer Programs postpetition or to pay amounts due and owing to their Customers under the Customer Programs, the Debtors risk alienating their Customer constituency, losing Customer loyalty and goodwill, and decreasing the Debtors' prospects for value-maximizing reorganization.

87.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, I believe that the Court should approve the Customer Programs Motion.

**XI.    Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock (the "Equity Trading Procedures Motion").**

88.     I understand that a company generates net operating losses ("NOLs" and together with certain other tax attributes, "Tax Attributes") if the operating expenses it has incurred exceed the revenues it has earned during a single tax year.  I understand that the Internal Revenue Code (the "IRC") permits a company to apply, or "carry forward," NOLs to reduce future tax payments in a tax year or years up to 20 years after the year in which the NOLs were generated (subject to certain conditions as discussed below).

89.     I understand that, as of December 31, 2015, the Debtors estimate that they have NOLs in the amount of approximately $900 million and certain other Tax Attributes, which translate to the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases.[3]  I believe that the Tax Attributes are of significant value to the Debtors and their estates because the Debtors can carry forward their Tax Attributes to offset their future taxable income potentially for as long as 20 years, thereby reducing their future aggregate tax obligations.  In addition, such Tax Attributes may be utilized by the Debtors to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

---

[3]    I understand that approximately $400 million of these NOLs are subject to a pre-existing annual limitation of approximately $140 million.  I understand that a new ownership change would impose a much more serious annual restriction.

90.     I understand that sections 382 and 383 of the IRC limit the amount of taxable income that can be offset by a corporation's NOLs and certain other Tax Attributes in taxable years (or portions thereof) following an ownership change.  I understand that an "ownership change" occurs if the percentage (by value) of the stock of a corporation owned by one or more 5-percent shareholders has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change.

91.     I understand that, if an ownership change occurs, sections 382 and 383 of the IRC limit the amount of a corporation's future income that may be offset by its "pre-change losses" to an annual amount equal to the value of the corporation prior to the ownership change multiplied by the long-term tax exempt rate.  I understand that pre-change losses include the NOLs, certain other Tax Attributes, and any net unrealized built-in loss (as defined in section 382(h)(3) of the IRC).  I understand that once an NOL or other Tax Attribute is limited under section 382 or 383 of the IRC, its use is limited forever.  I have been advised by counsel that certain transfers of Ultra Petroleum Corp.'s common stock (the "Common Stock") that are effected before the Debtors' emergence from chapter 11 protection may trigger an "ownership change" for IRC purposes.  I understand that such an occurrence, if it were to occur, would severely endanger the Debtors' ability to utilize the Tax Attributes and causing substantial damage to the Debtors' estates.  In light of the foregoing, the Debtors believe that it is prudent to implement procedures that establish certain notification and hearing procedures related to certain transfers of Debtor Ultra Petroleum Corp.'s existing common stock.

92.     I understand that the proposed Interim Order and Final Order will affect only holders of the equivalent of 4.5 percent or more of outstanding Common Stock, and also parties

32

who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5 percent or more of outstanding Common Stock.  The proposed procedures are the mechanism by which the Debtors propose that they will monitor, and, if necessary, object to, certain transfers of Common Stock and declarations of worthlessness with respect to the Common Stock to ensure preservation of the Tax Attributes.  In light of the value of the Tax Attributes to the Debtors' estates, I believe that the proposed procedures set forth in the Equity Trading Procedures Motion are in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to maximize the value of their Tax Attributes for the benefit of all stakeholders.

**XII.    Debtors' Emergency Motion for Entry of Order Establishing and Implementing Exclusive and Global Procedures for Treatment of Reclamation Claims (the "Reclamation Procedures Motion").**

93.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors purchased on credit a variety of raw materials, parts, supplies, and other goods used in their operations (collectively, the "Goods").  I understand that, as of the Petition Date, the Debtors were in possession of certain Goods that had been delivered to them, but for which they had not yet been invoiced or made payment to the suppliers.  As a result of the commencement of these chapter 11 cases, the Debtors may receive Reclamation Claims from various vendors or other parties (collectively, the "Sellers") with respect to the Goods.

94.     I believe that avoiding costly and distracting litigation relating to Reclamation Claims is critical at this stage of the Debtors' chapter 11 cases.  I understand that if the Debtors are unable to establish and implement uniform procedures to resolve unpaid claims seeking reclamation of goods that may be asserted against the Debtors (the "Reclamation Claims"), the Debtors could be faced with the prospect of simultaneously defending numerous reclamation proceedings at a time when their efforts should be focused on preserving enterprise value.

95.    To eliminate such piecemeal litigation, the Debtors seek entry of an order establishing exclusive procedures for the treatment of Reclamation Claims and prohibiting the Sellers from interfering with the delivery of the Goods.  I believe that the Reclamation Procedures will effectively and efficiently streamline the process of resolving Reclamation Claims to the benefit of both the Debtors and the Sellers.

**XIII.    Debtors' Emergency Motion for Entry of an Order Authorizing Ultra Petroleum Corp. To Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 (the "Foreign Representative Motion").**

96.    I understand that Debtor Ultra Petroleum is a corporation registered in Yukon, Canada.  I understand that Ultra Petroleum, as the proposed Foreign Representative (as defined herein), will shortly seek ancillary relief in Canada on behalf of its estate in a court of proper jurisdiction in Yukon, Canada (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act* (Canada) R.S.C. 1985, c. C-36 (as amended, the "CCAA").  I have been advised by counsel that the purpose of the ancillary proceeding (the "Canadian Proceeding") is to request that the Canadian Court recognize Ultra Petroleum's chapter 11 case as a "foreign main proceeding" under the applicable provisions of the CCAA to, among other things, protect Ultra Petroleum's interests—as well as the interests of any putative creditors—in Canada.  I understand that, although Ultra Petroleum does not have any Canadian assets or operations, the Debtors seek to ensure that potential Canadian parties-in-interest have the opportunity to be heard in a convenient forum, and further, to ensure coordination and consistency as between these proceedings and the Canadian Proceeding.

97.    I understand that, to commence the Canadian Proceeding, Ultra Petroleum requires authority for a Debtor or other entity to act as the foreign representative on behalf of its estate (the "Foreign Representative") in connection with the Canadian proceeding.  If the order is granted, Ultra Petroleum will be able to file the order with the Canadian Court as the instrument

34

authorizing Ultra Petroleum to act as the Foreign Representative pursuant to the CCAA.  I believe that authorizing Ultra Petroleum to act as the Foreign Representative on behalf of its estate in the Canadian Proceeding will allow for coordination between these chapter 11 cases and the Canadian Proceeding, and provide an effective mechanism to protect and maximize the value of the Ultra Petroleum's assets and estate.

*      *      *      *      *

KE 41482318

**Exhibit B**

**Capital and Organizational Structure Chart**

