IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | Case No. 16-32202 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

LIMITED OBJECTION OF THE AD HOC COMMITTEE OF
UNSECURED CREDITORS OF ULTRA RESOURCES, INC.
REGARDING CERTAIN MATTERS SCHEDULED TO BE HEARD ON JUNE 13, 2016

The *ad hoc* committee (the "Senior Creditor Committee") of unsecured creditors

of Ultra Resources, Inc. ("Ultra Resources")[2] submits this limited objection regarding certain

matters scheduled for the "second day" hearing in these chapter 11 cases on June 13, 2016.[3]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are:  Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

[2]    The members of the Senior Creditor Committee will be identified in a statement to be filed pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

[3]    Specifically, the Senior Creditor Committee objects to certain aspects of:  (i) *Debtors' Emergency Motion for Entry an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, and (E) Maintain Existing Investment Practices and (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances* [D.I. 7] (the "Cash Management Motion"); (ii) *Debtors' Emergency Motion for Entry of (I) an Interim Order Authorizing the Debtors to Engage in Discussions with Possible Critical Vendors and (II) a Final Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors* [D.I. 10] (the "Critical Vendor Motion"); (iii) *Debtors' Corrected Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Claims of Certain Lien Claimants and Section 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Orders* [D.I. 28] (the "Lien/503(b)(9) Motion" and, together with the Critical Vendor Motion, the "Prepetition Claims Motions"); (iv) *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Petition Date* [D.I. 194] (the "Kirkland Application"); (v) *Application of Debtors-in-Possession to Employ Jackson Walker LLP as Co-Counsel for Debtors* [D.I. 193] (the "Jackson Walker Application"); (vi) *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Rothschild Inc. and Petrie Partners Securities, LLC as Investment Bankers to the Debtors, Nunc Pro Tunc to the Petition Date* [D.I. 192] (the "Bankers Application"); (vii) *Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [D.I. 190] (the "OCP Motion," and collectively with the Kirkland Application, the Jackson Walker Application, and the Bankers Application, the "Retention

## PRELIMINARY STATEMENT

1.     The Senior Creditor Committee is comprised of senior unsecured creditors of Ultra Resources that collectively hold, control, or otherwise have discretionary authority over a substantial portion of Ultra Resources' funded indebtedness arising under or in connection with (i) senior notes issued under that certain Master Note Purchase Agreement dated as of March 6, 2008 (as amended, modified, or supplemented in accordance therewith) among Ultra Resources, as issuer, and the purchasers party thereto from time to time (the "MNPA"); and (ii) that certain Credit Agreement dated as of October 6, 2011 (as amended, modified, or supplemented in accordance therewith) among Ultra Resources, as borrower, the lenders party thereto from time to time, and JPMorgan Chase Bank, N.A., as administrative agent (the "Credit Agreement").[4]

2.     As the Debtors explained at the "first day" hearing on May 3, 2016, virtually all of the value of the Debtors' enterprise is concentrated in Ultra Resources and its subsidiaries (collectively, "UR"), while Ultra Petroleum Corp. ("Ultra Petroleum") and UP Energy Corporation ("UP Energy," and together with Ultra Petroleum, the "Holdcos"), the direct and indirect holders of UR's equity interests, have no meaningful assets other than their equity interests in UR.[5]  Thus, the Holdcos' creditors—including the holders of unsecured notes issued

Applications"); (viii) *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [D.I. 191] (the "Compensation Procedures Motion," and collectively with the Cash Management Motion, the Prepetition Claims Motions, and the Retention Applications, the "Second Day Matters").

[4]     See *Amended Declaration of Garland R. Shaw In Support of Chapter 11 Petitions and First Day Motions* [D.I. 44] ¶ 37.

[5]     According to the Debtors, Ultra Petroleum "doesn't have any assets other than some de minimis assets" and UP Energy "[a]gain, does not hold any material assets."  5/3/16 Hr'g Tr. 9:23-10:3; see also Ultra Petroleum Corp., Annual Report (Form 10-K) (Feb. 29, 2016) at 65, 66, 90 ("Ultra Petroleum Corp. and UP Energy Corporation are holding companies that own no operating assets and have no significant operations independent of its [sic] subsidiary, Ultra Resources, Inc.").  The Cash Management Motion provides that, as of April 29, 2016 (the "Petition Date"), Ultra Petroleum held approximately $426,000 in its bank accounts while UP Energy held approximately $10,000.  Cash Management Motion ¶ 4.  Ultra Resources holds "the lion's share" of the Debtors' cash.  5/3/16 Hr'g Tr. 30:13-14.  According to the Debtors, Ultra Resources had approximately $217.1 million as of the Petition Date.  Cash Management Motion at 3-4.

by Ultra Petroleum (the "Holdco Notes")—are structurally subordinated to UR's creditors, whose contractual claims under the MNPA and the Credit Agreement must be satisfied fully before any residual value can be distributed from UR to the Holdcos.  To date, the Debtors have not introduced any evidence that any such residual value exists for distribution to the Holdcos and, in fact, the Debtors' counsel acknowledged at the first day hearing that the Debtors' "filings indicated that [UR's] assets, at least the book value were substantially less than the liability." See 5/3/16 Hr'g Tr. 32:25-33:3.

3.      Given that the Senior Creditor Committee represents the interests of the senior-most creditors in these cases, it expects to play a critical role in any restructuring negotiations and in the Debtors' chapter 11 cases generally.  The Senior Creditor Committee looks forward to engaging productively with the Debtors in the near term to commence discussions toward a reorganization plan that recapitalizes the Debtors while also appropriately treating the structurally senior claims under the MNPA and the Credit Agreement.

4.      Moreover, the Senior Creditor Committee is deeply concerned that the Official Committee of Unsecured Creditors (the "Official Committee") that is a fiduciary for both UR's and Ultra Petroleum's unsecured creditors[6] may necessarily and understandably be paralyzed and sidelined with respect to the issues in dispute between the unsecured creditors at UR and Ultra Petroleum. The Senior Creditor Committee expects, therefore, to actively represent the unique interests of UR's structurally senior creditors and, specifically, to guard against one-sided activities that could result in an unjustified and inappropriate redistribution of value from UR to the Holdcos, including, as described in more detail herein, the funding of these chapter 11

---

[6]     Pursuant to the *Notice of Appointment of Official Joint Committee of Unsecured Creditors* [D.I. 102], the Official Committee includes Delaware Trust Company, as successor indenture trustee for the Holdco Notes, and JPMorgan Chase Bank, N.A., as agent for the "bank group" under the Credit Agreement.

cases for the benefit of the Holdcos and their creditors, without any commensurate benefit to UR

or its estates and stakeholders.[7]

        5.        The Second Day Matters exemplify the careful balancing of competing

interests that will be required throughout these chapter 11 cases.  While acknowledging that the

Holdcos have only "de minimis" assets, and thus no means for reimbursing or compensating UR

for intercompany receivables, the Debtors nonetheless have asked for authority to (i) continue to

engage in intercompany transfers from UR to the Holdcos without explaining what benefit, if

any, may inure to UR from such transfers or providing any safeguards to UR,[8] (ii) pay certain

prepetition claims using Ultra Resources' cash without differentiating between claims against

UR and claims against the Holdcos,[9] and (iii) retain professionals under arrangements pursuant

to which UR would be jointly and severally liable for all professional fees and expenses incurred,

---

[7]    At the first day hearing, the Court questioned what benefit Ultra Resources and its estate would receive from transferring money to the Holdcos.  See 5/3/16 Hr'g Tr. 31:18-32:6 (Court:  "Why would any money be transferred to any parent entity out of the sub at a point when the sub is representing that its liabilities exceeds its assets?  What's the benefit to the sub of doing so?  . . .  Well, I understand why the parent cares, I don't know why the sub cares. . . .  I mean why should the creditors of the sub care what happens to the parents?").  The Court also observed that Ultra Resources "shouldn't pay for the parent."  See id. 33:6-9.

[8]    Cash Management Motion ¶ 1.  The "Cash Management System Schematic" annexed as Exhibit 1 to Exhibit A to the Cash Management Motion suggests only two reasons for UR's transfers of cash to the Holdcos:  (1) to enable Ultra Petroleum to make interest payments on the Holdco Notes, and (2) to enable the Holdcos to pay their general and administrative ("G&A") expenses.  Shortly before the Debtors' bankruptcy filings, Ultra Petroleum reported spending approximately $20 million on interest payments and $60,000 on G&A expenses in the three month period from January 2016 through March 2016.  See Ultra Petroleum Corp., Quarterly Report (Form 10-Q) (Apr. 28, 2016) at 22.  Funding payments to the holders of the Holdco Notes plainly does not benefit UR estates in any way (and, in any case, with the filing of chapter 11 is not permissible), and the Cash Management Motion does not provide sufficient detail to determine what benefits, if any, UR would receive from funding the Holdcos' G&A expenses.

[9]    Critical Vendor Motion ¶ 1; Lien/503(b)(9) Motion ¶ 1.  Given that the Debtors have not obtained post-petition financing, substantially all of the payments presumably will be funded from Ultra Resources' cash.  See 5/3/16 Hr'g Tr. 14:7-10 (Debtors' counsel stating in reference to Ultra Resources' cash:  "We have approximately $215 million in cash, so we feel that that's, you know, an appropriate level of cash to operate throughout the Chapter 11 case.").

irrespective of whether it benefits from the services provided, and without any mechanism for allocating the fees and expenses among the Debtors' estates.[10]

6.      The costs of the Debtors' operations and these chapter 11 cases should not be borne solely by UR's creditors and appropriate protections need to be implemented to prevent that result.[11]  As discussed further herein, with respect to the Debtors' requests to continue intercompany transactions and pay prepetition claims, the Court should impose a case budget and require, as a condition of its approval, that the Debtors demonstrate (i) a legitimate business justification for each intercompany transfer UR makes to a Holdco and for UR paying each prepetition claim asserted against a Holdco, and (ii) that the Holdcos will be able to satisfy in cash any intercompany receivable that will be created in favor of UR as a result of such transfers or payments.   Similarly, with respect to the Debtors' proposed retention of estate professionals, the Court should, as a condition of its approval, mandate that each Debtor only will be liable for professional fees and expenses incurred for its own benefit.  The Court should further (i) require the Debtors to implement a reasonable mechanism for allocating professional fees and expenses among the several Debtors, and (ii) provide that UR cannot satisfy (directly or indirectly) any fees and expenses that are allocable to a Holdco unless such Holdco demonstrates that it will be able to fully reimburse UR in cash for the amount to be paid by UR on the Holdco's behalf.

## LIMITED OBJECTION

7.      The relief that the Debtors are seeking in the Second Day Matters would treat UR as a captive debtor-in-possession ("UR") lender forced to fund the Holdcos' operations

---

[10]    Kirkland Application, Ex. 1 to Ex. A, at 7; Jackson Walker Application ¶ 11; Bankers Application, Ex. 1 to Ex. A, at § 4.

[11]    Although the Interim CM Order (as defined hereafter) provides that UR will receive "superpriority" administrative expense claims against the Holdcos' estates for any intercompany receivables owed to it, Interim CM Order ¶ 14, this alone is a hollow remedy because the Holdcos do not have the assets with which to pay such administrative claims.

and obligations but without any assets to support such loans and without the payment of any interest—in short, upon terms that no third party DIP lender would ever accept. Indeed, if UR truly were acting in its own best interests, neither would it.

8.     Although the Debtors no doubt will argue that they are merely operating in accordance with their ordinary business practices prior to the commencement of these cases, there is nothing ordinary about such practices in chapter 11. That Ultra Resources is an affiliate of the Holdcos does not mean that it is appropriate for it to continue to engage in transactions with the Holdcos and provide the Holdcos with access to cash—especially when there is no evidence that the Holdcos will be able to repay their intercompany obligations. In addressing the Debtors' requests for relief in these cases generally, and in the Second Day Matters specifically, the separateness of the Debtors' estates must be respected.[12]

## A.     Cash Management Motion and Prepetition Claims Motions

9.     The Cash Management Motion requests authority to, among other things, "continue to perform intercompany transactions consistent with historical practice," Cash Management Motion ¶ 1; see also id. ¶¶ 30-32, including to "move money up" from Ultra Resources to the Holdcos in connection with certain transactions, see 5/3/16 Hr'g Tr. 30:12-23.[13]

---

[12]    It is axiomatic that a separate bankruptcy estate is created for each debtor and the assets of one debtor cannot be used to fund the operations or satisfy the liabilities of another. See, e.g., In re Tribune Co., 464 B.R. 126, 139 (Bankr. D. Del. 2011) ("In the absence of substantive consolidation, entity separation is fundamental.") (citations omitted); In re Xonics Photochemical, Inc., 841 F.2d 198, 201 (7th Cir. 1988) ("[T]here is no automatic piercing of the corporate veil in affiliation settings. The assets of affiliated corporations are not treated as a common pool available to the creditors of each affiliate.") (citations omitted).

[13]    After the first day hearing, the Court entered an interim order (the "Interim CM Order") that authorizes the Debtors to continue intercompany transactions "arising from or related to the operation of their business in the ordinary course; provided subject to further order of the Court, Debtor Ultra Resources, Inc. shall not directly or indirectly transfer cash to, or incur liabilities on behalf of, Ultra Petroleum Corp. or UP Energy, unless such distribution is in furtherance of the implementation of a separate order of this Court; and in such an event, shall not distribute in excess of $500,000 absent further order of the Court." Interim CM Order ¶ 14. The restrictions the Court imposed in paragraph 14 of the Interim CM Order are "subject to further order of the Court." Id. As of the date hereof, the Debtors have not filed with the Court a proposed final order on the Cash Management Motion or any detail on the intercompany transactions contemplated between UR and the Holdcos. Accordingly, it remains unclear what final relief the Debtors intend to seek at the second day hearing.

In the Prepetition Claims Motions, the Debtors separately request authority to make payments on account of prepetition claims but they do not specify whether any of these payments would be made to creditors of the Holdcos.[14]

10.     To properly protect UR's structurally senior creditors, the Senior Creditor Committee respectfully submits that the Court should require the Debtors to develop and commit to a multi-week budget that clearly specifies what intercompany transactions the Debtors expect UR to engage in and what benefits UR is expected to receive from such transactions.  Further, the Court should not authorize any intercompany transfers of any kind from UR to either of the Holdcos or any payment by UR of a prepetition claim against a Holdco unless (i) the Debtors provide a legitimate business justification for each such transfer or payment, and demonstrate how (and to what extent) each such transfer or payment benefits UR and its stakeholders,[15] (ii) the Court grants UR superpriority liens on all assets of the applicable Holdco(s) pursuant to section 364(c) and (d) of the Bankruptcy Code as security for any intercompany receivable that

---

[14]     The Court's interim order on the Critical Vendor Motion requires the Debtors to identify before the second day hearing which vendors' claims and what amounts the Debtors propose to pay.  See *Interim Order Authorizing the Debtors to Engage in Discussions with Possible Critical Vendors* [D.I. 74] ¶ 3.  As of the date hereof, no such notice has been provided.  The Senior Creditor Committee reserves the right to further object, on any grounds, to any of the proposed payments once the identity of the purported critical vendors and the amounts proposed to be paid thereto have been identified.

[15]     Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor may only use property of the estate "other than in the ordinary course of business" after notice and a hearing.  Before the Court can authorize a debtor to use property of its bankruptcy estate, the Court must find that the debtor has a legitimate business justification for the proposed use of such property.  See ASARCO, Inc. v. Elliott Mgmt. (In re Asarco, LLC), 650 F.3d 593, 601 (5th Cir. 2011) ("[T]here must be some articulated business justification for [transfers of estate] property outside the ordinary course of business.") (quotation omitted).  The debtor bears the burden of proving such a justification exists.  See ASARCO, 650 F.3d at 601; see also In re Torch Offshore, Inc., 327 B.R. 254, 258 (E.D. La. 2005) ("[T]he first step [in assessing a non-ordinary course transfer] is for the debtor in possession to demonstrate that there are 'business justifications' for the proposed transaction.").  Although the Debtors assert in footnote 5 of the Cash Management Motion that all of the post-petition intercompany transactions would be "ordinary course" transactions, for which no court approval is required, that unsupported assertion is not sufficient to satisfy their burden of proof.  Notably, the authorization requested in that motion is not limited to "ordinary course" transactions, but rather transactions "consistent with historical practice."  Cash Management Motion ¶ 1.  Moreover, by affirmatively seeking the Court's approval, the Debtors have invoked section 363(b)(1) of the Bankruptcy Code and subjected themselves to the requirements for approval thereunder.

would be created in favor of UR,[16] and (iii) each applicable Holdco can credibly demonstrate that

it has and will have the ability to compensate UR in cash for all such transfers or payments. [17]

To do otherwise would be to have UR, its estates and its stakeholders unjustifiably subsidizing

the Holdcos.

**B.      Retention Applications and Compensation Procedures Motion**

11.     As with the Cash Management Motion and the Prepetition Claims

Motions, the Retention Applications and the Compensation Procedures Motion are fatally flawed

inasmuch as the Debtors seek authorization to employ and compensate attorneys and investment

bankers on a joint and several basis, putting UR on the hook for potentially millions of dollars of

fees and expenses, irrespective of whether it benefits from the services to which such fees and

expenses relate.  See Kirkland Application, Ex. 1 to Ex. A, at 7 (engagement letter providing that

"[e]ach party signing below is jointly and severally responsible for all obligations due to the

Firm"); Jackson Walker Application ¶ 11 ("The Debtors will be jointly and severally liable for

all fees and expenses incurred by the Firm for services rendered to the Debtors pursuant to the

Engagement Letter."); Bankers Application, Ex. 1 to Ex. A, at § 4 (providing that professional

fees will be paid by "the Company," the definition of which includes all of the Debtors).[18]  More

pointedly, UR may be paying for professional advice that benefits the Holdcos and is

---

[16]   UR should also continue to receive allowed superpriority administrative expense claims for any receivables created in its favor as a result of post-petition intercompany transfers, as provided in paragraph 14 of the Interim CM Order.

[17]   The Court's order should also expressly provide that Ultra Resources and its subsidiaries are entitled to set off any post-petition intercompany receivable due to any of them from a Holdco against any pre- or post-petition obligation that such UR entity owes to such Holdco, in accordance with section 558 of the Bankruptcy Code. See In re Braniff Airways, Inc., 42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) ("[T]he Bankruptcy Code implicitly recognizes the use of offset by a debtor as a 'defense' which the debtor may assert under Section [558] of the Code."); see also In re 1701 Commerce, LLC, No. 12-41748-DML-11, 2014 Bankr. LEXIS 3962, at *38-40 (Bankr. N.D. Tex. Sep. 17, 2014) ("Several courts have held that the debtor's setoff rights are not bounded by the prepetition/post-petition distinction for mutuality of debts.").

[18]   The OCP Motion does not indicate the terms on which the covered professionals will be retained.  To the extent the Debtors anticipate the same joint and several liability arrangement, the Senior Creditor Committee objects to that motion as well.

- 8 -

***detrimental*** to UR, its estates and its stakeholders.   Moreover, the Retention Applications and the Compensation Procedures Motion do not indicate whether or how the professional fees and expenses would be apportioned among the Debtors' separate estates.

12.     The Senior Creditor Committee respectfully submits that the Court should condition its approval of the Retention Applications and the Compensation Procedures Motion on the Debtors' liability for only those professional fees and expenses that are incurred for their respective benefit, rather than joint and several liability for *all* professional fees and expenses incurred for any purpose.[19]  The Court should also (i) require the Debtors to obtain approval of and implement a reasonable mechanism for allocating professional fees and expenses among the several Debtors, and (ii) provide that UR cannot satisfy (directly or indirectly) any fees and expenses that are allocable to a Holdco unless such Holdco demonstrates that it will be able to fully reimburse UR in cash for the amount that will be paid by UR on the Holdco's behalf.

13.     Proceeding without the foregoing protections presents too great a risk that UR, which holds virtually all of the cash in the Debtors' enterprise and where virtually all of the Debtors' value resides, will be forced to pay fees and expenses properly attributable to the Holdcos from which no benefits accrue to UR estates.  If the structurally subordinate creditors of the Holdcos want the Holdcos to be included in, and benefit from, this reorganization process, the Holdcos must be made to bear their own share of any attendant costs.

---

[19]   The Retention Applications request that the Court approve the Debtors' proposed compensation of estate professionals pursuant to section 328(a) of the Bankruptcy Code.  "The overarching purpose of a review of proposed compensation under section 328(a) is for the bankruptcy court to 'act as a gatekeeper to ensure that the employment of these professionals is in the best interests of the Debtor's bankruptcy estate . . . .'"  3 Collier on Bankruptcy ¶ 328.02 (16th ed.) (quoting In re Energy Partners, Ltd., 409 B.R. 211, 225 n.12 (Bankr. S.D. Tex. 2009)).  Thus, "[a] court may approve employment of a professional either on the terms and conditions requested *or on any terms and conditions that the court finds necessary to satisfy the requirement of reasonableness in section 328(a).*"  *Id.* (emphasis added).  If necessary, the Court may also "reserv[e] judgment upon the reasonableness of certain proposed terms and conditions until later in the case."  Id.

## CONCLUSION

Based on the foregoing, the Senior Creditor Committee respectfully requests that the Court (a) modify the orders proposed in connection with the Second Day Matters in accordance with the Senior Creditor Committee's limited objection, and (b) grant the Senior Creditor Committee such other relief as the Court deems appropriate.[20]

Dated: June 6, 2016
     New York, New York

                          MILBANK, TWEED, HADLEY
                          & McCLOY LLP

                          By: /s/ *Evan Fleck*
                          Dennis F. Dunne (*pro hac vice* pending)
                          Evan R. Fleck (*pro hac vice* pending)
                          28 Liberty Street
                          New York, New York  10005
                          Telephone: (212) 530-5000
                          Facsimile:  (212) 530-5219
                          Email:  ddunne@milbank.com
                                      efleck@milbank.com

                          *Attorneys for the Ad Hoc Committee of*
                          *Unsecured Creditors of Ultra Resources, Inc.*

---

[20] The Senior Creditor Committee reserves the right to amend or supplement this limited objection, to file additional objections, and to join in any objection asserted by any party before or at the June 13, 2016 hearing, including, without limitation, to (i) address any proposed final order approving the Cash Management Motion, (ii) respond to any additional written or oral testimony that the Debtors may offer in support of the Second Day Matters, or (iii) object to the compensation proposed in the Bankers Application on any and all grounds.