**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ULTRA PETROLEUM CORP.,** | § | NO. 16-32202 |
| **ULTRA RESOURCES, INC.,** | § | |
| **ULTRA WYOMING, INC.,** | § | |
| **UPL PINEDALE, LLC, AND** | § | |
| **ULTRA WYOMING LGS, LLC** | § | |
| | § | |
| **DEBTORS** | § | |
| | | |
| **DOYLE and MARGARET M. HARTMAN,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Adversary No. _____** |
| | § | |
| **ULTRA PETROLEUM CORP.,** | § | |
| **ULTRA RESOURCES, INC.,** | § | |
| **ULTRA WYOMING, INC.,** | § | |
| **UPL PINEDALE, LLC, AND** | § | |
| **ULTRA WYOMING LGS, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## <u>COMPLAINT</u>

Plaintiffs state as follows for their claims against defendants Ultra Petroleum Corp. ("Ultra Petroleum"), Ultra Resources, Inc. ("Ultra Resources"), Ultra Wyoming, Inc. ("Ultra Wyoming"), UPL Pinedale, LLC ("UPL Pinedale") and Ultra Wyoming LGS, LLC (collectively, "Ultra").

## I.  SUMMARY STATEMENT OF THE CASE

1.      Plaintiffs seek to recover monies due to them from Ultra under the net profits interest created by the 1954 Pinedale Unit Area Net Profits Contract ("Net Profits Contract" or "NPC"), covering a major portion of the giant Pinedale Field, Sublette County, Wyoming.  This is the second lawsuit Plaintiffs were forced to file to protect and recover their net profits interest ("NPI") created by the Net Profits Contract.  In *Ultra Resources, Inc. et al. v. Hartman, et al.,* 2010 WY 36, 226 P.3d 889 ("Hartman I"), the Wyoming Supreme Court affirmed judgment in favor of Plaintiffs establishing that (1) the NPI is a valid interest burdening certain leases on the Pinedale Anticline in Sublette County, Wyoming, (2) Plaintiffs are successors to Novi Oil Company, the original NPI owner, and (3) Ultra is a successor to the original "First Parties" under the Net Profits Contract, and is obligated to account to Plaintiffs pursuant to the Net Profits Contract and to pay the net profits when they accrue.  The Court in Hartman I determined the value of the NPI account as of December 31, 2006, and awarded Plaintiffs damages for accrued net profits.

2.      Following the Wyoming Supreme Court's direction and remand in Hartman I, Plaintiffs filed a motion in district court to enforce the judgment and challenging certain aspects of Ultra's proffered NPI accounting in post-appeal proceedings.  The district court's rulings in those post-appeal proceedings were the subject of a second appeal to the Wyoming Supreme Court.  On March 19, 2015, the Wyoming Supreme Court issued its opinion affirming various rulings by the district court in favor of Plaintiffs in the post-appeal proceedings.  *Ultra Resources, et al. v. Hartman, et al.,* 2015 WY 40 ("Hartman II").

3.      The parties in the post-appeal proceedings (Ultra and Plaintiffs Doyle and Margaret Hartman) agreed that disputes between them other than those adjudicated in Hartman I

2

and II were reserved for another lawsuit.  In part, this is the lawsuit the parties reserved.  This lawsuit seeks to (1) determine the true status of the NPI account for the NPI accounting period beginning January 1, 2007, (2) declare the parties' rights and obligations with respect to the proper method of NPI accounting, including Ultra's obligations to report all revenue due to the NPI account as set forth under the NPC, (3) determine that the gross revenue amount to be reported for Plaintiffs' NPI shall include the amount of overriding royalties paid to any of the First Parties, if any, as provided for on Page 4 of the Supplemental Accounting Agreement, (4) determine the parties' rights and obligations with respect to the scope, procedure, and operator response time for efficient and complete audits of the NPI full revenues received and expenses incurred, (5) determine Ultra's obligations to provide plaintiffs with all requested information relative to producing operations and exploratory work under the Exhibit "A" NPI leases, (6) recover damages for any net profits that have accrued under a full and correct NPI accounting for the period beginning April 29, 2016 (the date of Ultra's bankruptcy filing)[1], and (7) recover interest, attorney's fees, costs, expenses and statutory penalties due to Plaintiffs, including under the Wyoming Royalty Payment Act (W.S. § 30-5-301 - W.S. § 30-5-305).

## II.  PARTIES

4.      Plaintiffs are owners of a 2.49% NPI under the Exhibit "A" NPI leases.  Doyle Hartman and Margaret M. Hartman, husband and wife, are residents of the State of Texas.

---

[1] Plaintiffs timely filed its *Proof of Claims* in Ultra's bankruptcy proceedings (U.S. Bankruptcy Court, Southern District of Texas, Nos. 16-32202, 16-32204, 16-32205, 16-32206, 16-32208) related to the rigorously-estimated pre-petition bankruptcy amounts due to them, for the period of January 1, 2007 to April 29, 2016.

5.     Ultra Resources, Inc. is a Wyoming corporation with its principal place of business in Colorado.  Ultra Resources is an operator and/or owner of oil and gas leases in the Pinedale Field in Sublette County, Wyoming ("Pinedale Field") that are subject to the NPI held by Plaintiffs.

6.     Ultra Wyoming, Inc. is a Wyoming corporation with its principal place of business in Colorado.  Ultra Wyoming is an owner of oil and gas leases in the Pinedale Field that are subject to the NPI.   Ultra Wyoming and Ultra Resources are corporate affiliates.

7.     UPL Pinedale, LLC is a Wyoming corporation and is an owner of oil and gas leases in the Pinedale Field that are subject to the NPI.

8.     Ultra Resources, Ultra Wyoming and UPL Pinedale are corporate affiliates and wholly owned subsidiaries of Ultra Petroleum, Corp., a publicly traded Canadian corporation. Ultra Petroleum reports revenues, expenses and profitability for its Pinedale leases and wells, including the NPI wells, in SEC filings on behalf of "the Company." Ultra Wyoming acquired the leasehold interests burdened by the NPI by assignment from Ultra Resources effective January 1, 2012.  Notwithstanding the assignment, Ultra Resources continues to function as the operator of the assigned leases for purposes of accounting to Plaintiffs for the NPI under the Net Profits Contract at issue in this litigation.  The actions herein alleged against Ultra Resources, Ultra Wyoming, and Ultra Petroleum apply equally against UPL Pinedale, LLC and Ultra Wyoming LGS, LLC.

### III.  VENUE AND JURISDICTION

9.     Venue is proper in this Court because Defendants are Debtors in the above styled and numbered bankruptcy proceeding and this action arises in or is related to a case under title 11, 28 U.S.C. Sec. 1409.

10.     This Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. Sec. 1334 and 28 U.S.C. Sec. 157.

### IV.  NATURE OF THIS ACTION AND PRIOR LITIGATION

11.     The original parties to the 1954 Net Profits Contract were Malco Refineries, Inc., El Paso Natural Gas Company, and Continental Oil Company (collectively, "First Parties") and Novi Oil Company ("Novi").  A copy of the Net Profits Contract is attached as Exhibit A.

12.     Effective April 1, 1954, Novi received from First Parties[2] a 5%[3] net profits interest (NPI) resulting from operations by First Parties in the Pinedale Unit Area of Sublette County, Wyoming covering a total of 62 leases and 90,179 acres, more or less, in return for Novi assigning to First Parties its working interest ownership in four Pinedale leases covering 5,847 acres, more or less.

---

[2] Ultra is a successor in interest to the First Parties and the First Parties' obligation to pay the NPI.

[3] Plaintiffs are the successors in interest to a 2.49% NPI which is derived out of the 5% NPI originally granted by First Parties to Novi under the 1954 Net Profits Contract. For documentation as to how Plaintiff's 2.49% NPI is derived out of the original 5% net profits interest granted by First Parties to Novi, under the 1954 Net Profits Contract, see Paragraph 26 of Exhibit B attached hereto titled Amended Findings of Fact, Conclusions of Law, and Judgment, dated December 6, 2010 (recorded in Book 96, Page 421, Miscellaneous Records, Sublette County, Pinedale, Wyoming) and Exhibit C attached hereto titled Stipulation of Interest and Acknowledgment, dated December 7, 2015 (recorded in Book 157, Page 547, Oil and Gas Records, Sublette County, Pinedale, Wyoming). That is, Plaintiff's effective NPI is a 2.49% NPI, or 50% of the same 4.98% NPI remainder ownership discussed in both (1) the December 7, 2015 Stipulation of Interest and Acknowledgment (Exhibit C), and (2) Paragraph 26 of the December 6, 2010 Amended Findings of Fact, Conclusions of Law, and Judgment (also referred to herein as "Judgment") (Exhibit B).

13.     Today, the net profits interest received by Novi's successors still burdens 23 leases and 44,166 acres, more or less, in the Pinedale Field. Two strategic and valuable federal leases assigned in 1954 by Novi to First Parties, WYW-015314 and WYW-015315, remain in force and effect and presently account for approximately 16.3% of the total production that has been produced from the 23 Exhibit "A" NPI leases that are burdened by the NPI, and have accounted to date for 13.3% of the total Pinedale Field production (both NPI and non-NPI leases). There are currently over 459 producing gas wells on the two remaining strategic and valuable federal leases assigned by Novi to First Parties.

14.     In Hartman I, Plaintiffs were forced to file a lawsuit for declaratory judgment to establish they owned the NPI, that the NPI burdened defendants' oil and gas leases, and to secure an accounting and damages for unpaid net profits.   Defendants in that case included Ultra, Shell Rocky Mountain Production, LLC (now SWEPI), Questar Exploration and Production Company, and Wexpro Company ("Wexpro"), all of whom operated NPI wells at that time.[4]  Defendants in

---

[4] SWEPI was an operator and owner of oil and gas leases in the Pinedale Field that are subject to the NPI. SWEPI is a successor by corporate merger to Shell Rocky Mountain Production, LLC ("SRMP"), also a party defendant in Hartman I.  SWEPI is a party to a Gas Purchase Agreement with Shell Energy North America ("SENA").   Ultra and SWEPI were both "operator defendants" for the period January 2007 until approximately October 1, 2014 with NPI reporting obligations to plaintiffs under the Net Profits Contract and Judgment in Hartman I.  SWEPI and Ultra entered into a Purchase and Sale Agreement, dated August 13, 2014, but effective April 1, 2014, which closed on September 25, 2014, by which SWEPI assigned various oil and gas interests in Wyoming to UPL Pinedale, LLC, including interests burdened by the NPI.  Since physically taking over field operations from SWEPI, Ultra has been the sole First Party operator defendant that is responsible for the monthly consolidated NPI Accounting and payment.  SWEPI, SRMP, and SENA are affiliates of Royal Dutch Shell, plc, and are collectively referred to herein as "Shell".

Questar Exploration and Production Company ("Questar") owned and operated oil and gas leases in the Pinedale Field that are subject to the NPI held by Plaintiffs.  Plaintiffs settled with Defendant Questar Exploration and Production Company, now known as QEP Energy, prior to trial in Hartman I. The Settlement Agreement obligates QEP Energy to provide NPI revenue and expense information pursuant to the NPC so Ultra can provide to Plaintiffs an accurate and complete consolidated NPI accounting, and pay accrued net profits owing.

Hartman I also included non-operating working interest owners and First Parties SWEPI, LP, Arrowhead Resources (U.S.A.) Ltd. ("Arrowhead"), Gemini Resources, Inc., Lance Oil & Gas Company ("Lance"), and Williams Production Rocky Mountain Co. (WPX Energy RM Company).

15.     The Hartman I lawsuit was tried in October 2007.  Prior to trial, Questar and Wexpro settled.  As part of that settlement, Questar (now QEP Energy) and Wexpro accepted the ongoing written obligation of providing both Plaintiffs and the operator defendants with essential and accurate NPI revenue and expense information that is necessary to facilitate the consolidated monthly NPI accounting computation and resulting NPI payments due Plaintiffs, as required by the Net Profits Contract.

16.     The trial in Hartman I established the status of the NPI account for the period 1954 through December 31, 2006, and ordered First Party operator defendants Ultra and SWEPI to account for the NPI in accordance with the Net Profits Contract, Accounting Procedure, and Judgment.  Ultra and SWEPI had never accounted for the NPI prior to that time.

17.     The original Judgment was entered on April 11, 2008 in Hartman I.   The Judgment included a list of the twenty-three Pinedale leases and 44,166 acres burdened by the NPI.  Plaintiffs refer to those leases herein as "the Exhibit "A" NPI leases."

18.     All parties appealed.  The Wyoming Supreme Court issued its decision March 23, 2010 in *Ultra Resources, Inc. et al. v. Hartman, et al.,* 2010 WY 36, 226 P.3d 889 (Wyo. 2010). Following remand, the district court entered Amended Findings of Fact, Conclusions of Law and Judgment on December 8, 2010, to conform the Judgment to the Supreme Court's decision.  A copy of that amended document, including the Exhibit "A" list of NPI leases, is attached as Exhibit B, also referred to herein as "Judgment".

19.    Following remand, Plaintiffs filed a Motion to Enforce Judgment and Net Profits Contract in the Hartman I case[5].  The Motion sought to compel Ultra (and SWEPI)[6] to provide the required monthly NPI accounting and to resolve disputes that immediately arose between the parties concerning whether the NPI accounting provided to Plaintiffs conformed with or violated the district court judgment.  During the course of those post-appeal enforcement proceedings, the district court issued orders on December 17, 2012 (1) approving a format for the monthly NPI Statement that Ultra is obligated to provide Plaintiffs, and (2) prohibiting the inclusion of division expenses in the NPI calculation. By order dated February 28, 2013 titled Order Regarding Access to Accounting Record and Audit Rights, the district court defined Plaintiffs' rights and method to access and audit records regarding NPI costs and expenses incurred and all receipts and credits received by the operators and non-operators for sales and disposition of production subject to the net profits interest.

---

[5]    "4. "A court that has jurisdiction to make a decision also has the power to enforce it by making such orders and issuing such writs as are necessary to carry its judgment or decree into effect. For example, it can issue a contempt order." 20 Am. Jr. 2d Courts § 86. See also *Stephens v. Lavitt*, 2010 WY 129, 239 P.3d 634 (Wyo. 2010) (where District Court held party in civil contempt for violating the Court's order)". [Order on Court's Jurisdiction to Enforce its Judgment, dated June 8, 2011].

"[¶10] Courts have inherent power to enforce their own judgments. In *Hurd v. Nelson,* 714 P.2d 767 (Wyo. 1986), we affirmed the district court's post-judgment order enforcing a property settlement in a divorce action.  Speaking to the district court's enforcement powers, we stated:

"Courts have inherent power to enforce their own judgments and should see to it that such judgments are enforced when they are called upon to do so. To deprive a court of power to execute its judgments is to impair its jurisdiction, and the general rule is that every court having jurisdiction to render a particular judgment has inherent power and authority to enforce it and to exercise equitable control over such enforcement. Thus, a court of equity has inherent power to enforce its decrees. A court of equity retains and possesses the power to control the manner of the execution of its decree, and has the inherent right to modify, by a subsequent order, the manner in which it shall be enforced. * * * " 46 Am.Jur.2d Judgments § 898, p. 1032 (1969). *Id.* at 771."

[*Ultra Resources, et al. v. Hartman, et al.,* 2015 WY 40, 346 P.3d 880, dated March 19, 2015].

[6] Ultra has sole responsibility to provide the monthly consolidated NPI accounting and payment after it acquired SWEPI's interest in the Exhibit "A" NPI leases at issue herein effective April 1, 2014.

20.     On October 14, 2013, the district court entered its Order precluding the operator defendants from charging certain pre-2007 expenses in the NPI calculation for the accounting period beginning January 1, 2007.  In that Order, the court observed that the defendants have made enormous profits from Operations on the leases subject to the net profits interest and recognized that defendants (including Ultra) are obligated to conform their business and accounting practices to comply with their obligations under the NPC and the Judgment[5], and found that they have continually failed to meet the obligation to do so. In this regard, also see *Ultra Resources, et al. v. Hartman, et al.,* 2015 WY 40, §69, 346 P.3d 880, 903, dated March 19, 2015.

21.     In ruling on the Motion to Enforce Judgment, the district court recognized that jurisdiction to enforce its Judgment did not authorize it to resolve all future potential disputes between the parties.  The parties entered into a Stipulation in the post-appeal proceedings in Hartman I, which the trial court approved, acknowledging that the issues raised in this Complaint concerning the correctness of the NPI accounting for the period beginning January 1, 2007 should be resolved in a new lawsuit.  A copy of the signed Stipulation is attached as Exhibit D.

## V.  FACTS COMMON TO ALL CLAIMS

22.     A net profits interest is a passive income interest[7] that is determined by the document which created the interest - here, the Net Profits Contract[8].  The Net Profits Contract

---

[7] "§ 9.9  Income Interests Created From the Lessee's Interest…Frequently an oil and gas lessee will create passive income interests out of the lessee's right to production under the oil and gas lease. The interests are "passive" because their owner does not have any right to develop the leased land but will share in the benefits of production if development is successfully undertaken by the lessee…[Hemingway Oil and Gas Law and Taxation, § 9.9 pg. 479-480 (*Ultra, etal. v. Hartman, etal,* 2010 WY 36, ROA 7236-47)].

[8] *Ultra Resources, Inc. v. Hartman*, 2010 WY 36 and *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 976 (Wyo. 1994).

contemplated that Novi's (now in part the Hartmans') economic interest would be directly aligned with the economic interests of the First Parties.  That is, if the First Parties realized profits from the Exhibit "A" NPI leases, Novi would also realize proportional net profits.  The Net Profits Contract does not contemplate that the First Parties could realize profits from the Exhibit "A" NPI leases while the NPI account is simultaneously put into a substantial and prolonged deficit.  However, that is exactly what happened according to the NPI accounting provided by Ultra to Plaintiffs.

23.     The Net Profits Contract provides that "First Parties agree to pay to Novi a sum or sums representing 5% of the net profits…resulting from operations for oil and gas by First Parties" under the Exhibit "A" NPI leases.  It defines net profits as follows:

> Net profits as used herein shall mean the gross revenue (not required for payment of the overriding royalties...and landowners' royalties) from unit operations allocable to said leases [the Exhibit "A" NPI Leases] after deduction of all expenses of unit operations (unit operations being construed to include all operations of any of First Parties under said leases) except those charged to the working interest owners, if any, under the said unit other than First Parties.

> In computing gross revenue, there shall be taken into account the proceeds of production sold for delivery at the wellhead.  As to production not so sold[9], the fair market value of such production at the wellhead shall be taken into account; provided, however, that as to gas the value to be taken into account shall be equivalent to the price that Continental is entitled to receive for its share of gas under the provisions of that certain agreement by and between Continental and El Paso entitled "Option to Purchase Gas Agreement," dated January 7, 1954, a copy of which has been furnished Novi (emphasis added).

---

[9] "[¶132] …We conclude, therefore, the…language, "production not so sold" speaks only to production that is not sold in accordance with the previous provision, i.e., at the wellhead.  The language simply provides a means of calculating[9a] the value of gas sold downstream from the wellhead…" (emphasis added) [In the Supreme Court, State of Wyoming, *Ultra, et al vs. Hartman, et al*, 2010 WY 36, dated March 23, 2010].

[9a]  calculate – "to ascertain or determine by mathematical processes especially of some intricacy…" [Merriam Webster's Unabridged Online Dictionary].

24.     With respect to accounting for and payment of net profits, the Net Profits Contract further provides:

> Operator shall keep an accurate record of all accounts hereunder, showing the costs and expenses incurred and charges made and all receipts and credits received, which record shall be available at all reasonable times for the examination and inspection of Novi or its duly authorized representative. Within one (1) month after the close of each calendar month, Operator shall furnish to Novi a statement of costs and expenses incurred and charges made and all receipts and credits received during such calendar month.

25.     The January 7, 1954 Option to Purchase Gas Agreement, by and between Continental Oil Company and El Paso Natural Gas Company (as filed of record in Sublette County, Wyoming, at Book 14 of Oil and Gas Leases, Page 1, on October 24, 1955), and referenced in the Net Profits Contract, obligated original First Party operator and seller El Paso Natural Gas Company to market gas production from "said lands" (the Exhibit "A" NPI leases) in a manner to realize the highest possible price.   As a result, as to gas, the NPC-prescribed amount that shall be taken into account, in the NPI accounting, cannot be an amount that is less than the full receipts willingly accepted and received by First Parties while endeavoring in good faith to realize the highest possible price for any gas marketed from the Exhibit "A" NPI leases.

26.     The NPC includes an attached Exhibit C-1 Accounting Procedure.   That Accounting Procedure, along with the NPC, requires Ultra to provide a monthly statement in detail of all charges and credits of operations corresponding to the NPI account.  All expenses of all operations, that shall be charged to the NPI account, are identified in specificity in Section 2 on Page 3 of the NPC, in the Exhibit C-1 Accounting Procedure, and in the Court's Judgment in Hartman I and II.  The expenses of First Parties (Ultra's) production marketing activities are

11

included among the contractually-specified expenses of operations, for which the NPI account has been substantially charged in the monthly NPI accounting process.

27.     The Net Profits Contract provides that the accounting for the NPI is to be accomplished monthly on a consolidated basis utilizing the required accurate record of all accounts; i.e., utilizing the full monthly revenues (receipts and credits) resulting from operations by First Parties after deduction of all expenses (of all operations) incurred by First Parties in such month.  First Parties are obligated to make payments to the NPI owners based on the true net profits resulting from operations by First Parties for oil and gas, which must include, in the net profits calculation, the full and accurate revenues (receipts and credits) received as a result of First Parties operations under the "Exhibit "A" NPI leases.

28.     Although substantial and sustained development of the Exhibit "A" NPI leases began in earnest in 1997, the Court in Hartman I determined that net profits did not first accrue until May 2005. From May 2005 to December 2006, the status of the NPI account balance fluctuated with the account going negative in some months and positive in others. After adjustments, a total of over $21 million in net profits accrued to the NPI owners during this nineteen (19) month period. As of December 31, 2006, after taking into account the prior accrued net profits, the NPI account balance was in a reported $38.7 million deficit position, based on First Parties accounting information as reported during the Hartman I discovery process.

29.     As to the implementation of the required ongoing post 2006 consolidated monthly NPI accounting, Ultra, in November 2011, first commenced providing the required NPI monthly accounting utilizing a preliminary version of the seven (7) forms high-level format that was to be a part of the court-approved NPI monthly statement format order that was signed December 17, 2012, and filed of record on December 21, 2012. That December 17, 2012 court-approved NPI

monthly statement format order specified that operator defendants would continue to provide the NPI owners with a NPI monthly statement that is to (1) include the seven (7) forms format as identified and marked, in the August 21, 2012 hearing, as exhibits 4A-4G, and (2) also include, as part of the monthly NPI Statement format, the supporting electronic hard drive expense and revenue detail for all First Party Defendants at a level at least as comprehensive as that provided since the July 27, 2012 Monthly NPI Statement (March 2012 production month), as entered into evidence at the August 21, 2012 hearing. In regard to the required NPI monthly statement, Ultra has never provided Plaintiffs with an NPI accounting that it represents is final, for the NPI accounting period beginning January 2007 and continuing to the present. Since the time Ultra first began providing a consolidated NPI accounting, it has made numerous accounting adjustments back to January 2007. Notwithstanding the various ongoing adjustments to the reported NPI Statement accounting information, shortly after the court's signing of the December 17, 2012 NPI monthly statement format order, and coinciding with the court's issuance of its Order Regarding Access to Accounting Record and Related Audit Rights, dated February 28, 2013, Plaintiffs gave written notice to Ultra and SWEPI that they intended to conduct a post 2006 audit of the NPC-required consolidated accurate record of all accounts of costs and expenses incurred and all receipts and credits received.

30.    For the two and one-half year time period from July 2010 to December 2012, Ultra's various NPI Statements consistently represented that the NPI account was in a deficit of many hundreds of millions of dollars.  The highest reported deficit was a negative $1,046 million ($1.046 billion), in the NPI report dated March 22, 2011.  During this same two and one-half year accounting period, Ultra publicly boasted about the profitability of its Pinedale Field operations, which operations include in substantial part the Exhibit "A" NPI leases.

13

31.      Plaintiffs gave Ultra notice of numerous errors in the NPI accountings, as the NPI reports were provided.  Despite repeated requests from Plaintiffs, Ultra has to date failed and refused to provide Plaintiffs with all necessary documents and information that would allow Plaintiffs to fully determine (1) if the defendants' reported NPI accounting is accurate, (2) if the reported NPI account proceeds are the full amount of money actually received by First Parties from operations under the Exhibit "A" NPI leases, (3) if the initial claimed substantial deficit (for the accounting period of January 2007 through December 2008) was the true profitability of First Parties' operations under the Exhibit "A" NPI leases, and (4) to what extent have defendants imprudently operated the NPI properties for the period at issue herein.

32.      Ultra's NPI accounting representations of large and sustained Exhibit "A" NPI lease deficits, from 2007 through 2012, are inconsistent with the aggressive pace of development of the Pinedale Field that the operators undertook for that period, including Ultra, SWEPI, QEP and Wexpro Company.  From 2004 to 2012, the Pinedale operators continued to accelerate well drilling on the Exhibit "A" NPI leases.  They processed applications at the Wyoming Oil and Gas Conservation Commission to reduce the spacing of wells on the Exhibit "A" NPI leases from one well per 20 acres, to one well per 10 acres, and finally to one well per 5 acres.  Ultra's third party reserve engineers Netherland, Sewell & Associates projected that Ultra's acreage contained a total undrilled well inventory, in the Pinedale and Jonah fields, of approximately 5,000 plus remaining profitable well locations, as of June 3, 2013, of which more than 90% of those projected 5,000 plus additional well locations are situated on Ultra acreage in the Pinedale Field.

33.      Ultra, QEP, and SWEPI consistently and aggressively drilled wells on the Exhibit "A" NPI leases, from 2007 through 2015, at the rates reflected below.  This level of drilling

activity indicates they were meeting their expected financial goals and budget parameters and were operating the NPI wells and leases profitably, notwithstanding the simultaneously-claimed and prolonged substantial deficit account balance reported for the NPI account:

2007    182 wells drilled and completed

2008    259 wells drilled and completed

2009    231 wells drilled and completed

2010    290 wells drilled and completed

2011    314 wells drilled and completed

2012    148 wells drilled and completed

2013    175 wells drilled and completed

2014    200 wells drilled and completed

2015    207 wells drilled and completed

34.    Ultra's NPI accounting representations of large and sustained NPI deficits from 2007 through 2012 are inconsistent with the public statements that it made concerning the profitability of its Pinedale operations, and are not in compliance with the NPC requirement that the operator shall keep an accurate record of all accounts.

35.    Ultra Petroleum is a publicly-traded oil and gas company and regularly files SEC Form 10K reports and publicly releases other financial information that has represented the positive and profitable nature of its operations, including the positive financial performance of its important Pinedale Field properties that are made up in significant part by the Exhibit "A" NPI leases.  Ultra's Pinedale Field oil and gas assets represent a material portion of the corporate assets of Ultra.

36.     Ultra consistently compensated its CEO and senior management with valuable performance incentives[10] during the period when it aggressively drilled wells and added production and reserves on the Exhibit "A" NPI leases, but simultaneously reported to the NPI owners that it had lost many hundreds of millions of dollars on its Pinedale operations.

37.     Ultra is a for profit oil and gas company.   Based on the NPI revenues and substantial deficits reported by Ultra to the NPI account, economically rational conduct, by Ultra, should result in amended business strategies leading to reduced development expenditures, lowered financial risk, and attempted maximization of profitability from its Pinedale Field operations, for both itself and proportionally for the NPI owners, under the Exhibit "A" NPI leases.   The NPI was created out of First Parties' substantial Pinedale leasehold interests, and the parties to the NPC, in Section 1, specified that the financial interests of the net profits interest owner and First Parties would be aligned, with First Parties receiving 95% of the net profits resulting from operations by First Parties under the Exhibit "A" NPI leases and the NPI owners receiving the other 5% of the very same net profits resulting from operations by First Parties under the Exhibit "A" NPI leases.   The NPI owners are dependent on the good faith business judgment, acumen and expertise of First Parties to realize their 5% of the resulting net profits from the Exhibit "A" NPI leases, which was the valuable consideration promised by First Parties

---

[10] *AMERICA'S HIGHEST-PAID CEOs,* by Christopher Helman, Forbes Online, Dated October 14, 2011, 8:26:37 AM ET

"…Some among the top-10 are real standouts, like Michael Watford of Ultra Petroleum, at $43.7 million. Watford has had a great few years finding and developing oil and gas in places like Pennsylvania and Colorado, but the company he runs (market cap $4.5 billion) is far smaller than those of his pay peers…Compared to Watford, ExxonMobil's Rex Tillerson, who didn't crack the top 25, sounds like a real bargain. The Big Oil chief made just $13.9 million...".

to Novi in exchange for the valuable Novi leases WYW-015314 and WYW-015315 that were assigned by Novi to First Parties, and which First Parties have very profitably operated.

38.     The natural gas industry in general and Ultra specifically enjoyed historically high gas prices in the first eight months of 2008.  In the later part of 2008, spot gas prices dropped sharply, and have not since that time returned back to the higher 2008 levels.  In the face of that weakened market development, Ultra did not promptly and proportionally curtail drilling activities, but instead continued with its then ongoing aggressive drilling operations.  For several years, Ultra continued to follow a "growth for growth's sake" drilling policy in both Wyoming and Pennsylvania, and funded those operations in material part from its cash flow derived from the Pinedale Field, including the Exhibit "A" NPI leases, and in some part by taking on additional levels of debt and corresponding interest expense.

39.     In early 2012, Ultra commenced reducing the level of its drilling activities on the Exhibit "A" NPI leases in conjunction with a further temporary decline in spot gas prices that occurred in late 2011 and the first part of 2012. However, during the more than seven (7) year (86 month) time period from February 2007 (January 2007 production month) up to the June 30, 2014 NPI Statement, that immediately preceded Ultra's positive-NPI-balance July 31, 2014 NPI Statement, Ultra's NPI Statements to the NPI owners had represented the NPI account balance as being in a continuous deficit status. This reported long-time and continuous deficit status of more than seven (7) years was due in important part to reported insufficient NPI revenues (i.e., insufficient calculable gas price levels), and was also due to a material increase in drilling activity, by the Pinedale operators (and especially by Ultra), for the calendar years 2008, 2009, 2010, and 2011. From its issuance of the positive-NPI-balance July 31, 2014 NPI Statement to present, Ultra has reported, for the NPI account, a positive NPI balance for 16 of the 27

17

accounting months subsequent to the July 31, 2014 NPI Statement, with accrued net profits being payable to the NPI owners for the positive NPI balance months. Most recently, the NPI balance again reached a positive position as of the May 31, 2016 NPI Statement (February 2016 production month), and has remained positive for the subsequent NPI Statement months of June 2016, July 2016, August 2016, September 2016, and October 2016.

40.     First Party Arrowhead sold its small non-operating producing interests, in the Pinedale field, for $61 million, in February, 2013, effective August 1, 2012. Anadarko (Lance) also sold its non-operating interests in the Pinedale Field to Vanguard Natural Resources, LLC (Encore Energy Partners Operating, LLC) for more than $500 million, effective October 1, 2013. On September 25, 2014, effective April 1, 2014, SWEPI sold its operated Pinedale assets to Ultra for a total consideration (consisting of both cash and an assignment by Ultra of certain of its Pennsylvania properties) that totaled to substantially more than one billion dollars. These sales are further meaningful indicators that operations under the Exhibit "A" NPI leases have been consistently and materially profitable for First Parties, for the time period from January 2007 to the present, notwithstanding the significant long-running seven-plus-year (86 month) continuous deficit NPI balance that was reported by Ultra to the NPI account for the period from February 2007 through the June, 30, 2014 NPI Statement (April, 2014 production month).

### A. Ultra has underreported NPI revenues and overstated expenses

41.     Operator defendant Ultra has an obligation to provide Plaintiffs with an accurate consolidated NPI accounting, on behalf of itself and all other working interest owners.

42.     Ultra and the other working interest owners have worked to depress the real profitability of the NPI account for the period beginning January 2007 and continuing to the present, by reporting revenue for the NPI accounting in substantially lower amounts than the full

proceeds that have actually been achieved from sales and other dispositions of production from the NPI wells and leases.

### 1.      Hedge Marketing of NPI Production

43.      Since 2007, Ultra (and other First Parties), in the normal course of business and as part of their production marketing activities, have at times entered into fixed-price "hedge"[11] marketing transactions related to the sale of oil and gas production derived from the Exhibit "A" NPI leases.[12,13] Ultra has achieved fixed prices for NPI production by entering into (1) fixed-price physical forward sales contracts, (2) fixed-for-floating price substitute swap contracts, and (3) other production-based substitute hedge price contracts. The purpose for such "hedge"

---

[11]  "Appropriately hedging oil and gas production can provide a producer with a measure of financial certainty. The ability to lock in or establish a minimum price *in advance* that the producer will receive in the marketplace for a percentage of its expected production gives the producer the advantage of predictable revenue in a future period. This certainty allows a producer to service its debt, budget for drilling operations under its existing oil and gas leases, and plan for and fund future exploration and production activities and growth opportunities, even during a period of declining or volatile prices. Thus, hedging is a powerful financial management tool." ["Hedging Oil and Gas Production", by Jesse S. Lotay, Dan Nossa, and Paul E. Vrana of Jackson Walker L.L.P., presented at the 41st Annual Ernest E. Smith, Oil, Gas and Mineral Law Institute, March 27, 2015, Houston, Texas (2015), Page 1] [Hosted by The University of Texas School of Law and The Oil, Gas & Energy Resources Law Section of the State Bar of Texas].

[12]  "Commodity Hedges - The company [Ultra] has in place fixed price natural gas swaps for the balance of 2015 of 135.8 Bcf at a weighted average price of $3.71 per Mcf. This is approximately 64 percent of the estimated natural gas production for the remaining nine months of 2015. A majority of the swaps are in the second and third quarters of the year where it is estimated that approximately 87 percent of the company's natural gas production is hedged. The company opportunistically hedges a portion of its forecasted production to lessen the volatility associated with swings in commodity prices and improve the certainty of cash flows in support of its capital investment program." [Ultra Petroleum First Quarter 2015 Operating and Financial Results, dated April 30, 2015].

[13]  Questar may hedge up to 100% of forecasted production from proved reserves to lock in acceptable returns on invested capital and to protect returns, cash flow and net income from a decline in commodity prices…Market Resources does not enter into derivative arrangements for speculative purposes…Market Resources uses fixed-price swaps to realize a known price for a specific volume of production delivered into a regional sales point. A fixed-price swap is a derivative instrument that exchanges or "swaps" the "floating" or daily price of a specified volume of natural gas, oil or NGL, over a specified period, for a fixed price for the specified volume over the same period (typically three months or longer)…The fixed-price swap price is reduced by gathering costs and adjusted for product quality to determine the net-to-the-well price…[Questar Corporation, Form 10K-FY 2007, Pages 26 and 38].

transactions is to lock in economically-acceptable contractually-specified fixed prices and corresponding fixed revenue amounts for a portion of its software forecasted production[12], including forecasted production from the Exhibit "A" NPI leases embedded among the forecast group of leases. This allows Ultra (and other First Parties) to manage exposure to market price risks associated with forecasted (expected) production volumes and provides a needed level of certainty to production revenues and cash flow to support the substantial capital-intensive drilling and completion programs that are necessary for the ongoing replacement of depleting production capacity and depleting PDP reserve volumes (inventory), for which the NPI account is likewise fully charged in the NPI accounting. By virtue of such elected contractually-specified fixed-price marketing transactions, First Parties have realized revenues, credits and receipts corresponding to forecasted production produced from the Exhibit "A" NPI leases.

44.    As a result of its fixed-price hedging activities, Ultra states that it may realize prices for its oil and gas production, including production from the Exhibit "A" NPI leases, that are more or less than the floating spot prices (and floating revenue amounts) that would have been otherwise received for such production, if there had been no willing election to lock in a known and acceptable contractually-specified substitute fixed price and fixed revenue amount.

45.    Ultra willingly elects to enter into hedge transactions, including swap transactions, in order to reduce potential price risks and improve certainty of cash flow[11,12], in the conduct and management of its ongoing substantial and complex commercial enterprise, which in significant part is the development, production and marketing of oil and gas from the Exhibit "A" NPI leases. Such elected integrated swap transactions are prearranged substitute (replacement) transactions for transactions to be made at a later time in a physical marketing channel. Ultra has expressly recognized in filings with the Securities Exchange Commission, and

in other public statements to investors and the financial community, and this court[14], that the volumes hedged by virtue of its hedge transactions represent a specified prearranged portion of its forecasted production, resulting from oil and gas operations, which includes in substantial part operations under and production from the Exhibit "A" NPI leases.

46.     As a public oil and gas company, Ultra publicly reports elected hedge prices and corresponding net realized wellhead prices for its production, that includes production from the Exhibit "A" NPI leases.  The reported realized wellhead prices are composed of a combination of both non-hedged prices and contractually-specified fixed prices achieved in hedge transactions. The publicly-reported weighted-average realized wellhead prices, and corresponding revenues, that also include revenues received from fixed-price hedge marketing transactions, have materially exceeded the reported revenues (and calculable weighted-average net-to-the-well prices) that Ultra has reported for the NPI account, for the Exhibit "A" NPI leases, for the period from January 2007 to the present.

47.     For some period during 2007-08, Ultra included hedge receipts and hedge prices in the NPI accounting.  In conjunction with a two-day meeting with Plaintiffs, in September 2010, Ultra provided to Plaintiffs a tabulation of the "cash collected" for Ultra's gas production for the production month of January 2008, a portion of which was reported by Ultra to be hedged as of January 1, 2008.   That January 2008 "cash collected" tabulation included transactions with

---

[14] Ultra's Most Recently Stated Risk Management Objectives as of October 22, 2016:
"Hedges may be used by the Company to reduce the volatility of prices received for its production and to assure cash flow. Hedges may not be used by the Company for speculative purposes." [Exhibit 1, Commodity Price Hedging Policy for Ultra Petroleum Corp., attached to that certain proposed order titled ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM POSTPETITION HEDGING TRANSACTIONS, (B) PROVIDING ADMINISTRATIVE EXPENSE STATUS TO AUTHORIZED POSTPETITION HEDGING TRANSACTIONS, AND (C) MODIFYING THE AUTOMATIC STAY, as filed in Case 16-32202, Document 637-1, filed in TXSB on October 22, 2016, Page 8 of 8].

several large financial institutions.  Due to the Ultra-furnished January 2008 "cash collected" tabulation, it was Plaintiffs understanding that the NPI account was being proportionally credited, in the NPI accounting, with the full receipts received for Ultra's production from the various listed tabulation entities, including the listed financial institutions.

48.     At some point in time after January 2008, which exact time is currently unknown to Plaintiffs, Ultra discontinued, for the NPI account, the practice of reporting the full revenues (receipts) received from fixed-price hedge transactions.  Ultra did not advise Plaintiffs of its change in production revenue reporting methodology for the NPI accounting.

49.     Had the operator defendants, with their commencement of the NPI accounting, initially begun accurately reporting to the NPI account all proceeds (receipts) fully received from the Exhibit "A" NPI lease production, including the proceeds received from willingly elected hedge contract activities, net profits would have accrued and been payable materially before the July 31, 2014 NPI Statement (April 2014 production month), when the cumulative NPI balance finally again became positive, after more than 7 years (86 months) of a continuously reported deficit NPI balance (with no corresponding NPI payments to the NPI owners), according to the NPI Statements issued by Ultra to Plaintiffs.

50.     Plaintiffs are also informed and believe, based upon written statements by or on behalf of Shell, that Shell also hedged a portion of the production from the Pinedale leases owned and operated by affiliate Shell Exploration and Production Companies, including SWEPI, and allocated external third-party swap transactions back to the various Shell affiliates by means of inter-affiliate swaps between commonly-controlled Shell entities. Plaintiffs are unable without the benefit of full discovery to determine (1) the exact extent to which SWEPI's production from the Exhibit "A" NPI leases was hedged prior to its sale to Ultra, and (2) the full contractually-

22

specified external prices and corresponding gross production revenues received from those fixed-price hedge transactions.

51.     Plaintiffs have made demand on operators Ultra, SWEPI and QEP to include, in the NPI accounting, the full fixed-price hedge revenues received for the Exhibit "A" NPI lease production.  Ultra has refused to include, as to the production revenue they report for the NPI accounting, the full NPI production prices and corresponding revenues that are willingly accepted and received from elected fixed-price hedge transactions, including substitute fixed-price swap transactions.  As the party responsible for accurately performing the monthly consolidated NPI accounting, and paying net profits when owed, Ultra has failed and refused to require the other First Parties to accurately report the full proceeds (receipts) of NPI production received from operations under the Exhibit "A" NPI leases, including the full contractually-specified substitute fixed prices and corresponding fixed revenue amounts willingly accepted and received through elected prearranged substitute hedge activities.

52.     Because the accounting for the NPI is required to reflect an accurate record of the contractually-required consolidated NPI account, Ultra (as operator) is obligated to ensure that all First Parties correctly report all revenues, credits and receipts (i.e., all proceeds) associated with production resulting from operations under all 23 Exhibit "A" NPI leases and more than 44,000 corresponding NPI acres in the Pinedale Field.  Ultra has failed and refused to take the necessary steps to ensure that all production revenues, credits and receipts received (i.e., all proceeds received) from oil and gas operations under the Exhibit "A" NPI leases are accurately reported by First Parties for the NPI calculation.

2.      **Affiliate Transfer Pricing**

53.      On information and belief, before its sale to Ultra, SWEPI reported NPI revenue on processed gas based on an affiliate gas purchase agreement with Shell corporate affiliate SENA that calls for "payment" based upon index (spot) prices.  SENA then marketed the same production to unaffiliated third parties (by means of physical sales, physical sales integrated with hedge transactions, or other dispositions) at higher prices than SWEPI reported for the consolidated NPI calculation.  By virtue of this affiliate arrangement, SWEPI (now Ultra) has failed to report for the NPI calculation the full proceeds of production that the Shell corporate family received from its external marketing arrangements or other dispositions of natural gas from NPI wells and leases, failed to report revenue (receipts) that reflects full fair market value, as required by the NPC, corresponding to First Parties operations under the Exhibit "A" NPI leases, and failed to report the highest possible price for its gas production from the Subject Leases as required by the NPC.  Plaintiffs have taken written exception to this practice but, to date, no related adjustment to the NPI accounting has occurred.

54.      SWEPI reported revenue for the NPI calculation based on an affiliate transfer index price even though SENA, its marketing affiliate, has admitted in correspondence with the U.S. Commodity Futures Trading Commission that Royal Dutch Shell, plc inter-company transactions are not market reflective transactions, and that economic concepts such as supply and demand do not apply to such inter-company transactions; "i.e., there is no "market" for an inter-affiliate  transaction".

55.      The SWEPI-SENA agreement allowed SWEPI to retain and sell extracted natural gas liquids (NGLs) and does not cover oil sales.  SWEPI never reported NGL revenue for the

24

NPI calculation. Thus SWEPI did not accurately report for the NPI accounting the full proceeds of NPI production received from operations on the Exhibit "A" NPI leases.

56.     SWEPI utilized the SENA contract to shield Shell corporate revenue from the NPI accounting.   Rather than utilizing internal non-market affiliate transfer index prices for NPI revenue reporting, SWEPI should have used, for the NPI accounting, the full prices and revenues that SENA achieved in its elected external marketing arrangements (with unaffiliated third parties) for Exhibit "A" NPI lease production.

### 3.     Natural Gas Liquids

57.     Ultra has not reported revenue for valuable natural gas liquids ("NGLs"), which are produced in the NPI lease operations as part of the gas stream from the NPI wells, extracted at processing plants, and sold downstream.   While spot natural gas prices decreased beginning in late 2008, NGL prices increased relative to natural gas prices, since they are typically valued in relation to oil prices, which command a higher dollar per MMBTU value than natural gas.

### 4.     The Supplemental Accounting Agreement and Gross Revenues

58.     In the proper computation and payment of the NPI, the Judgment in Hartman I determined that the First Parties to the NPC were obligated to follow a Supplemental Accounting Agreement, Net Profits Interest, Pinedale Unit Area that First Parties executed in 1954 (and filed of record in Sublette County, Wyoming, at Book 14 of Oil and Gas Leases, Page 85, on October 24, 1955) (see attached Exhibit E), that "clarif[ies] the accounting procedure to be followed" by First Parties in accounting for and paying the NPI owners' net profits resulting from operations by First Parties under the Exhibit "A" NPI leases. Subsequent to its 1954 execution, the Supplemental Accounting Agreement was recognized (1) by Ultra's predecessors in interest, in various correspondence, assignments, and title opinions, and (2) in certain of Ultra's pre-2007

NPI accounting calculations, to be the accounting procedure to be followed by the First Parties so as to conform the operator's NPI accounting procedures to the contractually-required accounting obligations under the Net Profits Contract. Today, the Supplemental Accounting Agreement, as a document that runs with the Exhibit "A" NPI leases, is being utilized by Ultra for the purpose of allocating to and billing the non-operator First Parties for a share of the monthly NPI payments that are paid by Ultra to the NPI owners[15].

59.     The Supplemental Accounting Agreement also importantly and clearly provides that operator, in calculating and paying accrued net profits, shall take into account, for each First Party, the "gross revenue [as defined in the NPC] received by such party as a result of such operations" under the Exhibit "A" NPI leases. In the post 2006 NPI accounting calculations, Ultra has failed to take the necessary steps to ensure that the monthly NPI accounting computation accurately includes the full gross revenue received by each of the First Parties as a result of such operations by First Parties under the Exhibit "A" NPI leases, which gross revenue must include all willingly-elected prearranged substitute fixed-price production receipts received.

**5.     Overriding Royalties**

60.     The Supplemental Accounting Agreement also provides that "gross revenue shall include revenue from any overriding royalty provided for in favor of any party hereto in either the Malco Agreement, the Malco Supplement, or the El Paso Farmout and as so modified, such overrides shall apply to production allocated to the Novi leases." Because of Ultra's failure to

---

[15] As of the September 1, 2016 Bar Date, Proof of Claims have been filed against Ultra Resources, Inc., in the Ultra Petroleum Corp, etal bankruptcy, by both Southern California Public Power Authority (SCPPA) and Turlock Irrigation District (TID), as non-operator First Parties, and successor in interests, under the April 1, 1954 Pinedale Unit Area Net Profits Contract and the May 7, 1954 Supplemental Accounting Agreement, Net Profits Interest, Pinedale Unit Area, Sublette County, Wyoming, pertaining to certain operator-non-operator Net Profits Interest accounting and payment issues.

provide adequate and accurate supporting accounting documentation regarding NPI revenues, it is unknown as to whether the operator defendants have accurately included in the NPI calculation those revenues received from such herein referenced overrides, if any, as required under the Supplemental Accounting Agreement.

### B.    Unfurnished Essential Audit Information

61.    Plaintiffs have undertaken costly audits of both Ultra and SWEPI, for the NPI accounting period beginning January 2007.  During the audit process, Ultra failed and refused to provide Plaintiffs with all documents and information that are necessary for Plaintiffs to fully and accurately audit the revenues and expenses record reported with the monthly NPI Statements:

- Ultra has refused to produce copies of its "hedge" contracts (including fixed-for-floating swap contracts) and other contracts and related documents and information that would provide (1) confirmation that such hedge transactions involve revenue (receipts) associated with the sale and disposition of Ultra's software forecasted production, including Ultra's forecasted production from the embedded Exhibit "A" NPI wells and leases, and (2) confirmation of the total fixed-price revenue amounts that Ultra has actually achieved from its fixed-price hedge activities for production derived from the Pinedale Field and proportionally from the Exhibit "A" NPI leases and wells.  Such contractually-specified full hedge prices and corresponding fixed-price revenue amounts must be taken into account in the NPI accounting so as to fully reflect all revenues, receipts, and credits willingly accepted and received for Exhibit "A" NPI lease production resulting from operations by First Parties under the Exhibit "A" NPI leases.

27

- Ultra has refused to provide invoices that would reflect its actual costs associated with operator-owned water disposal facilities.

- Ultra has refused to provide invoices to substantiate claimed NPI expenses.

- SWEPI (now Ultra) has failed to provide documents reflecting the full prices and full revenue amounts achieved by affiliate SENA in the marketing of SWEPI's production derived from the Exhibit "A" NPI leases, and has also refused to furnish relevant hedge contract information corresponding to its NPI lease production.

62.    Additional essential audit information that has not been furnished would include information related to (1) operator-owned facility charges in excess of costs allowed by the Exhibit C-1 Accounting Procedure, (2) excessive lease operating expense charges, (3) expense charges in excess of those allowed by the Net Profits Contract, and (4) expense charges that are not attributable to NPI wells and leases.  As a result of the various foregoing unfurnished audit information, Plaintiffs have not been able to fully ascertain the accurate status of the NPI account and the net profits amount owing to Plaintiffs.

**C.    Unfurnished Information Relative to Section 4 of the NPC**

63.    Section 4 of the Net Profits Contract titled "Logs and Information Relating to Production and Exploratory Work" provides that:

> Operator shall furnish Novi copies of well logs of all types with respect to operations hereunder and shall, at Novi's request, furnish Novi with all information relative to producing operations hereunder or relative to exploratory work conducted in connection with operations hereunder whenever the expense of any such exploratory work is chargeable as an expense in computing net profits under the provisions hereof.

28

- When requested, "all information relative to producing operations hereunder" would include but not be limited to:

    All planning, preparation, and economic analysis information necessary to justify the development and production of booked NPI lease PUD reserves; all information relative to the drilling, completing, and equipping of required NPI producing wells; all production volumes and other necessary information relative to the operation of NPI producing wells and associated production facilities; all information relative to the treatment, storage, and marketing of production derived from NPI producing operations, including accurate information regarding the full prices and revenues (receipts) received as a result of producing operations under the Exhibit "A" NPI leases, the accurate costs and expenses of ongoing NPI producing operations (up to the economic limit), and operators necessary and accurate profitability analysis of ongoing NPI producing operations, which profitability analysis would include forecasted reserves and corresponding price sensitivity analysis, acceptable rates of return and corresponding price sensitivity analysis, hurdle rate sensitivity analysis, costs of sales analysis, breakeven sensitivity analysis, and economic limit and economically recoverable reserves analysis, as well as the related development, producing and marketing operations decisions pertaining to such analyses corresponding to the Exhibit "A" NPI leases.

- When requested, and when such exploratory work costs are charged to the NPI account, "all information relative to…exploratory work conducted in connection with operations" would include but not be limited to:

> All information relative to geological and geophysical preparatory work leading up to the drilling of an exploratory well or wells on Exhibit "A" NPI leases; all information relative to the planning and economic analysis of an exploratory project on the Exhibit "A" NPI leases (including projected reserves, prices, revenues, expenses, cash flows, rates of returns, and payouts); and all information regarding the details of the drilling and completion of an exploratory well on Exhibit "A" NPI leases, including a full and accurate description of hydrocarbon shows, corresponding operational decisions, and comprehensive and accurate test results.

Ultra has failed to provide Plaintiffs with such information relative to producing operations and exploratory work that has been requested by Plaintiffs under Section 4 of the Net Profits Contract.

### VI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

64.    Plaintiffs incorporate by reference the preceding paragraphs.

65.    Ultra has breached the Net Profits Contract by, *inter alia*, (1) failing to include in the NPI calculation all revenues, receipts and credits received for production derived from the Exhibit "A" NPI leases, including failing to include revenues achieved through elected fixed-price hedge marketing of such NPI lease production, (2) failing to include in the NPI accounting

their full actual realized revenues (receipts) received from sales or other dispositions of production from operations under the Exhibit "A" NPI leases, (3) failing to provide access to and make available all receipts and credits received, from Exhibit "A" NPI lease operations, including from elected hedging activities, pursuant to the court's February 28, 2013 Order Regarding Access to Accounting Record and Audit Rights, (4) failing to include in the NPI accounting all floating and fixed-price receipts, revenues and credits received by other First Parties for production produced from the Exhibit "A" NPI leases, (5) reporting revenue for the NPI accounting based on affiliate sales which do not reflect actual market operations and fair market value, (6) failing to report revenues received pursuant to the Supplemental Accounting Agreement from the Exhibit "A" NPI lease operations and specified overrides, (7) failing to report all revenues, credits and receipts generated by and received from all marketing efforts related to NPI lease production, (8) reporting excessive expenses for the NPI accounting or expenses that are in excess of the actual expenses incurred, (9) reporting expenses for operator-owned facilities in excess of the actual cost of service, and (10) reporting expenses in excess of those authorized by the NPC, the Exhibit C-1 Accounting Procedure, Supplemental Accounting Agreement, and the Court's Judgment in Hartman I and II.

66.    Ultra, in performing the consolidated NPI accounting, has also breached the Net Profits Contract by failing and refusing to require QEP, Wexpro, SWEPI, and the non-operating First Parties to provide, for the consolidated NPI calculation, the full and accurate production revenues (receipts) received (both floating and fixed price) from operations in the manner prescribed by the Net Profits Contract and the Supplemental Accounting Agreement.

67.    Ultra's breaches have damaged Plaintiffs in an amount to be determined at trial. In addition to the foregoing breaches and resulting damages, Ultra has breached the Net Profits

Contract by refusing to provide underlying supporting documentation regarding the NPI calculation and accurate revenues (receipts) received and expenses incurred related to the Exhibit "A" NPI leases.  It has breached Section 4 of the Net Profits Contract, titled "Logs and Information Relating to Production and Exploratory Work," by failing to furnish to Plaintiffs upon request all requested information relative to both (1) ongoing producing operations (i.e., the preparation for the drilling of wells, the drilling, completion and equipping of production-related wells, the producing of wells, and the treatment, storage, and marketing of production therefrom), and (2) exploratory work conducted in connection with NPI lease operations when such exploratory work is charged to the NPI account.

68.     Plaintiffs are entitled to a Judgment requiring Ultra to furnish to Plaintiffs upon request all information relative to NPI lease producing operations and relative to exploratory work conducted in connection with NPI lease operations when such exploratory work is chargeable to the NPI account.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Covenant to Market

69.     Plaintiffs incorporate by reference the preceding paragraphs.

70.     Ultra is subject to an implied covenant to market for the benefit of the entire Exhibit "A" NPI leasehold, which extends to and benefits Plaintiffs as the owners of the passive NPI.  At all relevant times, Ultra was and is obligated to act with due regard for the rights and interests of Plaintiffs, to market production from the Exhibit "A" NPI leases for the mutual benefit of Plaintiffs, whose "passive income interest" is derived out of First Parties leasehold

rights[16], and to achieve the highest possible price for sales or other dispositions of production from the Exhibit "A" NPI wells and leases attainable under the existing circumstances, which price cannot be less than the full price received by First Parties.

71.     Ultra has breached its implied covenant to market production by, *inter alia,* failing to market the Exhibit "A" NPI lease production for the benefit of the NPI account, including valuable natural gas liquids, accepting an internal non-market affiliate transfer index price reported by SWEPI for the consolidated NPI accounting, and failing to achieve for the NPI account the highest possible price for production from the Exhibit "A" NPI wells and leases, so that the Hartmans will be paid their proportionate share of the true net profits resulting from operations by First Parties under the Exhibit "A" NPI leases.  Those breaches have proximately caused plaintiffs to suffer damages.

72.     The breaches of the implied covenant to market have been intentional and were carried out in order to deprive the Hartmans of net profits that would otherwise have been payable.  Such conduct is willful and wanton and in disregard of plaintiffs' rights and supports an award of exemplary or punitive damages.

### THIRD CLAIM FOR RELIEF
#### Breach of Duty of Good Faith and Fair Dealing

73.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

---

[16]  "…the net profits interest holder has no claim to any share of the production in kind, nor does he have the right to participate in any of the decisions concerning its marketing, since these matters are decided by the working interest owner alone…like a working interest, the ultimate value of a net profits interest is a function of production from the property and of the efficiency of its operation; thus, the net profits interest has value only when its supporting working interest has value…" [Institute on Oil and Gas Law - J.N. Sherrill Jr., 19 SW Legal FDN. Oil & Gas Inst 170 (1968) (*Ultra, etal. v. Hartman, etal,* 2010 WY 36, ROA 7248-91)].

74.     Under Wyoming law, every contract, including the Net Profits Contract, imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.  The duty requires that neither party act in a manner that would injure the rights of the other party to receive the specified benefits of the agreement.

75.     The NPI is a "passive income interest" that is created from lessee's interest.  As the owners of a "passive income interest", Plaintiffs are totally dependent on the First Parties, whose net profits from the Exhibit "A" leasehold are burdened by the NPI, to act in a manner that will allow the NPI owners to realize the full benefit of the contract, i.e., realize their full proportionate share of the net profits resulting from operations by First Parties under the Exhibit "A" NPI leases.  The interests of the NPI owners and the First Parties must be aligned.  If First Parties realize net profits from their operations on the Exhibit "A" NPI leases, the NPI owners should also simultaneously realize their specified proportional share of the full net profits from operations by First Parties under the Exhibit "A" NPI leases.

76.     Ultra has accounted for the NPI so as to sometimes claim significant deficits for the NPI (which interest is derived out of First Parties working interest rights to production under the Exhibit "A" NPI leases), while Ultra has simultaneously and materially profited from its operations under the same Exhibit "A" NPI leases.  Ultra has utilized its superior knowledge of its operational decisions and the revenues (receipts) received and expenses incurred pertaining to those operations to depress the NPI account in order to minimize its contractual liability to pay to the NPI owners their full proportional share of the net profits resulting from operations by First Parties under the Exhibit "A" NPI leases.  Ultra has accounted for the NPI so that the interests of Plaintiffs and Ultra are not aligned, under the very same Exhibit "A" NPI leases, thereby depriving the Hartmans of the benefit of their proportional share of the full net profits resulting

from Exhibit "A" NPI lease operations by First Parties, which was the consideration promised by First Parties to Plaintiffs' predecessor Novi, in 1954, in return for First Parties being assigned by Novi the highly-valuable Novi leases WYW-015314 and WYW-015315. Please refer to paragraph 13 included herein.

77.    Ultra's breaches of the duty of good faith and fair dealing have caused Plaintiffs to suffer substantial damages in an amount to be determined at trial.

78.    Defendants' breaches of the duty of good faith have been intentional and were carried out in order to depress the value of the NPI account and avoid paying to plaintiffs their full proportional share of the Net Profits resulting from First Parties operations under the Exhibit "A" NPI leases.  Such conduct is willful and wanton and in disregard of Plaintiffs' rights and supports an award of exemplary or punitive damages.

### FOURTH CLAIM FOR RELIEF
**Breach of Duty of Prudent Operator**

79.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

80.    Ultra has a duty to Plaintiffs arising from the NPC to operate the Exhibit "A" NPI leases prudently and in a manner which allows Plaintiffs to realize the bargained for financial benefit of the NPI; i.e., realize their proportional share of the promised 5% of the net profits resulting from operations by First Parties under the Exhibit "A" NPI leases.

81.    Ultra, based on its reported NPI accounting, has breached its prudent operator duties by performing ongoing operations under the NPI properties in a manner that resulted in

reported excessive deficit NPI account balances and an excessively-lengthened payout[17] of the NPI account balance, which deficit balances were represented by Ultra to be in the high hundreds of millions of dollars. If Ultra's reported NPI Statement deficit account balances and excessive payout time are indeed determined to be accurate and true, Ultra's breaches of its prudent-operator duty have caused Plaintiffs to suffer damages in an amount to be determined at trial.

82.    Plaintiffs have initiated costly NPI account revenue and expense audits from Ultra, in order to ascertain the accuracy of Ultra's NPI accounting, including the accuracy of its reported substantial deficit NPI account balances and excessive NPI balance payout time. Plaintiffs have been unable to achieve satisfactory closure in regard to the reported NPI accounting, and reported substantial NPI deficit NPI account balances and excessive payout time, because of Ultra's failure to respond to Plaintiffs auditor's (AMS-PAR's) July 31, 2014 Audit Report[18] and refusal to provide all necessary and requested NPI revenue (receipts) and expense information. Ultra's failure to furnish such essential NPI revenue (receipts) and expense

---

[17] "Due to the present low natural gas price environment and Ultra's anticipated capital expenditure program in the coming years, it does not appear that the NPI account will be positive in the foreseeable future" (Sworn Affidavit of Garland R. Shaw (Ultra CFO), dated August 25, 2010).

[18] In conjunction with the NPI accounting audit process and Plaintiffs' auditor's (AMS-PAR's) July 31, 2014 Audit Report, Plaintiffs, by separate 36-page letter (plus attachments) to Ultra, also dated July 31, 2014, likewise made a clear written demand upon Ultra to perform "…a full and accurate **consolidated** NPI accounting, as to **all** Pinedale producers [i.e., all First Parties], for the time period January, 2007 to the present (emphasis added)."

information is a breach by Ultra of its contractual and prudent operator duty to keep and report an accurate record of all accounts, and make such record available at all reasonable times.

83.    In addition to the foregoing, and based on the NPI accounting computations reported by Ultra for the NPI account, Ultra has breached its duty to conduct itself as a prudent operator by, among other things, (1) engaging in a leveraged and overly-aggressive well drilling program not economically justified by the NPI lease production revenues (and corresponding calculable unit pricing) as reported to the NPI account, and (2) failing to rationally adjust its elevated Pinedale operations Capex expenditures to conform to the NPI-reported materially-reduced NPI revenues and corresponding calculable net-to-the-well prices, that (if correct) should have mandated a timely and appropriate reduction in capital-intensive drilling activities and investments.

84.    Ultra has also breached its duty to act as a prudent operator in its drilling and completion of the Mesa 10D-33 exploratory well.  That duplicative exploratory well had no readily apparent rational reason to be drilled, at the selected time it was drilled, and has contributed nothing material to the overall profitability and financial return achieved from the Exhibit "A" NPI leases.  Ultra has charged the NPI account with substantial single-well post-2006 Mesa 10D-33 cumulative expenses that total $57.5 million (or more than $2,950 per foot of holed drilled), with a relatively meager $750,000 of total Mesa 10D-33 production revenues

being reported to date to the NPI account.  During the Mesa 10D-33 drilling and completion process, Ultra's various Mesa 10D-33 news releases helped support the price of its stock, while Ultra used the Mesa 10D-33 accounts payable account as a receptacle for non-NPI expenses that were charged to the NPI account, including unauthorized expenses such as a property tax bill for its Denver office. The substantial wasted money corresponding to the Mesa 10D-33 well could have been much more efficiently utilized to drill and complete an additional nine or more Lance Pool gas wells that are needed today to help replace ongoing depleting Exhibit "A" NPI lease reserves and contribute towards the ultimate full development of the existing large inventory of Lance Pool PUD reserves underlying the Exhibit "A" NPI leases.

85.    Ultra's breaches of its prudent operator duty have caused Plaintiffs to suffer damages in an amount to be established at trial.

## FIFTH CLAIM FOR RELIEF
### Breach of Wyoming Royalty Payment Act

86.    Plaintiffs incorporate herein by reference the preceding paragraphs.

87.    Net profits constitute proceeds derived from the sale of production as defined by the Wyoming Royalty Payment Act, W.S. § 30-5-301(a).  The Wyoming Royalty Payment Act applies to the NPI.

88.    Ultra has the legal obligation to pay Plaintiffs their contractually-prescribed proportional share of the consolidated net profits resulting from operations by First Parties under the Exhibit "A" NPI leases, when such profits rightfully accrue.

89.     Ultra has not paid Plaintiffs all net profits due and owing for the period beginning January 2007 and continuing to the present.  Consequently, plaintiffs are entitled to the remedies provided by the Wyoming Royalty Payment Act, including interest, attorneys' fees, costs, expenses, and statutory penalties.

### SIXTH CLAIM FOR RELIEF
**Declaration of the Parties' Rights and Obligations**
**Under the Net Profits Contract**

90.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

91.     Pursuant to 28 U.S. Code § 2201 and the Wyoming Uniform Declaratory Judgments Act (W.S. § 1-37-101 through 1-37-115), this Court has the power to "declare rights, status and other legal relations whether or not further relief is or could be claimed."  Pursuant to W.S. § 1-37-103:

> Any person interested under a . . . written contract, or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute . . . contract . . . may have any question of construction or validity arising under the instrument determined and obtain a declaration of the rights, status or legal relations.

92.     Disputes have arisen between Plaintiffs and Ultra concerning the NPC-required consolidated NPI accounting for the period beginning January 2007 and continuing to the present.  The disputes involve both NPI accounting items related to revenues (receipts) willingly accepted and received and expenses incurred.  Given the nature of the parties' relationship, it is likely that such disputes will continue into the future unless the Court declares the parties' rights and obligations with respect to the required consolidated NPI accounting.

93.     Disputes have arisen between Plaintiffs and Ultra concerning Ultra's obligation to secure from and require all other First Parties to accurately report all revenues (receipts) received and expenses incurred in a manner consistent with the Net Profits Contract.

94.     In addition to disputes concerning NPI revenues (receipts) received and expenses incurred, disputes have arisen between the parties concerning the scope of and procedure for audits that Plaintiffs have noticed regarding First Parties NPI accounting records.  Given the nature of the parties' relationship and Ultra's conduct in the recent initial audit, it is probable that such disputes will continue into the future and result in substantial costs to the NPI owners and a multiplicity of lawsuits unless the Court declares the parties' rights and obligations with respect to the scope, procedure, and operator response time for accomplishing efficient and complete audits of the reported NPI revenues (receipts) willingly accepted and received and expenses incurred as a result of operations by First Parties under the Exhibit "A" NPI leases.

95.     Disputes have arisen over Ultra's obligations to provide plaintiffs with all requested information and documents relative to producing operations and exploratory work under the Exhibit "A" NPI leases.

96.     Plaintiffs ask the Court to declare:

(1) the gross revenue amounts to be reported for Plaintiffs' NPI shall include, and Ultra is required to include in its consolidated calculation of the NPI, all revenues, receipts, and credits received from elected prearranged substitute fixed-price hedging transactions or other elected marketing transactions and dispositions that generate revenues (receipts) received by First Parties for the production derived from the Exhibit "A" NPI Leases; and,

(2) the gross revenue amounts to be reported for Plaintiffs' NPI shall include the full revenues (receipts) received from the first sale by a First Party to a third party, including from

40

elected prearranged substitute fixed-price external hedge transactions, rather than non-market amounts/prices between First Party affiliate companies; and,

(3) the gross revenue amount to be reported for Plaintiffs' NPI shall include the amount of overriding royalties paid to any of the First Parties, if any, as provided for on Page 4 of the Supplemental Accounting Agreement; and,

(4) the parties' rights and obligations with respect to the scope, procedure, and operator response time for efficient and complete audits of the NPC-required accurate record of all NPI revenues, receipts, and credits received, and expenses incurred; and,

(5) Ultra's obligations to provide plaintiffs with all requested information and documents relative to producing operations and exploratory work under the Exhibit "A" NPI leases.

### SEVENTH CLAIM FOR RELIEF
**Civil Conspiracy**

97.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98.     Ultra Wyoming LGS has conspired with the other Ultra Defendants to charge/deduct from Plaintiffs' NPI amounts in excess of those allowed by the NPC.  The Defendants herein had a meeting of the minds related to such actions.  Further, when Plaintiffs conducted their audit of the NPI reported to them, Ultra refused to provide supporting documentation/information underlying the amounts being charged to the NPI.  To date, Ultra continues to refuse to provide such information.  Plaintiffs have been damaged as a result of such actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that with respect to their claims, this Court:

A.     Enter a declaratory judgment concerning the parties' rights and obligations with respect to the required consolidated NPI accounting corresponding to operations by First Parties under the Exhibit "A" NPI leases, and establishing Ultra's obligation to report all revenues, receipts, and credits received, for the NPI accounting, pursuant to the Net Profits Contract, Accounting Procedure, Supplemental Accounting Agreement, Judgments, and Orders; establishing Ultra's obligations to provide plaintiffs with all requested information and documents relative to producing operations and exploratory work under the Exhibit "A" NPI leases; establishing the parties' rights and obligations with respect to the scope of audits of the Exhibit "A" NPI lease revenues (receipts) received and expenses incurred in accordance with the allegations herein;

B.     Enter judgment in favor of plaintiffs and against Ultra on all other claims and award compensatory and punitive damages in an amount to be proven at trial;

C.     Enter judgment in favor of plaintiffs against Ultra for interest on the unpaid amount of plaintiffs' NPI at the rate of eighteen percent (18%) per annum as provided by W.S. §30-5-303(a), assess the operator defendants the amount of $100 per month as provided by  W.S. §30-5-303(c) for each month in which they failed to provide the required monthly NPI Statement, and awarding Plaintiffs their attorney's fees, expert witness fees, costs and expenses as provided by W.S. §30-5-303(b);  and

D.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____

DERON R. DACUS
State Bar No. 00790553
ddacus@dacusfirm.com
PETER KERR
State Bar No. 24076478
pkerr@dacusfirm.com
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX  75701
903/705-1117
Fax - 903/581-2543

JASON R. SEARCY
State Bar No. 17953500
jsearcy@jrsearcylaw.com
SEARCY & SEARCY
446 Forest Square
Longview, Texas 75605
903/757-3399
Fax: 903-757-9559

43