UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>ULTRA PETROLEUM CORP., *et al.*,[1]<br><br>　　　　　　　　　　　Debtors.<br><br><br>AD HOC COMMITTEE OF UNSECURED CREDITORS OF ULTRA RESOURCES, INC.,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>ULTRA RESOURCES, INC.; ULTRA PETROLEUM CORP.; and UP ENERGY CORPORATION,<br><br>　　　　　　　　　　　Defendants. | Chapter 11<br><br>Case No. 16-32202 (MI)<br><br>(Jointly Administered)<br><br><br><br>Adversary Proceeding<br><br>Adv. No. 16-_____ (MI) |

**COMPLAINT SEEKING DECLARATORY JUDGMENT
DECLARING MAKE-WHOLE AMOUNT TO BE DUE AND PAYABLE
WITH RESPECT TO NOTES ISSUED BY ULTRA RESOURCES, INC.**

The *ad hoc* committee of unsecured creditors of Ultra Resources, Inc. (the "Senior Creditor Committee"), for its complaint against Debtors Ultra Resources, Inc. ("OpCo"), Ultra Petroleum Corp. ("HoldCo"), and UP Energy Corporation ("MidCo," and collectively with OpCo and HoldCo, "Defendants"), alleges as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

## NATURE OF THE ACTION

1. The Senior Creditor Committee seeks a judgment declaring (i) that the commencement of voluntary cases under chapter 11 of the Bankruptcy Code by OpCo, MidCo, HoldCo and certain of their affiliates (collectively, the "Debtors") triggered an obligation under the terms of a Master Notes Purchase Agreement dated as of March 6, 2008 (as amended, modified, or supplemented from time to time, the "Note Agreement") on the part of OpCo, as issuer, and HoldCo and MidCo, as guarantors (together, the "Parent Guarantors"), to pay a Make-Whole Amount[2] to holders of notes sold by OpCo pursuant to the Note Agreement (collectively, "OpCo Notes"); and (ii) the aggregate amount of that obligation.

2. The Make-Whole Amount must be allowed in full and Defendants are obligated to pay it in full for at least three reasons. First, the language of the operative documents clearly and expressly provides for the payment of such Make-Whole Amount in bankruptcy. Second, the Debtors are seeking to retire the OpCo Notes and replace them with new notes that have a lower interest rate (indeed, lower than a market rate of interest), thus depriving the holders of the OpCo Notes (collectively, "OpCo Noteholders") of their bargained-for consideration. Third, equity demands it. Under the Debtors' *Joint Chapter 11 Plan of Reorganization* [ECF No. 817] (the "Plan"), OpCo is treated as solvent. Allowance of the Make-Whole Amount will not dilute any creditor's recovery. Denial of the Make-Whole Amount, in contrast, would reallocate value from OpCo Noteholders to equity holders of HoldCo. HoldCo equity holders cannot be permitted to receive a windfall by the non-payment of the contractually due Make-Whole Amount, which obligation was negotiated and agreed to by their elected

---

[2] Unless otherwise indicated, capitalized terms that are not defined herein have the meanings ascribed to them in the Note Agreement.

agents, the company's prepetition board of directors. Rather, all amounts due under the OpCo Notes must be paid in full before HoldCo equity holders can receive or retain any property.

3. The Note Agreement provides that when an "acceleration" occurs as a result of any Event of Default, all amounts become automatically due and payable to the OpCo Noteholders, including not only the "entire unpaid principal amount of [the OpCo] Notes" plus "all accrued and unpaid interest thereon," including interest that accrues at the Default Rate, but also "***any applicable Make-Whole Amount determined in respect of such principal amount*** (to the full extent permitted by applicable law)." Note Agreement § 12.1 (emphasis added). The definition of Make-Whole Amount in the Note Agreement supplies a mathematical formula for calculating this "applicable" amount. *Id.* § 8.7. The definitions used in that formula for calculating the Make-Whole Amount explicitly reference amounts due and payable upon an acceleration event pursuant to Section 12.1 of the Note Agreement. *Id.*

4. By definition, the bankruptcy filings by OpCo and each of its Material Restricted Subsidiaries were Events of Default that caused all OpCo Notes to automatically accelerate and become due and payable "immediately." *Id.* §§ 11, 12.1. The Note Agreement's contractually prescribed formula for determining the Make-Whole Amount as of the time that these Events of Default occurred yields no less than $200,725,869, exclusive of any interest thereon. Thus, by the Note Agreement's plain terms, this Make-Whole Amount has become "due and payable," in addition to any unpaid principal and interest.

5. Despite purporting to be solvent, and without an articulated justification, the Debtors are now abusing the bankruptcy process in an attempt to avoid their clear contractual obligation to pay the Make-Whole Amount due to OpCo Noteholders. This is one of several

ways that the Debtors are attempting to siphon value from OpCo creditors to equity holders of HoldCo in their Plan.

6. Specifically, the Plan provides that claims based on the Make-Whole Amount (the "OpCo Note Makewhole Claims") "shall not be Allowed pending a determination by the Bankruptcy Court as to the allowance of such Claims." Plan § 3.2(g)(2). Thus, under the Plan's definition, the OpCo Note Makewhole Claims are "Disputed,"[3] despite that the Debtors have not filed an objection to the OpCo Note Makewhole Claims, which would have required them to articulate some legally cognizable defense to these claims.

7. The Plan further provides that the "Allowed" OpCo Note Makewhole Claims will be reduced to account for the amount of interest that would accrue on the new notes to be issued by reorganized OpCo under the Plan in purported satisfaction of the funded debt claims against OpCo. Plan § 3.2(g)(2). This Plan provision has no support in the Note Agreement's contractually-prescribed formula for calculating the Make-Whole Amount.

8. Prompt determination of the Make-Whole Amount dispute is critical to the resolution of issues that will be presented to the Court at the upcoming confirmation hearing on the Plan. Indeed, the Plan itself recognizes as much.

9. The Plan proposes to satisfy the OpCo Note Makewhole Claims, once allowed, by distributing "Additional New OpCo Notes" (as defined in the Plan) to the OpCo Noteholders. Pending the allowance of the OpCo Note Makewhole Claims, the Additional New OpCo Notes are to be "held in reserve." *Id.* § 4.5. Critically, the Plan specifies that a finite

---

[3] *See* Plan § 1.1.46 (defining "Disputed" as meaning, "with respect to any Claim, a Claim that is not yet Allowed"). The Debtors' *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [ECF No. 818] ("Disclosure Statement") further implies that holders of the OpCo Note Makewhole Claims might not be entitled to any recovery on their claims by estimating the allowed amount of such claims at between "$0 and $[202] million." Disclosure Statement at 12.

amount of Additional New OpCo Notes will be held in reserve, limited to "$200 million *(or such other amount as may be determined by the Bankruptcy Court)*." *Id.* (emphasis added).

10. Accordingly, the Plan by its own terms expressly contemplates that this "other amount" of Additional New OpCo Notes must be determined by the Court before the Additional New OpCo Notes are issued. As the Plan does not provide any mechanism for the Court to determine the amount of the OpCo Note Makewhole Claims, and the Debtors have taken no steps toward obtaining such a determination, this action has become necessary.

11. Resolution of this action is critical to assure that there is a sufficient reserve of Additional New OpCo Notes.[4] The Make-Whole Amount due—no less than $200,725,869, exclusive of any interest thereon—already is more than $725,000 in excess of the default amount of Additional New OpCo Notes to be reserved under the Plan. The Debtors' estimates of the allowed OpCo Note Makewhole Claims, and their calculations of the appropriate amount of Additional New OpCo Notes to be held in reserve under the Plan, are based on several faulty assumptions regarding the amount of the OpCo Note Makewhole Claims, including their assumption that, despite OpCo being treated as solvent under the Plan, post-petition interest does not accrue on the Make-Whole Amount.

12. Moreover, if the Court were to go forward with Plan confirmation without determining the allowed amount of the OpCo Note Makewhole Claims, the Debtors' stakeholders would be deprived of material information regarding the proposed capital structure for the reorganized Debtors. Irrespective of the resolution of the Make-Whole Amount dispute, the Plan already provides for reorganized OpCo to issue $2 billion of New OpCo Notes. Plan § 4.5. The Debtors themselves acknowledge that one of the key risk factors that parties should

---

[4] For the avoidance of doubt, the Senior Creditor Committee objects to the proposed treatment of OpCo Note Makewhole Claims under the Plan, and is not waiving any objections to the Plan based on the proposed distribution of Additional New OpCo Notes on account of such claims or on any other grounds.

consider in evaluating the Plan is whether the reorganized Debtors will be able to service their funded indebtedness after emergence, because "[t]he Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the New OpCo Notes."[5] Any such risk evaluation would be better informed by a determination as to the Make-Whole Amount in this action. In the Debtors' own words, "if the Debtors are required to satisfy the make-whole claim, the Reorganized Debtors would emerge from chapter 11 with a higher amount of funded indebtedness"[6]—by a factor of 10% or more.

13. Additionally, this Court's determination of the Make-Whole Amount dispute also would help resolve whether the OpCo Noteholders can vote on account of the OpCo Note Makewhole Claims to accept or reject the Plan, and whether they will have the right to demand "fair and equitable" treatment and/or object to "unfair discrimination." *See* 11 U.S.C. § 1129(b). The Plan classifies the OpCo Note Makewhole Claims in their own class (Class 7), and provides that the Class 7 Claims "shall not be Allowed pending a determination by the Bankruptcy Court." Plan § 3.2(g)(2). Because the Plan further provides that "[a]ny Class of Claims . . . that does not have a holder of an Allowed Claim . . . as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code," *id.* § 3.4, determination of the Make-Whole Amount dispute is necessary to prevent Class 7 from being eliminated for voting purposes and the holders of OpCo Note Makewhole Claims from being disenfranchised.

---

[5] Disclosure Statement at 41.

[6] Disclosure Statement at 39.

14. Accordingly, to resolve the Make-Whole Amount dispute and facilitate a full and fair hearing on confirmation of the Plan, the Senior Creditor Committee requests that the Court enter judgments declaring that OpCo, as issuer, and HoldCo and MidCo, as the Parent Guarantors, are obligated to pay a Make-Whole Amount of no less than $200,725,869, plus post-petition interest thereon at the contractual Default Rate, and that the OpCo Note Makewhole Claims should be treated on a *pari passu* basis with other claims based on OpCo Notes and the Note Agreement.

## THE PARTIES

15. The Senior Creditor Committee, Plaintiff in this action, is an unincorporated association comprised of members that collectively hold, control, or otherwise have discretionary authority over a substantial portion of OpCo's funded indebtedness arising under or in connection with (i) OpCo Notes and the Note Agreement, and (ii) that certain Credit Agreement dated as of October 6, 2011 between OpCo, as borrower, the lenders party thereto from time to time, and Wilmington Savings Fund Society, FSB (as successor to JPMorgan Chase Bank, N.A.), as administrative agent.

16. Defendant Ultra Resources, Inc. (OpCo) is incorporated in Wyoming and is one of the Debtors in these chapter 11 cases. OpCo is the issuer of the OpCo Notes.

17. Defendant Ultra Petroleum Corp. (HoldCo) is incorporated in Yukon, Canada and is one of the Debtors in these chapter 11 cases. HoldCo is OpCo's ultimate parent and is a guarantor of OpCo's obligations under the Note Agreement.

18. Defendant UP Energy Corporation (MidCo) is incorporated in Nevada and is one of the Debtors in these chapter 11 cases. MidCo is OpCo's immediate parent and is also a guarantor of OpCo's obligations under the Note Agreement.

**JURISDICTION, VENUE, AND PREDICATES FOR RELIEF**

19. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 2201. The predicates for the relief requested herein are 11 U.S.C. § 105(a), 28 U.S.C. § 2201, and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

20. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 and Bankruptcy Rule 7001. Pursuant to Local Bankruptcy Rule 7008-1, the Senior Creditor Committee consents to the entry of final orders or judgment by this Court in this adversary proceeding.

21. This Court is a proper venue pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**I. The Note Agreement and the OpCo Notes**

22. OpCo issued $300 million in aggregate principal amount of OpCo Notes pursuant to the Note Agreement on March 6, 2008, of which $200 million remains outstanding. OpCo has since issued an additional $1.26 billion in principal amount of OpCo Notes pursuant to three supplements to the Note Agreement dated as of March 5, 2009, January 28, 2010, and October 12, 2010 (collectively, the "Supplements"), all of which remains outstanding. Specifically, OpCo issued the following OpCo Notes that were outstanding on the Petition Date:

| Series | Principal Amount | Maturity |
|---|---|---|
| 7.31% Series 2009-A Senior Notes | $62 million | March 1, 2016 |
| 4.98% Senior Notes Series 2010-A | $116 million | January 27, 2017 |
| 5.92% Senior Notes, Series 2008-B | $200 million | March 1, 2018 |
| 7.77% Series 2009-B Senior Notes | $173 million | March 1, 2019 |
| 5.50% Senior Notes Series 2010-B | $207 million | January 28, 2020 |
| 4.51% 2010 Series E Senior Notes | $315 million | October 12, 2020 |

| Series | Principal Amount | Maturity |
|---|---|---|
| 5.60% Senior Notes Series 2010-C | $87 million | January 28, 2022 |
| 4.66% 2010 Series F Senior Notes | $35 million | October 12, 2022 |
| 5.85% Senior Notes, Series 2010-D | $90 million | January 28, 2025 |
| 4.91% 2010 Series G Senior Notes | $175 million | October 13, 2025 |

23. Pursuant to the Note Agreement and separate guaranty agreements (the "Parent Guaranties"), a form of which was attached as an exhibit to the Note Agreement, the Parent Guarantors guaranteed OpCo's obligations under the Note Agreement, including all three Supplements, and the OpCo Notes.

## II. Terms of the Note Agreement Pertaining to the Make-Whole Amount

### A. Bankruptcy Is An Event of Default

24. Section 11 of the Note Agreement specifies a number of conditions or events that constitute an Event of Default and impact the parties' rights thereunder. Paragraph (g) of Section 11 provides that it is an Event of Default if "[OpCo] or any Material Restricted Subsidiary . . . files . . . a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction." Note Agreement § 11.

### B. A Bankruptcy Event of Default Results In Automatic Acceleration

25. Section 12.1(a) of the Note Agreement, in turn, provides that "[i]f an Event of Default with respect to [OpCo] described in paragraph (g) . . . of Section 11 . . . has occurred" (*e.g.,* an Event of Default has occurred as a result of OpCo's bankruptcy filing), then "all the Notes then outstanding shall automatically become immediately due and payable." *Id.* § 12.1.

### C. A Make-Whole Amount Becomes Due Upon Acceleration

26. Critically here, Section 12.1 of the Note Agreement further provides that "[u]pon any Notes becoming due and payable under . . . Section 12.1," they "mature and the entire unpaid principal amount of such Notes, plus . . . all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) [and] *any applicable Make-Whole Amount determined in respect of such principal amount (to the full extent permitted by applicable law) . . . shall all be immediately due and payable,* in each and every case without presentment, demand, protest or further notice . . . ." *Id.* § 12.1 (emphasis added). The word "all" in the phrase "shall all be immediately due and payable" in Section 12.1 underscores that the Make-Whole Amount is an additional obligation that becomes "immediately due and payable" along with the entire unpaid principal amount and all interest thereon.

27. Pursuant to Section 8.7 of the Note Agreement, the "applicable" Make-Whole Amount for each OpCo Note is equal to the amount by which the "Discounted Value of the Remaining Scheduled Payments" exceeds the "Called Principal" for such OpCo Note. *Id.* § 8.7.

28. "Called Principal" is defined is defined in Section 8.7 of the Note Agreement as "the principal of such Note that . . . *has become or is declared to be immediately due and payable pursuant to Section 12.1*." *Id.* (emphasis added).

29. "Remaining Scheduled Payments" is defined in Section 8.7 of the Note Agreement as "all payments of such Called Principal and interest thereon that would be due after the Settlement Date," which is "the date on which such Called Principal . . . *has become or is declared to be immediately due and payable pursuant to Section 12.1.*" *Id.* (emphasis added).

30. The "Discounted Value" of such Remaining Scheduled Payments is defined in Section 8.7 of the Note Agreement as "the amount obtained by discounting all

- 10 -

Remaining Scheduled Payments . . . from their respective scheduled due dates to the Settlement Date"—*i.e.*, the date on which such Called Principal . . . **has become or is declared to be immediately due and payable pursuant to Section 12.1**—"in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal." *Id.* (emphasis added).

31. These definitions mean that a Make-Whole Amount is due under the Note Agreement upon an acceleration as a result of an Event of Default such as an OpCo bankruptcy filing whenever the principal amount that "has become . . . immediately due and payable pursuant to Section 12.1" on the date of acceleration is less than the Discounted Value of the principal and interest payments that originally were scheduled to come due after that acceleration date.

32. The parties' intent that a Make-Whole Amount would be payable upon an acceleration as a result of an Event of Default is further confirmed by (i) the definition of "Make-Whole Amount" cross-referencing Section 12.1, the section that governs acceleration as a result of an Event of Default and its consequences, *id.* § 8.7, and (ii) the statement in Section 12.1 of the Note Agreement in which "[OpCo] acknowledges, and the parties [t]hereto agree, that each holder of a Note has the right to maintain its investment in the Notes free from repayment by [OpCo] . . . and *that the provision for payment of a Make-Whole Amount,* prepayment premium or LIBOR Breakage Amount by [OpCo], if any, in the event that the Notes . . . are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances," *id.* § 12.1 (emphasis added).

33. Notably, the definition of Make-Whole Amount in the Note Agreement does not provide for different formulas based on how the OpCo Notes ultimately are satisfied. Thus, by invoking the defined term "Make-Whole Amount" in Section 12.1, the parties to the Note Agreement made it clear that they intended a full Make-Whole Amount would be due upon an acceleration pursuant to Section 12.1 irrespective of when and how the OpCo Notes are satisfied following that acceleration—*i.e.*, regardless of whether the OpCo Notes are satisfied pursuant to the Plan or otherwise.

34. Indeed, other terms of the Note Agreement show that when the parties intended that a Make-Whole Amount would *not* become due following an event or condition, they expressed that intention specifically. For example, Section 8.3 of the Note Agreement, which requires OpCo to offer to prepay OpCo Notes following a Change of Control or Control Event, says that "Prepayment of Notes . . . pursuant to Section 8.3 . . . shall not require the payment of any Make-Whole Amount." *Id.* § 8.3. No comparable terms exist that limit payment of a Make-Whole Amount upon an Event of Default and acceleration pursuant to Section 12.1.

### III. The Debtors File for Bankruptcy and Dispute the Make-Whole Amount Is Due

35. On April 29, 2016 (the "Petition Date"), the Debtors, including OpCo, each of its subsidiaries, and the Parent Guarantors, filed petitions for relief under chapter 11 of the Bankruptcy Code, thus (i) triggering an Event of Default pursuant to Section 11 of the Note Agreement, (ii) causing the automatic acceleration of the OpCo Notes pursuant to Section 12.1 of the Note Agreement, and (iii) triggering Defendants' obligations to pay the Make-Whole Amount.

36. On December 6, 2016, the Debtors filed the Plan. Under the Plan, the OpCo Note Makewhole Claims are classified separately and treated differently from all other unsecured claims against OpCo and the Parent Guarantors.

37. In particular, the Plan provides that the holders of all allowed general unsecured claims against OpCo and the Parent Guarantors will be paid in full in cash. Holders of "Non-Election OpCo Note Claims" and "Non-Election OpCo RCF Claims" (each as defined in the Plan) in Class 4 of the OpCo Plan and "Election OpCo Note Claims" and "Election OpCo RCF Claims" (each as defined in the Plan) in Class 5 of the OpCo Plan are to receive between 20% and 100% of their allowed claims in cash. Plan § 3.2(d), (e), (i), (j). In contrast, holders of allowed OpCo Note Makewhole Claims are only entitled to "receive an amount of Additional New OpCo Notes equal to the amount of the Allowed OpCo Note Makewhole Claims held by such holder." *Id.* § 3.2(g)(3).

38. The Plan further provides, without support, that the "Allowed" amount of any OpCo Note Makewhole Claims "shall be reduced to account for the fact that interest on the New OpCo Notes should be taken into account in connection with such determination." *Id.* § 3.2(g)(2).

39. The Plan also provides that the OpCo Note Makewhole Claims "shall not be Allowed pending a determination by the Bankruptcy Court as to the allowance of such Claims." *Id.* § 3.2(g)(2). Until such determination is made, the Plan provides that "$200 million (or such other amount as may be determined by the Bankruptcy Court) in Additional New OpCo Notes will be 'held in reserve.'" *Id.* § 4.5.

40. As discussed above, because the Make-Whole Amount due exceeds $200 million, the reserve of Additional New OpCo Notes that the Plan proposes to establish is insufficient and threatens to deprive the holders of the OpCo Note Makewhole Claims of the treatment to which they are entitled under the Plan.

41. Further, by treating all OpCo Note Makewhole Claims as disputed, the Plan disenfranchises the OpCo Noteholders. If the OpCo Noteholders were permitted to vote and rejected the Plan, in order to confirm the Plan under section 1129(b) of the Bankruptcy Code, the Debtors would have to establish that the treatment they have proposed for these claims is fair and equitable, and that the Plan does not unfairly discriminate against the OpCo Note Makewhole Claims by failing to provide the same treatment to such claims as it does to other similarly situated claims. *See* 11 U.S.C. § 1129(b).

## CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

42. The Senior Creditor Committee repeats and re-alleges the allegations in paragraphs 1 through 41 hereof with the same force and effect as if fully set forth herein.

43. Section 12.1 of the Note Agreement unambiguously provides that the OpCo Notes become immediately due and payable upon the acceleration triggered by an Event of Default.

44. Under the Note Agreement, the voluntary chapter 11 filings by OpCo and each of its Material Restricted Subsidiaries constitute Events of Default that automatically accelerated the respective maturity dates of the OpCo Notes to the Petition Date.

45. As of the Petition Date, the Discounted Value of the Remaining Scheduled Payments on the OpCo Notes exceeded the amount of the Called Principal that became immediately due and payable on the Petition Date pursuant to Section 12.1 of the Note Agreement by no less than $200,725,869.

46. Post-petition interest continues to accrue on the unpaid Make-Whole Amount at the Default Rate prescribed in the Notes Agreement. As of the date hereof, no less than $10,220,282 of post-petition interest has accrued on the Make-Whole Amount.

47. Accordingly, OpCo owes, and OpCo Noteholders are entitled to payment of, a Make-Whole Amount of no less than $200,725,869, plus post-petition interest thereon at the contractual Default Rate. Likewise, each of the Parent Guarantors is obligated to pay to the OpCo Noteholders that same Make-Whole Amount under the terms of their respective Parent Guaranties. As OpCo acknowledged and agreed in Section 12.1 of the Note Agreement, this Make-Whole Amount "is intended to provide compensation for the deprivation of" OpCo Noteholders' "right to maintain its investment in the Notes free from repayment by [OpCo]."

48. The Debtors dispute that any Make-Whole Amount is due, and the terms of the Plan reflect such position. To the extent a Make-Whole Amount is due, the Debtors contend that such amount should be reduced to account for interest that would accrue on "New OpCo Notes" (as defined in the Plan) to be issued by reorganized OpCo under the Plan to holders of funded debt claims.

49. Thus, an actual controversy exists between the Senior Creditor Committee and Defendants over whether the OpCo Noteholders are entitled to payment of the Make-Whole Amount. Issuance of a declaratory judgment would resolve that controversy and facilitate a full and fair confirmation hearing on the Plan.

**RELIEF REQUESTED**

WHEREFORE, the Senior Creditor Committee respectfully requests that the Court:

(a) Enter judgment declaring that Defendants are obligated to pay the Make-Whole Amount to the OpCo Noteholders in an amount no less than $200,725,869;

(b) Enter judgment declaring that Defendants are obligated to pay post-petition interest on the Make-Whole Amount at the contractual Default Rate;

(c)	Enter judgment declaring that Defendants' obligations with respect to the Make-Whole Amount rank *pari passu* with other claims based on OpCo Notes;

(d)	Enter judgment declaring that Defendants are obligated to bear any of the costs or attorneys' fees and expenses incurred by the Senior Creditor Committee in connection with this action; and

(e)	Grant the Senior Creditor Committee such further relief as the Court deems appropriate.

Dated:	December 29, 2016
	Houston, Texas

NORTON ROSE FULBRIGHT US LLP

By: /s/ Jason Boland
William R. Greendyke (TX Bar No. 08390450)
Jason L. Boland (TX Bar No. 24040542)
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone: (713) 651-5151
Facsimile:  (713) 651-5246
Email:  william.greendyke@nortonrosefulbright.com
	jason.boland@nortonrosefulbright.com

- and -

MILBANK, TWEED, HADLEY & McCLOY LLP

Dennis F. Dunne (*pro hac vice*)
Evan R. Fleck (*pro hac vice*)
Andrew M. Leblanc (*pro hac vice*)
28 Liberty Street
New York, New York  10005
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email:  ddunne@milbank.com
	efleck@milbank.com
	aleblanc@milbank.com

*Attorneys for the Ad Hoc Committee of
Unsecured Creditors of Ultra Resources, Inc.*