## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

------------------------------------------------------------ X

In re:

ULTRA PETROLEUM CORP., *et al*.,

Debtors.[1]

: Chapter 11

: Case No. 16-32202 (MI)

: (Jointly Administered)

: **Related to Document Nos. 818 and 819**

: **Hearing Date:  January 19, 2017 at 9:00 A.M.**

:

------------------------------------------------------------ X

## OBJECTION OF THIRD POINT LOAN LLC TO DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 5

OBJECTION ...................................................................................................... 8

    **I.**    The Court Should Deny Approval of the Disclosure Statement
    for Failing to Contain Adequate Information for Holders to Choose
    Between Two Alternative Treatments Proposed Under the Plan .......................... 8

        **A.**    Timely Disclosure Regarding the Terms
        of the Proposed New OpCo Notes Is Necessary ......................................... 10

        **B.**    The Plan Supplement Must Be Filed Earlier ............................................... 13

        **C.**    Given the Disclosure Statement Deficiencies, Additional
        Disclosures Are Necessary to Provide "Adequate Information" ................ 14

    **II.**    The Plan Is Patently Unconfirmable and Therefore,
    the Court Should Deny Approval of the Disclosure Statement .......................... 16

JOINDER .......................................................................................................... 18

RESERVATION OF RIGHTS ............................................................................... 18

CONCLUSION ................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                <u>PAGE(S)</u>

<u>In re Am. Capital Equip., LLC</u>,
    688 F.3d 145 (3d Cir. 2012).........................................................................17

<u>In re Applegate Prop., Ltd.</u>,
    133 B.R. 827 (Bankr. W.D. Tex. 1991)........................................................8

<u>In re Capital W. Inv'rs</u>,
    186 B.R. 497 (N.D. Cal. 1995)....................................................................13

<u>In re Divine Ripe, L.L.C.</u>,
    554 B.R. 395 (Bankr. S.D. Tex. 2016) .........................................................8

<u>In re E. Redley Corp.</u>,
    16 B.R. 429 (Bankr. E.D. Pa. 1982) ...........................................................16

<u>In re Ferretti</u>,
    128 B.R. 16 (Bankr. D.N.H. 1991) .............................................................11

<u>Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>,
    No. 00 Civ. 8688 (WHP), 2004 WL 1119652 (S.D.N.Y. May 20, 2004) .......14

<u>Hall v. Vance</u>,
    887 F.2d 1041 (10th Cir. 1989) ..................................................................15

<u>Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.)</u>,
    150 F.3d 503 (5th Cir. 1998) ........................................................................8

<u>In re McLean Indus., Inc.</u>,
    87 B.R. 830 (Bankr. S.D.N.Y. 1987)..........................................................11

<u>In re Metrocraft Publ'g Servs., Inc.</u>,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ............................................................9

<u>Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)</u>,
    25 F.3d 1132 (2d Cir. 1994)........................................................................14

<u>In re P.J. Keating Co.</u>,
    168 B.R. 464 (Bankr. D. Mass. 1994) ........................................................13

<u>In re Pecht</u>,
    57 B.R. 137 (Bankr. E.D. Va. 1986).............................................................17

In re Quigley Co.,
     377 B.R. 110 (Bankr. S.D.N.Y. 2007) .............................................................................17

In re Sanders,
     No. 14-02271 (NPO), 2015 Bankr. LEXIS 3987 (Bankr. S.D. Miss. Nov. 23, 2015) ..9, 16

Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.),
     647 F.3d 547 (5th Cir. 2011) ....................................................................................8

Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),
     844 F.2d 1142 (5th Cir. 1988) ..................................................................................8

In re U.S. Brass Corp.,
     194 B.R. 420 (Bankr. E.D. Tex. 1996) .....................................................................9, 17

In re Unichem Corp.,
     72 B.R. 95 (Bankr. N.D. Ill. 1987) ............................................................................10

In re Valrico Square Ltd. P'ship,
     113 B.R. 794 (Bankr. S.D. Fla. 1990) ......................................................................17

Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.,
     157 B.R. 100 (S.D. Tex. 1993) ..................................................................................8

## OTHER AUTHORITIES

Garland Hansmann & David Ford, The Value of Analysing High-Yield Bond Covenants, in
     UNDERSTANDING HIGH-YIELD BONDS 121 (DebtXplained ed., 2014) ...............................11

Third Point Loan LLC ("<u>Third Point</u>"), as a significant (i) holder of those certain notes issued pursuant to that certain Master Note Purchase Agreement, dated as of March 6, 2008 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Ultra Resources, Inc., as issuer, and the purchasers party thereto from time to time, and (ii) lender under that certain Credit Agreement, dated as of October 6, 2011 (as amended, restated, supplemented, or otherwise modified from time to time), by and among Ultra Resources, Inc., as borrower, the lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent, and certain other parties thereto, hereby submits this objection (the "<u>Objection</u>") to approval of the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [ECF No. 818] filed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") on December 6, 2016 (the "<u>Disclosure Statement</u>").[2]  In support of the Objection, Third Point, by and through its undersigned counsel, respectfully represents:

## PRELIMINARY STATEMENT

1.      This is the rare case where a bankruptcy court should not approve a disclosure statement.  The Disclosure Statement describes a plan that deprives creditors of the solvent OpCo estate of significant value by forcing them to take below-market replacement notes, the terms of which are unknown at this time — all for the benefit of HoldCo creditors and equity holders.  The Debtors are pursuing this strategy despite the simple, but critical lesson provided by the Court at the first day hearing:  that the Debtors need to consider these cases from the

---

[2]      Defined terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement.

perspective of OpCo and the OpCo creditors, who are structurally senior to the HoldCo debt, which, the Court agreed, was essentially equity.[3]

2.      And while that simple truth has not changed, many other things in this case have. The price and outlook for commodities and the opening of the credit markets has had a profoundly positive impact on the options available to the Debtors.  So have the operational improvements that have been made by the Debtors in these cases.  But rather than seize on this opportunity of rising value to bring all of their constituents together to coalesce around a restructuring proposal that treats all parties fairly according to their relative priorities, the Debtors (and their management) have, instead, cooked up a restructuring proposal with their two most junior constituents — the junior HoldCo debt and equity (including management) — to transfer value from OpCo and its senior creditors for the benefit of HoldCo and its new owners (including management).

3.      Despite these developments, parties are now faced with the Debtors' current proposal.  The negotiations that led to this deal are troubling — not only because they consciously cut out the senior OpCo debtholders, but because of the very real concerns about management's motivations and their ability to manage the conflicts between HoldCo's and OpCo's competing interests.  In addition, the path chosen by the Debtors and junior HoldCo constituents will inevitably tee up complex, time-consuming and expensive litigation over issues like valuation and the appropriate rate of interest on the cramdown notes.  This outcome is unfortunate and one that could have been avoided altogether given the fact that refinancing the OpCo debt provides a very real option for the Debtors due to the improvements in commodities outlooks, the credit markets and the Debtors' operations.  Moreover, in support of this flawed

---

[3]      May 3, 2015 Hrg Tr. at 32:1-7, 31:12-18.

strategy the Debtors have proposed a plan of reorganization that is riddled with confirmation

defects.  The many ways the Debtors' proposed plan is contorting the Bankruptcy Code is

beyond defensible limits — including, but not limited to, numerous classification, impairment

and cramdown defects — all of which cannot be tolerated.

4.     This strategy of confirmation at all costs is exacerbated by the Debtors' flawed

Disclosure Statement, which fails to provide sufficient information for the holders of Senior

Funded Debt Claims to determine whether to vote to accept or reject the Plan.  For these holders,

acceptance or rejection of the Plan presents a particularly unusual dilemma, and thus, the

adequacy of the Disclosure Statement assumes a particularly unusual significance given the fact

that their very decision will determine the nature of the currency such holders are to receive

under the Plan.  The Disclosure Statement simply and clearly fails to provide adequate

information for holders to make this decision.

5.     The Disclosure Statement fails to provide adequate information in several regards.

For example, the decision by holders of Senior Funded Debt Claims will dictate the amount of

restricted cash or replacement notes they will receive.  However, a complete set of terms and

covenants to be contained in the notes (which, in turn, dictate the level of risk assumed by such

holders and the calculation of the appropriate cramdown interest rate) is not set forth in the Plan

or Disclosure Statement.  Nor is there any information on the exact amount of cash to be

received under the Class 5 opt-in mechanic.  At a minimum, the Disclosure Statement must be

supplemented with details regarding the New OpCo Notes, such as a detailed description of the

covenants, representations and warranties and default provisions that will govern the notes.

Moreover, the amount of cash to be distributed to Class 5 must be disclosed in order for holders

to assess whether the opt-in mechanic represents a viable alternative or a disguised trap to manufacture an artificially impaired class of accepting creditors.

6.      The Debtors propose to disclose these features in a plan supplement to be filed seventeen (17) days *after* the plan objection deadline has expired and only three (3) days prior to the voting deadline.  These missing facts are fundamental to the decision confronting the OpCo debtholders — the very type of information intended by the Bankruptcy Code to be provided in a disclosure statement.  Until this critical information is disclosed, the Disclosure Statement is inadequate and cannot be approved.

7.      The Disclosure Statement is also inadequate because it fails to disclose: (1) details surrounding the formation of the Plan Support Agreement and management's decision-making process in connection therewith; (2) a basic description of the makewhole litigation, the inevitable cramdown litigation, and the effect of each (and attendant litigation expenses) on plan distributions; and (3) details of the claims to be released under the Plan, the steps undertaken by the Debtors to determine if their estates have any claims against any released party, and the substantial consideration provided (if any) by the released parties.

8.      Finally, apart from its inadequacy of information, the Disclosure Statement should not be approved because the Plan it describes is patently unconfirmable.  Among other things, the Plan:  (1) contains multiple classification and impairment defects; (2) is not "fair and equitable" with respect to, and "unfairly discriminates" against, holders of Senior Funded Debt Claims; (3) impermissibly withholds from such holders postpetition interest calculated at the contract rate; and (4) includes overbroad and impermissible release provisions that are beyond the scope of what courts in the Fifth Circuit may impose.  This inability to satisfy the

requirements for plan confirmation renders approval of the Disclosure Statement futile and inappropriate at this time.

9. In sum, before the Court is a disclosure statement that is woefully deficient and a plan that is patently unconfirmable. Rather than propose a plan that has the support of all key constituencies that would enable a quick exit from chapter 11, the Debtors have steered these solvent Debtors into a buzz saw of litigation to suit their own parochial interests. Accordingly, Third Point respectfully submits that approval of the Disclosure Statement should be denied.

## **BACKGROUND**

10. On April 29, 2016, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11. On December 6, 2016, the Debtors filed their *Joint Chapter 11 Plan of Reorganization* [ECF No. 817] (the "Plan"), along with the related Disclosure Statement. In support of the Disclosure Statement, the Debtors also filed the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Matters, and (V) Scheduling Certain Dates with Respect Thereto* [ECF No. 819], filed on December 6, 2016 (the "Disclosure Statement Motion"). On December 22, 2016, the Debtors filed certain exhibits to the Disclosure Statement [ECF No. 872], including the Debtors' financial projections, valuation analysis, liquidation analysis and a summary of "certain indicative terms and conditions" of the New OpCo Notes and Additional New OpCo Notes (the "New OpCo Notes Term Sheet").

12. With respect to Third Point's claims, the Plan divides funded debt claims against OpCo into three separate classes: (i) Class 4 is a "default" class for the OpCo Note Claims and

5

OpCo RCF Claims; (ii) Class 5 consists of all OpCo Note Claims and OpCo RCF Claims whose holders opt in and elect to receive Class 5 treatment; and (iii) Class 7 consists of all OpCo Note Makewhole Claims.

13.     Each holder of an allowed claim in Class 4, regardless of how the Class votes, is to receive (a) its *pro rata* share of $2 billion of the New OpCo Notes, plus (b) cash in an amount equal to the difference between the allowed amount of that holder's claim and the amount of the New OpCo Notes received.  See Plan § 3.2(d)(3).  As the Disclosure Statement estimates the maximum aggregate allowed amount of Class 4 claims (assuming that no holder makes the Class 5 election) to be approximately $2.5 billion (see Disclosure Statement at 11), the holders of Class 4 claims stand to receive cash payments equal to approximately 20% of their allowed principal plus interest claims.  If, however, any holder of the OpCo Note Claims or the OpCo RCF Claims makes the Class 5 opt-in election, and Class 5 as a whole votes to accept the Plan, the distribution to such holder is flipped, and each such holder will receive (i) between 20% and 100% of its allowed claim in cash (such amounts are still bracketed in the Disclosure Statement), and (ii) the balance of their recovery in New OpCo Notes.  See Plan § 3.2(e)(3).  If, however, Class 5 rejects the Plan, all creditors in that Class will receive the exact same distribution as the creditors in Class 4.  Id.  Thus, not only does the Plan create a clear incentive for the holders of senior funded debt claims against OpCo (the "Senior Funded Debt Claims") to both make the Class 5 opt-in election and vote to accept the Plan — by providing such holders the incentive to receive a much greater percentage of cash recovery — it also separately classifies those claims that make the Class 5 opt-in election from those that do not with the transparent intent of assuring the existence of an impaired accepting class of creditors.

14.     The Plan also separately classifies in Class 6 the Senior Funded Debt Claims on account of HoldCo's and UP Energy Corporation's ("MidCo") guarantees of OpCo's funded debt.  See Plan § 3.2(f)(1).  The Plan provides that these existing guarantees will be canceled on the effective date of the Plan.  Id. § 4.9.  In place of these guarantees, reorganized HoldCo and MidCo will provide new guarantees of the New OpCo Notes issued to holders of allowed claims in Classes 4 and 5 "on the same terms (except as to amount) as the current guarantees."  Id. § 3.2(f)(2).  The Plan treats Class 6 as unimpaired, and provides that holders of Class 6 claims are not entitled to vote to accept or reject the Plan.  See Plan § 3.2(f)(3).

15.     As to the treatment of Class 7, the Plan provides that, to the extent the Court allows the OpCo Note Makewhole Claims, each holder of such allowed claim will receive an amount of Additional New OpCo Notes equal to the allowed amount of such claim.  See Plan § 3.2(g)(3).

16.     Finally, the Plan also divides general unsecured claims against OpCo into two classes.  Specifically, "trade" claims, which constitute Class 9, are classified separately from all "other" general unsecured claims, which constitute Class 10.  See Plan § 3.2(i)(1), (j)(1).  Despite this separate classification, however, allowed claims in Classes 9 and 10 receive the exact same treatment:  payment in full in cash, plus postpetition interest calculated at the Federal Judgment Rate.  Id. § 3.2(i)(2)-(3), (j)(2)-(3).  The only "difference" in the proposed treatment is that the Plan allows the holders of Class 9 trade claims to elect a different treatment on whatever terms the parties may settle any such claim.  Id. § 3.2(j)(3).

**OBJECTION**

I.     **The Court Should Deny Approval of the Disclosure Statement**
       **for Failing to Contain Adequate Information for Holders to Choose**
       **Between Two Alternative Treatments Proposed Under the Plan**

17.     Before soliciting votes to accept or reject a chapter 11 plan, a bankruptcy court

must approve a disclosure statement as containing "adequate information."  See 11 U.S.C. §

1125(b).  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as

"information of a kind, and in sufficient detail, . . . that would enable . . . a hypothetical investor

of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

18.     Courts characterize the phrase "adequate information" as information sufficient to

permit creditors to make an informed decision as to whether to approve or reject a plan.  See

Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.), 844 F.2d 1142, 1157 (5th

Cir. 1988).  Determining whether adequate information is present is "subjective and made on a

case by case basis" and is "largely within the discretion of the bankruptcy court."  Id.; see also

Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop.), 150 F.3d 503, 518 (5th Cir.

1998).  Moreover, adequate disclosure is critical to the bankruptcy process.  It is "the primary

notice mechanism informing a creditor's vote for or against a plan."  Spicer v. Laguna Madre Oil

& Gas II, L.L.C. (In re Tex. Wyo. Drilling, Inc.), 647 F.3d 547, 551 (5th Cir. 2011); see also

Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc., 157 B.R. 100, 102 (S.D. Tex. 1993)

(disclosure is "pivotal" in chapter 11 cases).  In contrast, disclosure statements that are

"misleading, or which contain unexplained inconsistencies, should not be approved."  In re

Applegate Prop., Ltd., 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991).

19.     In determining whether a disclosure statement contains "adequate information"

for purposes of section 1125 of the Bankruptcy Code, some courts in this Circuit have considered

a non-exhaustive list of factors.  See, e.g., In re Divine Ripe, L.L.C., 554 B.R. 395, 401-02

(Bankr. S.D. Tex. 2016) (citing In re Metrocraft Publ'g Servs., Inc., 39 B.R. 567 (Bankr. N.D.

Ga. 1984)); In re Sanders, No. 14-02271 (NPO), 2015 Bankr. LEXIS 3987, at *12-14 (Bankr.

S.D. Miss. Nov. 23, 2015); In re U.S. Brass Corp., 194 B.R. 420, 424-25 (Bankr. E.D. Tex.

1996).  Disclosure of each of these factors is not necessary in every case.  Id.  Conversely, a

disclosure statement that includes all of the above-listed information may nevertheless be

deemed inadequate.  Sanders, 2015 Bankr. LEXIS 3987, at *14.  These factors are:

> (1)    the events which led to the filing of a bankruptcy petition;
> (2)    a description of the available assets and their value;
> (3)    the anticipated future of the company;
> (4)    the source of information stated in the disclosure statement;
> (5)    a disclaimer;
> (6)    the present condition of the debtor while in chapter 11;
> (7)    the scheduled claims;
> (8)    the estimated return to creditors under a chapter 7 liquidation;
> (9)    the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
> (10)   the future management of the debtor;
> (11)   the chapter 11 plan or a summary thereof;
> (12)   the estimated administrative expenses, including attorneys' and accountants' fees;
> (13)   the collectability of accounts receivable;
> (14)   financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
> (15)   information relevant to the risks posed to creditors under the plan;
> (16)   the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
> (17)   litigation likely to arise in a non-bankruptcy context;
> (18)   tax attributes of the debtor; and
> (19)   the relationship of the debtor with the affiliates.

Id. at *13-14.

20.    The Disclosure Statement and Plan present holders of Senior Funded Debt Claims

with not just a single up or down vote, but two choices.  First, whether such holders accept or

reject the Plan.  Second, the Plan  requires holders to choose among alternative Plan

distributions.  However, that choice may be nullified if *other holders* decide to reject the Plan.

But the Debtors have not provided sufficient information to allow holders to make either of these choices.

21.     As an initial matter, the Disclosure Statement contains inadequate information for holders to evaluate the New OpCo Notes.  If, however, OpCo debtholders opt into Class 5 and vote to accept the Plan, the Plan states that such holders will receive a cash payment of between "[20 – 100]%"  of their claims (the amount is still bracketed in the Plan) with the balance paid in New OpCo Notes.  This ambiguous 80% swing in the cash consideration for Class 5, with no formula even provided to determine the factors that would affect such a huge swing, makes it impossible to ascertain what Class 5 will actually receive.  In addition to this ambiguity, the Plan is clearly structured to coerce OpCo debtholders to accept the Class 5 option, thereby releasing the Released Parties and providing the Debtors with an impaired accepting class of creditors.

22.     Thus, not only does the Disclosure Statement fail to provide adequate information to allow each OpCo debtholder to decide whether or not to vote in favor of the Plan, but the Disclosure Statement does not remotely provide adequate information for a holder to select between the alternative Plan treatments attendant to its vote.

### A.     Timely Disclosure Regarding the Terms of the Proposed New OpCo Notes Is Necessary

23.     The proposed terms of the New OpCo Notes do not contain sufficient information for a hypothetical reasonable investor to make an informed decision as to whether to accept or reject a plan.  It is not enough for a disclosure statement to inform creditors of the dollar amount of consideration they will receive under a plan; rather, creditors must also be informed of any conditions or strings that are attached to the payments, and other indicia that may include the value of the currency proposed to be distributed.  See In re Unichem Corp., 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) (declining to approve disclosure statement informing creditors the

amount they would receive under proposed plan but did not detail the manner of payment); In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (stating that "substantial financial information with respect to the ramifications of any proposed plan" should be provided to creditors and other parties in interest); In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (declining to approve disclosure statement that did not fairly spell out contingencies to creditor receiving distributions under plan).

24.     In order to make similar investments in securities, investors typically review a detailed prospectus setting forth specific terms of the notes such as events of default and covenants, which can alter the value of the notes.  Indeed, "[u]nderstanding the covenant package is an integral part of appreciating the risks of investing in a high-yield bond.  Digging through the carve outs and definitions in the Offering Memorandum is often key to understanding the true scope of the covenants and how they can influence the shape of potential outcomes, both on the upside and the downside.  While covenants cannot make a weak issuer's bonds a great investment, they can make the bonds of a strong issuer a poor one.  This means that the covenant package must be considered alongside the company analysis to ensure that the yield of the bond adequately compensates the investor for the potential range of outcomes." Garland Hansmann & David Ford, The Value of Analysing High-Yield Bond Covenants, in UNDERSTANDING HIGH-YIELD BONDS 121, 136-37 (DebtXplained ed., 2014).  Therefore, to satisfy their burden, which requires a debtor to provide the information a hypothetical reasonable investor would need to make an informed decision, the Debtors must provide prospectus-level disclosures concerning the New OpCo Notes, a measure by which they have fallen far short.

25.     The New OpCo Notes Term Sheet provides the bare outlines of the terms of the notes, such as the maturity date and interest rate, leaving significant gaps.  For example,

(a)     While the interest rate on the New OpCo Notes has been disclosed (4.8%), it is still not clear *how* the interest rate was calculated, which is essential to the looming cramdown dispute. For example, it is not evident whether the interest rate is intended to reflect the two potential approaches under applicable cramdown case law — the prevailing market rate or the "prime-plus" approach (and if the latter, the relevant risk adjustment premium asserted by the Debtors).[4]

(b)     The New OpCo Notes Term Sheet provides that the replacement notes will be callable at any time for a purchase price equal to the principal amount, plus accrued but unpaid interest.  In other words, there is no makewhole, despite the fact that one existed under the prepetition OpCo Notes.  The existence (or non-existence) of a makewhole has a large impact on the value of notes and how they trade.  Nowhere in the Disclosure Statement do the Debtors explain how the absence of the makewhole affects the calculation of the cramdown interest rate under the New OpCo Notes or the risk assumed by the OpCo debtholders thereunder.

(c)     The cash distribution under the Class 5 opt-in mechanic has not been disclosed.  The Plan and Disclosure Statement merely state (in brackets) that such distribution will range between "[20 – 100]%" in cash.  Therefore, OpCo debtholders are unable to assess whether the Class 5 opt-in mechanic is a viable alternative.

(d)     The New OpCo Notes Term Sheet provides an opaque description of the terms and covenants of the New OpCo Notes.  This lack of specificity also renders the Disclosure Statement inadequate.

(i)     As a preliminary matter, the New OpCo Notes Term Sheet merely provides a generic description that the notes will contain "certain covenants" that will be subject to "specified baskets and exceptions" (some of which will be subject to ratios) without even disclosing what any of the actual baskets, exceptions or ratios will be.  The outcome of these terms will have a large impact on the risk profile of the New OpCo Notes.

(ii)     In addition, the New OpCo Notes Term Sheet does not specify whether the covenants are similar to those in the prepetition loan documents relating to the OpCo Notes or OpCo RCF, nor whether the new terms are "typical" or "customary", which might enable debtholders to form a bare understanding of the parameters of the replacement notes.

(iii)     Finally, a description of the events of default (or the existence thereof) in the New OpCo Notes is not disclosed in the New OpCo Notes Term Sheet.

(iv)     Thus, the summary of the terms and covenants of the New OpCo Notes is inadequate and leaves the OpCo debtholders unable to assess the sufficiency of their Plan treatment and the cramdown interest rate proposed in connection therewith.  See In re P.J. Keating Co., 168 B.R. 464, 473 (Bankr. D. Mass. 1994) (with respect to cramdown replacement notes, "the covenants should not leave the lender so bare of protection as to greatly increase the

---

[4]     This is particularly important considering the Plan Support Agreement explicitly provides that the New OpCo Notes will bear "the most favorable terms to OpCo (as determined by the Debtors in consultation with the Holdco Noteholder Committee and Equityholder Committee) that are permitted under applicable law (see Section 1129(b)(2)(B)) [(i.e., the Bankruptcy Code cramdown provision for unsecured claims)]."

risk or require a corresponding increase in the interest rate"); In re Capital W. Inv'rs, 186 B.R. 497 (N.D. Cal. 1995) (plan may not omit mortgage insurance covenant and surplus cash provisions originally inserted in favor of government when it insured mortgage loan because, in part, deleting requirement that debtor pay mortgage insurance made note more risky, thereby reducing its value at the agreed upon interest rate).

26.     As such, the Debtors have failed to provide the OpCo debtholders with adequate information.  No reasonable investor would purchase or invest in notes without knowing their terms, and the OpCo debtholders should not be expected to vote on the Plan without such information.  Accordingly, the Disclosure Statement should, at a minimum, (i) disclose sufficient detail regarding the terms, covenants, representations and warranties and default provisions that will govern the New OpCo Notes, (ii) describe how the interest rate on the New OpCo Notes was calculated and how the absence of a makewhole provision impacted this calculation, and (iii) disclose the exact amount of cash to be distributed under the Class 5 opt-in mechanic.

### B.     The Plan Supplement Must Be Filed Earlier

27.     Compounding the Disclosure Statement's lack of adequate information is the timing of the Plan Supplement disclosure.  OpCo debtholders will require sufficient time to consider the terms of the New OpCo Notes once they have been disclosed.  The Debtors propose to disclose this information in a Plan Supplement to be filed seventeen (17) days **after** the plan objection deadline has expired and three (3) days before the voting deadline.  See Plan at § I(1.1)(112) and (139); Disclosure Statement Motion at 4-5.  This is grossly insufficient, as three days is simply not enough time to allow the OpCo debtholders to make an informed decision regarding the Plan.[5]  This information will undoubtedly be voluminous, and it will therefore take a significant amount of time for the OpCo debtholders to process and evaluate this information

---

[5]     The terms of the New OpCo Notes constitute critical information, and the other information provided in the Plan Supplement is also essential to an informed judgment by the OpCo debtholders.

with the care and deliberation a hypothetical investor would reasonably exercise.  Providing a mere three days to consider terms that are integral to the decision of whether to accept the Plan defeats the purpose behind the disclosure requirements set forth in the Bankruptcy Code.  See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994) (stating that full and fair disclosure is of "prime importance" in bankruptcy proceedings); Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 00 Civ. 8688 (WHP), 2004 WL 1119652, at *4 (S.D.N.Y. May 20, 2004) (noting the "well-established policy that a debtor must give creditors reasonable notice of the plan's contents").  Furthermore, the OpCo debtholders should be given a fair amount of time to consider the terms of the notes prior to the confirmation objection deadline.

> **C.     Given the Disclosure Statement Deficiencies, Additional
> Disclosures Are Necessary to Provide "Adequate Information"**

28.     In addition to the issues described above, the Disclosure Statement suffers from the following deficiencies, each of which must be remedied in order to satisfy the "adequate information" standard.

29.     *First*, given the fact that Third Point (along with other constituents) has been walled off from a plan negotiation process that highly benefits certain insiders, the Disclosure Statement needs to disclose, among other things:  (i) how the Plan Support Agreement was formulated; (ii) management's role in the decision-making process in connection therewith; and (iii) information that addresses creditor concerns that OpCo recoveries are being siphoned to HoldCo stakeholders.

30.     *Second*, the Disclosure Statement is inadequate absent, at a minimum, a basic description of the makewhole litigation, the inevitable cramdown litigation, and the alternative

arguments and the parties' respective perspectives.[6]  See Hall v. Vance, 887 F.2d 1041, 1043

(10th Cir. 1989) (upholding bankruptcy court's finding that disclosure statement lacked adequate

information because it failed, among other things, "to reveal the status of any pending litigation

against the debtors and their assets").  Despite containing twelve pages of risk factors, the

Disclosure Statement makes no mention of the ramifications of these litigations.  These

deficiencies must be addressed with the addition of specific disclosures in Article X ("Risk

Factors") in order for the Disclosure Statement to contain adequate information.

31.     Third, the Disclosure Statement similarly should note that the Plan is not

supported by Third Point and the ad hoc committee of unsecured creditors of OpCo (the "Senior

Creditor Committee").  The fact that these parties intend to object to the Plan, plus the contested

nature of these chapter 11 cases — as evidenced by, among other things, the Senior Creditor

Committee's (i) motion to appoint a trustee, or in the alternative, independent directors to the

board of OpCo [ECF No. 875], (ii) motion requesting a determination that the classifications of

several Classes are impermissible or improperly characterized as "unimpaired" [ECF No. 878],

and (iii) adversary proceeding complaint seeking declaratory judgment declaring the makewhole

amount to be due and payable with respect to the OpCo Notes [ECF No. 880] — is not

adequately disclosed.  In addition, the Disclosure Statement should remove all references that

Senior Funded Debt Claims are receiving 100% recovery and that such treatment is in the "best

interests" of holders of such claims.  See In re E. Redley Corp., 16 B.R. 429, 430 (Bankr. E.D.

---

[6]     At most, the Disclosure Statement merely notes that if the makewhole provision is found to be enforceable, the
OpCo noteholders will be entitled to a "significant unsecured damages claim" and the "Reorganized Debtors
would emerge from chapter 11 with a higher amount of funded indebtedness."  See Disclosure Statement at §
X(B)(2).  Even this, however, fails to adequately describe what the dispute is about, nor does it highlight the
fact that the OpCo noteholders strongly contest the Debtors' position on the enforceability of the makewhole
provision.

Pa. 1982) ("[O]pinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information.").

32.     *Fourth*, there are brackets and blanks throughout the Disclosure Statement.  All of this incomplete information should be provided.

33.     *Fifth*, with respect to the released parties under the Plan, there is no disclosure of the steps undertaken by the Debtors to determine if their estates have any claims against any of those parties, the nature of any such potential claims, and the strengths and weaknesses of those claims, or the conclusions reached by the Debtors regarding the value (if any) of such potential claims.  Also, there is no description of the substantial consideration provided (if any) by the released parties.[7]  The Plan and Disclosure Statement should also clarify that the releases only extend "to the extent permissible under applicable law."  This information is particularly important to the OpCo holders' decision to accept or reject the Plan since the Debtors expect the OpCo holders to remain ongoing creditors of the Debtors.

## II.     The Plan Is Patently Unconfirmable and Therefore, <u>the Court Should Deny Approval of the Disclosure Statement</u>

34.     Courts have long acknowledged that if a plan is not confirmable as a matter of law, the related disclosure statement should not be approved.  <u>See</u> <u>Sanders</u>, 2015 Bankr. LEXIS 3987, at *16 ("[I]t is well settled that a bankruptcy court may disapprove a disclosure statement, even if it contains adequate information, if there is a defect that renders a proposed plan 'inherently or patently unconfirmable.'"); <u>In re U.S. Brass Corp.</u>, 194 B.R. at 422 ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible"); <u>In re Am.</u>

---

[7]     While the Debtors promise to present evidence at confirmation to justify the third-party releases, <u>see</u> Disclosure Statement at 16, such evidence (if any) should be presented prior to the voting deadline.

Capital Equip., LLC, 688 F.3d 145, 148 (3d Cir. 2012) (holding that it was proper for bankruptcy court to find plan patently unconfirmable at disclosure statement hearing); In re Quigley Co., 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if plan is "patently unconfirmable on its face" then solicitation of votes on plan would be futile).

35.     A plan is considered "patently unconfirmable" if (i) confirmation defects cannot be overcome by creditor voting results and (ii) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing. Am. Capital Equip., 688 F.3d at 154–55; see also In re Quigley, 377 B.R. at 115–16 (if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile).  In such circumstances, the related disclosure statement may not be approved.  To do otherwise would be to impose upon a debtor's estate the costs and expenses associated with an unnecessary solicitation and allow the debtor to waste further the time and resources of its creditors and this Court.  See In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (declining to subject estate to expense of soliciting votes for unconfirmable plan); In re Valrico Square Ltd. P'ship, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

36.     Here, the Plan is unconfirmable on its face for multiple reasons and thus, the Disclosure Statement should not be approved.  Among other things,[8]

(a)     The Plan contains multiple classification and impairment defects, as outlined in the *Motion by the Senior Creditor Committee for an Order Pursuant to Bankruptcy Rule 3013 Determining That Claims in Classes 4, 5, 9 and 10 Are Improperly Classified and*

---

[8]     Third Point's objections concerning the confirmability of the Plan are not intended, nor should they be construed, to represent all of the objections Third Point may have to any chapter 11 plan or plans the Debtors have filed or may file.  Third Point reserves all of its rights with respect thereto.

*Claims in Class 6 Are Impaired Under the Debtors' Plan* [ECF No. 878].

(b)      The Plan cannot satisfy the cramdown requirements under section 1129(b)(2)(B) of the Bankruptcy Code should the holders of Senior Funded Debt Claims vote to reject the Plan.

(c)      The Plan improperly withholds from holders of Senior Funded Debt Claims postpetition interest calculated at the contract rate.

(d)      The Plan includes overbroad and impermissible release provisions that are beyond the scope of what courts in the Fifth Circuit may impose.

(e)      Despite the Debtors' characterization to the contrary, the Class 6 guarantee claims are indeed impaired under the Plan.  Therefore, OpCo debtholders should be entitled to vote such claims against HoldCo and MidCo.

37.      Accordingly, approval of the Disclosure Statement must be denied.  Moving forward with the hearing on approval of the Disclosure Statement under these circumstances threatens to cause further delay, increase the costs of these proceedings, and potentially harm the interests of unsecured creditors.  Instead, this Court should deny the approval of the Disclosure Statement or, at a minimum, adjourn the Disclosure Statement hearing to a future date to give stakeholders a chance to negotiate the terms of a confirmable plan with the Debtors.

## JOINDER

38.      Contemporaneously herewith, the Senior Creditor Committee filed an objection to the Disclosure Statement.  Third Point concurs with and joins the legal arguments advanced in that objection and supports the relief requested therein.

## RESERVATION OF RIGHTS

39.      Nothing herein is intended to constitute a waiver by Third Point of any right, objection, argument, claim or defense with respect to any matter, including matters involving the

Plan Support Agreement, the Disclosure Statement and the Plan, all of which are hereby expressly reserved.

*The remainder of this page is intentionally left blank.*

## CONCLUSION

For the reasons set forth above, Third Point respectfully requests that the Court deny approval of the Disclosure Statement and grant such other and further relief as the Court deems just and appropriate.

Dated:   Houston, Texas
January 10, 2017

Respectfully Submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Jennifer J. Hardy
Jennifer J. Hardy (Texas Bar No. 24096068)
600 Travis Street, Suite 2310
Houston, Texas 77002
Telephone:  713-510-1700
Facsimile:  713-510-1799
Email:  jhardy2@willkie.com

**AND**

Matthew A. Feldman (*admitted pro hac vice*)
Joseph G. Minias (*admitted pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  212-728-8000
Facsimile:  212-728-8111
Email:  mfeldman@willkie.com
jminias@willkie.com

*Attorneys for Third Point Loan LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 10, 2017, I caused a copy of the foregoing document to be served by electronic notification by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and on the parties listed below by overnight mail:

### <u>Counsel to the Debtors</u>

David R. Seligman P.C.
Gregory F. Pesce
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Il 60654

Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, NY 100122

### <u>Counsel to the HoldCo Noteholder Committee</u>

Andrew N. Rosenberg
Elizabeth R. McColm
Michael S. Rudnick
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064

### <u>Counsel to the United States Trustee</u>

Christine March
OFFICE OF THE UNITED STATES TRUSTEE
SOUTHERN DISTRICT OF TEXAS
515 Rusk Street, Suite 3516
Houston, Texas 77002

### <u>Counsel to the Equityholder Committee</u>

Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036

**<u>Counsel to the Committee</u>**

Alfredo R. Perez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

<u>/s/ Jennifer J. Hardy</u>
Jennifer J. Hardy