**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | Case No. 16-32202 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re: Docket No. 875** |

**DEBTORS' OBJECTION TO MOTION OF THE AD HOC COMMITTEE**
**OF UNSECURED CREDITORS OF ULTRA RESOURCES, INC. FOR**
**AN ORDER (I) APPOINTING A TRUSTEE PURSUANT TO SECTION 1104(a)**
**OF THE BANKRUPTCY CODE OR (II) IN THE ALTERNATIVE, APPOINTING**
**INDEPENDENT DIRECTORS TO THE BOARD OF ULTRA RESOURCES, INC.**
**PURSUANT TO SECTIONS 105(a), 1107(a), AND 1108 OF THE BANKRUPTCY CODE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this objection to the *Motion of the Ad Hoc Committee of Unsecured Creditors of Ultra Resources, Inc. for an Order (I) Appointing a Trustee Pursuant to Section 1104(a) of the Bankruptcy Code or (II) in the Alternative, Appointing Independent Directors to the Board of Ultra Resources, Inc. Pursuant to Sections 105(a), 1107(a) and 1108 of the Bankruptcy Code* [Docket No. 875] (the "Motion") filed by an ad hoc group of unsecured creditors of Ultra Resources Inc. (the "OpCo Group").

**<u>Introduction</u>**

1.     This Court should deny the Motion because there is no "cause" for appointment of a chapter 11 trustee, and a trustee manifestly is *not* in the best interests of any estate. The Motion acknowledges that there is no fraud, dishonesty, incompetence, or mismanagement here.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

Instead, the Motion tries to manufacture a "conflict" between the solvent Ultra Resources, Inc. ("OpCo") estate, its ultimate (also solvent) parent, Ultra Petroleum Corp. ("HoldCo"), and HoldCo's stakeholders, in a baseless attempt to meet the high burden of proof.  But the Motion falls far short of identifying the sort of conflict that makes confirmation of a plan impossible— particularly a plan that satisfies all claims in full.  Moreover, the Motion does not come remotely close to showing that the alleged benefits of a trustee at OpCo to one constituency (*i.e.*, the OpCo Group's five members) outweigh the resultant tremendous cost, delay, expense, and disruption.

2.     In reality, the Motion is a pure litigation tactic—the opening salvo in an avalanche of filings commenced the Friday before Christmas by the OpCo Group, a small ad hoc group of distressed investors that bought into the unsecured funded debt of OpCo at a significant discount and now stand to recover par plus accrued interest under the terms of the proposed *Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 817] (as amended, modified, or supplemented, the "Plan").  The Motion was filed for one reason:  the distressed investors in the OpCo Group do not like the proposed Plan, which proposes to pay them in full plus applicable postpetition interest, in the form of a mix of cash and take-back debt; instead the OpCo Group would like a plan which forces the Debtors to raise billions of dollars of third-party financing to pay the OpCo Group in full in cash.  As a result, the OpCo Group has flatly refused—despite multiple entreaties by the Debtors—to engage in any negotiations or even discussions about plan treatment, and instead is doing everything possible to avoid a confirmation hearing where the Court will decide whether or not the cash and take-back debt constitutes payment in full.  But rather than simply raise their objections at a confirmation hearing, the OpCo Group, under the guise of a trustee motion, tries to litigate those plan objections now.  But there is no basis for those plan objections, particularly where, as here:  (a) all creditors stand to be satisfied in full;

(b) junior stakeholders have committed to fund $580 million in cash to fund the Plan; (c) overwhelming numbers of the HoldCo creditors and equityholders support the Plan; and (d) the primary opponent of the Plan is a five-member group of distressed unsecured investors who prefer all cash as their form of consideration as opposed to the Plan's proposal of cash and take-back debt.

3.      There is a glaring mismatch between the OpCo Group's arguments and the actual legal standard for appointment for a trustee at OpCo. The OpCo Group does not claim that the Debtors are being mismanaged, nor does it suggest any fraud or incompetence. Nor could it. The Debtors' management team, and the board of directors of both OpCo and HoldCo, comprise among the best and most efficient operators in the oil and gas business; they have done nothing during these chapter 11 cases but run the business well, build cash, and maximize value for stakeholders; and they are managing an estate that is massively and unquestionably solvent. These circumstances are a far cry from those that would justify appointment of a chapter 11 trustee in any case.

4.      In the alternative to appointment of a chapter 11 trustee—and without citing any support in the Bankruptcy Code because there is none—the OpCo Group demands that the Court appoint "three independent directors" to the Board of OpCo. *See* Motion ¶ 28. Beside the straightforward reality that the Court lacks the authority to order the debtor to alter its board of directors, no director would conclude that his or her fiduciary duties require going to the capital markets immediately following a period of historic turmoil in the oil and gas industry to attempt to pay its contractual unsecured creditors in full in cash, when the Bankruptcy Code allows OpCo to satisfy claims (like those of the OpCo Group) with "property of a value, as of the

effective date of the plan, equal to the allowed amount of [an unsecured creditor's] claim."  11

U.S.C. § 1129(b)(2)(B)(i).[2]

5.      What is really happening here is simple.  The Debtors have the exclusive right to

propose a plan of reorganization through March 1, 2017, they have in fact done so, and the

Debtors have every right to a hearing to seek confirmation of the Plan.[3]  The OpCo Group knows

this, and knows that the proposed Plan is confirmable.  But the members of the OpCo Group do

not like the way in which the proposed Plan treats their claims, and they are instead demanding

to be paid, in cash, immediately—even though the Debtors have no obligation to raise the

roughly $2.8 billion in new money the OpCo Group claims would be required to cash them

out.[4]  And, despite efforts by the Debtors to engage in negotiations of the proposed treatment of

OpCo funded debt claims, the OpCo Group elected instead to file the Motion, an equally flawed

classification motion [*see* Docket No. 878], an adversary proceeding seeking the allowance of

makewhole claims [*see* Adv. Proc. No. 16-03287], and three different sets of discovery requests

[*see* Ex. A–C], all of which are consuming substantial sums of the Debtors' resources to the

detriment of other stakeholders.  And just a few days ago, the OpCo Group served subpoenas on

eight third parties who are signatories to the Debtors' plan support agreement.  *See* Ex. D.

---

[2]     By contrast, other provisions of the Bankruptcy Code **require** a debtor to satisfy claims in cash.  *See, e.g.*, 11 U.S.C. § 1129(a)(9) (requiring a debtor to satisfy administrative claims in full in cash to confirm a chapter 11 plan).

[3]     Indeed, at a contested evidentiary hearing in August, the Court determined that "cause" existed to extend the Debtors' exclusivity periods for an additional six months, overruling an OpCo Group objection that demanded the Debtors move along their plan process at a faster pace.  It is ironic that the same OpCo Group that complained that this case was moving too slowly now seeks to derail the process entirely.

[4]     The Plan contemplates a backstopped $580 million rights offering, the terms of which are subject to confirmation and consummation of the proposed Plan.  As a result, the OpCo Group's demand that the Debtors satisfy all OpCo funded debt claims, which the OpCo Group asserts to be over $2.2 billion, in full in cash could require the Debtors to raise roughly $2.8 billion in financing at a time following significant tumult in the oil and gas industry.

6.       All of this litigation is a sheer distraction.  Again, the proposed Plan will satisfy all OpCo claims, including those held by the members of the OpCo Group, in full.  And if the OpCo Group believes that the manner in which the proposed Plan satisfies their claims in full is inconsistent with the Bankruptcy Code, it should simply prepare for confirmation and make its arguments, hoping to defeat the proposed Plan.  Indeed, if the OpCo Group really believed its own rhetoric, it would simply do that—prepare for confirmation—rather than pursue a scorched-earth litigation strategy aimed at interrupting the path to approval of the Debtors' proposed *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 818] (as amended, modified, or supplemented, the "Disclosure Statement") and a hearing on confirmation of the Plan.

7.       Accordingly, the Court should deny the Motion and allow the Debtors to continue to focus on the important work necessary to pursue their request that the Court confirm the Plan, which (if confirmed) will satisfy all claims against the Debtors ***in full***.  At a minimum, the Court should recognize the Motion for what it is—a premature plan confirmation objection—and continue the Motion until the confirmation hearing, at which time all of the issues raised in the Motion will have been addressed in their proper context.  Even the Committee has stated that it believes that the appointment of a trustee is not appropriate at this time [Docket No. 934].

<u>**Background**</u>

8.       In understanding why the Motion is so unfounded, it is important to remind the Court and parties of the important and undisputed facts of this case.  In late 2015 and early 2016, amidst unprecedented market dislocations, the Debtors faced a crossroads regarding OpCo's upcoming payment obligations for its funded debt.  While all of the Debtors' funded indebtedness is unsecured (and thus the OpCo Group's claims are no more senior than any other unsecured claims at OpCo), OpCo breached its debt covenants, which cross-defaulted to

HoldCo's funded debt.  Before filing for chapter 11, the Debtors spent months attempting to negotiate a consensual, comprehensive out-of-court solution with a large group of OpCo's lenders and private-placement noteholders that were advised by Morgan Lewis Bockius LLP, Mayer Brown LLP, FTI Consulting, Inc., and RPA Advisors.  However, after the best deal the Debtors could negotiate with OpCo's lenders and private-placement noteholders would have wiped out the Debtors' junior stakeholders nearly entirely, the Debtors concluded their best chance to maximize the value of their estates for all of their stakeholders was to pursue an in-court chapter 11 restructuring.

9.     Since that time, the Debtors have charted a careful, prudent path to achieve that goal.  And the Debtors' efforts to maximize stakeholder value speak for themselves: the Debtors and have negotiated and filed a plan of reorganization that anticipates satisfying in full all claims against the Debtors and providing a substantial recovery to HoldCo's shareholders.  In addition, during these chapter 11 cases, the Debtors have obtained the first-day relief necessary to stabilize their business; filed their schedules and statements; commenced a process to reconcile claims; began litigating and negotiating resolutions for hundreds of millions of dollars of claims; and worked to determine how and whether to restructure, replace, or terminate their existing leases and contracts.

10.     The Debtors also developed a go-forward business plan to serve as the basis for restructuring discussions and provided business diligence to their stakeholders.  After soliciting feedback on their business plan from their constituents, the Debtors entered into discussions with their fulcrum stakeholders regarding the terms of a potential reorganization—one premised on a significant new-money investment backstopped by the Debtors' junior stakeholders.  These discussions culminated in the Debtors' entry into the Plan Sponsor Agreement on November

6

21, 2016 (the "PSA").  Again, the restructuring contemplated by the PSA, if consummated, will permit the Debtors to **satisfy all claims against the estates in full** and to provide a significant **recovery to common stockholders** while providing liquidity to the reorganized business through a $580 million rights offering backstopped by certain HoldCo noteholders and equityholders.

11.      Since the very day that they entered into the PSA, the Debtors have continued to engage with their stakeholders in an effort to forge further consensus regarding the Plan.  The Debtors have sought—on multiple occasions, in writing and by telephone—to engage the Official Committee of Unsecured Creditors (the "Committee") and the OpCo Group regarding the Plan and potential consensual alternatives, with the Debtors going so far as presenting a take-back debt term sheet to the OpCo Group before publicly including those terms in the disclosure statement in an effort to spur negotiations.  Unfortunately, despite these multiple outreaches, both the OpCo Group and the Committee simply refuse to engage in any discussions with the Debtors at all, or provide the most basic feedback to the Plan.  Rather, their only form of engagement has been litigation and making repeated, baseless claims of being "excluded." Nevertheless, in an effort to responsibly move these chapter 11 cases forward, the Debtors then filed their Plan and Disclosure Statement on December 6, 2016, approximately 85 days earlier than their exclusivity deadline.  The Debtors propose to emerge from chapter 11 in mid-April 2017, approximately a year after the Petition Date.

12.      Finally, in addition to the over two gigabytes of information available through the Debtors' virtual data room, the Debtors have produced over 3,500 documents, totaling over 48,000 pages and over 130 native spreadsheets, to the OpCo Group and Committee regarding the Plan, the backstop commitment contemplated thereby, and certain unrelated matters, and the Debtors have made their Chief Executive Officer, Michael Watford, and their Chief Financial

Officer, Garland Shaw, available for depositions.  The Debtors will also continue to respond to reasonable inquiries and legitimate document requests from parties in interest regarding the Plan, preferring to negotiate an amicable resolution but preparing to litigate, at confirmation, if necessary.

**Objection**

I.     **The OpCo Group Does Not—and Cannot—Satisfy the High Burden Necessary for the Extraordinary Step of Appointing a Trustee at OpCo**.

     A.     **Overview of the Applicable Legal Standard**.

13.     "The underlying assumption of Chapter 11 is that debtor-in-possession governance is to be the norm . . . [and] arises from a belief that current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989).  As the Fifth Circuit has stated, "there is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee."  *In re Cajun Elec. Power Co-op., Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *op. withdrawn in part on reh'g*, 74 F.3d 599 (5th Cir. 1996).  This is because, among other reasons, "[t]he presumption in chapter 11 cases is that 'current management' is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  *In re Ag Serv. Ctrs., L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) (quoting *Petit v. New England Mtg. Servs. Inc. (In re Petit)*, 182 B.R. 64, 68–69 (D. Me. 1995)); *see also In re Marvel Entm't Grp.*, 140 B.R. 463, 471 (3d Cir. 1998) (same).

14.     To overcome the Bankruptcy Code's strong presumption that a debtor's management and board remain in possession of the estate postpetition, a party seeking the appointment of a chapter 11 trustee must demonstrate either (a) "cause," which includes "fraud,

8

dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by the current management," or (b) that the appointment of a chapter 11 trustee is in "the interests of creditors, any equity security holders and other interests of the estate." *See* 11 U.S.C. § 1104(a).

15.     The law is clear that appointment of a trustee is an extraordinary remedy that courts should not grant lightly. *See, e.g.*, *Cajun*, 69 F.3d at 749; *In re W.R. Grace & Co.*, 285 B.R. 148, 158–60 (Bankr. D. Del. 2002) ("[A]ppointing a trustee must be considered a last resort."). Trustee appointment "should be the exception, rather than the rule." *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655–56 (Bankr. S.D.N.Y. 2006) *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006); *see also In re Bayou Grp., LLC*, 564 F.3d 541, 547 (2d Cir. 2009) (stating that the trustee standard is "very high"); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("[A]ppointment of a trustee should be the exception, rather than the rule."); *In re Kutner*, 3 B.R. 422, 427 (Bankr. N.D. Tex. 1980) ("The Chapter 11 Trustee is appointed only as the exception, and not as the general rule.").

### B.     There Is No "Cause" to Appoint a Trustee under Section 1104(a)(1) of the Bankruptcy Code.

16.     Under section 1104(a)(1) of the Bankruptcy Code, the existence of "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the debtor" may constitute a basis for appointment of a trustee. However, the movant must satisfy its burden by clear and convincing evidence. *See In re ATP Oil & Gas Corp.*, 2013 WL 9792582, at *9 (Bankr. S.D. Tex. Feb. 10, 2013) (stating that the appointment of a trustee requires a showing of cause "by clear and convincing evidence"); *In re Cajun Elec. Power Co-op., Inc.*, 191 B.R. 659, 662 (M.D. La. 1995) ("[T]he burden is on the movant to prove the need for the appointment of a trustee by clear and convincing evidence."), *aff'd*, 69 F.3d 746 (5th Cir. 1995), *op. withdrawn in*

KE 44892851

*part on reh'g and aff'd sub nom. Cajun Elec. Power Coop. v. Central La. Elec. Coop.*, 74 F.3d 599 (5th Cir. 1996).

17.    Cases where "cause" is found under section 1104(a)(1) of the Bankruptcy Code generally involve egregious and fraudulent conduct.  *See, e.g.*, *In re Amerejuve, Inc.*, No. 14-35482, 2015 WL 2226344, at *1 (Bankr. S.D. Tex. Apr. 29, 2015) (holding that embezzlement of the debtor's funds by the debtor's president, along with dishonesty in siphoning funds for personal gain, constituted cause for appointment of trustee); *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *5 (Bankr. S.D. Tex. Feb. 25, 2014) (holding that a managing member's self-dealing, drafting documents that identified the debtor's assets as his own, and concealing of activities from the court and creditors constituted "cause"); *In re ATP*, 2013 WL 9792582, at *9 (holding that the debtor's incompetence and gross mismanagement were sufficient grounds for appointment of a trustee); *In re Grasso*, 490 B.R. 500, 510 (Bankr. E.D. Pa. 2013) (holding that debtor's improper diversion of estate assets constituted sufficiently egregious behavior under section 1104(a) of the Bankruptcy Code); *In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) (holding that the diversion of funds and misuse of corporate assets constituted "cause").

1.    **The OpCo Group Does Not Allege, Let Alone Present Evidence of, Any Evidence of Fraud, Dishonesty, Incompetence, or Gross Mismanagement by the Debtors' Management**.

18.    Here, the Motion does not allege—let alone contain or even suggest any clear and convincing evidence of—any "fraud, dishonesty, incompetence, or gross mismanagement."  Nor could it.  Since well before the Petition Date, the Debtors' board and management have guided the Debtors' restructuring process more than appropriately.  As detailed above, the Debtors first engaged their stakeholders (starting with their OpCo funded debt creditors) almost six months before the Petition Date in a responsible effort to reach a consensual out-of-court restructuring.

10

Only after months of discussions over various restructuring proposals, and the expiration of various forbearances, did the Debtors determine that the best way to maximize value was to commence these chapter 11 cases.  The Debtors then transitioned into chapter 11 smoothly, appropriately, and on a relatively uncontested basis, and provided all relevant stakeholders with massive amounts of diligence, both formally and informally as requested by stakeholders.  The Debtors also promptly turned toward developing a business plan, presenting it to all stakeholders (including their OpCo creditors) as it was being developed, and obtaining board approval for the business plan within four months of the Petition Date.  The Debtors then entered into negotiations with their fulcrum creditors, entered into the PSA and filed the Plan and Disclosure Statement well ahead of the expiration of their exclusive periods.  Further, although the Plan satisfies all OpCo claims in full, the Debtors nevertheless immediately sought to engage with the OpCo Group and the Committee to attempt to reach consensus on the terms of the Plan. Although the OpCo Group and the Committee have refused to engage in any discussions, and although the OpCo Group has responded by demanding payment in full in cash and by commencing a litigation onslaught, the Debtors have continued to attempt to engage with both constituents, with no response to date.

19.     Perhaps most importantly, OpCo's strong operational and financial performance since its chapter 11 filing shows that, far from there being incompetence or mismanagement, OpCo is thriving under current management.  For example, the Debtors have increased their cash position by nearly $178.5 million since the Petition Date (an increase from approximately $221.5 million as of the Petition Date, to approximately $400 million as of December 31, 2016. The Debtors continue to reduce their expenses and make other operational improvements.  As a result of these operational and commodity-price improvements, the Disclosure Statement values

KE 44892851

the Debtors at a range of $5 billion to $7 billion, well in excess of the roughly $2.4 billion of OpCo funded indebtedness.

> ### 2. There Are No Conflicts between OpCo and HoldCo or between OpCo's Management and Its Creditors.

20.     Recognizing that it cannot allege (let alone prove) any "fraud, dishonesty, incompetence, or gross mismanagement," the OpCo Group instead asserts that a trustee at OpCo is necessary because of purported "conflicts" between HoldCo and OpCo.  Specifically, the OpCo Group alludes to three alleged conflicts:  (a) the parent-subsidiary relationship between HoldCo and OpCo; (b) the fact that OpCo board members Michael Watford and Garland Shaw hold HoldCo common stock and are participants under the Plan's proposed management equity incentive plan; and (c) that the issuance of the new OpCo Notes pursuant to the proposed Plan allegedly "shifts value" from OpCo to HoldCo.  As explained below, these alleged conflicts are not conflicts at all, do not harm any stakeholders (let alone the OpCo Group), and certainly do not arise to the level of "cause" mandating the appointment of a trustee at OpCo.

> #### a. There Is No Conflict between HoldCo and OpCo.

21.     The OpCo Group's principal basis for the appointment of a chapter 11 trustee is the purported "conflict" between HoldCo and OpCo.  But other than noting the obvious fact that OpCo is a wholly owned subsidiary of HoldCo, and that any OpCo value (after full satisfaction of OpCo liabilities) "flows up" to HoldCo and its stakeholders, the OpCo Group does not allege—let alone prove—any conflict that would justify the appointment of a trustee at OpCo.

22.     Scenarios where an actual conflict may warrant the appointment of a trustee are generally limited to two specific circumstances.  *First*, courts have appointed a trustee where there is a debilitating "corporate governance" type of conflict, like a deadlocked board of directors, that renders it impossible to propose let alone confirm a plan of reorganization.

*See, e.g.*, *Cajun Elec.*, 191 B.R. at 663 (finding that non-profit debtor cooperative was incapable of resolving deadlock among the debtor's board and management and therefore unable to successfully manage the chapter 11 process).  **Second**, courts have appointed trustees where there is a board-level conflict that is symptomatic of significant fraud or misconduct.  *See, e.g.*, *In re Patman Drilling Int'l, Inc.*, No. 07-34622 (SGJ), 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008) (holding that conflicts of interest constituting cause were present where directors, who served both the debtor and a creditor, improperly transferred and assigned debtor assets to their other companies); *Marvel*, 140 F.3d at 471 (holding that creditors that foreclosed on the bonds and stock of the debtor postpetition, thereby effectively controlling the debtor in possession, were unable to manage the conflicts associated with their position as creditors and debtor simultaneously).  As previously stated, the OpCo Group does not allege any fraud or misconduct, so this second line of case law is irrelevant here.

23.     Here, the OpCo Group has not—and cannot—allege any "corporate governance" type conflict that makes a reorganization impossible.  There is no deadlocked OpCo (or any other Debtor) board; instead, the Debtors' boards and management have functioned quite appropriately and moved these cases forward on a brisk pace, having entered into the PSA within six months of the Petition Date with two of their three main stakeholders, and proposed the Plan, which proposes to satisfy all claims in full.

24.     For its part, the OpCo Group attempts to argue that there is a corporate governance type conflict here through selective, and wholly misleading, quotes from *Cajun Electric*.  *Cajun Electric*'s facts, however, are completely different than these chapter 11 cases. *Cajun Electric* involved a non-profit electric generating and transmission cooperative that was wholly owned by twelve non-profit retail electric-distribution cooperatives, each of which were

13

owned by members who were also consumers.  *See Cajun Elec.*, 191 B.R. at 661.  Each of the

twelve electric-distribution cooperatives had two representatives on the debtor's board of

directors.  *Id.*  The *Cajun Electric* court cited numerous examples of conflicts present in that

case, including:

- a longstanding deadlock among individual members of the debtor over whether to appeal an unfavorable public utility rate decision;

- the debtor's failure to collect moneys owed by the member cooperatives;

- the debtor's failure to allow some members access to information about and to participate in possible sales of estate assets;

- the manner in which certain contracts between the debtor and its members operated, causing conflicts of interest between the debtor's officers and directors, the interlocking directors and officers, and the member cooperatives;

- the debtor's failure to take a position on the preemption issue decided by the bankruptcy court;

- the interest of some members in the purchase of all or part of the debtor's estate, and their apparent desire to purchase the property at the lowest price possible;

- the members' interest in purchasing part of the estate in determining whether to accept or reject other offers that may be made; and

- the apparent primary interest of the board in protecting the rates and the actual existence of its members rather than trying to maximize the value of the estate.

*Id.* at 662–63.  Finally, the court noted that millions of end-use consumers were directly affected

by the debtor's inability to manage its estate, and millions of taxpayers were at risk given the

$4 billion owed to the federal government.  *See id.*

25.     The facts in *Cajun Electric* in no way resemble this case.  The Debtors' boards

and management are not crippled by deadlock.  There is no insider claim that the Debtors refuse

to pursue.  The Debtors are not running a sale process that privileges insiders to the detriment of

third parties.  And none of the Debtors have intercompany operating agreements in place that

create inherent conflicts of interest for dozens of parties.  Rather, unlike in *Cajun Electric*, the

KE 44892851

Debtors have appropriately managed these cases and have not shirked any responsibility placed on them by the Bankruptcy Code or applicable non-bankruptcy law.  This is not a case where a trustee is needed to help manage the debtor's business because the debtor is incapable of doing so itself.  *See, e.g.*, *In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 692 (Bankr. E.D. La. 2006) (holding that section 1104(a)(1) of the Bankruptcy Code is satisfied where "the board of directors of a debtor corporation is effectively deadlocked").

26.    Moreover, unlike in *Marvel, Cajun Electric*, and the numerous other cases incorrectly cited by the OpCo Group, there is no impossibility of reorganization here.  Indeed, the Debtors have already proposed a confirmable chapter 11 plan with the support of multiple stakeholder groups and are moving toward confirmation.  Certainly, with a confirmable plan of reorganization on file and with a contemplated emergence from chapter 11 in a matter of months, there are no circumstances rendering the confirmation of a chapter 11 plan an impossibility.

27.    Unable to argue board deadlock or any other corporate-governance problem, the OpCo Group next suggests that the Debtors' corporate structure creates an inherent conflict, because the OpCo directors cannot simultaneously fulfill their fiduciary duties to OpCo creditors and to HoldCo stakeholders.  The OpCo Group miscites *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 797 (Bankr. S.D. Tex. 1993) to suggest that the OpCo board, in addition to its state-law fiduciary duties to its ultimate shareholder, HoldCo, owes some new unidentified, free-forming (and conflicting) fiduciary duty to OpCo creditors once in chapter 11, thus requiring the appointment of a trustee.

28.    But *Schepps* stands for the completely opposite proposition.  In *Schepps*, hours after the bankruptcy court confirmed the debtor's plan, the debtor's shareholders filed a state-court suit against the debtor's directors, alleging that the directors breached their fiduciary

duties in the way they conducted and managed the chapter 11 case.  The bankruptcy court held that the shareholder suit brought derivative claims that appropriately belonged to the debtor and stayed the lawsuit.  The bankruptcy court also noted that the shareholders, in addition to being the beneficiaries of the directors' state law fiduciary duties, had the protections of specific statutory requirements in the Bankruptcy Code—such as court-approval requirements for section 363 sales and confirmation requirements under section 1129 of the Bankruptcy Code, among other provisions—and yet the shareholders never participated in the bankruptcy case or raised any issues with the debtor's compliance.  The case confirms that stakeholders have the protections of the Bankruptcy Code and Bankruptcy Rules' substantive and procedural requirements.  Thus, *Schepps* does not stand for the proposition asserted by the OpCo Group that there is some additional fiduciary duty owed to creditors in chapter 11 beyond compliance with the Bankruptcy Code—indeed, no case is cited for such a proposition—and certainly not a duty that creates an inherent conflict any time there is a parent-subsidiary structure.  Indeed, if the OpCo Group's members found the Debtors' corporate structure so objectionable, they were free to pass on making a distressed investment in OpCo's funded debt with full knowledge of that structure.[5]

29.     The reality is that there is absolutely no conflict whatsoever.  In fact, the interests of OpCo and HoldCo are completely ***aligned*** because OpCo is solvent, and OpCo's board is obligated to maximize the value of OpCo to ensure that OpCo's contractual liabilities are satisfied in full (but no more and no less), and there is as much value as possible for HoldCo and its stakeholders.  That is consistent with Wyoming law, where OpCo is incorporated.  The Wyoming duty of loyalty is codified: "each member of the board of directors, when discharging

---

[5]     Indeed, at the time that OpCo issued its private placement notes and entered into its unsecured credit facility, OpCo's board of directors included current board member Michael D. Watford as well as another former employee who was at the time the CFO of HoldCo.

the duties of a director, shall act . . . in a manner he reasonably believes to be in or at least not opposed to the best interests of the corporation."  WY Stat. 17-16-830.  The Wyoming statute also states that "a director, in determining what he reasonably believes to be in or not opposed to the best interests of the corporation, ***shall*** consider the interests of the corporation's shareholders and, in his discretion, may consider . . . the interests of the corporation's employees, suppliers, creditors and customers . . . ." *Id.* (emphasis added).

30.     OpCo's directors do not, as suggested by the OpCo Group, owe some special, undefined fiduciary duty directly to creditors, beyond compliance with the Bankruptcy Code. *See Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (finding, under Delaware law, even in the case of an insolvent corporation, "directors never owe fiduciary duties directly to creditors." (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007)).  "[C]reditors do not need direct fiduciary protection because 'creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights.'" *Id.* (quoting *Gheewalla*, 930 A.2d at 99).

31.     To hold otherwise would "create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and [a] fiduciary duty to individual creditors."  *Gheewalla*, 930 A.2d at 103.  Instead, in chapter 11, OpCo's directors owe fiduciary duties to the bankruptcy estate and its beneficiaries collectively.  *See Duke Energy Trading & Marketing, L.L.C. v. Enron Corp. (In re Enron Corp.)*, 2003 Bankr. LEXIS 330, at *24 (Bankr. S.D.N.Y. Apr. 17, 2003) (stating that the debtor in possession "has a fiduciary duty to all creditors and must seek to protect the interests of all

creditors collectively"); *Hampton Hotel Inv'rs, L.P.*, 270 B.R. 346, 362 (Bankr. S.D.N.Y. 2001) (holding that a debtor in possession has a duty of loyalty to the estate).

32.     Moreover, when a wholly owned subsidiary is solvent, as is the case here, the subsidiary's corporate fiduciary duties are owed exclusively to its parent. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) ("[A] wholly-owned subsidiary has only one shareholder:  the parent.  There is only one substantive interest to be protected, and hence no divided loyalty of the subsidiary's directors and no need for special scrutiny of their actions.") (internal quotations omitted)); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006) ("Wholly-owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created.").   Thus, given OpCo's solvency, it is perfectly appropriate, and consistent with OpCo's fiduciary duties to its ultimate shareholder, to utilize the chapter 11 process to propose a plan of reorganization that satisfies its contractual obligations in full as allowed by the Bankruptcy Code.   Consistent with these principles, the Debtors' directors and officers have worked doggedly to maximize the value of the OpCo estate to ensure full satisfaction of OpCo's liabilities—again, OpCo's creditors are entitled to what the law provides them, no less, but no more—with as much residual value to HoldCo as possible.  The fruit of these efforts is the Debtors' entry into the PSA, a good-faith, arm's-length bargain between the Debtors and their stakeholders that will result in a full recovery for OpCo pursuant to a plan that satisfies all of the Bankruptcy Code's requirements.

33.     In contrast, the Motion twists basic principles of corporate governance to assert that there is an inherent conflict in any parent-subsidiary chapter 11 because each entity must act in the sole interests of its respective creditors, and, presumably, if a subsidiary's creditors are unhappy about its treatment under a debtor's plan—even if that group's claims are being

18

satisfied in full in compliance with the Bankruptcy Code—the debtor's board must have a conflict. In effect, the OpCo Group suggests that in any solvent debtor case, where the debtor's board—consistent with its fiduciary duties—is attempting to maximize value for its shareholder, by definition the board has a debilitating conflict mandating the appointment of a trustee.

34.     Moreover, if parent-subsidiary relationships by themselves created *de facto* conflicts of interest requiring appointment of a trustee, then virtually every large chapter 11 would require the appointment of multiple trustees, one for each debtor subsidiary, regardless of whether grounds actually exist for a trustee. Multi-debtor cases—without separate trustees for each debtor—are common in this, and other, jurisdictions. *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex.) (15 debtors); *In re SandRidge Energy, Inc.,* No. 16-32488 (DRJ) (Bankr. S.D. Tex.) (22 debtors); *In re Linn Energy, LLC,* No. 16-60040 (DRJ) (Bankr. S.D. Tex.) (15 debtors); *In re Energy XXI Ltd.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex.) (26 debtors); *In re Aztec Oil & Gas, Inc.*, No. 16-31895 (DRJ) (Bankr. S.D. Tex.) (18 debtors).

35.     Congress certainly contemplated debtor affiliate filings, and if Congress meant for each affiliate subsidiary to have its own trustee, it would have said so. *See* Fed. R. Bankr. P. 2009 (contemplating the appointment of a single trustee for estates being jointly administered); Fed. R. Bankr. P. 1015(b), Advisory Committee Notes ("The election or appointment of one trustee for two or more jointly administered estates is authorized by Rule 2009.") If every debtor in every jointly administered case each required a separate set of directors and officers because of perceived conflicts of interest, chapter 11 cases would grind to a halt. *Cf. In re Adelphia*, 342 B.R. at 128 ("Requiring appointment of independent professionals to represent each individual debtor in all such cases, regardless of the factual circumstances,

19

would burden estates with unjustified and insurmountable costs."); *In re Mulberry Phosphates, Inc.*, 142 B.R. 997, 999 (Bankr. M.D. Fla. 1992) (refusing to disqualify debtors' counsel on the basis that a conflict of interest resulted in one law firm representing each of the debtors).

> **b.     There Are No Conflicts Due to OpCo Directors' Equity Holdings**.

36.     The OpCo Group also attempts to manufacture a conflict by arguing that OpCo's board members, Michael Watford and Garland Shaw, cannot represent OpCo's interests because (a) they hold some equity in HoldCo, no different than employee-directors of other debtor-subsidiaries in complex chapter 11 cases who hold the equity in their respective upstream debtor entities, and (b) the Debtors have proposed in the Plan, which is subject to confirmation by this Court, and subject to awards being approved by HoldCo's (and reorganized HoldCo's) board, a go-forward management equity incentive plan ("MIP") that is dilutive to the owners of reorganized HoldCo (*i.e.*, the parties to the PSA who negotiated the terms of the Plan). This argument is puzzling on many grounds—perhaps most obviously, the reality that the proposed MIP does not impact recoveries to OpCo creditors **at all**.

37.     Indeed, other than just baldly saying that there is a conflict, nowhere does the OpCo Group even attempt to argue or explain how Messrs. Watford and Shaw's equity ownership in HoldCo improperly influences their conduct to the detriment of OpCo creditors or impairs OpCo's ability to put forth a confirmable plan. In fact, the opposite is true. OpCo solvency directs them, as it would any fiduciary, to ensure that OpCo satisfies its funded debt claims in full. If a director's equity holdings in the parent of a solvent debtor were a per se basis for the appointment of a trustee, then trustees would be commonplace in most chapter 11 cases, given that equity is a ubiquitous form of incentive compensation in corporate America.

38.     In a similar vein, there are no grounds for the appointment of a trustee merely because Watford and Shaw may be participants in a post-emergence management equity incentive plan at HoldCo.[6] ***First***, the Plan proposes to set aside a certain amount of reorganized HoldCo stock for a post-emergence management equity incentive plan, all of which is subject to confirmation by this Court after notice and hearing.  ***Second***, no awards under the management equity incentive plan were determined in conjunction with the negotiations of the PSA or the preparation of the Plan, no awards have yet been determined with respect to any potential plan participant, and the majority of the awards, if any, will be determined post-emergence.  ***Third***, the only constituents who bear the expense of the proposed management equity incentive plan (*i.e.*, the only constituents whose recoveries are subject to being diluted by it), the HoldCo shareholders and creditors, are the same ones who negotiated the MIP with the Debtors, and they are supportive of that reserve.  ***Fourth***, it is commonplace for a debtor in a complex chapter 11 case to propose a post-emergence management equity incentive plan under a plan of reorganization.  *See, e.g.*, *CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) (providing for a post-effective management equity incentive plan reserving 10 percent of the new common stock for management of the reorganized debtors); *Midstates Petroleum Co., Inc.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. Sept. 28, 2016) (same).

### c.      The Plan Does Not "Shift Value" from OpCo to HoldCo.

39.     The OpCo Group also argues that a trustee is mandated because OpCo is "shifting" value from OpCo creditors to HoldCo stakeholders.  This is a remarkable argument.

---

[6]     The Motion incorrectly asserts that "management stands to receive . . . nearly $292.5 million under [the MIP]."  *See* Motion ¶ 3.  Under the management equity incentive plan, 7.5 percent of the fully diluted, fully distributed shares of HoldCo will be reserved for issuance to management.  Plan § 4.17.  60 percent of this reserve will be available to be granted by the New Board (as defined in the Plan) post-reorganization.  *Id.*  40 percent of the reserve will be available for grant by the HoldCo board in place before the Plan's effective date:  one-third of the 40 percent will vest on the effective date of the Plan and the remaining two-thirds will vest, ***if at all***, upon the total enterprise of the Reorganized Debtors (as defined in the Plan) meeting certain thresholds.  *Id.*

KE 44892851

OpCo is proposing to satisfy all allowed claims against it in full.  If this Court confirms the Plan (including the proposed new take-back notes to be distributed to OpCo funded debt creditors), the Court by definition will have determined that the Debtors have satisfied the OpCo funded debt claims in full, meaning that the OpCo Group will have received everything to which it is entitled.  It is impossible to call a court-approved satisfaction of OpCo claims in full—with any residual value flow to HoldCo—a "value shift."

40.      Not content to let the Debtors have their proverbial day in court on confirmation, the OpCo Group disguises its confirmation objection as a motion for a trustee, all because the OpCo Group would prefer a different form of treatment under the proposed Plan.  But unlike with the treatment of administrative and priority claims, which must be paid in full in cash, the Bankruptcy Code does not mandate that a debtor pay prepetition unsecured claims in cash before junior stakeholders receive a recovery.  Proposing a plan that provides for full satisfaction of claims in the form of cash and new notes, as allowed by the Bankruptcy Code, cannot conceivably be grounds for the appointment of a trustee.[7]

41.      At bottom, the OpCo Group does not believe that the combination of cash and new notes they are proposed to receive under the Plan results in payment in full.  That is a confirmation issue.  If the Court confirms the Plan as providing the OpCo Group with payment in full, then the whole rationale for the OpCo Group seeking a trustee (*i.e.*, the new notes have terms they do not like) will have crumbled.  But there is no precedent whatsoever for appointment of a trustee simply because a party does not like the proposed treatment in a chapter

---

[7]   Under the OpCo Group's theory, taken to its illogical extreme, any time a debtor objected to a creditor's claim, the claimant would be entitled to seek the appointment of a trustee, because the effect of a successful claim objection would be a "value shift" to other creditors or interest holders.  Indeed, there is a dispute between OpCo and the OpCo Group regarding the allowance of the OpCo Group's makewhole claims, where OpCo, UP Energy Corporation, and the HoldCo stakeholders will benefit from the disallowance of the makewhole claims. Clearly it is not the law that a dispute over the OpCo Group's makewhole claims mandates the appointment of a trustee.  But that is what the OpCo Group's incorrect argument would mandate.

11 plan, even if that treatment is pursuant to section 1129(b)'s cramdown rules.  Indeed, the law is exactly the opposite:  the disaffected group has a clear remedy, which is to object to the proposed Plan at a confirmation hearing.

> **C.**     **The Appointment of a Trustee Would Not Be in the Best Interests of All of OpCo's Stakeholders**.

42.     The OpCo Group also makes an alternative argument that even absent "cause," the court should appoint a chapter 11 trustee because it is in the "best interests" of the Debtor's stakeholders.  *See* 11 U.S.C. § 1104(a)(2).  To do so, the OpCo Group must demonstrate that the benefits of appointment of a trustee outweigh the costs with respect to ***all*** parties of the estate. *See ATP*, 2013 WL 9792582, at *12; *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[A] creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests.  It must show that the appointment is in the interests of all those with a stake in the estate . . . ."); *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 2192, at *16 (Bankr. S.D.N.Y. May 16, 2003).  Furthermore, the OpCo Group must demonstrate that the benefits derived by the appointment of a trustee outweigh the costs, not just for its five members, but for all creditors, shareholders, and other parties in interest in the OpCo case.  *See In re ATP Oil & Gas Corp.*, 2013 WL 9792582, at *12; *In re Stein & Day, Inc.*, 87 B.R. 290, 295 (Bankr. S.D.N.Y. 1988) (refusing to appoint trustee where a trustee would benefit only one creditor while burdening the entire estate); *In re Sea Queen Kontaratos Lines, Ltd.*, 10 B.R. 609, 610 (Bankr. D. Me. 1981) (finding that a creditor confused "its own self-interest with the interests of the estate and creditors generally" and denying its motion to appoint a trustee).

43.     Here, the OpCo Group makes two arguments in support of its "best interests" theory.  ***First***, it argues that the OpCo board is conflicted between its alleged duties to the OpCo

creditors and the OpCo shareholders.  *See* Motion ¶ 25.  However, that presumes a conflict that does not actually exist, as discussed in detail above.  ***Second***, the OpCo Group suggests that because the Debtors are not doing exactly what the OpCo Group wants (*i.e.*, payment in full in cash in the amounts asserted by the OpCo Group), this case will be litigious, and that it would be in the best interests of creditors to avoid that by appointing someone who will give in to their demands.  *See* Motion ¶ 26.  But the present dispute is exemplary of the healthy plan disputes that almost always exist between debtors and creditors, with such disputes being resolved through negotiation or litigation as part of the confirmation process.  The OpCo Group cannot seriously believe that, merely because it will have a litigable dispute at a confirmation hearing, there are grounds today for a trustee.  *Cf.* 15 Collier on Bankruptcy ¶ 1104.03[2][b], citing 124 Cong. Rec. H11,103 (daily ed. Sept. 28, 1978) (explaining that section 1104(c)(2) of the Bankruptcy Code, which states that a court "shall order the appointment of an examiner" if, among other things, "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate," was "not intended and should not be relied on to permit blatant interference with the chapter 11 case or the plan confirmation process"); *see also Schepps*, 148 B.R. at 30 (stating, in the context of a motion to appoint an examiner, "[w]hile the statute states that the court may appoint an examiner any time before the plan is confirmed, a creditor cannot use the provision to disrupt the proceedings").  This is especially the case here, where the OpCo Group has publicly stated its demand—to be paid in full in cash in the amount of its asserted claim on the effective date—which is simply not required by the Bankruptcy Code.

44.    To win its motion, the OpCo Group must also show that the appointment of a trustee would benefit OpCo and all of its other stakeholders.  The OpCo Group does not even

pretend to show that appointment of a trustee benefits other stakeholders, because it cannot.  As a preliminary matter, the appointment of a trustee would constitute a termination event under the PSA and entitle the consenting creditors and equity holders to walk away from the Plan.  *See* PSA, § 7(g).  Termination of the PSA, which reflects extensive negotiations between the Debtors and dozens of represented parties, would likely throw these chapter 11 cases into a state of disarray, delay the Debtors' emergence from chapter 11, and reduce recoveries.  Moreover, the appointment of a trustee at OpCo would cause significant cost and delay as a new trustee would have to be identified and appointed, get up to speed on the Debtors' business and restructuring efforts, potentially hire his or her own professionals, and then engage in discussions with the Debtors' stakeholders—steps that would delay the Debtors' restructuring by many months.  This would cause severe disruption, delay, expense and uncertainty right at a time when the Debtors are prepared to move forward with solicitation and confirmation of the Plan.

45.     The OpCo Group's argument that the appointment of a trustee at OpCo would aid the plan development process rings hollow.  The Debtors have already proposed, and are seeking to confirm, a chapter 11 plan that satisfies all OpCo claims in full.  The OpCo Group's opposition to certain proposed Plan terms is consistent with the give-and-take of stakeholder discussions and indicative of the fact that the Bankruptcy Code is operating correctly.  And the Debtors have repeatedly sought to engage the OpCo Group regarding a consensual resolution. With the Motion, the OpCo Group has, however, made it clear that its five members are more interested in attempting to exert leverage through inflammatory and unfounded accusations than engaging in good-faith negotiations regarding treatments under the proposed plan.

46.     That a trustee is not in the best interests of all stakeholders is demonstrated by the fact that the OpCo Group nowhere actually suggests how a trustee for a solvent OpCo estate

would act differently or make different decisions from those made by OpCo in entering into the PSA and proposing the Plan.  Because of OpCo's massive solvency, a trustee would be compelled, like OpCo's current board, to satisfy OpCo claims in full—no more, no less—and to preserve as much value as possible for OpCo's shareholder.  The unstated premise of the OpCo Group's Motion is that the OpCo Group believes that a trustee should propose a Plan that provides more than full payment in the form of take-back notes with better terms, or payment in full in cash, which would require the cost, expense, delay and uncertainty of raising billions of dollars of new third-party capital simply to use those proceeds to pay down the OpCo funded debtholders.  Again, a trustee should not be appointed merely because a party wishes better or different treatment than what the Bankruptcy Code requires.

### D.    The Appointment of a Chapter 11 Trustee at OpCo Would Undermine, Not Advance, Bankruptcy Principles.

47.    In a final salvo, the OpCo Group asserts that "[a]ppointing a trustee would . . . protect the public interest in avoiding future conflicts of interest and safeguarding the role of a fiduciary as disinterested and independent."  *See* Motion ¶ 27.  As noted above, the only two factors that are relevant to the inquiry are whether "cause" exists and whether such action is in the best interests of the debtor and its stakeholders.  Generalized public policy considerations do not bear on this inquiry because those factors are already embedded in the Bankruptcy Code.  Unlike chapter 7, which automatically vests an independent third party with authority to liquidate a debtor's estate, "[t]he underlying assumption of Chapter 11 is that debtor-in-possession governance is to be the norm."  *V. Savino Oil*, 99 B.R. 518 at 524.  The presumption that a debtor remains in possession of the estate is not an oversight; rather, it "arises from a belief that current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  *Id.*

KE 44892851

48.     Here, the appointment of a chapter 11 trustee at OpCo will impede the Bankruptcy Code's core public policy interests.  "The bankruptcy laws are intended as a shield, not as a sword.  Their purpose is to minimize fiscal chaos and disruption, not to aggravate it." *In re Penn Central Transp. Co.*, 458 F. Supp. 1346, 1356 (E.D. Pa. 1978).  The appointment of a trustee at OpCo would significantly delay OpCo's emergence from chapter 11 because a trustee would need to take significant time to get up to speed and engage professionals.  The appointment of a trustee at OpCo would also lead to greater administrative costs for the estate and disrupt OpCo's business activities.  Accordingly, to advance the Bankruptcy Code's public policy interests, the Debtors respectfully submit that the Court should deny the Motion.

## II.     The OpCo Group's Request to Appoint an Independent Board at OpCo Is a Back Door to Appointing a Trustee.

49.     Implicitly recognizing that their request for a trustee is deeply flawed, the OpCo Group attempts to suggest a "less intrusive" request—one which is equally unwarranted and legally unavailable: that this Court order the Debtors to appoint "independent directors."  *See* Motion ¶ 28–33.

50.     As a preliminary matter, there is no legal basis for the Court to require a debtor to appoint independent directors—or, for that matter, to employ any directors, officers, employees, or other agents—during the debtor's bankruptcy case.  Furthermore, the cases cited by the OpCo Group in support of this proposition generally feature circumstances where it is not practicable for the debtor's management or a trustee to manage the estate, or, worse, where there is illegal conduct by estate officers or directors that thwart the goals of chapter 11.  None of these facts or circumstances are present here, where OpCo's current directors have acted, and continue to act, responsibly and appropriately as fiduciaries for the OpCo bankruptcy estate.

51.     For example, the OpCo Group cites *In re Blue Stone Real Estate, Const. & Dev. Corp.*, 392 B.R. 897, 903 (Bankr. M.D. Fla. 2008), for the proposition that "bankruptcy courts can 'alter the powers of the Debtors' boards of directors' under section 1107(a)" of the Bankruptcy Code.  (Motion ¶ 30.)  That case concerned an objection filed by the U.S. Trustee to a debtor's motion to engage an independent third party as chief restructuring officer.  *See* 392 B.R. at 899.  To resolve the court's concerns that the chief restructuring officer would act at the direction of the debtor's disputed management team (which the U.S. Trustee asserted had engaged in fraud), the debtor's management agreed in open court that it would act at the chief restructuring officer's direction.  *See id.* at 899–902.  The U.S. Trustee objected to that arrangement on the grounds that the arrangement would effectively neuter the debtor's board of directors.  The Court overruled the U.S. Trustee's objection because the arrangement was consistent with applicable state law, which permitted corporations and limited liability companies to restrict the board's discretion or powers or even totally eliminate the board.  *Id.*

52.     Similarly, the OpCo Group cites *In re FSC Corp.*, 38 B.R. 346, 349 (Bankr. W.D. Pa. 1983), for the proposition that a court may appoint a "responsible officer . . . to vote stock of wholly-owned subsidiaries."  (Motion ¶ 32.)  The OpCo Group fails to note that the debtor in *In re FSC Corp.* had no board of directors or officers as of the petition date, and state law authorized the bankruptcy court's appointment of a responsible officer.  *In re FSC Corp.*, 38 B.R. at 347.  That is not the case here.

53.     Other cases cited in the Motion are equally distinguishable. In *In re Commc'ns Options Inc.*, 299 B.R. 481 (Bankr. S.D. Ohio 2003), the court appointed a responsible officer to oversee the debtors' affairs in the face of significant fraudulent conduct by the debtors' management.  *See id.* at 482.  Indeed, in granting the motion to appoint a responsible party, the

*Communications Options* court noted:  "Were this case at any earlier phase, the Court would not hesitate to order the appointment of a trustee.  However, this case has been pending for three years, and two reorganization plans are now pending.  Appointment of a trustee at this point would merely delay the process and incur expense that this estate cannot afford."  *Id*.  In *In re Gaslight Club Inc.,* 782 F.2d 767 (7th Cir. 1986), the bankruptcy court designated an individual to exercise the rights and powers of the debtor, replacing the person initially designated to do so. The person initially designated to exercise such rights and powers had not proposed a plan after eight months in chapter 11, during which the debtors had suffered significant operating losses, and had consented to the bankruptcy court designating somebody else to replace him.  *Id*. at 769. The Seventh Circuit noted that it would typically question the method adopted by the bankruptcy court but affirmed the decision, citing the "peculiar circumstances of the case" and "the consent on all sides to the procedure."  *Id.* at 772.  Finally, in *In re Prop. Co. of Am. Joint Venture*, 110 B.R. 244 (Bankr. N.D. Tex. 1990), the court appointed a disinterested, responsible officer under section 1107 of the Bankruptcy Code to serve as interim chief executive officer and to exercise business judgment to resolve any business decisions "where the [debtors] could not agree."  *Id.* at 246.

## III.    Alternatively, the Court Should Adjourn the Motion until the Confirmation Hearing.

54.    For the reasons stated above, the Debtors respectfully submit that there is no basis whatsoever to appoint a trustee or other responsible party at OpCo.  The Motion is essentially a confirmation objection based on unfounded allegations that OpCo's directors and officers did not act in good faith and proposed a Plan that does not satisfy certain confirmation requirements. These are topics that the Court will consider in connection with confirmation.  *E.g.*, 11 U.S.C. § 1129(a)(3).  Thus, to the extent that the Court is not inclined to deny the Motion now, the

29

Debtors respectfully submit that it should adjourn the Motion until after the confirmation hearing, at which time, assuming the Plan is confirmed, the Motion will be moot.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court deny the Motion and grant such other relief as is just and proper under the circumstances.

Houston, Texas

January 13, 2017

/s/ *David R. Seligman*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)

David R. Seligman, P.C. (admitted *pro hac vice*)

Michael B. Slade (TX Bar No. 24013521)
(admitted *pro hac vice*)

Gregory F. Pesce (admitted *pro hac vice*)

300 North LaSalle

Chicago, Illinois 60654

Telephone:  (312) 862-2000

Facsimile:  (312) 862-2200

Email:       james.sprayregen@kirkland.com
             david.seligman@kirkland.com
             michael.slade@kirkland.com
             gregory.pesce@kirkland.com

- and -

Christopher T. Greco (admitted *pro hac vice*)

601 Lexington Avenue

New York, New York 10022

Telephone:  (212) 446-4800

Facsimile:  (212) 446-4900

Email:       christopher.greco@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

31

### Certificate of Service

I certify that on January 13, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ David R. Seligman
One of Counsel