IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| ULTRA PETROLEUM CORP., et al.,[1] | § § § | Case No. 16-32202 (MI) |
| Debtors. | § § § § | (Jointly Administered) |

**OBJECTION OF THE AD HOC EQUITY COMMITTEE TO THE MOTION
OF THE AD HOC OPCO COMMITTEE FOR APPOINTMENT OF A TRUSTEE
OR INDEPENDENT DIRECTORS TO THE BOARD OF ULTRA RESOURCES, INC.**

The ad hoc committee of holders of common stock (the "Equity Committee") issued by Ultra Petroleum Corporation, hereby objects to the *Motion of the Ad Hoc Committee of Unsecured Creditors of Ultra Resources, Inc. for an Order (I) Appointing a Trustee Pursuant to Section 1104(a) of the Bankruptcy Code or (II) in the Alternative, Appointing Independent Directors to the Board of Ultra Resources, Inc. Pursuant to Section 105(a), 1107(a) and 1108 of the Bankruptcy Code* [ECF No. 875] (the "Motion"),[2] dated Dec. 23, 2016, and respectfully states as follows:[3]

---

[1] The Debtors in these chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are (if any): Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] The Equity Committee also hereby joins the *Debtors' Objection to the Motion* [ECF No. 941].

**PRELIMINARY STATEMENT**

1. Despite the fact that the Debtors' Plan proposes treatment that would result in a full recovery for its constituency, and having refused to engage in any negotiations for anything less than payment in full in cash, the ad hoc committee of unsecured creditors of Ultra Resources, Inc. (the "Opco Committee") seeks the extraordinary relief of appointment of a chapter 11 trustee or, in the alternative, appointment of three independent directors to Opco's Board. Critically, the Motion is devoid of any evidence, or even any allegations of fraud or mismanagement, the *sine qua non* of such unique relief. As set forth herein, this is clearly not a case involving egregious misconduct or exceptional circumstances necessitating a trustee or modification to the Debtors' long-standing corporate governance.

2. The Opco Committee recklessly seeks to uproot and delay these well-advanced cases and overthrow management solely because they disagree with the Debtors on what constitutes payment in full of the Opco debt under the Bankruptcy Code. This is a narrow confirmation issue for the Court, not sufficient grounds to grant the extreme relief requested in the Motion.

3. The Opco Committee fallaciously complains that they have been excluded from the Plan negotiation process, the Debtors have not been responsive to their discovery requests, and that appointment of a trustee is therefore needed to remedy these perceived process defects. Nothing could be farther from the truth. The evidence will plainly show that the Debtors have repeatedly sought to engage the Opco Committee with respect to the appropriate terms for their Plan support to no avail. Likewise, the Debtors have produced a significant amount of material responsive to the Opco Committee's scatter-shot discovery requests at significant administrative costs borne by shareholders. The Opco Committee cannot credibly complain about the fair

stewardship of these cases and, instead, seems intent on a scorched-earth litigation campaign with other people's money.

4. Likewise, the Motion's allegation of disqualifying conflicts of interest is made out of whole cloth. Examined more closely, the Opco Committee's argument appears to be that Messrs. Watford (the Debtors' CEO and Chairman) and Shaw (the Debtors' CFO) *have done too good a job of managing the Debtors*.

5. Investors in the Opco debt had no misgivings with the composition of management and the Board when they invested $2.46 billion into the enterprise pre-petition. Since then, management has excelled and the Debtors have emerged as one of the industry's lowest-cost producers. Management's post-petition efforts have also directly benefited the members of the Opco Committee as Opco funded debt currently trades at or above 100 cents on the dollar - up from approximately 70 cents on the dollar on the Petition Date, and 90 cents on the dollar when the Opco Committee filed its Bankruptcy Rule 2019 Statement on June 8, 2016 [ECF No. 228]. If the members of Opco Committee are so unhappy with management, they could trade out now at or above par, in cash, and move on.

6. Moreover, the presence of inter-debtor conflicts, which is the characteristic of nearly every large multi-debtor chapter 11 case, does not by itself require the appointment of a trustee. Equally, that Watford and Shaw stand to recover under the Plan as equity holders and via the management incentive plan (the "MIP") does not present an adverse interest or unfair self-dealing. Considering the fact that Opco debt will receive full recompense under the Plan, the MIP represents a value allocation by key stakeholders of equity interests and Holdco debt, and its propriety (both as a good faith, arm's-length negotiation and within market terms), will be shown at confirmation.

7. In sum, the Motion reflects principles out of line with, and far astray from, the purposes of Bankruptcy Code Sections 1104(a), 1107(a), and 1108. Bankruptcy Code Section 1104(a) is meant to protect creditors and the public interest from fraud or gross mismanagement, not to advance the value decretive litigation tactics of distressed investors who have already made a considerable profit on their purchase of Opco funded debt and stand to receive payment in full of their allowed claims under the Plan. Accordingly, the Court should reject the Opco Committee's unfounded challenges to the stewardship of these Cases. The Motion should be denied.

## BACKGROUND

### A. General Background Of Debtors' Operations.

8. The Company has historically been one of the lowest-cost operators in the domestic U.S. oil and gas industry, particularly with regard to the cash costs components of its drilling, completion, and production operations. See *Declaration of Garland R. Shaw in Support of Chapter 11 Petitions and First Day Motions* (the "Shaw Declaration") at ¶ 33 [ECF No. 30].

9. Current management has demonstrated its ability to consistently improve its operating efficiencies, particularly in the Pinedale field, over many years. Since 2006, the Company has reduced its average total Pinedale well cost by 57% (from approximately $7 million in 2006 to approximately $3 million in 2015) and its average cycle time—from rig release on one well to rig release on the next well—by 71% (from nearly 80 days in 2006 to just over 10 days in 2015). See id. at ¶ 34.

10. Because the Company operates the vast majority of its properties, it has the opportunity to continue to realize the significant benefits of being a low-cost operator, including the ability to control the timing and amount of its capital expenditures, the nature and scope of its

development activities and, to a far greater extent than if it were primarily a non-operator, the costs of its drilling, completion, and production operations. Id. at ¶ 36.

11. The Company undertook a series of operational and financial actions in 2014 and 2015 to improve its liquidity position and stabilize its capital structure. During this period, among other stabilizing initiatives, the Company reduced its capital spending and negotiated material cost reductions from key vendors. The Company made less than $500 million in capital investments in 2015 after investing over $1.4 billion in 2014 (including acquisition capital expenditures). Id. at ¶ 56, 57.

**B.    Bankruptcy Filing, Capital Structure, and Debt Trading Prices.**

12. On April 29, 2016 ("the Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (this "Court") commencing these chapter 11 cases.

13. For more than eight months, the Debtors have continued to manage and operate their businesses and properties as Debtors-In-Possession pursuant to Bankruptcy Code Sections 1107 and 1108.

14. The Debtors' funded indebtedness is all unsecured and consists of approximately $1.3 billion of HoldCo Notes, approximately $999 million of OpCo Bank Debt, and an estimated $1.46 billion OpCo Notes, for total funded debt outstanding of approximately $3.7 billion with a weighted average interest rate of 5.8%. See Shaw Declaration at ¶ 37.

15. On the Petition Date, common stock of Ultra Petroleum Corp. traded at 31 cents on the dollar, Holdco Notes traded at approximately 15.5 cents on the dollar, and Opco funded debt traded at approximately 70 cents on the dollar.

5

16. As of January 13, 2017, common stock of Ultra Petroleum Corp. traded at $7.20, Holdco Notes traded at approximately 95 cents on the dollar, and Opco funded debt traded at or above par.

**C.     Plan Background.**

17. On November 21, 2016, after extensive negotiations, the Debtors and entities holding a majority of Holdco's common stock and a substantial majority of Holdco's outstanding unsecured notes agreed to the terms of the restructuring set forth in the Plan Support Agreement.

18. On December 6, 2016, the Debtors' filed the Plan [ECF No. 817], Disclosure Statement [ECF No. 818], and *Motion for Entry of an Order Authorizing (I) Debtors' Entry into Backstop Commitment Agreement and (ii) Payment and Allowance of Related Fees and Expenses as Administrative Claims* [ECF No. 820].

19. The Plan includes a $580 million rights offering backstopped by Consenting Holdco Noteholders and Equityholders (as defined in the Plan Support Agreement).

20. The Plan provides for the equitization of nearly $1.3 billion in HoldCo Notes, a significant recovery to holders of existing Holdco common stock in the form of reorganized equity, the satisfaction of all of Opco's allowed funded indebtedness, allowed general unsecured claims against Opco (including trade creditor claims), allowed administrative claims, and allowed priority claims.

21. Under the Plan, each holder of an OpCo Note Claim or an Opco RCF Claim will receive value in the form New OpCo Notes and/or cash, as of the Effective Date, equal to the allowed amount of such claim. Plan § 3.2(d)-(e).

22. The New OpCo Notes will be general unsecured obligations in an amount up to $2.2 billion, bearing interest at 4.80% per annum and maturing ten years after the Effective Date. See Disclosure Statement at Exhibit H.

23. Pending a determination by the Bankruptcy Court as to allowance, each holder of an Allowed OpCo Makewhole Claim, if any, shall receive an amount of Additional OpCo Notes equal to the amount of the Allowed OpCo Note Makewhole claims held by such holder. Plan at § 3.2(g).

24. The Plan establishes the MIP under which 7.5% of the fully-diluted, fully-distributed shares of HoldCo will be reserved for issuance to management (the "Share Reserve"). See Plan Term Sheet at 3. Forty percent (40%) of the Share Reserve will be granted to members of management identified by the pre-Effective Date HoldCo Board. The remaining sixty percent (60%) of the Share Reserve will be available to be granted by the post-Effective Date HoldCo Board. Id.

**D.  Plan Process.**

25. As more fully set forth in the Debtors' Objection, the Debtors have continuously sought (both before and after filing the Plan) to engage the Opco Committee, as well as the Official Creditors' Committee, with respect to the terms for their Plan support.

26. The Opco Committee has yet to respond with any comments to the Plan or engagement short of demands for full cash payment of the Opco funded debt, plus payment of default interest, interest on interest, and payment in full of the disputed make-whole amounts, plus interest.

27. However, the Opco Committee has served extensive discovery on the Debtors, which the Debtors have responded to at a significant cost to the estate and shareholders who bear

the cost of administration of these cases. More recently, the Opco Committee has served extensive additional discovery on the Equity Committee and the Holdco Committee.

### E. The Motion.

28. Significantly, the Motion does not include any evidence or allegations of misconduct or mismanagement by the Debtors. Rather, the Motion presents the unique and somewhat bewildering circumstance where a constituency standing to receive property of a value as of the Effective Date equal to the allowed amount of its claim, chooses to file a Motion on the eve of the Christmas holiday requesting appointment of a trustee.

## OBJECTION

### I. Appointment Of A Trustee Is Unwarranted Under Bankruptcy Code Section 1104(a)(1) Because The Opco Creditors Committee Cannot Demonstrate Fraud, Gross Mismanagement, Incompetence, Dishonesty, Or Any Other Misconduct By The Debtors.

#### A. Legal Standard.

29. Appointment of a trustee under Bankruptcy Code Section 1104(a) is only appropriate:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause…; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §§ 1104(a).

30. The movant must prove the need for a trustee under either subsection by clear and convincing evidence. See In re G-I Holdings, Inc., 385 F.3d 313, 317-18 (3d Cir. 2004); In re New Millennium Mgmt. LLC, 2014 WL 792115, at *5 (Bankr. S.D. Tex. Feb. 25, 2014).

8

31. Appointment of a trustee is well-recognized as an "extraordinary remedy." In re Evans, 48 B.R. 46, 47 (Bankr. W.D. Tex. 1985); see In re Adelphia Commc'ns Corp., 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006), aff'd, 342 B.R. 122 (S.D.N.Y. 2006) (appointment of a trustee is the "exception, rather than the rule.") (quoting In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir. 1989).

32. There is a strong presumption against the appointment of a trustee. See In re Cajun Elec. Power Co-op, Inc., 69 F.3d 746, 749 (5th Cir. 1995), opinion withdrawn in part on reh'g, 74 F.3d 599 (5th Cir. 1996).

33. Appointment of a trustee is reserved only for cases in which there is clear and convincing evidence of fraud, gross mismanagement, dishonesty, incompetence, or similar egregious misconduct. See, e.g., In re Amerejuve, Inc., 2015 WL 2226344, at *6-11 (Bankr. S.D. Tex. Apr. 29, 2015) (president-majority shareholder embezzled debtor's funds and withheld funds from debtor's employees); Order For Appointment of Chapter 11 Trustee, In re Edward I. Nwokedi, No. 12-32759, (Bankr. S.D. Tex. May 22, 2012), ECF No. 46 (jury verdict found debtor liable for fraud, civil theft, and piercing the corporate veil); In re Cajun Elec. Power Co-op, 69 F.3d at 750, opinion withdrawn in part on reh'g, 74 F.3d 599 (cooperative failed to collect monies from members and denied members access to information); In re Millennium Mgmt., 2014 WL at *5 (debtor's sole member drafted documents identifying debtor's property as his own and concealed various agreements from the court).

34. Under Bankruptcy Code Section 1104(a)(2), courts will only appoint a trustee in the rare and unique circumstance where such appointment is in the best interests of all constituencies. See 11 U.S.C. § 1104(a)(2); 7 Collier on Bankruptcy ¶¶ 1104.02[1], 1104.02[3][d][i] (16th ed.) ("[T]he 'interests' standard requires a finding that appointment of a

9

trustee would be in the best interest of *essentially all interested constituencies*.") (emphasis added).

35. To determine whether the appointment of a trustee is in the best interests of all interested constituencies, courts apply a fact-driven, cost-benefit analysis that takes into consideration the substantial administrative cost to the estate of a trustee. See, e.g., In re New Orleans Paddlewheels, Inc., 350 B.R. 667, 691-93 (Bankr. E.D. La. 2006) (best interests is determined on a case by case basis dependent on the facts); In re Evans, 48 B.R. at 47-49 (court must consider whether cost of appointment of trustee outweighs benefit to estate).

B. **The Fiduciary Duties That Are Inherent To Multiple Debtor Bankruptcies Do Not Pose Disabling Conflicts Of Interest Sufficient To Appoint A Trustee Under Bankruptcy Code Section 1104(a)(1).**

36. The potential for conflicts of interest inherent in multi-debtor bankruptcies are not the exceptional grounds that warrant appointment of a trustee. Indeed, the Opco Committee cites no cases supporting appointment of a trustee on this basis and there are none.

37. Rather, the cases cited by the Opco Committee are readily distinguished from these Chapter 11 cases as those cases were all rife with misconduct and acrimony that is not present here.[4]

---

[4] See In re Patman Drilling Int'l Inc., No. 07-34622-SGJ, 2008 WL 724086, at *3-4 (Bankr. N.D. Tex. Mar. 14, 2008) (officer-owners drew imprudent salaries from debtor, leased jet airplane to debtor at excessive rates, and falsely characterized debtor's $3.7 million loan as a capital contribution); In re Ashley River Consulting, LLC, 2015 WL 1540941, at *10 (Bankr. S.D.N.Y. Mar. 31, 2015) (debtors' management concealed real property, concealed corporate relationships, commingled funds, and indicated they would not investigate claims against the estate held by affiliated companies); In re Marvel Entm't Grp., 140 F.3d 463, at 472-73 (3d Cir. 1998) (court appointed trustee based on fact that controlling interest holders were in "awkward position of evaluating their own indenture and debt claims" resulting in extreme acrimony between debtors and creditors); In re Bowman, 181 B.R. 836, 845 (Bankr. D. Md. 1995) (debtor-in-possession rejected settlement offer that would have paid all creditor claims); In re Cajun Elec. Power Coop., Inc., 191 B.R. 659, 662 (M.D. La. 1995) (disqualifying conflict of interest existed where board members of utility cooperative managed individual member companies that would could benefit from board's decision whether to appeal agency order regarding utility rates), aff'd sub nom., Cajun Elec. Power Coop., Inc. v. Central La. Elec. Coop. (In re Cajun Elec. Power Coop., Inc.), 74 F.3d 599, 600 (5th Cir. 1996).

38. Notwithstanding the absence of credible case law, the Opco Committee concludes that Watford and Shaw are somehow prevented from carrying out their fiduciary duties to Opco, and that the Plan does not align with the interests of Opco's estate and creditors, even though Opco creditors will be paid in full under the Plan. Motion at ¶¶ 18, 21, 23.

39. That Watford and Shaw have fiduciary duties to shareholders, Holdco creditors and Opco creditors, does not establish cause for appointment of a trustee. Management teams are often responsible for balancing inter-debtor interests in large, complex Chapter 11 cases, and such inter-debtor conflicts are not themselves evidence of self-dealing or misconduct sufficient to establish cause under Bankruptcy Code Section 1104(a)(1). See In re Adelphia, 336 B.R. at 678 ("The presence of inter-debtor conflicts, which is characteristic of nearly every large multi-debtor chapter 11 case, does not by itself require the appointment of trustees" under Section 1104(a)). Accordingly, the Motion should be denied.

### C. That Watford And Shaw Stand To Receive Reorganized Equity And MIP Value Under The Plan Does Not Pose A Disqualifying Conflict Of Interest Or Sufficient Cause Under Bankruptcy Code 1104(a)(1) For Appointment of a Trustee.

40. The Opco Committee alleges that Watford and Shaw, by virtue of being equity holders in and management of the Debtors, are "incapacitated" by conflicts of interest because they stand to receive "massive consideration" in the form of reorganized equity and distributions under the MIP if the Plan is confirmed. See Motion at ¶¶ 12, 23.

41. Notwithstanding the Opco Committee's colorful choice of words, the validity of the Plan and the MIP are confirmation issues, not good cause for appointment of a trustee under Bankruptcy Code Section 1104(a)(1).

42. At confirmation, the evidence will show that the Plan and the MIP resulted from arm's length negotiations and have significant stakeholder support, including the support of the

11

Equity Committee and the Holdco Committee. Evidence will also show that the MIP is a market-based, appropriate award for an accomplished management team.

43. For now, that Watford and Shaw stand to receive equity distributions under the Plan and value under the MIP does not constitute a disqualifying conflict of interest requiring the appointment of a trustee.

**D.    The Opco Creditors Committee's Dissatisfaction
With The Plan Under Which They Are Paid In Full Is Not
Good Cause To Appoint A Trustee Under Bankruptcy Code Section 1104(a)(1).**

44. In clear contrast to the cases militating in favor of appointment of a trustee, the Motion fails to allege fraud or gross mismanagement by the Debtors. Instead, the Motion simply previews the Opco Committee's potential objections to the Plan under Bankruptcy Code Sections 1126(e) and 1129(b).

45. The Opco Committee's discontent with the Plan raises narrow confirmation issues and not grounds to appoint a trustee under Bankruptcy Code Section 1104(a)(1). Accordingly, the Motion should be denied.

**II.    Appointing A Trustee Is Not In The Best Interests Of All Constituencies.**

46. The Opco Committee asserts that appointment of a trustee is in the best interest of the Opco estate because Watford and Shaw's purported conflicts of interest cast doubt on their trustworthiness and ability to make impartial decisions for Opco. See Motion at ¶ 25.

47. The only support for this exaggerated proposition is the Opco Committee's self-serving argument that they have been excluded from the Plan process. As set forth herein and in the Debtors' Objection, the Opco Committee's decision not to engage in good faith in Plan negotiations cannot now be used as credible grounds to seek appointment of a trustee under Bankruptcy Code Section 1104(a)(2).

48. The Opco Committee's rhetoric regarding "untrustworthy" conduct is off base and ill-fitting. There is not a scintilla of evidence that management has engaged in any untrustworthy conduct.

49. Untrustworthy conduct includes only such conduct that casts a shadow on a debtor's ability to run its business. See, e.g., In re Evans, 48 B.R. at 48-49 (debtor failed to file income tax returns for three years); 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (16th ed.) ("[W]hen current management is competent and able to adjust to its new obligations under chapter 11…there may in fact be little or no benefit to the appointment of a trustee."); Id. at ¶ 1104.02[3][d][i] ("[W]hen equity security holders or other ownership interests properly and in good faith support the debtor's current management, it will be difficult to obtain an order for the appointment of a trustee under the 'interests' standard, as such an appointment will presumably not be in the interests of equity.").

50. Rather, Watford and Shaw have effectively led the Debtors through complex restructuring negotiations and communicated material updates to the public on an ongoing basis, including hosting an earnings call on October 29, 2016, and issuing a press release and 8-K on November 22, 2016. The Opco Committee has not pointed to any untrustworthy conduct on the part of Watford or Shaw that would require appointment of a trustee.

51. The Motion is otherwise devoid of any evidence of the purported benefits of appointing a trustee, short of the Opco Committee's dissatisfaction with the current Plan – far short of sufficient grounds for appointment of a trustee. See H.R. Rep. 95-595, 95th Cong., 1st Sess. 402 (1977), U.S. Code Cong. & Admin. News 1978, at 5963, 6358 ("The court may order appointment [of a trustee] *only if* the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection

13

afforded . . . for example, in cases where the current management of the debtor has been fraudulent or dishonest, or has grossly mismanaged the company, or where the debtor's management has abandoned the business.") (emphasis added).

52. Furthermore, appointment of a trustee would surely interject needless delay, expense, and disruption to these cases. At this stage of these cases, it is undisputed that a trustee would require substantial time and incur significant expense getting up to speed.

53. Moreover, under the Plan Support Agreement, failure to meet the following milestones is an event of default: (i) entry of orders approving the Disclosure Statement and Backstop Commitment Agreement by January 20, 2017; (ii) entry of the Confirmation Order by March 17, 2017; and (iii) occurrence of the Effective Date of the Plan by April 15, 2017. See PSA §§ 4(b), 4(c), 4(d), 7(n)-(o). Appointing a trustee now would impede the Debtors' ability to meet the milestones set forth in the Plan Support Agreement and would completely derail the restructuring contemplated by the Plan.

54. The time, expense, and disruption necessitated by the appointment of a trustee are not justified by any countervailing benefit to the estate. The Opco Committee's request for appointment of a trustee serves only their self-interest and the Motion should be denied.

### III.   There Is No Reasonable Basis To Replace Watford And Shaw On The Opco Board.

55. Bankruptcy Code Section 105(a) does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity. See United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir. 1986).

56. Under Bankruptcy Code Section 1107(a), a debtor in possession has all the same rights and duties as a trustee. See 11 U.S.C. § 1107(a). According to legislative history, Bankruptcy Code Section 1107(a) "places a debtor in possession in the shoes of a trustee in

every way." S. Rep. 95-989, 95th Cong., 2d Sess. 116 (1978); U.S. Code Dong. & Admin. News 1978 at 5787, 5902. Likewise, Bankruptcy Code Section 1108 enables a debtor-in-possession to operate the business without court approval. See 11 U.S.C. § 1108.

57. There is a "strong presumption that the debtor should be permitted to remain in possession" and retain management and control of the bankruptcy process, which can only be overcome by clear and convincing evidence. See In re Blue Stone Real Estate, Const. & Dev. Corp., 392 B.R. 897, 905 (Bankr. M.D. Fla. 2008) (quoting In re Adelphia, 336 B.R. at 655) (indicating that altering the debtors' management involves an analysis similar to a cause analysis under Section 1104(a)).

58. Here, the Opco Committee alleges that appointing three independent directors for Opco would obviate the purported conflicts of interest they have conjured up. See Motion at ¶¶ 29, 33. For the same reasons set forth herein as to the denial of their request to appoint a trustee, this request should be summarily denied.

59. The Opco Committee's request to replace Watford and Shaw on the Opco Board is wholly inappropriate and unwarranted because there is no evidence to overcome the strong presumption under Bankruptcy Code Sections 1107(a) and 1108 that management retain control over the Debtors.[5]

---

[5] The cases cited by the Opco Creditors Committee in support of removal of Watford and Shaw from the Opco Board and replacing them are inapplicable here because there is no evidence of cronyism, inability of the board to function effectively, or consent to replacement. See, e.g., In re Blue Stone Real Estate, 392 B.R. at 903 (altering powers of debtors' boards of directors in order to alleviate concern that accountant would function as a crony to debtors' principal); In re Commc'n Options, Inc., 299 B.R. 481, 482 (Bankr. S.D. Ohio 2003) (granting motion for the appointment of a responsible party because of debtor's use of delay tactics to avoid paying creditors); In re Gaslight Club, Inc., 782 F.2d 767, 771 (7th Cir. 1986) (approving the replacement of debtor's president and majority shareholder because he consented to the replacement); In re Prop. Co. of Am. Joint Venture, 110 B.R. 244, 245-46 (Bankr. N.D. Tex. 1990) (ordering a disinterested business consultant to act as interim CEO because the only two members of debtor's management were at an impasse and needed "a tie-breaker mechanism to preserve the estate"); In re FSC Corp., 38 B.R. 346, 349 (Bankr. W.D. Pa. 1983) (appointing a responsible officer because debtor did not have a board of directors to oversee its affairs).

60.     As discussed above, the Opco Committee cannot demonstrate, by any evidence, yet alone the high standard required of clear and convincing evidence, any disqualifying conflict of interest or exceptional circumstances that would support a finding of cause to remove Watford and Shaw from the Opco Board.  See, e.g., In re Adelphia, 336 B.R. at 654 (holding that when there is no cause to appoint a trustee under Bankruptcy Code Section 1104(a)(1), appointing independent directors to represent an estate is an impermissible circumvention of the Bankruptcy Code).  Accordingly, the Opco Committee's request to remove Watford and Shaw from the Opco Board should be denied.

[*remainder of page left intentionally blank*]

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Equity Committee respectfully requests that the Court deny the Motion.

Dated: January 13, 2017

                          **BROWN RUDNICK, LLP**

                          By:  /s/ Howard S. Steel
                          Edward S. Weisfelner (admitted *pro hac vice*)
                          Howard S. Steel (admitted *pro hac vice*)
                          Seven Times Square
                          New York, NY 10036
                          Telephone: (212) 209-4800
                          Facsimile: (212) 209-4801
                          Email: eweisfelner@brownrudnick.com
                          Email: hsteel@brownrudnick.com

                          - and -

                          **GRAY REED & MCGRAW, LLP**
                          Jason S. Brookner
                          Texas Bar No. 24033684
                          Lydia R. Webb.
                          Texas Bar No. 24083758
                          1300 Post Oak Blvd., Suite 2000
                          Houston, TX 77056
                          Telephone: (469) 320-6111
                          Facsimile: (713) 986-7100
                          Email: jbrookner@grayreed.com
                          Email: lwebb@grayreed.com

                          *Counsel to the Ad Hoc Equity Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2017, a copy of the foregoing Objection was filed electronically. Notice of this filing will be sent to all parties through the Court's Electronic Case Filing System and a copy will be sent by first class mail to the parties on the Master Service List.

*/s/ Howard S. Steel*
Howard S. Steel