**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | CASE NO. 16-32202 (MI) |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |
| SOUTHERN CALIFORNIA PUBLIC POWER AUTHORITY and TURLOCK IRRIGATION DISTRICT, | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | Adversary No. 17-_____ |
| v. | § | |
| | § | |
| ULTRA RESOURCES, INC., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Southern California Public Power Authority ("SCPPA") and Turlock Irrigation District ("TID"; and collectively with SCPPA, the "Plaintiffs"), each of which are creditors and/or parties-in-interest in the above-referenced bankruptcy proceeding (the "Bankruptcy Case"), file this their Complaint (the "Complaint") against debtor Ultra Resources, Inc. (the "Debtor" or "Ultra"), and would respectfully show the Court as follows:

**I.**
**NATURE OF THE ACTION**

1.      Plaintiffs SCPPA and TID, each as successors in interest, are non-operating working interest owners of certain oil and gas leases located in Sublette County, Wyoming (the

---

[1] The debtors in the chapter 11 cases, along with the last four digits of each debtor's federal tax identification number (if any), are: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

"Pinedale Field").  Ultra is the operator for the Plaintiffs' leases in the Pinedale Field pursuant to, among other similar and applicable operating agreements, that certain Model Form Operating Agreement (the "Joint Operating Agreement") dated June 30, 2005.

2.     As affirmed by the Wyoming Supreme Court in *Ultra Resources, Inc. v. Hartman*, 226 P.3d 889 (Wyo. 2010), the Pinedale Field was, and remains, subject to that certain Pinedale Unit Area Net Profits Contract dated April 1, 1954 (the "Net Profits Contract"), whereby working interest owners, through Ultra as the operator, must pay a net profits interest ("NPI") to Doyle and Margaret Hartman (the "Hartmans") and certain other parties, each as successors in interest (collectively, the "NPI Owners").[2]

3.     NPI payments made pursuant to the Net Profits Contract are apportioned among the working interest owners pursuant to that certain Supplemental Accounting Agreement, Net Profits Interest, Pinedale Unit Area, Sublette County, Wyoming (the "Supplemental Accounting Agreement"), dated May 7, 1954.

4.     Since May 2014, Ultra has provided periodic invoices to SCPPA and TID demanding payment of NPI amounts pursuant to Ultra's interpretation of the Net Profits Contract and the Supplemental Accounting Agreement.  Each of SCPPA (with certain exceptions) and TID paid those amounts in reliance on Ultra Resources' calculation of the NPI amounts due and owing under the Net Profits Contract and Ultra's apportionment of that liability among the working interest owners pursuant to the Supplemental Accounting Agreement.

5.     However, SCPPA and TID determined that Ultra was mis-calculating the working

---

[2] The Hartmans, as set forth in their Amended Complaint filed at Adversary Proceeding 16-03250 (S.D. Tex.) [Dkt. No. 2], are successors to Novi Oil Company ("Novi") and claim entitlement to a 2.49% NPI, which is derived from the 5% NPI originally granted to Novi under the Net Profits Contract; *see also* Hartmans' Proof of Claim, Case No. 16-32204, Claim No. 48 (Epiq Claim No. 235).  The remaining 2.49% NPI created by the Net Profits Contract is owned by various other NPI Owners, which have each asserted proofs of claim against Ultra.

interest owners' allocable share of the NPI payments by allocating NPI liability based on each working interest owners' respective *net profits*, rather than the parties' respective *gross revenue*, derived from the Pinedale Field leases.[3]   By apportioning NPI liability amongst (non-settling) working interest owners based on net profits—and by virtue of Ultra Resources having (or, on information and belief, wrongfully attributing) disproportionately high expenses on its operations—Ultra has demanded that SCPPA, TID, and similarly-situated parties pay significantly higher percentages of the NPI liability in violation of the Supplemental Accounting Agreement and/or the Net Profits Contract.

6.      Furthermore, Ultra's apportionment of NPI responsibility based on net profits directly contradicts the ruling of the Wyoming District Court, as affirmed by the Wyoming Supreme Court: In determining whether proper settlement credit was granted with respect to NPI owing to the NPI Owners, the Court held that "**[w]hile we agree that the [Net Profits] Contract focuses on net profits, that does not change the fact that the First Parties agreed to use the Supplemental Accounting Agreement to allocate the NPI burden among themselves and the Supplemental Accounting Agreement allocates on the basis of revenue.**"[4]

7.      Each of SCPPA and TID have asserted proofs of claim in the Bankruptcy Case setting forth the prepetition amounts owed for their respective NPI overpayments and certain other wrongfully assessed charges by Ultra relating to the Hartman litigation.  By and through this Complaint, the Plaintiffs bring this suit in order to (a) resolve the anticipated objection to

---

[3] *See Ultra Resources, Inc. v. Hartman*, 226 P.3d 889 (Wyo. 2010) (the "Hartman Opinion") ("While we agree that the Unit NPI Contract focuses on net profits, that does not change the fact that the First Parties agreed to use the Supplemental Accounting Agreement to allocate the NPI burden among themselves and the Supplement Accounting Agreement allocates on the basis of revenues.").

[4] Hartman Opinion at p. 935 (emphasis added).

their claims against the Ultra bankruptcy estate relating to NPI apportionment; (b) request immediate turnover of any NPI over-payment because such funds are not property of Ultra or its bankruptcy estate; (c) establish their rights to recoup NPI overpayments from future NPI charges; and (d) resolve all future disputes with respect to allocation of NPI payment responsibilities from working interest owners pursuant to the Net Profits Contract and Supplemental Accounting Agreement (including recognition of the Wyoming Supreme Court's definitive and preclusive ruling on the subject).

## II.
## JURISDICTION AND THE PARTIES

**A.**     **Jurisdiction and Venue**

8.      On April 29, 2016, Ultra and various related entities filed voluntary petitions under chapter 11 of title 11 of Bankruptcy Code (the "Petition Date") initiating the Bankruptcy Case.

9.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The Adversary Proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  In the event any part of this Adversary Proceeding is determined to be non-core, the Plaintiffs consent to the entry of final orders and judgment by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

10.     This Court has personal jurisdiction over the Debtor pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

11.     Venue in this District is proper pursuant to 28 U.S.C. § 1409.

**B.**     **The Parties**

12.     Plaintiff Southern California Public Power Authority is a joint powers agency comprised of eleven municipal utilities and one irrigation district in the State of California.

SCPPA's members consist of the municipal utilities of Anaheim, Azusa, Banning, Burbank, Cerritos, Colton, Glendale, Los Angeles, Pasadena, Riverside, Vernon and the Imperial Irrigation District.  Together they deliver electricity to over 2 million customers in the southern California basin, spanning an area of 7,000 square miles, and with a total population that exceeds 5 million. SCPPA's headquarters is located in Glendora, California.

13.     Plaintiff Turlock Irrigation District is an irrigation district organized in 1887 under the Wright Act and operates under provisions of the California Water Code as a special district.  TID's headquarters is located in Turlock, California.  TID provides electricity to over 100,000 customers in its 662 square mile service territory in the counties of Stanislaus, Merced, and Tuolumne.

14.     Ultra Resources, Inc. is a Wyoming corporation with its principal place of business in Colorado.  Ultra is the operator of and a working interest owner in certain oil and gas leases located in the Pinedale Field in Sublette County, Wyoming.  Ultra is a chapter 11 debtor, along with various parent and affiliated entities, in the Bankruptcy Case, as jointly administered.

## III.
## FACTUAL BACKGROUND

**A.     The Pinedale Field and the Net Profits Contract**

15.     In the 1950s, Malco Refineries, El Paso Natural Gas Company, and Continental Oil Company (as referenced in the Net Profits Contract, the "First Parties") sought to develop oil and gas interests in Sublette County, Wyoming.  Because Novi Oil Company ("Novi") controlled certain leases that the First Parties wanted to include in their development plans, the First Parties and Novi entered into an assignment agreement whereby Novi would assign three federal leases and one fee lease to the First Parties in exchange for payment of the NPI.

16.     In 1954, the Pinedale unit was approved by the United States Geological Survey

(the "USGS"), and the Pinedale Unit Agreement (the "Unit Agreement") was executed between the operators, other working interest owners, and Novi.  Among other things, the Unit Agreement outlined the operators' responsibilities, included general unit accounting terms, and provided for contraction of the unit to eliminate non-producing properties at certain intervals.

17.     Consistent with the requirements of the assignment agreement, Novi and the First Parties entered into the Net Profits Contract, dated April 1, 1954.  A copy of the Net Profits Contract is attached hereto as **Exhibit A** and incorporated herein for all purposes.

18.     The Net Profits Contract provides that the "First Parties agree to pay to Novi a sum or sums representing 5% of the net profits . . . resulting from operations for oil and gas by First Parties . . . " pursuant to certain defined leases existing on the Pinedale Field.  The contract defines net profits, in sum, as the gross revenue (not required for payment of the overriding and landowners' royalties) from unit operations allocable to the applicable Pinedale Field leases after deduction of all unit operations expenses, except those charged to the working interest owners, if any, under the said unit other than the First Parties.  Moreover, the Net Profits Contract calls for "all accounting for the purposes of determining net profits" to be made on a consolidated basis involving all Pinedale Field leases, irrespective of the fact that separate operations involving separate oil and gas deposits may exist.[5]

B.     **The Supplemental Accounting Agreement**

19.     On May 7, 1954, the First Parties also entered into the Supplemental Accounting Agreement to govern amongst themselves their respective responsibilities for satisfying the NPI obligations created by the Net Profits Contract.  A copy of the Supplemental Accounting Agreement is attached hereto as **Exhibit B** and incorporated herein for all purposes.

---

[5] *See* Net Profits Contract at p. 4.

20.     Pursuant to the agreement, and consistent with the Net Profits Contract, the operator has the responsibility to compute and attribute NPI liability amongst the responsible parties (i.e., working interest owners).[6]

21.     The Supplemental Accounting Agreement clarifies that the agreement is premised on "placing a proportionate share of the burden" for paying the NPI obligation on all responsible parties (i.e., working interest owners).[7]

22.     The Supplemental Accounting Agreement requires that the operator establish an account dedicated to satisfying the NPI obligations.  The account shall be funded by cash payments from the working interest owners in an amount—as calculated by the operator—based on each such working interest owners' respective "**gross revenue**" from the operations (adopting the definition of gross revenue from the Net Profits Contract[8]).

## C.     The Hartman Litigation

23.     For approximately fifty (50) years, for reasons not relevant to this proceeding, no NPI was paid by or to any party.

24.     In 2007, the NPI Owners initiated suit in Wyoming district court requesting, *inter alia*, declaratory relief to determine whether (a) the Net Profits Contract burdened the existing leases on the Pinedale Field; (b) whether the NPI Owners are successors to Novi thereunder; and (c) whether Ultra is the successor to the First Parties.  The court answered each of these questions in the affirmative, and awarded the NPI Owners damages for unpaid NPI amounts

---

[6] Supplemental Accounting Agreement at p. 3.

[7] Supplemental Accounting Agreement at p. 4 ("Without limiting the foregoing but by way of clarifying the Accounting Procedure to be followed in placing a proportionate share of the burden of such net profits interest upon the parties hereto, such interest shall be borne and paid for by the parties hereto as follows . . . .").

[8] The Net Profits Contract provides, in relevant part: "[i]n computing gross revenue, there shall be taken into account the proceeds of production sold for delivery at the wellhead.  As to production not so sold, the fair market value of such production at the wellhead shall be taken into account[.]"  Net Profits Contract at p. 2.

through December, 2006.

25.     On appeal, the Wyoming Supreme Court affirmed the findings and order of the district court.  *See Ultra Resources, Inc. v. Hartman*, 226 P.3d 889 (Wyo. 2010).  A copy of the Hartman Opinion is attached hereto as **Exhibit C**.

26.     In that litigation, the trial court was required, in part, to interpret the Supplemental Accounting Agreement in order to provide a settlement credit against the total joint and several NPI award because two current First Parties, Questar and Wespro,[9] reached a settlement with the NPI Owners prior to conclusion of the litigation.

27.     After considering testimony from competing experts, the trial court held that attributing the NPI obligations between the working interest owners must be done by "dividing that party's revenues by the total revenues attributable to the NPI leases."[10]  Hence, the Wyoming district court allocated thirty percent (30%) of the NPI burden to the settling defendants.

28.     This settlement allocation—and the corresponding analysis of the Supplemental Accounting Agreement—was among the findings and orders that were appealed by Ultra and its co-defendants.[11]

29.     The Wyoming Supreme Court affirmed the trial court's decision, stating:

---

[9] Like Plaintiffs and Ultra, Questar and Wexpro are successors-in-interest to the original First Parties.  *See generally* Hartman Opinion.

[10] The Wyoming Supreme Court recounted from the record that "[t]he plaintiffs' expert testified in the rebuttal portion of the trial that, under the Supplemental Accounting Agreement, the net profits payable by each First Party successor is determined by **dividing that party's revenues by the total revenues attributable to the NPI leases.**" Hartman Opinion at 935 (emphasis added).

[11] Specifically, the Wyoming Supreme Court considered whether "the district court erred by adopting the [NPI Owners'] expert's method for determining what percentage [the settling First Parties] settlement reflected of the NPI obligation." Hartman Opinion at 935.

> While we agree that the Unit NPI Contract focuses on net profits, that does not change the fact that the First Parties agreed to use the Supplemental Accounting Agreement to allocate the NPI burden among themselves and **the Supplemental Accounting Agreement allocates on the basis of revenues**.

Hartman Opinion at 935 (emphasis added).

### D.   Ultra Nonetheless Allotted NPI Responsibility Based on Profits

30.     In June and July, 2005, SCPPA and TID acquired working interest ownership rights in the Pinedale Field leases, thus becoming successor-in-part to the First Parties.  Since becoming successor working interest owners, Ultra has served as the Plaintiffs' operator pursuant to that certain Model Form Operating Agreement (the "Joint Operating Agreement"), dated June 30, 2005.

31.     As Operator, pursuant to the Net Profits Contract and the Supplemental Accounting Agreement, Ultra was and is responsible for calculating the NPI due to the NPI Owners and allocating those obligations among the working interest owners, including SCPPA and TID.

#### (a)   SCPPA's NPI Obligations, as Calculated by Ultra

32.     In connection with those duties, Ultra issued the following invoices to SCPPA, demanding payment by SCPPA of its alleged allocable share of NPI pursuant to the Supplemental Accounting Agreement:

- Invoice 3853 (dated October 8, 2014), in the amount of $695,931.00;

- Invoice 4074 (dated April 21, 2015), in the amount of $349,600.66;

- Invoice 4004 (dated February 27, 2015), in the amount of $1,056,717.11;

- Invoice 4302 (dated October 12, 2015), in the amount of $522,111.27;

- Invoice 4512 (dated April 20, 2016), in the amount of $239,104.82;

- Invoice 4621 (dated July 31, 2016), in the amount of $172,554.20; and

- Invoice 4847 (dated January 17, 2017), in the amount of $333,566.60 (including a credit of $9,815.37 for the previous period).

33.     As of this filing, SCPPA timely remitted payment on account of the first four invoices (Invoice Nos. 3853, 4074, 4004, 4302) (the "Paid SCPPA Invoices") in the total amount of $2,624,360.04.  The remaining invoices are unpaid (except for recoupment/setoff credit due to SCPPA on account of prior overpayments).

**(b)     TID's NPI Obligations, as Calculated by Ultra**

34.     Also in its capacity as operator and pursuant to the Net Profits Contract and Supplemental Accounting Agreement, Ultra issued the following invoices to TID, demanding payment by TID of its alleged allocable share of NPI:

- Invoice 3854 (dated October 8, 2014), in the amount of $58,950.23;

- Invoice 4006 (dated February 27, 2015), in the amount of $139,470.55;

- Invoice 4075 (dated April 21, 2015), in the amount of $54,316.05;

- Invoice 4303 (dated October 12, 2015), in the amount of $53,799.41;

- Invoice 4513 (dated April 20, 2016), in the amount of $14,918.35;

- Invoice 4622 (dated July 31, 2016), in the amount of $20,421.22;

- Invoice 4740 (dated October 12, 2016), in the amount of $2,167.91; and

- Invoice 4848 (dated January 31, 2017), in the amount of $50,914.93.

35.     As of this filing, TID has timely remitted payment—in protest—on account of the above invoices (the "TID Invoices") in the total amount of $344,043.72.[12]

**(c)     Ultra's Invoices Apportioned NPI Obligations Based on Profits, Not Gross Revenue**

36.     Each of the above-referenced invoices were generated based on a spreadsheet

---

[12] As of this Complaint, TID has not made payment on account of the January 2017 invoice.

created and maintained by Ultra (the "<u>NPI Apportionment Spreadsheet</u>"), which accompanied the respective invoices.  A copy of the most recent (as of this filing) NPI Apportionment Spreadsheet is attached hereto as **Exhibit D** and incorporated herein for all purposes.[13]

37.     The first column of the NPI Apportionment Spreadsheet lists the "Total NPI Revenues" relating to the Pinedale Field leases (the "<u>Gross Revenue</u>").  Ultra allots itself $6,981,624,649.80 in Gross Revenue (in Ultra's capacity as a working interest owner), representing 83.37% of the total revenue from the working interest owner "Non-Settled Parties" (as referenced therein) over the relevant period.[14]

38.     By comparison, SCPPA's allotted Gross Revenue was $185,695,144.14, which represents 2.22% of the total revenue of the Non-Settled Parties.  TID's allotted Gross Revenue was $21,979,236.38, which represents 0.26% of the total revenue of the Non-Settled Parties.

39.     The NPI Apportionment Spreadsheet also includes a column labeled "Total NPI Expenses," which is delineated amongst the working interest owners by Ultra.  Ultra provides limited description, accounting, or explanation of the expenses that comprise the amounts set forth in the spreadsheet.

40.     Ultra then deducts the "Total NPI Expenses" from the Gross Revenues to arrive at a "Positive Net Revenue Minus Expense" calculation, again apportioned among the Non-Settled Parties.

41.     The Positive Net Revenue Minus Expense amounts, representing the total revenues from the Pinedale Field leases minus the total expenses (presumably associated with

---

[13] The NPI Spreadsheet, which was originally an Excel document with numerous columns, is attached in multiple formats for purposes of readability and printability.

[14] The total Gross Revenue, per the spreadsheet, is $8,374,768,178.41 after deducting revenue of certain parties that reached settlement in connection with the Hartman litigation with respect to NPI obligations.

the Pinedale Field leases) is, on information and belief, equivalent to a net income or profits/losses calculation for the Pinedale Field leases (the "Net Income" or "Profits").

> **(d)   Ultra's NPI Obligation is Substantially Higher when Calculated based on Gross Revenue, Rather than Profits**

42.     According to the NPI Apportionment Spreadsheet, Ultra is responsible (as a working interest owner) for payment of $9,978,563.70 of the total NPI liability of $19,805,624.10 from January 2007 to October 2016.[15]   Ultra's obligation is derived from multiplying the total NPI liability by 50.38%, which is the "Cumulative NPI Net Revenue Minus Expense % of Non-Settled Parties" (or, put differently, Ultra's proportionate share of the Profits).

43.     If Ultra's NPI obligation (as a working interest owner) was instead calculated based on Gross Revenue, the obligation would rise by over $6.5 million to $16,510,956.54. Correspondingly, if NPI obligation was calculated based on the parties' respective Gross Revenue, SCPPA's NPI obligation would decrease from $3,369,585.67 to $439,153.44; and TID's NPI obligation would decrease from $344,043.72 to $51,979.05.[16]

44.     Therefore, the result of Ultra's improper allocation in violation of the Supplemental Accounting Agreement and in contravention of the Hartman Opinion is to substantially over-charge SCPPA, TID, and the other working interest owners to the benefit of Ultra.

---

[15] The Plaintiffs reserve all rights to seek relief based on updated and/or additional NPI calculations and amounts owed/paid through the pendency of this Adversary Proceeding.

[16] Ultra's leasehold interests generate approximately 83% of the Gross Revenue at issue, but Ultra has allocated to itself only approximately 50% of the Profits—and thus shouldered only 50% of the NPI obligation.  On the other hand, SCPPA's interests have generated a little more than 2% of the Gross Revenue but have been charged for over 17% of the NPI obligation; and TID's interests have generated only about a quarter of a percent of the Gross Revenue but have been invoiced for nearly 2% of the NPI obligations.

45.     Through various communications between SCPPA and TID, on one hand, and Ultra, on the other, the Plaintiffs have protested Ultra's NPI allocation methodology. Specifically, on April 28, 2016, TID sent a letter to Ultra Resources demanding return of its NPI overpayment; and on August 23, 2016, SCPPA sent a similar, detailed letter to Ultra to the same effect.[17]   Ultra has responded, in very limited substance, indicating that it believes the NPI obligations are correctly apportioned, as set forth in the NPI Apportionment Spreadsheet.

46.     On information and belief, other (if not all) relevant non-settling working interest owners subject to the Net Profits Contract and Supplemental Accounting Agreement have similarly demanded that Ultra conform its NPI apportionment based on Gross Revenue, rather than Profit/Net Income.

47.     On September 1, 2016, both SCPPA and TID filed proofs of claim against the Ultra Resources bankruptcy estate, asserting claims based on overpayment of NPI, and additionally for legal fees that Plaintiffs contend were wrongfully charged by Ultra Resources under the JOA relating to the Hartman litigation.  The SCPPA proof of claim asserts a claim in the amount of at least $2,442,137.80, which includes an NPI overpayment amount of $2,276,309.50 (net of unpaid, appropriately calculated 2016 invoices).  The TID proof of claim asserts a claim in the amount of at least $321,024.92, which includes an NPI overpayment amount of $301,265.75.[18]

---

[17] The Net Profits Contract includes an Exhibit C-1, entitled "Accounting Procedure," which provides that "payment of any bills shall not prejudice the rights of Non-Operator to protest or question the correctness thereof.  . . . [A]ll statements rendered to Non-Operator by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period Non-Operator takes written exception thereto and makes claim on Operator for adjustment."

[18] The amounts requested in the proofs of claim were as of the petition date, and such amounts owed are herein revised based on subsequent NPI billings from Ultra.

E.     **All or a Portion of the NPI Payments Remain in Ultra's Possession**

48.     As set forth above, the Supplemental Accounting Agreement provides that Ultra, as operator, is responsible for computing (on a consolidated basis) NPI obligations to the NPI Owners and maintaining the cash payments from its working interest owners in a dedicated NPI account.[19]

49.     On information and belief, Ultra has not paid all, or a significant portion of, the NPI payments to the NPI Owners.[20]

50.     Moreover, prior to releasing any NPI funds to the NPI Owners, the Supplemental Accounting Agreement permits Ultra to reimburse certain expenses and make certain accountings, as appropriate.[21]

51.     Accordingly, through Ultra's withholding of expenses from the working interest owners' NPI payments (including any overpayments) and Ultra's apparent refusal to distribute the payments to the NPI Owners, Ultra possesses all or most of the NPI payments made by the working interest owners, such as SCPPA and TID, including those parties NPI overpayments

---

[19] *See* Supplemental Accounting Agreement at pp. 3-4.

[20] According to the non-Hartman NPI Owners' proofs of claim, as of the Petition Date, at least $13,515,683.48 in NPI obligations remain unpaid by Ultra to the respective non-Hartman NPI Owners. *See, e.g.,* Claim No. 120 (Epiq Claim No. 441) (asserting a claim on behalf of the Hendrix Trust in the amount of $3,311,342.45); Claim No. 116 (Eqip Claim No. 438) (asserting a claim on behalf of Michael L. Klein and Jeanne Klein in the amount of $3,311,342.45); Claim 119 (Epiq Claim No. 440) (asserting a claim on behalf of Ronnie Westbrook in the amount of $67,578.42); Claim 122 (Epiq Claim No. 444) (asserting a claim on behalf of the Estate of Karen Westbrook in the amount of $67,578.42).

[21] The Supplement Accounting Agreement provides at page 6:

> Proceeds of the five per cent (5%) gross revenue from any operation received by an operator, as above defined, shall first be used for reimbursing such operator for five percent (5%) of the expenses of such operator's operations chargeable in computing the Novi net profits interest; then to reimbursing each party proportionately for amounts advanced on account of deficits in the Novi account resulting from such operations; then to reimbursing each party proportionately for amounts advanced on account of deficits in the Novi account resulting from other operations subject to said Novi net profits interest; and finally after the parties hereto have been so reimbursed, to payment of the amounts due Novi under the Net Profits Contract . . . .

made on account of Ultra's wrongful apportionment.

## IV.
## CAUSES OF ACTION

**A.**     **COUNT 1: Declaratory Relief – NPI Apportionment**

52.     The Plaintiffs adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1 through 51 as if fully set forth herein.

53.     The unambiguous terms of the Supplemental Accounting Agreement—as confirmed by the Wyoming Supreme Court in the Hartman Opinion—require that the NPI obligation created by the Net Profit Contract be apportioned by Ultra, as operator, and charged to the working interest owners according to the gross revenue from the applicable Pinedale Field leases.

54.     Gross revenue, as defined by the Net Profits Contract (through reference and incorporation by the Supplemental Accounting Agreement), is the proceeds of production sold for delivery at the relevant wellhead(s) or, if production is not so sold, the fair market value of such production at the relevant wellhead(s).

55.     Ultra apportioned NPI liability created by the Net Profits Contract amongst the working interest owners by aggregating the total revenue at the relevant wellheads as recorded by it and as reported to it by the non-operating working interest owners, deducting expenses it incurred as Operator from the respective parties' revenue, and computing a percentage for each party based on their attributed Net Income, as set forth on the NPI Apportionment Spreadsheet (the "Ultra NPI Computation").

56.     An actual and present dispute and controversy exists regarding whether the Ultra NPI Computation is in violation of the Supplemental Accounting Agreement and/or the Net Profits Contract.

57.     Pursuant to 28 U.S.C. § 2201, the Plaintiffs thus respectfully request that the Court declare that:

(i)     The Supplemental Accounting Agreement requires that Ultra attribute NPI obligation, as created under the Net Profits Contract, according to the working interest owners' proportionate "Gross Revenues" from the applicable Pinedale Field leases;

(ii)    "Gross Revenue," as that term is used in the Supplemental Accounting Agreement and defined in the Net Profits Contract, is the proceeds of production sold for delivery at the wellhead(s) or, if not so sold, the fair market value of such production at the wellhead(s) relating to the Pinedale Field leases;

(iii)   The Ultra NPI Calculation, by deducting expenses, violates the Supplemental Accounting Agreement;

(iv)    As a result of Ultra's miscalculation of working interest owners' apportioned liability for NPI pursuant to the Net Profits Contract and Supplemental Accounting Agreement, SCPPA has overpaid to Ultra no less than $2,185,206.60;

(v)     As a result of Ultra's miscalculation of working interest owners' apportioned liability for NPI pursuant to the Net Profits Contract and Supplemental Accounting Agreement, TID has overpaid to Ultra no less than $299,443.95[22];

---

[22] This amount is expected to increase to $342,979.60 when (or if) TID remits payment on account of the pending January 2017 invoice.

(vi)    SCPPA properly exercised its recoupment and/or setoff rights by refusing to pay Ultra additional NPI amounts in reference to those invoices sent after October 12, 2015, because of SCPPA's then- and currently-existing NPI overpayments to Ultra; and

(vii)   Ultra is responsible for returning all NPI overpayments to SCPPA (with appropriate recoupment/setoff credit, as applicable) and TID, respectively.

**B.      COUNT 2: Accounting and Refund of Overpayments**

58.     The Plaintiffs adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1 through 57 as if fully set forth herein.

59.     In the event that Ultra is found to have miscalculated the NPI obligations of SCPPA and TID, the Plaintiffs request an order from this Court ordering an accounting from Ultra of all prior NPI payments, both received by Ultra from working interest owners and paid through Ultra to any NPI Owner or any other party; a re-calculation of the NPI liability apportionment amongst the working interest owners; and a money judgment against Ultra for any amounts overpaid by the Plaintiffs, respectively (with appropriate recoupment/setoff credit, as applicable), including interest, fees, and expenses.

**C.      COUNT 3: Declaratory Relief – Turnover of NPI Overpayments**

60.     The Plaintiffs adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1 through 59 as if fully set forth herein.

61.     Under Wyoming (and any other applicable) law and pursuant to the Net Profits Contract and Supplemental Accounting Agreement, NPI payments from working interest owners are payments made to the NPI interest holder (to the extent properly calculated and charged), by and through Ultra, as operator.

62.     The Supplemental Accounting Agreement requires that Ultra compute the NPI

payments due from the working interest owners, collect the sums due, and remit the sums to the NPI interest holder.

63.     To the extent any NPI overpayment is made by a working interest owner to Ultra, such amounts do not become property of Ultra, but remain property of the paying working interest owner.

64.     The Net Profits Contract and the Supplemental Accounting Agreement, as well as applicable law, do not provide Ultra any equitable interest in NPI payments, including NPI overpayments.

65.     At most, Ultra has only bare legal title to NPI overpayments.  Any NPI overpayment made by SCPPA or TID thus is not property of the Ultra bankruptcy estate, and should be turned over to SCPPA and TID.  *In re MCZ*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner."); *In re Lenox Healthcare Inc.*, 343 B.R. 96, 100 (Bankr. Del. 2006) (explaining that "property in which a debtor holds only bare legal title is not property of the estate" under section 541(d) of the Bankruptcy Code).

66.     Alternatively, Ultra holds the NPI overpayments in constructive and/or resulting trust under applicable law and, therefore, such funds are not property of Ultra's bankruptcy estate.

67.     An actual and present dispute and controversy exists regarding whether the NPI overpayments by SCPPA and TID, to the extent such overpayments are found to exist, belong to Ultra and its bankruptcy estate or should be turned over to SCPPA or TID, the respective equitable owner of such overpayments.

68.     The Plaintiffs thus respectfully request that the Court declare, pursuant to 28 U.S.C. § 2201, that any NPI overpayment is not property of the Ultra bankruptcy estate pursuant to 11 U.S.C. § 541; Ultra has no right or claim to any NPI overpayment; and, accordingly, any NPI overpayment must be turned over to the working interest owner payor of such NPI overpayments.

**D.      COUNT 4:  Breach of the Supplemental Accounting Agreement**

69.     The Plaintiffs adopt and incorporate by reference the allegations set forth in the preceding paragraphs 1 through 69 as if fully set forth herein.

70.     The Supplemental Accounting Agreement requires that Ultra, as operator, calculate and apportion the NPI liability, as created by the Net Profits Contract, among the applicable working interest owners to the Pinedale Field leases.

71.     The Plaintiffs, as successor working interest owners to leases burdened by the Net Profits Contract, relied on Ultra to fulfill its obligations under the Supplemental Accounting Agreement by calculating the NPI owed pursuant to the Net Profits Contract and apportioning that liability to the working interest owners as required by the Supplemental Accounting Agreement.

72.     Ultra was required to apportion NPI obligations based on the applicable working interest owners' proportionate gross revenue.

73.     Ultra violated the Supplemental Accounting Agreement by instead calculating the proportionate responsibility for NPI obligations according to the working interest owners' Profits.

74.     But for Ultra's improper calculation and invoicing, SCPPA would not have overpaid for its proportionate share of the NPI obligations in an amount of no less than $2,185,206.60; and TID would not have overpaid for its proportionate share of the NPI

obligations in amount of no less than $299,443.95.

75.     Ultra's above-described actions are a breach of the Supplemental Accounting Agreement.

76.     Accordingly, the Plaintiffs request judgment in an amount of no less than $2,185,206.60 (to SCPPA), $299,443.95 (to TID), as well as an award of attorneys' fees, expenses, interest, and all such other damages allowable under the law.

**V.**
**RESERVATION OF RIGHTS**

77.     The Plaintiffs hereby expressly reserve the right to amend and or supplement either the factual bases and/or the relief request in this Complaint.

**VI.**
**PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs respectfully request that the Debtor be cited to appear and answer this Complaint and that, upon consideration of the merits of this Complaint, Plaintiffs be awarded the following relief against the Debtor as follows:

(1) On the first claim for relief, declaratory judgment that

    a.  the Supplemental Accounting Agreement requires apportionment of NPI obligation amongst working interest owners based on that parties' proportionate "Gross Revenue" from the Pinedale Field leases that are the subject of the Net Profits Contract;

    b.  "Gross Revenue" shall have the meaning ascribed in the Net Profits Contract, which is the proceeds of production sold for delivery at the wellhead(s) or, if not so sold, the fair market value of such production at the wellhead(s);

    c. Ultra's apportionment of NPI responsibility to date violates the Supplemental Accounting Agreement because, by deducting certain expenses, the apportionment is based on Profits, not "Gross Revenue";

    d. Ultra's miscalculation of working interest owners' apportioned liability for NPI caused SCPPA to overpay to Ultra an amount no less than $2,185,206.60;

    e. Ultra's miscalculation of working interest owners' apportioned liability for NPI caused TID to overpay to Ultra an amount no less than $342,979.60;

    f. SCPPA properly exercised its recoupment and/or setoff rights by refusing to pay Ultra NPI amounts after October 12, 2015; and

    g. Ultra shall return all NPI overpayments to SCPPA (with appropriate recoupment/setoff credit, as applicable) and TID, respectively.

(2) On the second claim for relief, entry of an order mandating an accounting from Ultra of all prior NPI payments, both received from working interest owners and made through Ultra to any NPI Owner; re-calculation of the working interest owners' proportionate NPI liability based on gross revenue; and providing a money judgment against Ultra for any amounts overpaid by the Plaintiffs, respectively (with appropriate recoupment/setoff credit, as applicable), including appropriate interest, fees, and expenses.

(3) On the third claim for relief, declaratory judgment that any NPI overpayment is not property of the Ultra bankruptcy estate pursuant to 11 U.S.C. § 541; that Ultra has no right or claim to any NPI overpayment; and, accordingly, that any NPI

overpayment must be immediately turned over to the working interest owner payor of such NPI overpayment.

(4) On the fourth claim for relief, judgment in favor of the Plaintiffs in an amount no less than $2,185,206.60 (to SCPPA) and $299,443.95 (to TID) on account of Ultra's breach of the Supplemental Accounting Agreement, plus reasonable attorneys' fees, costs and post-judgment interest on the same; and

(5) Such other and further relief as to which the Plaintiffs have shown or hereafter show themselves to be justly entitled, either at law or in equity.

DATED: February 9, 2017.              Respectfully submitted,

**MUNSCH HARDT KOPF & HARR PC**

By: */s/ John D. Cornwell*
John D. Cornwell
Texas Bar No. 24050450
700 Milam Street, Suite 2700
D. Mitchell McFarland
Texas Bar No. 13597700
Houston, TX 77002-2806
Telephone: 713.222.1470
Facsimile: 713.222.1475
jcornwell@munsch.com

*Counsel for Southern California Public Power Authority and Turlock Irrigation District*