

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
10/26/2017

| | | |
|---|---|---|
| IN RE: | § | |
| ULTRA PETROLEUM CORP., *et al* | § | **CASE NO: 16-32202** |
| | § | |
| Debtor(s) | § | |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION IN SUPPORT OF CERTIFICATION OF A DIRECT <u>APPEAL TO THE COURT OF APPEALS</u>

This Memorandum Opinion is issued in support of a Certification of a Direct Appeal to the United States Court of Appeals for the Fifth Circuit.

### Statutory and Rule Authority

This Certification is made pursuant to 28 U.S.C. § 158(d)(2) and is governed by Federal Rule of Bankruptcy Procedure 8006.

### Facts and Law Establishing this Court's Authority

Pursuant to Rule 8006(b), the matter that is the subject of a direct appeal is "pending" in the Bankruptcy Court for 30 days after the effective date under Rule 8002 of the first notice of appeal of the order for which direct review is sought. The timing of events in this case is:

| Date | Event |
|---|---|
| September 21, 2017 | The Court issues the Memorandum Opinion (ECF No. 1569) and Order (ECF No. 1570). |
| October 5, 2017 | Ultra Resources *et al.* (the "Debtors") file a notice of appeal. The notice is timely under Federal Rule of Bankruptcy Procedure 8002(a)(1). October 5, 2017, is the "effective date" of the notice of appeal under Rule 8002(a). |
| October 18, 2017 | The Debtors file an emergency motion for certification of direct appeal. |
| October 26, 2017 | This Certification is issued. This Certification is timely under Federal Rule of Bankruptcy Procedure 8006(b). |
| November 5, 2017 | The last day in which the matter would be "pending" in the bankruptcy court, thus allowing the certification by this Court through November 7, 2017, under Federal Rule of Bankruptcy Procedure 8006(b). |

Based on the preceding table, this matter remains "pending" in the bankruptcy court for the purposes of Rule 8006(b).

**Information Required by Federal Rule of Bankruptcy Procedure 8006(f)(2(A)–(D)**

Bankruptcy Rule 8006(e)(1) requires this Court to include the information required by Rule 8006(f)(2)(A)–(D) with its Certification. This information includes the facts necessary to understand the question presented on appeal, the specific question presented on appeal, the relief sought, and the reasons for the Court's Certification.

*Facts necessary to understand the question presented (Rule 8006(f)(2)(A))*

An Ultra entity—OpCo—issued multiple series of unsecured notes totaling approximately $1.46 billion pursuant to a Master Note Purchase Agreement and three Note Agreement supplements. Pursuant to the Note Agreement, OpCo, at its option and upon notice, could prepay one or more of the Notes at 100% of the Notes' principal amount plus a contractual Make-Whole Amount. If an Event of Default—as listed within the Note Agreement—occurred, all of the Notes then outstanding would become automatically due. OpCo's filing of a bankruptcy petition constitutes an Event of Default. If any Note became due under the Note Agreement, that Note matures and the entire unpaid principal of that Note, all accrued and unpaid interest thereon, and any applicable Make-Whole Amount would become immediately due.

On April 29, 2016, OpCo and two other Ultra entities—MidCo, and Holdco—filed chapter 11 bankruptcy petitions. The commencement of these chapter 11 bankruptcy cases constituted Events of Default under the Note Agreement that automatically accelerated the balance of the underlying Notes under the Note Agreement. The balance following acceleration included the principal, pre-petition interest, post-petition interest, and Make-Whole Amounts.

During the course of this case, the Debtors became solvent. The Debtors' proposed chapter 11 plan treated the OpCo Noteholders as unimpaired. As holders of unimpaired claims, the Noteholders were conclusively presumed to have accepted the plan.

The Senior Creditor Committee objected to confirmation of the proposed plan on the grounds that, for the Noteholders' claims to be unimpaired, OpCo must pay the Make-Whole Amount and post-petition interest on the OpCo Notes at the default rates listed in the Note Agreement. The Senior Creditor Committee consists of senior unsecured creditors of OpCo that collectively hold or control the various OpCo Notes.

The Debtors objected to the Senior Creditor Committee's claims, asserting that the claim for the Make-Whole Amount should be disallowed because: (i) the claim seeks unmatured interest expressly barred by 11 U.S.C. § 502(b)(2); and (ii) the Make-Whole Amount is an unenforceable liquidated damages provision under New York law. Debtors also argued that any post-petition interest awarded on the claim should be assessed, at most, at the Federal Judgment Rate because: (i) post-petition interest on unsecured claims is awarded, if at all, at the legal rate or federal Judgment Rate; and (ii) the Court should reject the minority view that state law governs post-petition interest. The Debtors alternatively claimed that the claim should be disallowed to the extent necessary to avoid a duplicative recovery.

The Court confirmed the Debtors' chapter 11 plan and the confirmation order provided that the Noteholders' claims included any amounts necessary to make the holders of the allowed claims unimpaired. The plan itself classified the Noteholders' claims as unimpaired.

The Senior Creditor Committee filed a response in opposition to the Debtors' objection to the Noteholders' claims, arguing that the Make-Whole Amount must be allowed in its entirety because: (i) for the Noteholders' claims to be unimpaired, the Debtors must pay the full Make-

Whole Amount due under state law; (ii) 11 U.S.C. § 502(b)(2) is inapplicable to the Noteholders' claims because the Make-Whole Amount is not unmatured interest; and (iii) the Make-Whole Amount is fully enforceable under New York law.   The Senior Creditor Committee also claimed that post-petition interest should be allowed on the Noteholders' claims at the Note Agreement's default rates because: (i) 11 U.S.C. § 726(a)(5) is not applicable in chapter 11 cases; and (ii) even if § 726(a)(5) were applicable, the circumstances of the bankruptcy require that post-petition interest be paid at the contract default rates.

On May 16, 2017, the Court heard oral arguments on the Debtors' claims objections.   The Court took this matter under advisement on June 16, 2017.

### The questions themselves (Rule 8006(f)(2)(B))

*"Whether, as the Third Circuit held in In re PPI Enterprises (U.S.), Inc., 324 F.3d 197 (3d Cir. 2003), a plan leaves a claim unimpaired as long as it does not alter the rights to which that claim entitles the creditor under applicable bankruptcy law"* and *"Whether the Make-Whole Amount should be disallowed as unmatured interest under 11 U.S.C. § 502(b)(2)."*

As part of their claims objection, the Debtors argued that, for the Noteholders to be considered unimpaired under the chapter 11 plan, they need only receive their "allowed" claims under the Bankruptcy Code, not their state law claims.   The Debtors based their position on the argument that 11 U.S.C. § 502(b)(2) precludes the allowance of the Make-Whole Amount because that Amount is merely a proxy for unmatured interest.

The Noteholders argued that the "unimpairment" language of 11 U.S.C. § 1124 requires them to receive all that they are entitled to under state law.   This notion stems from the amendment of § 1124 by Congress in 1994 that eliminated an "Allowed" claim standard barring full recovery of state law rights in a chapter 11 solvent debtor case.

The Court determined that the Make-Whole Amount's post-confirmation enforcement was governed by the Debtors' confirmed chapter 11 plan, which provided that the Noteholders' claims were not impaired and would be paid whatever amount necessary to make those claims unimpaired. The Debtors' liability was thus not discharged under 11 U.S.C. § 1141(d) because the Make-Whole claims had not be paid in their state law amount. The Memorandum Opinion holds that "unimpairment" under § 1124(1) entitles a claimant's non-bankruptcy rights to be fully honored. This holding contrasts with the Debtors' position that only the claimants' rights under § 502 must be honored. The difference is potentially staggering. If the Make-Whole Amount is determined to be unmatured interest and thus not an allowed claim under § 502(b)(2), the Noteholders would receive over $350,000,000.00 less than the Court awarded.

As part of its ruling, the Court rejected the Third Circuit's opinion in *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003), which held that the § 502(b)(6) cap on a landlord's claim would be applied before determining whether the claim was impaired. The Third Circuit determined that "unimpairment" should be judged against the allowed amount of the bankruptcy claim rather than the allowed amount of the state law claim. The Third Circuit's holding was rejected based on the Court's reasoning that, under § 1141(d), the extent of a debtor's discharge is governed by the terms of the confirmed plan, not the Bankruptcy Code's allowance provisions such as §§ 502(b)(2) and (6). Because the plan provided that the Noteholders' claims are not impaired and must be paid whatever amount necessary to make them unimpaired, the Court determined that the Debtors are obligated to pay the Make-Whole Amount.

*"Whether the Make-Whole Amount should be disallowed as an unenforceable liquidated damages provision under New York law, or at least disallowed to the extent necessary to prevent double recovery in light of any award of post-petition interest."*

The Debtors asserted that the Make-Whole Amount represents an improper liquidated damages provision under New York law because it is designed to double count any actual harm the Noteholders might suffer upon the automatic acceleration of the Notes. This double-counting results from the fact that the Make-Whole formula allegedly overcompensates the Noteholders because they will be able to reinvest their principal at higher rates than that reflected in the formula upon being paid by the Debtors. Consequently, the Make-Whole Amount does not provide a reasonable measure of probable actual loss and is grossly disproportionate to the Noteholders' probable loss at the time the parties entered into the Note Agreement.

The Court analyzed this issue under New York law. Under New York law, the Debtors held the burden of proof. The Court found that the Noteholders failed to prove (as required by New York law) that the damages resulting from prepayment of the Amount were readily ascertainable at the time the Note Agreement was executed. Specifically, the damages were not easily calculable on the date of execution due to the difficulty in determining the selection of an alternative investment for the Noteholders upon default and acceleration of the Notes. Consequently, the Debtors and the Noteholders agreed on the reinvestment rate listed within the Note Agreement.

The Debtors additionally failed to prove that the damages were conspicuously disproportionate to foreseeable damage amounts. Contrary to the Debtors' argument, the Court determined that the Make-Whole Amount does not lead to a double recovery of actual and liquidated damages for the same injury. Instead, the Make-Whole Amount only liquidates the

Noteholders' damages stemming from the early termination of their investment; in contrast, the post-petition default interest compensates the Noteholders for the Debtors' failure to pay the principal, unpaid interest, and Make-Whole Amount as they came due at the time of acceleration of the Notes. Additionally, the mere size of the Make-Whole Amount fails to prove that it is conspicuously disproportionate to the foreseeable losses at the time of execution. Accordingly, the Court determined that the Debtors failed to prove that the Make-Whole Amount was an unenforceable liquidated damages provision under New York law.

*"Whether an unimpaired claim in chapter 11 proceedings must receive post-petition interest at the contract default rate rather than the federal judgment rate under 11 U.S.C. § 726(a)(5)."*

The Debtors argued that any post-petition interest on the Noteholders' claims should be assessed, at most, at the "legal rate" listed within 11 U.S.C. § 726(a)(5). The Debtors claimed that the term "legal rate" is defined as the federal judgment rate of interest based upon federal case law, the language of § 726, and legal policy. In the Debtors' opinion, post-petition interest on unsecured claims is limited to the federal judgment rate because 11 U.S.C. § 502(b)(2) prohibits claims for such unmatured interest. The Debtors recognized that unsecured creditors may receive post-petition interest on their claim if a debtor is solvent; however, pursuant to § 726(a)(5) and the chapter 11 plan, the Noteholders are entitled only to what the plan provides them.

The Senior Creditor Committee asserted that the Noteholders' unsecured claims fall within the solvent debtor exception to disallowance of post-petition interest on unsecured claims under § 502(b)(2). Additionally, the Senior Creditor Committee claimed that the exception of the Noteholders' post-petition interest claims to disallowance is not limited by § 726(a)(5)

because that provision is not applicable to chapter 11 cases, the claims are unimpaired, and the Debtors are solvent. The OpCo Noteholders joined the Senior Creditor Committee's arguments, claiming that Congress's repeal of 11 U.S.C. § 1124(3) requires unsecured creditors receive post-petition interest at the underlying contract rate in order to be unimpaired.

The Court found that the Debtors failed to rebut the Noteholders' claim for post-petition interest at the rate listed in the Note Agreement because those claims are treated as unimpaired under the Debtors' chapter 11 plan. Paying interest on the Make-Whole Amount at the federal judgment rate would cause the Noteholders to be impaired. Additionally, the Court found that § 726(a)(5) is not applicable to the Noteholders' post-petition claims because its only application in a chapter 11 case—11 U.S.C. § 1129(a)(7)—limits only impaired claims, not unimpaired ones.

### *The relief sought (Rule 8006(f)(2)(C))*

The Debtors seek reversal of this Court's September 21, 2017, Order, and, if necessary, remand of this case for further proceedings in accordance with governing law.

### *The reason why a direct appeal should be allowed (Rule 8006(f)(2)(D))*

Federal Rule of Bankruptcy Procedure 8006(f)(2)(D) requires an examination of the relevant factors set forth in 28 U.S.C. § 158(d)(2)(A)(i)–(iii) to illustrate the reasons why a direct appeal from the bankruptcy court to the Fifth Circuit should be allowed.

The issue under § 158(d)(2)(A)(i) is whether this Court's Order involves a question of law as to which there is not controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or whether the Order involves a matter of public importance. In order to determine whether the principal issues raised by the Appellant justify relief by the Fifth Circuit, the underlying legal question described in the next paragraph must be resolved.

Fifth Circuit law is unambiguous in holding that even a slight deterioration in the rights of a claimant leaves the claimant impaired. *In re Vill. at Camp Bowie I, L.P.*, 454 B.R. 702,708 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir. 2013). However, the Fifth Circuit has not addressed the issue of whether impairment should be measured against the non-bankruptcy state law claim or against the claim allowed under § 502. Because that issue of law is fundamental to the appeal, it constitutes a matter on which there is no controlling precedent within this Circuit or the Supreme Court. Accordingly, certification is appropriate under this subsection.

Although the parties have briefed and argued other reasons for certification of a direct appeal under 28 U.S.C. § 158(d), the Court sees no need to address those reasons. Section 158(d) is disjunctive. Because a direct appeal should be authorized based on the absence of controlling authority, the Court sees no need for further analysis.

### Copies of the Order and Memorandum Opinion

Attached as Exhibit "A" is the Court's Memorandum Opinion.

Attached as Exhibit "B" is the Court's Order.

### Separate Certification

As required by Federal Rule of Bankruptcy Procedure 8006(f)(5), a separate document contains this Court's Certification. Service on the parties under Federal Rule of Bankruptcy Procedure 8003(c)(1) will occur upon the entry of the Certification and this Memorandum Opinion on the docket.

SIGNED **October 26, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A



### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **ULTRA PETROLEUM CORP.,** *et al* | § | **CASE NO: 16-32202** |
| | § | |
| **ULTRA RESOURCES, INC.** | § | **CASE NO: 16-32204** |
| | § | |
| **ULTRA WYOMING, INC.** | § | **CASE NO: 16-32205** |
| | § | |
| **ULTRA WYOMING LGS, LLC** | § | **CASE NO: 16-32206** |
| | § | |
| **UP ENERGY CORPORATION** | § | **CASE NO: 16-32207** |
| | § | |
| **UPL PINEDALE, LLC** | § | **CASE NO: 16-32208** |
| | § | |
| **UPL THREE RIVERS HOLDINGS, LLC** | § | **CASE NO: 16-32209** |
| | § | **Jointly Administered** |
| **Debtor(s)** | § | |
| | § | **CHAPTER 11** |

### MEMORANDUM OPINION

The Ad Hoc Committee of Unsecured Creditors of Ultra Resources, Inc. (the "Senior Creditor Committee") filed a complaint against Debtors Ultra Resources ("OpCo"), Ultra Petroleum Corp. ("HoldCo"), and UP Energy Corporation ("MidCo") seeking a judgment declaring: (i) that the Debtors' filing for chapter 11 bankruptcy triggered an obligation under the terms of a Master Note Purchase Agreement (the "Note Agreement") to pay a Make-Whole Amount to certain noteholders of OpCo; and (ii) the amount of that obligation. The Debtors objected to the Senior Creditor Committee's claim for the Make-Whole Amount, post-petition interest at the contract default rate, and other related fees and expenses. Debtors' objection is denied.

## Background

OpCo issued multiple series of unsecured notes (the "Notes") totaling approximately $1.46 billion pursuant to the Note Agreement dated March 6, 2008, and three Note Agreement supplements dated March 5, 2009, January 28, 2010, and October 12, 2010. (ECF No. 44 at 13; ECF No. 880 at 8; ECF No. 1215 at 15). These Notes, along with funds borrowed under the OpCo RCF Credit Agreement, are known as the "OpCo Funded Debt Claims." (ECF No. 1393 at 18). HoldCo and MidCo each guaranteed OpCo's obligations under the Note Agreement and its supplements. (ECF No. 880 at 2; ECF No. 1215-1 at 8).

Pursuant to the Note Agreement, OpCo "may, at its option, upon notice . . . prepay . . . one or more series or tranches of fixed rate Notes . . . at 100% of the principal amount so prepaid, plus the Make-Whole Amount determined for the prepayment date . . . ." (ECF No. 1215-1 at 24). Section 8.7 of the Note Agreement defines a "Make-Whole Amount" as "an amount equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such fixed rate Note over the amount of such Called Principal . . . ." (ECF No. 1215-1 at 27). "Called Principal" is "the principal of such Note that . . . has become or is declared to be immediately due and payable pursuant to Section 12.1 . . . ." (ECF No. 12151 at 27). "Remaining Scheduled Payments" includes "all payments of such Called Principal and interest thereon that would be due after the Settlement Date," which is "the date on which such Called Principal . . . has become or is declared to be immediately due and payable pursuant to Section 12.1 . . . ." (ECF No. 1215-1 at 28). The "Discounted Value" of such Remaining Scheduled Payments is comprised of "the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respected scheduled due dates to the Settlement Date . . . in accordance with accepted financial practice

and at a discount factor . . . equal to the Reinvestment Yield" of 0.5% over the yield to maturity of specified United States Treasury obligations. (ECF No. 1215-1 at 27).

Section 11 of the Note Agreement specifies a number of conditions constituting an "Event of Default" that consequently affects the rights of the parties under the Agreement. (ECF No. 1215-1 at 35–38). If an Event of Default occurs, Section 12.1(a) of the Note Agreement provides that "all the Notes then outstanding shall automatically become immediately due and payable." (ECF No. 1215-1 at 38). Each Note incorporates by reference the Event of Default, Acceleration, and Make-Whole Amount provisions of the Note Agreement. (ECF No. 1215-1 at 158–59). Under Paragraph (g) of Section 11, OpCo's filing of a bankruptcy petition constitutes an Event of Default. (ECF No. 1215-1 at 37).

In the event that any of the Notes become due under the Note Agreement, those Notes "mature and the entire unpaid principal amount of such Notes, plus . . . all accrued and unpaid interest thereon . . . [and] any applicable Make-Whole Amount determined in respect of such principal amount (to the full extent permitted by applicable law) . . . shall all be immediately due and payable . . . ." (ECF No. 1215-1 at 38). The Note Agreement is governed by New York law. (ECF No. 1215-1 at 47).

On April 29, 2016, OpCo, MidCo, and Holdco filed chapter 11 bankruptcy petitions. (ECF No. 1). On April 30, 2016, the Court ordered the joint administration of the Debtors' bankruptcy cases under this case number. (ECF No. 40). The commencement of these chapter 11 bankruptcy cases constituted Events of Default under the Note Agreement that automatically accelerated the balance of the underlying Notes under Section 12.1. The balance following acceleration included the principal, pre-petition interest, post-petition interest, and Make-Whole Amounts. (ECF No. 1215-1 at 37, 38). Consequently, $1.46 billion of OpCo Notes became due

pursuant to the Note Agreement while $999 million became due under the OpCo Notes. (ECF No. 1215 at 12).

During the course of this case, the Debtors became solvent due in part to commodity prices rising after their petition date. (ECF No. 1215 at 18). Consequently, the Debtors proposed a chapter 11 plan paying all unsecured claims, in full and in cash, and providing a substantial recovery for their equity owners. (ECF No. 1308; *see also* ECF No. 1215 at 18). The proposed chapter 11 plan treated the OpCo Noteholders as unimpaired. As holders of unimpaired claims, the Noteholders were "*conclusively* presumed to have accepted the plan." 11 U.S.C. § 1126(f) (*emphasis added*).

The Senior Creditor Committee objected to confirmation of OpCo's proposed plan on the grounds that, for the Noteholders' claims to be unimpaired, OpCo must pay the Make-Whole Amount and post-petition interest on the OpCo Notes at the default rates listed in the Note Agreement until the Noteholders' claims are fully satisfied. (ECF No. 1393 at 25). The Senior Creditor Committee consists of senior unsecured creditors of OpCo that collectively hold or control the various OpCo Notes. (ECF No. 1393 at 14 n. 1).

The Debtors objected to the Senior Creditor Committee's asserted entitlement to the Make-Whole Amount, post-petition interest at the Note Agreement's default rate, and other related fees and expenses on March 3, 2017. (ECF No. 1214). In their memorandum in support of their objection, the Debtors specifically assert that the Senior Creditor Committee's claims for the Make-Whole Amount should be disallowed because: (i) the claims seek unmatured interest, which is expressly barred by 11 U.S.C. § 502(b)(2); and (ii) the Make-Whole Amount is an unenforceable liquidated damages provision under New York law. (ECF No. 1215 at 21–36).

Debtors also argue that any post-petition interest awarded on the Senior Creditor Committee's claims should be assessed, at most, at the Federal Judgment Rate because: (i) post-petition interest on unsecured claims is awarded, if at all, at the "legal rate," which is the Federal Judgment Rate; and (ii) the Court should reject the minority view that state law governs post-petition interest. (ECF No. 1215 at 36–47). Should the Court award the OpCo Noteholders both the Make-Whole Amount and post-petition interest at the contract default rate, the Debtors claim that the Noteholders' claims should be disallowed to the extent necessary to avoid a duplicative recovery. (ECF No. 1215 at 47–49). The Ad Hoc Committee of HoldCo Noteholders and the Ad Hoc Equity Committee joined in Debtors' objection. (ECF No. 1216; ECF No. 1217). The Ad Hoc Equity Committee also filed an objection to the Noteholders' claims. (ECF No. 1217).

On March 13, 2017, the Senior Creditor Committee and the Debtors entered into a stipulation. (ECF No. 1314). Pursuant to that stipulation, the parties agreed that, among other things, the quantification of post-petition interest would be addressed in conjunction with the Make-Whole Amount dispute. (ECF 1314 at 7).

The Court confirmed the Debtors' chapter 11 plan on March 14, 2017. (ECF No. 1324). The confirmation order provided that the Noteholders' claims included any amounts necessary to make the holders of the allowed claims unimpaired. (ECF No. 1324 at 69). The plan itself classified the Noteholders' claims as unimpaired and provided that the members of the Committee would receive payment of all outstanding principal on the Notes in cash, pre-petition interest at the rate listed within the Note Agreement, post-petition interest at the Federal Judgment Rate, and a forbearance fee. (ECF No. 1324-1 at 26).

The Senior Creditor Committee filed a response in opposition to Debtors' objection to the Noteholders' claims on March 24, 2017. In its response, the Senior Creditor Committee argued

that the Make-Whole Amount must be allowed in its entirety because: (i) for the Noteholders' claims to be unimpaired, Debtors must pay the full Make-Whole Amount due under state law; (ii) § 502(b)(2) is inapplicable to the Noteholders' claims because the Make-Whole Amount is matured rather than unmatured interest; and (iii) the Make-Whole Amount is fully enforceable under New York law. (ECF No. 1393 at 27–65). The Senior Creditor Committee also claims that post-petition interest should be allowed on the Noteholders' claims at the Note Agreement's default rates, not the Federal Judgment Rate, because: (i) 11 U.S.C. § 726(a)(5) is not applicable in these chapter 11 cases; and (ii) even if § 726(a)(5) were applicable in the Debtors' bankruptcy case, the circumstances of the bankruptcy require that post-petition interest be paid at the contract default rates. (ECF No. 1393 at 65–76). The OpCo Noteholders, consisting of 42 holders of senior unsecured notes issued by OpCo, filed a joint response to the Debtors' claims objections. (ECF No. 1390).

On May 16, 2017, the Court heard oral arguments on the Debtors' claims objections. Following supplemental briefing on the question of whether the Court could rely on its own illustrative calculations as part of its reasoning, the Court took this matter under advisement on June 16, 2017.

### Jurisdiction

The district court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. The allowance or disallowance of a proof of claim against the estate is a core matter as defined in 28 U.S.C. § 157(b)(2)(B). This case was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a). Accordingly, the Court has congressional authority to render a final order on the Debtors' objections to the OpCo Funded Debt and OpCo RCF Claims.

Although subject-matter jurisdiction is proper in this Court, this Court may not issue a final order or judgment in matters within the exclusive authority of Article III courts. *Stern v. Marshall*, 564 U.S. 462, 502 (2011). This Court has constitutional authority to enter a final order on the OpCo Funded Debt and OpCo RCF Claims because they stem "from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 499. As claims against the Debtors' bankruptcy estates, the OpCo Funded Debt and OpCo RCF Claims directly stem from the Debtors' bankruptcy and the adjudication of Debtors' objections will necessarily resolve whether those claims are allowed. *See, e.g.*, *In re Brown*, 521 B.R. 205, 213 (Bankr. S.D. Tex. 2014), *adopted*, 2014 WL 7342435 (S.D. Tex. Dec. 23, 2014), *aff'd in part, appeal dismissed in part*, 807 F.3d 701 (5th Cir. 2015). Therefore, this Court possesses constitutional authority to enter a final order with respect to the allowance or disallowance of the OpCo Funded Debt and OpCo RCF Claims. Moreover, the parties have expressly or implicitly consented to the Bankruptcy Court's determination of this dispute. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

### Analysis

### *Proof of Claim Standard*

A proof of claim is a written statement setting forth a creditor's claim. FED. R. BANKR. P. 3001(a). The filing of "a proof of claim is analogous to the commencement of an action within the bankruptcy proceeding." *In re Ira Haupt & Co.*, 253 F. Supp. 97, 98–99 (S.D.N.Y.), *modified sub nom. Henry Ansbacher & Co. v. Klebanow*, 362 F.2d 569 (2d Cir. 1966). "The filing of a proof of claim effectively commences a proceeding within the bankruptcy proceeding to establish its provability, priority, amount, etc." *Id.* A party that files a proof of claim in accordance with the Federal Rules of Bankruptcy Procedure is deemed to have established a

prima facie case against the debtor's assets.  11 U.S.C. § 502(a); FED. R. BANKR. P. 3001(f); *see also In re Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

A proof of claim must "be executed by the creditor or the creditor's authorized agent." FED. R. BANKR. P. 3001(b).  A proof of claim that conforms substantially to the appropriate Official Form, and that is filed in accordance with Rule 3001, constitutes prima facie evidence of validity of the claim.  11 U.S.C. § 502(a); FED. R. BANKR. P. 3001(f).  Accordingly, a creditor's proof of claim is prima facie valid if the creditor completes all required portions of the Official Bankruptcy Proof of Claim Form, attaches all supporting documents available for that claim, and meets the requirements of any applicable subparagraph of FED. R. BANKR. P. 3001.  *See In re Harris*, 492 B.R. 225, 227–28 (Bankr. S.D. Tex. 2013) (discussing the required use of the Official Proof of Claim Form under Rule 3001, as well as the Form's requirements).  Ultimately, a proof of claim must fulfill its "essential purpose of providing objecting parties with sufficient information to evaluate the nature of the claims."  *In re Wyly*, 552 B.R. 338, 378 (Bankr. N.D. Tex. 2016).

If a proof of claim is prima facie valid, a party-in-interest may nevertheless object to the claim to disprove its validity.  To successfully object to a claim that has prima facie validity, the objecting party must produce evidence rebutting the claim and establish that the claim should be disallowed pursuant to 11 U.S.C. § 502(b).  *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698; *In re Depugh*, 409 B.R. 125, 135 (Bankr. S.D. Tex. 2009).  Rebuttal evidence must be equal in probative value to successfully rebut a creditor's proof of claim.  *In re Wyly*, 552 B.R. at 379.  "This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the

claim and its supporting documents, or by the presentation of pretrial pleadings . . . ." *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698.

If the objecting party produces evidence equal in probative force to the claimant's proof of claim, or the claimant fails to prove its claim's prima facie validity, the claimant must present additional evidence to "prove the validity of the claim by a preponderance of the evidence." *Id.* The ultimate burden of proof always rests upon the claimant. *Id.*

The OpCo Noteholders have filed proofs of claim seeking amounts under the Note Agreement and the OpCo RCF. (ECF No. 1214-11 at 5–122). Each proof of claim filed by the Noteholders constitutes prima facie evidence of the validity of that claim. Accordingly, as the objecting parties, the Debtors bear the burden of rebutting the Noteholders' claims represented by the valid proofs of claim.

The following issues remain in dispute in this matter:

     i.        Whether the Make-Whole Amount is fully enforceable under New York law;

    ii.       Whether the Noteholders are entitled to all of their non-bankruptcy rights under 11 U.S.C. § 1124(1) because they are treated as unimpaired by Debtors' chapter 11 plan;

   iii.       Whether the Make-Whole Amount should be disallowed as unmatured interest under 11 U.S.C. § 502(b)(2); and

   iv.       At what rate should post-petition interest be calculated?

(ECF No. 1478 at 2–3).

### *Is the Make-Whole Amount Fully Enforceable under New York Law?*

In order to carry their burden of rebutting the Noteholders' claims and establishing that those claims should be disallowed, the Debtors argue that the Make-Whole Amount represents an improper liquidated damages provision. (ECF No. 1215 at 32). This argument is made under New York law because the Note Agreement is governed by New York law. (ECF No. 1215-1 at

47). In general, if a claim is not allowed under applicable non-bankruptcy law, it is not allowed as a claim against the estate. 11 U.S.C. § 502(b)(1). The Debtors argue that the Note Agreement does not provide a reasonable measure of probable actual loss because it is designed to double count any actual harm the Noteholders might suffer upon the automatic acceleration of the Notes. (ECF No. 1215 at 32). The Make-Whole Amount formula is intended to compensate the Noteholders for the difference between the rate stated in the now-accelerated Notes and a hypothetical reinvestment rate. (ECF No. 1215 at 12; ECF No. 1393 at 40). The Debtors claim that the Make-Whole formula actually overcompensates the Noteholders because they will be able to reinvest their principal at higher rates than that reflected in the formula. (ECF No. 1215 at 33).

Because of the alleged overcompensation, the Debtors argue that the Make-Whole Amount is grossly disproportionate to the Noteholders' probable loss at the time that they entered the Note Agreement and is therefore invalid under New York law. *Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014).

Typically, New York contract law requires courts to enforce unambiguous contract terms. This principle rings particularly true where the contract was negotiated by sophisticated and represented parties in an arms-length and equal negotiation. *AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 388 (S.D.N.Y. 2012). A narrow exception to this rule of contract interpretation applies where a court is asked to enforce a liquidated damages provision that is proven to be a penalty and thus unenforceable by the party opposing it. *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (N.Y. 2005).

A liquidated damages provision is a "contractual provision that determines in advance the measure of damages if a party breaches the agreement." *Liquidated-Damages Clause*, BLACK'S

LAW DICTIONARY (10th ed. 2014). Contractual make-whole provisions and other, similar provisions are typically considered liquidated damages provisions. *See, e.g.*, *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134 (2d Cir. 1982) (recognizing a "pre-payment charge" as a liquidated damages provision); *JMD Holding Corp.*, 4 N.Y.3d at 380 (equating an early termination fee to a liquidated damages provision). The Note Agreement explicitly lists the Noteholders' remedies that automatically arise upon the occurrence of an Event of Default, including the acceleration of the Make-Whole Amount. (ECF No. 1215-1 at 38–39). Based upon the existence of such provisions in the Note Agreement, as well as the weight of New York case law considering make-whole provisions to be liquidated damages provisions, the Make-Whole Amount constitutes a liquidated damages provision.

A liquidated damages provision is enforceable under New York law "if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." *JMD Holding Corp.*, 4 N.Y.3d at 380. "The soundness of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages are incurred or become payable." *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 898 (2d Cir. 1972).

Whether damages in a particular case constitute enforceable liquidated damages is a question of law with the burden of proof on the party seeking to avoid paying the liquidated damages. *JMD Holding Corp.*, 4 N.Y.3d at 379–80. In order to meet this burden, the burdened party must demonstrate either that "damages flowing from a prospective early termination were readily ascertainable at the time" the parties entered into the liquidated damages provision, or

that the provision is conspicuously disproportionate to those foreseeable damages. *Id.* at 380. "Absent some element of fraud, exploitive overreaching or unconscionable conduct . . . to exploit a technical breach, there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties." *Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577 (N.Y. 1979). Nonetheless, "where there is doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damage clause, it should be resolved in favor of a construction which holds the provision to be a penalty." *Willner v. Willner*, 145 A.D.2d 236, 240–41 (N.Y. 1989).

Debtors fail to rebut the Noteholders' claim for the Make-Whole Amount because they fail to prove that the damages resulting from prepayment were readily ascertainable at the time the parties entered into the Note Agreement or that they were conspicuously disproportionate to foreseeable damage amounts. Debtors put forward no evidence or argument claiming that the prepayment damages were easily calculable as of the time the Note Agreement was finalized. As set forth below, the difficulty in forecasting damages in this case is consistent with the difficulty seen in other cases when quantifying damages under long-term debt instruments and contrasts sharply with cases in which damages could easily have been calculated at the time an agreement was created. *See In re United Merchants & Mfrs., Inc.*, 674 F.2d at 143 ("[I]t is apparent that the potential damages from breach of the loan agreements in this case were difficult to determine."); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 130 (Bankr. E.D.N.Y. 2002) ("Potential losses from prepayment of a large fixed-rate, long-term mortgage are 'not subject to easy calculation.'"). *But see Evangelista v. Ward*, 308 A.D.2d 504, 505 (2003) (finding plaintiff's actual loss susceptible to calculation).

At the point of prepayment (whether as a result of acceleration or otherwise), a lender would lose all future interest under its notes. The loss of that future interest would ordinarily be offset by the reinvestment of the prepaid proceeds in an alternative investment. However, the measurement difficulty comes from determining the selection of an alternative investment. If the perceived risk at issuance of the debt was low, may the lender quantify its reinvestment alternatives by looking at alternatives that have low risk? What if the lender invested in an industry for diversification purposes and offered a lower rate as a result? Would the reinvestment rate, at a low risk, necessarily be in the same industry? How do you measure perceived risks at the date of issuance and the date of prepayment? Other factors are more precise. Market fluctuations in interest rates are easily quantifiable. Nevertheless, changes in the yield curve are constant. *See generally* Tao Wu, *What Makes the Yield Curve Move?*, FRBSF ECON. LETTER (Fed. Reserve Bank of S.F.), June 6, 2003. How does one calculate a reinvestment rate with a fluctuating yield curve? Additionally, yield curves change based on the general risks of the loans. *Id.* What yield curve would be examined? The parties agreed on a simple measurement. The reinvestment rate was set at 0.5% in excess of the yield reported two business days before the Settlement Date "for the most recently issued actively traded on-the-run U.S. Treasury securities having a maturity" equal to the remaining tenor of the relevant OpCo Note as of the date it was accelerated. (ECF No. 1215-1 at 27).

The Debtors also fail to rebut the Noteholders' claim for the Make-Whole Amount by unsuccessfully proving that the Make-Whole Amount is conspicuously disproportionate to the foreseeable losses at the time the parties entered into the Note Agreement. To prove that the Make-Whole Amount is conspicuously disproportionate by attempting to collect both liquidated and actual damages, the Debtors attempt to compare it to the liquidated damages provision

invalidated in *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412 (S.D.N.Y. 2016). The liquidated damages provision in *Agerbrink* guaranteed defendants a "'minimum recovery' regardless of actual damages, while preserving their right to pursue actual damages if they so desire . . . ." *Id.* at 418. Because of such a double recovery for the same wage-related injury, the district court determined that this provision constituted an unfair penalty and resulted in unjust enrichment of the defendants. *Id.* at 418–19.

Unlike the liquidated damages provision in *Agerbrink*, the Make-Whole Amount does not lead to a double recovery of actual and liquidated damages for the same injury. The Make-Whole Amount liquidates the Noteholders' damages stemming from the early termination of their investment in OpCo. (ECF No. 1215-1 at 27, 38). In other words, the Make-Whole Amount is an agreed measure of damages between the parties. The calculation of the Make-Whole Amount is performed as of the date of acceleration. Although the Make-Whole Amount references future payments that would have been due on the Notes, it also references future hypothetical reinvestment rates. It then liquidates the differences in returns as of the acceleration date.

The Debtors argue that the default interest rate double counts the amounts captured through the Make-Whole Amount. This argument fails. Had the Debtors paid the principal, the interest, and the Make-Whole Amount on the date of acceleration, there would have been no default interest due. The post-petition default interest that the Noteholders seek would compensate the Noteholders for the Debtors' failure to pay the principal, unpaid interest, and Make-Whole Amount *as they came due at the time of acceleration*. (ECF No. 1215-1 at 37). Such interest comports with the fact that the Notes directed that any overdue payment of the Make-Whole Amount would include interest accrued at the Note Agreement's default rate.

(ECF No. 1215-1 at 38). Accordingly, these two forms of damages do not represent a double recovery of actual and liquidated damages for the same injury to the Noteholders.

An illustration is in order. This illustration reflects that the Make-Whole Amount captured only excess interest due under the Notes in a hypothetical reinvestment. The default rate only applies to the non-payment of the excess interest and not to the non-payment of the hypothetical reinvested amount. Assume the following:

- A $1,000,000,000 loan at a 5% interest rate, with 12 equal monthly installments of $85,607,482;

- A reinvestment rate of .5% over the treasury rate;

- A treasury rate for securities with a comparable maturity of 1.5%;

- A prepayment after month 6.

The original amortization of the hypothetical loan is represented in this table:

| Month | Beginning Principal | Interest | Payment | Ending Principal |
|---|---|---|---|---|
| 1 | $1,000,000,000 | $4,166,667 | ($85,607,482) | $918,559,185 |
| 2 | $918,559,185 | $3,827,330 | ($85,607,482) | $836,779,033 |
| 3 | $836,779,033 | $3,486,579 | ($85,607,482) | $754,658,131 |
| 4 | $754,658,131 | $3,144,409 | ($85,607,482) | $672,195,058 |
| 5 | $672,195,058 | $2,800,813 | ($85,607,482) | $589,388,389 |
| 6 | $589,388,389 | $2,455,785 | ($85,607,482) | $506,236,692 |
| 7 | $506,236,692 | $2,109,320 | ($85,607,482) | $422,738,530 |
| 8 | $422,738,530 | $1,761,411 | ($85,607,482) | $338,892,458 |
| 9 | $338,892,458 | $1,412,052 | ($85,607,482) | $254,697,028 |
| 10 | $254,697,028 | $1,061,238 | ($85,607,482) | $170,150,784 |
| 11 | $170,150,784 | $708,962 | ($85,607,482) | $85,252,264 |
| 12 | $85,252,264 | $355,218 | ($85,607,482) | ($0) |

As shown above, the principal balance would have been $506,236,692 at the end of 6 months. If the prepayment occurs at that time, and the $506,236,692 is hypothetically reinvested

for the remaining 6 months at 2% (i.e., 0.5% above the 1.5% hypothetical reinvestment rate), the lender would receive monthly payments of only $84,865,640:

| Month | Beginning Principal | Interest | Payment | Ending Principal |
|---|---|---|---|---|
| 1 | $506,236,692 | $843,728 | ($84,865,640) | $422,214,780 |
| 2 | $422,214,780 | $703,691 | ($84,865,640) | $338,052,832 |
| 3 | $338,052,832 | $563,421 | ($84,865,640) | $253,750,614 |
| 4 | $253,750,614 | $422,918 | ($84,865,640) | $169,307,892 |
| 5 | $169,307,892 | $282,180 | ($84,865,640) | $84,724,432 |
| 6 | $84,724,432 | $141,207 | ($84,865,640) | $0 |

Because the hypothetical reinvestment rate is lower, the monthly payment is reduced from $85,607,482 to $84,865,640. This is a shortfall of $741,842 per month. The present value of the $741,842, discounted at a 2% annual rate, is $4,425,204.

However, the *actual* missed interest payments would have been $7,408,199. Because the formula recognizes the hypothetical receipt of $2,957,145 of interest over the 6 months, it does not double count interest. The proof is in the calculation. The difference between $7,408,199 and $4,425,204 is $4,451,054. Because that $4,451,054 is hypothetically received over 6 months, its present value is slightly less and results in a Make-Whole Amount of $4,425,204 (a difference of $25,850).

Although this example is for only 6 months, it is intended to provide a straightforward explanation of how the math is performed. Once that understanding is achieved, it is apparent that there is no double counting.

The Make-Whole Amount in this case is enormous. However, the mere size of the Make-Whole Amount fails to prove that the Make-Whole Amount is conspicuously disproportionate to the foreseeable losses at the time the parties entered into the Note Agreement. As stated above, courts applying New York law analyze liquidated damages provisions at the time that the underlying agreement was executed. *JMD Holding Corp. v. Cong. Fin. Corp.*, 4

N.Y.3d 373, 380 (N.Y. 2005). "It thus makes no difference whether the actual damages are ultimately higher or lower than the sum stated in the clause." *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972). Because the Make-Whole Amount does not lead to a double recovery of actual and liquidated damages for the same injury, there is no reason for the Court to conclude that this provision is in any way disproportionate or invalid only because it is higher than potentially contemplated at the time the parties entered into the Note Agreement.

Accordingly, the Debtors failed to prove that either the Make-Whole Amount or the default interest amounts are unenforceable liquidation damages provisions under New York law.

### Are the Noteholders entitled to all of their non-bankruptcy rights under 11 U.S.C. § 1124(1) because they are treated as unimpaired?

The Debtors argue that "impairment" should be applied only to the Noteholders' "allowed" claims under the Bankruptcy Code, not to their state law claims. (ECF No. 1215 at 21). In this instance, Debtors argue 11 U.S.C. § 502(b)(2) precludes the allowance of the Make-Whole Amount because the Make-Whole Amount is merely a proxy for unmatured interest. (ECF No. 1215 at 21). In opposition, the Noteholders focus on the language of 11 U.S.C. § 1124 to support the position that "unimpairment" under § 1124 requires that the Noteholders receive all that they are entitled to receive under state law. (ECF No. 1390 at 29). The Noteholders also emphasize that Congress amended § 1124 in 1994 to eliminate an "Allowed" claim standard barring full recovery of their state law rights in a chapter 11 solvent debtor case. (ECF No. 1390 at 35).

This matter was directly addressed by the Third Circuit in *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003). *PPI* held that the § 502(b)(6) cap on a landlord's claim would be applied before determining whether the claim was impaired. *Id.* at 207. In that case, the plan

proposed to pay the landlord's claim in full, but only at the substantially reduced amount set by §
502(b)(6). *Id.* at 205. The Third Circuit ultimately held that the creditor's loss of payment did
not arise as a result of the plan—it arose because of § 502(b)(6). *Id.* at 204.

This Court rejects the reasoning in *PPI.* The *PPI* opinion correctly holds that the
disallowance of the lease rejection claim occurs as a result of § 502 rather than as a result of
confirmation of the plan. However, the issue confronting the Debtors in this case is whether the
Make-Whole Amount will be enforceable following confirmation of the Debtors' plan. In a
chapter 11 case, a discharge is granted under 11 U.S.C. § 1141(d). Under § 1141(d), the extent
of the discharge is governed by the terms of the confirmed plan. 11 U.S.C. § 1141(d)(1)(A)
("Except as otherwise provided in this subsection, in the plan, or in the order confirming the
plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the
date of such confirmation . . . ."). Because the *PPI* Court failed to analyze the fact that the issue
is one of discharge rather than allowance, the Court rejects its conclusions. It is the plan that
results in the discharge of the state-law based Make-Whole Amount—not § 502(b)(2).

Because the extent of a chapter 11 discharge is governed by the relevant plan, the issue of
the Make-Whole Amount's post-confirmation enforcement in this case is governed by the
Debtors' confirmed Plan. The Plan provides that the Noteholders' claims are not impaired and
shall be paid whatever amount necessary to make them unimpaired. (ECF No. 1324 at 26). The
Debtors' liability on the Make-Whole claims is thus not discharged under § 1141(d) unless the
Make-Whole claims are actually paid in their state law amount. Treating the Noteholders'
claims in this way is far more consistent with the mandate of the Fifth Circuit, which has held
that "even the smallest impairment nonetheless entitles a creditor to participate in voting." *In re*

*Vill. at Camp Bowie I, L.P.*, 454 B.R. 702,708 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir. 2013).

Regardless of the application of § 502(b)(2), the Court must determine the date on which acceleration occurred. The Court initially questioned whether, notwithstanding acceleration on account of an *ipso facto* clause, a claim may be unimpaired by the restoration of the creditors' rights pursuant to § 1124(2). However, the Debtors explicitly acknowledge that their chapter 11 plan treats the Noteholders' claims as unimpaired under § 1124(1). (ECF No. 1566 at 21). Because § 1124(1) applies in this case instead of § 1124(2), the prohibition against an *ipso facto* default present in § 1124(2) does not apply to the Make-Whole Amount. Debtors' obligation to pay the Noteholders the Make-Whole Amount thus arose on the Debtors' petition date, the applicable date of the Debtors' default under the Note Agreement. Consequently, interest payments on the outstanding balance of the Notes are calculated based upon the Debtors' petition date.

### *At what rate should post-petition interest be calculated?*

The issue remains as to what post-confirmation rate of interest must apply to the unpaid portion of the Noteholders' claims.

The Debtors argue that any interest on the Noteholders' claims should be assessed, at most, at the "legal rate," as stated in 11 U.S.C. § 726(a)(5). (ECF No. 1215 at 37). Based upon federal case law, the language of § 726, and legal policy, the Debtors claim that the term "legal rate" is defined as the federal judgment rate of interest. (ECF No. 1215 at 39–44). *See In re Gulfport Pilots Ass'n, Inc.*, 434 B.R. 380, 392 (Bankr. S.D. Miss. 2010) (applying the federal judgment rate to a post-petition interest claim); *In re Dow Corning Corp.*, 237 B.R. 380, 401 (Bankr. E.D. Mich. 1999) ("'[I]nterest at the legal rate' was, and is, commonly understood to

mean a rate of interest fixed by statute, and not by contract."); *see also In re Cardelucci*, 285 F.3d 1231, 1235 (9th Cir. 2002) ("[U]sing the federal rate promotes uniformity within federal law."). Post-petition interest on unsecured claims is awarded, if at all, at the federal judgment rate because § 502(b)(2) prohibits claims for such unmatured interest. (ECF No. 1215 at 37). *Matter of W. Texas Mktg. Corp.*, 54 F.3d 1194, 1197 (5th Cir. 1995) ("[I]nterest stops accruing at the date of the filing of the petition.").

Debtors recognize that unsecured creditors may receive post-petition interest on their claim if a debtor is solvent. (ECF No. 1215 at 37). *In re Cont'l Airlines Corp.*, 110 B.R. 276, 277 (Bankr. S.D. Tex. 1989). Nonetheless, pursuant to § 726(a)(5), the Debtors argue that such creditors receive interest at the legal or federal judgment rate. (ECF No. 1215 at 38). The Debtors cite to multiple cases—including Fifth Circuit precedent—and legal policy stating that the term "legal rate" in § 726 refers to the federal judgment rate of interest in 28 U.S.C. § 1961. (ECF No. 1215 at 39–42). Additionally, the Debtors argue that state law does not govern the rate of post-petition interest on unsecured claims in a solvent debtor case because such practice relies on pre-Bankruptcy Code practice, which defies the plain language of § 726(a)(5) and thus should not be followed. (ECF No. 1414 at 29). The Debtors finally assert that, pursuant to 11 U.S.C. § 1141(d), the Noteholders' claims were discharged under the Debtors' chapter 11 plan. (ECF No. 1478 at 2). Consequently, the Noteholders are entitled only to what the chapter 11 plan provides them—what the Bankruptcy Code and New York law entitles them to receive. (ECF No. 1478 at 2).

In opposition to the Debtors' position, the Senior Creditor Committee asserts that the Noteholders' unsecured claims fall squarely within the solvent debtor exception to disallowance of post-petition interest on unsecured claims under 11 U.S.C. § 502(b)(2). (ECF No. 1393 at 66).

The exception of the Noteholders' post-petition interest claims to disallowance is not limited by § 726(a)(5) because that provision of the Code is not applicable to chapter 11 cases, the claims are unimpaired, and the Debtors are solvent. (ECF No. 1393 at 66–70). Even if § 726(a)(5) were applicable to the Noteholders' post-petition interest claims, the Senior Creditor Committee argues that post-petition interest should still be paid at the Note Agreement's default rates because cases holding that the "legal rate" referred to in that provision are distinguishable as chapter 7 or 11 liquidation cases, as cases where no contract default rate existed, and as cases involving cramdown interest rates. (ECF No. 1393 at 72–74).

Joining the Senior Creditor Committee, the OpCo Noteholders claim that post-petition interest on the Noteholders' claims should be allowed at the Note Agreement's default rate because: Congress's repeal of 11 U.S.C. § 1124(3) in 1994 requires unsecured creditors to receive post-petition interest at the underlying contract rate in order to be unimpaired; this Court ruled in *In re Moody Nat. SHS Houston H, LLC*, 426 B.R. 667 (Bankr. S.D. Tex. 2010) that, for a claim to be unimpaired, interest must be paid at the contract default rate pursuant to § 1124(2); the Bankruptcy Code does not supplant the clearly established pre-code practice of awarding default interest at the contract rate in solvent debtor cases; if interest is awarded pursuant to § 726(a)(5), the Court should follow precedent holding that the "legal rate" is the contract rate of interest; and equitable principles merit awarding the contract rate of interest because the claims of the structurally subordinated creditors of the Debtors include post-petition interest at the rate included in the Note Agreement. (ECF No. 1390 at 36–37).

The Debtors fail to rebut the Noteholders' claim for post-petition interest at the rate listed in the Note Agreement because the Noteholders' claims are treated as unimpaired under the Debtors' chapter 11 plan. Paying post-petition interest on the Make-Whole Amount at the

federal judgment rate instead of the rate within the Note Agreement would cause the Noteholders to be impaired.

Section 726(a)(5) is not applicable to the Noteholders' post-petition claims because its only application in a chapter 11 case—through the "best interest of creditors" test in 11 U.S.C. § 1129(a)(7)—limits *impaired*, not unimpaired, claims.  11 U.S.C. § 1129(a)(7); *see also In re Energy Future Holdings Corp.*, 540 B.R. 109, 124 (Bankr. D. Del. 2015) ("[T]he applicability of Section 726(a) is limited to its incorporation in Section 1129(a)(7) and does not create a general rule establishing the appropriate rate of post-petition interest.").  The Noteholders are therefore entitled to their contractual rate of interest under the Note Agreement regardless of any disallowance provisions in the Bankruptcy Code.  *See In re Moody Nat. SHS Houston H, LLC*, 426 B.R. at 678 (finding that unimpairment of a creditor's claim requires the payment of interest at the default rate).

### Conclusion

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **September 21, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

Case 16-32202      Document 1570      Filed in TXSB on 09/21/2017      Page 1 of



ENTERED
09/21/2017

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **ULTRA PETROLEUM CORP.,** *et al* | § | **CASE NO: 16-32202** |
| | § | |
| **ULTRA RESOURCES, INC.** | § | **CASE NO: 16-32204** |
| | § | |
| **ULTRA WYOMING, INC.** | § | **CASE NO: 16-32205** |
| | § | |
| **ULTRA WYOMING LGS, LLC** | § | **CASE NO: 16-32206** |
| | § | |
| **UP ENERGY CORPORATION** | § | **CASE NO: 16-32207** |
| | § | |
| **UPL PINEDALE, LLC** | § | **CASE NO: 16-32208** |
| | § | |
| **UPL THREE RIVERS HOLDINGS, LLC** | § | **CASE NO: 16-32209** |
| | § | **Jointly Administered Order** |
| **Debtor(s)** | § | |
| | § | **CHAPTER 11** |

## ORDER DENYING ULTRA RESOURCES' CLAIM OBJECTION

For the reasons set forth in the Memorandum Opinion issued on this date, the OpCo Noteholders are entitled to the Make-Whole Amount, post-petition interest on the OpCo Notes at the default rate listed in the Master Note Purchase Agreement, and other related fees and expenses. Ultra Resources *et al.*'s objection to the Noteholders' claim is denied.

SIGNED **September 21, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE