### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ULTRA PETROLEUM CORP., *et al.* | ) | Case No. 16-32202 (MI) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

### OPCO NOTEHOLDERS' REPLY BRIEF

Sabin Willett (admitted *pro hac vice*)
Andrew J. Gallo (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street, Boston MA 02110
Telephone: 617.341.7700
Facsimile: 617.341.7701
*sabin.willett@morganlewis.com*
*andrew.gallo@morganlewis.com*

Renée M. Dailey (admitted *pro hac vice*)
Chip Fisher
Katherine L. Lindsay
AKIN, GUMP, STRAUSS, HAUER & FELD LLP
65 Memorial Road, Suite C340
West Hartford, CT 06107
Telephone:  860.263.2922
Facsimile: 860.263.2932
*renee.dailey@akingump.com*
*chip.fisher@akingump.com*
*kate.lindsay@akingump.com*

*ATTORNEYS FOR THE OPCO NOTEHOLDERS*

Dated:  April 28, 2020

## <u>TABLE OF CONTENTS</u>

**Page**

A.   The Solvent Debtor Exception Requires that the Judgment be Affirmed ............. 1

B.   Section 502(b)(2) of the Bankruptcy Code Does not Bar the Allowance of the Make-Whole Amount ..................................................................................... 5

    1.   The Make-Whole Amount Cannot be Interest Under Applicable Law. ...................................................................................................... 5

    2.   The Make-Whole Amount is Not Comparable to Original Interest Discount. .............................................................................................. 9

    3.   The Bankruptcy Code's *Ipso Facto* Provisions Do Not Bar Automatic Acceleration or Payment of the Make-Whole Amount. .......... 9

C.   Post-Petition Interest Was Payable at the Contract Default Rate ....................... 11

    1.   Debtors Never Confront the Inequitable Value Shift from Debt to Equity that their Framework Would Cause. ........................................... 11

    2.   The Bankruptcy Code Does Not Limit Unimpaired Chapter 11 Creditors' Post-Petition Interest to the Federal Judgment Rate.............. 13

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Achee Holds., LLC v. Silver Hill Financial, LLC,*
  342 Fed. Appx. 943 (5th Cir. 2009) ........................................................................6

*Butner v. United States,*
  440 U.S. 48 (1979) .................................................................................................5

*Dewsnup v. Timm,*
  502 U.S. 410 (1992)................................................................................................1

*Edward Andrews Grp., Inc. v. Addressing Servs. Co.,*
  No. 04 Civ. 6731, 2005 U.S. Dist. LEXIS 30125 (S.D.N.Y. 2005) ........................6

*Feldman v. Kings Highway Sav. Bank,*
  102 N.Y.S.2d 306 (App. Div. 1951), *aff'd,* 303 N.Y. 675 (N.Y. 1951) ..................6

*Gencarelli v. UPS Capital Business Credit,*
  501 F.3d 1 (1st Cir. 2007)........................................................................................3

*In re A&L Props.,*
  96 B.R. 287 (Bankr. C.D. Cal. 1988) ....................................................................18

*In re AMR Corp.,*
  730 F.3d 88 (2d. Cir. 2013)...........................................................................10, 11

*In re Anchor Resolution Corp.,*
  221 B.R. 330 (Bankr. D. Del. 1998) ......................................................................10

*In re Ancona,*
  2016 WL 828099 (Bankr. S.D.N.Y. Mar. 6, 2016) ..................................................4

*In re Beck,*
  128 B.R. 571 (Bankr. E.D. Okla. 1991) .................................................................18

*In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.,*
  592 F.3d 664 (5th Cir. 2009) ..................................................................................1

*In re Cardelucci,*
  285 F.3d 1231 (9th Cir. 2002) .........................................................................17, 18

*In re Carter,*
  220 B.R. 411 (Bankr. D.N.M. 1998) .................................................................16, 17

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ..................................................................14, 15

*In re Doctors Hosp. of Hyde Park, Inc.*,
   508 B.R. 697 (Bankr. N.D. Ill. 2014) ........................................................................8

*In re Dow Corning Corp.*,
   244 B.R. 678 (Bankr. E.D. Mich. 1999) ..............................................................14, 15

*In re Dow Corning Corp.*,
   456 F.3d 668 (6th Cir. 2006) ...................................................................................15

*In re Dvorkin Holdings*,
   547 B.R. 880 (N.D. Ill. 2016) ..................................................................................17

*In re Energy Future Holdings Corp.*,
   540 B.R. 109 (Bankr. D. Del. 2015) .............................................................4, 12, 13

*In re Farley*,
   146 B.R. 739 (Bankr. N.D. Ill. 1992) .........................................................................4

*In re Fast*,
   318 B.R. 183 (Bankr. D. Colo. 2004) ......................................................................17

*In re Federated Dept. Stores, Inc.*,
   131 B.R. 808 (S.D. Ohio 1991) .................................................................................4

*In re Fin.Ctr. Assocs. of E. Meadow, L.P.*,
   140 B.R. 829 (Bankr. E.D.N.Y. 1992) ......................................................................8

*In re Flanigan*,
   374 B.R. 568 (Bankr. W.D. Pa. 2007) .......................................................................4

*In re Lothian Oil Inc.*,
   650 F.3d 539 (5th Cir. 2011) .....................................................................................5

*In re Melenyzer*,
   143 B.R. 829 (Bankr. W.D. Tex. 1992)....................................................................18

*In re New Valley Corp.*,
   168 B.R. 73 (Bankr. D.N.J. 1994) .................................................................. *passim*

*In re Nortel Networks, Inc.*,
   522 B.R. 491 (Bankr. D. Del. 2014) ....................................................................14, 15

*In re PPI Enterprises*,
   324 F.3d 197 (3d Cir. 2003)........................................................................................4

*In re Pengo Industries, Inc.*,
   962 F.2d 543 (5th Cir. 1992) ............................................................................9

*In re Schoeneberg*,
   156 B.R. 963 (Bankr. W.D. Tex. 1993) .........................................................16

*In re School Specialty*,
   No. 13-10125 KJC, 2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013) .................9

*In re S. Pac. Funding Corp.*,
   268 F.3d 712 (9th Cir. 2001) .........................................................................10

*In re Trico Marine Servcs., Inc.*,
   450 B.R. 474 (Bankr. D. Del. 2011) ...............................................................9

*In re Ultra Petroleum Corp.*,
   943 F.3d 758 (5th Cir. 2019) ...........................................................1, 11, 15

*JMD Holding Corp. v. Cong. Fin. Corp.*,
   4 N.Y.3d 373 (N.Y. 2005) ..............................................................................5

*Parker Plaza W Ptnrs. v. UNUM Pension & Ins.*,
   941 F.2d 349 (5th Cir. 1991) ..........................................................................8

*U.S. Bank Nat. Ass'n v. S. Side House, LLC*,
   No 11-CV-4135 ARR, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012) .....................7

*Vanston Bondholders Committee v. Green*,
   329 U.S. 156 (1946) .....................................................................................13

*Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.*,
   459 F.2d 896 (2d Cir. 1972) ...........................................................................7

### STATUTES

11 U.S.C. § 363(l) ..........................................................................................10, 11

11 U.S.C. § 365(e)(1) .....................................................................................10, 11

11 U.S.C. § 502(b) ..............................................................................................5

11 U.S.C. § 502(b)(1) ...........................................................................................3

11 U.S.C. § 502(b)(2) .................................................................................. *passim*

11 U.S.C. § 502(b)(6) ...........................................................................................4

11 U.S.C. § 507(a)(1) ..........................................................................................16

11 U.S.C. § 507(a)(8) ...................................................................................................16

11 U.S.C. § 541(c) .......................................................................................................10

11 U.S.C. § 541(c)(1)(B) .........................................................................................10, 11

11 U.S.C. § 726(a)(1) ...................................................................................................16

11 U.S.C. § 726(a)(2) ...................................................................................................16

11 U.S.C. § 726(a)(5) .............................................................................................. *passim*

11 U.S.C. § 1124 ..........................................................................................................12

11 U.S.C. § 1124(2)(B) ...................................................................................................3

11 U.S.C. § 1124(2)(E) ...................................................................................................3

11 U.S.C. § 1124(3) ................................................................................................ *passim*

15 U.S.C. § 4303(a) ......................................................................................................15

21 U.S.C. § 844a(h) ......................................................................................................15

22 U.S.C. § 6082(a)(1)(B) .............................................................................................15

26 U.S.C. § 6621 ..........................................................................................................16

28 U.S.C. § 1961 .................................................................................................... *passim*

Tex. Fin. Code Ann. § 304.002 ......................................................................................16

Tex. Fin. Code Ann. § 304.003(c)(2) ..............................................................................16

Tex. Fin. Code Ann. § 304.103 ......................................................................................16

Tex. Fin. Code Ann. § 304.302 ......................................................................................16

## TREATISE

4 Collier on Bankruptcy ¶502.03[3][a] (16th ed. 2020) .............................................7, 8

**OTHER AUTHORITIES**

Douglas G. Baird, *Elements of Bankruptcy* (6th ed. 2014) ..........................................................8, 9

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ......................................................10

H.R. Rep. No. 103-835, *reprinted in* 1994 U.S.C.C.A.N. 3340 ...................................................1, 2

Webster's New World Dictionary (2d coll. ed. 1970)...................................................................8

The OpCo Noteholders[1] reply to the *Debtors' Opening Brief on Remand* ("Debtor Br.") [Docket No. 1834].

**A.   The Solvent Debtor Exception Requires that the Judgment be Affirmed.**

With the panel observing that its "review of the record reveals no reason why the solvent-debtor exception could not apply," *In re Ultra Petroleum Corp.*, 943 F.3d 758, 765 (5th Cir. 2019) ("Remand Opinion"), Debtors redefined the Solvent Debtor Exception – arguing that it "survived" in the Code era only to be limited by section 502's restrictions on contract rights.  That would be repeal, not survival, and make the Solvent Debtor Exception no exception at all.[2]  The Solvent Debtor Exception has always been articulated as a rule protecting the creditor's *contract rights* as they existed outside of bankruptcy.  *See* Noteholder Br. at 7, 10, and cases cited.

While courts balk at "major changes in pre-Code practice … that [are] not the subject of at least some discussion in the legislative history," *Dewsnup v. Timm*, 502 U.S. 410, 419 n.4 (1992), the Solvent Debtor Exception rests here on firmer ground than the mere presumption due where legislative history is absent.  *See* Noteholder Br. at 9 (discussing *In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664 (5th Cir. 2009)).  This case has what *Bodenheimer* lacked: clear evidence that Congress intended the opposite of what Debtors now seek.  That evidence is the prompt legislative repeal of the result in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994); *see* H.R. Rep. 103-835, 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356.  With that repeal, Congress's intent was unmistakable.  The Solvent Debtor Exception is alive and well and not limited by section 502(b)(2).

---

[1] Terms were defined in OpCo Noteholders' opening brief ("Noteholder Br.") [Docket No. 1831].

[2] The Solvent Debtor *Exception* is an "exception" precisely because it departs from the allowance rules.  Yet Debtors' position is that OpCo creditors should get less than 10% of their contractual interest (and less than 5% if the Make-Whole Amount were mistakenly recharacterized as interest).

During its chapter 11 case, New Valley's fortunes (like Ultra's) improved.  168 B.R. at 77. Fully solvent by 1994, it proposed a plan.  Negotiations between equity holders and bondholders reached impasse, for the interest claims were substantial.[3]  The debtor then wrote the script that *Ultra* would reprise.  It sought to avoid payment of the post-petition component of interest due to bondholders *and* avoid cram-down litigation by "unimpairing" those bondholders and thus denying them status as a rejecting class.  Its argument was textual.  At the time, section 1124(3) of the Code permitted a debtor to satisfy an unimpaired claim with the *allowed* amount of the claim, while section 502(b)(2) excluded unmatured interest, just as it does today.

The objecting bondholders relied solely on the Solvent Debtor Exception.  *See* 168 B.R. at 77.  The debtor countered that the Solvent Debtor Exception was limited by section 502(b)(2), and the bankruptcy court agreed.  *Id*. at 80.  This is precisely the theory now argued by Debtors – and *precisely the theory that Congress rejected a few months later*, when it struck subsection (3) from section 1124.  The House Committee on the Judiciary explained:

> In a recent Bankruptcy Court decision in [*New Valley*], unsecured creditors were denied the right to receive [post-petition] interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The New Valley decision applied section 1124(3) of the Bankruptcy Code literally by asserting, in a decision granting a declaratory judgment, that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive [post-petition] interest. . . . In order to preclude this unfair result in the future, the Committee finds it appropriate to delete section 1124(3) from the Bankruptcy Code.

H.R. Rep. 103-835, 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356.

*New Valley* had held that the Solvent Debtor Exception was limited by section 502(b)(2), but in "preclud[ing] this unfair result in the future," Congress *left section 502(b)(2) in place*. Failure to add text to the Code demonstrates Congress's intent and understanding that the Solvent

---

[3] New Valley's secured notes carried a coupon of 19.25%.  168 B.R. at 75.

Debtor Exception *already* solved the problem.  With section 1124(3)'s reference to the allowed claim removed, the solvent debtor would not be able to avoid paying post-petition interest at the contract rate – even with section 502(b)(2) undisturbed.[4]

The *New Valley* result and repeal is conclusive as to all aspects of this dispute.  Self-evidently, it requires application of the contract rate for post-petition interest incurred by unimpaired creditors.  But it applies equally to payment of the Make-Whole Amount, because the entire premise of Debtors' make-whole argument is that the claim is barred by section 502(b)(2).

What has been said above about Congress's intent disposes of the Debtor's argument about *Gencarelli v. UPS Capital Business Credit*, 501 F.3d 1 (1st Cir. 2007) as well, but the mandate in that case deserves a closer reading than Debtors give.  *Gencarelli* observed that "[w]hen the debtor is solvent, the bankruptcy rule is that where there is a contractual provision, valid under state law . . . the bankruptcy court will enforce the contractual provision."  *Id*. at 7.  The court remanded to determine whether a claim was enforceable as a matter of underlying state law – an open question for all unimpaired claims.  Although the claim at issue was a prepayment penalty, the court did *not* remand on section 502(b)(2).  Nor did it hold (or suggest) that a make-whole claim enforceable under state law should be limited by the Code in any way when a debtor is solvent.[5]

_____

[4] Nor did Congress amend section 1124(2).  Subsections (1) and (2) operate in parallel: a debtor may unimpair a class either by paying cash, or by reinstating all of the creditors' rights.  To reinstate within subsection (2), the debtor must cure all contractual defaults and reimpose the contract.  11 U.S.C. § 1124(2)(B); (E).  By definition, "contractual rights" can be restored only at contract rates. Congress intended the new "cash out" provision – subsection (1) – to offer no greater or lesser right than subsection (2), for the previous "cash out" provision, subsection (3), which gave the debtor a discount, was repealed.

[5] Section 502(b)(1) disallows claims that are unenforceable under "applicable law," thus adopting (in part) the definition of "claim" in section 101, and the Solvent Debtor Exception itself.  A creditor in bankruptcy cannot obtain more than its legal right outside of bankruptcy, merely because the debtor is solvent.

Debtors also rest on lower-court-level decisions on section 502(b)(6) disputes. These decisions are neither controlling nor persuasive. In four of them (*In re Ancona*, 2016 WL 828099 (Bankr. S.D.N.Y. Mar. 6, 2016); *In re Flanigan*, 374 B.R. 568, 575 (Bankr. W.D. Pa. 2007); *In re Farley*, 146 B.R. 739 (Bankr. N.D. Ill. 1992); and *In re Federated Dept. Stores, Inc.*, 131 B.R. 808 (S.D. Ohio 1991)), landlords tried to foist upon debtors a requirement that in every rejection damages dispute the debtor – and the bankruptcy court itself – conduct a mini-trial to prove that the debtor was *in*solvent. These courts sensibly rejected the argument. The Solvent Debtor Exception is, after all, an *exception*, and the narrow holding of the cases is that it is not the Debtor's burden to prove that it does not apply. This case presents no burden-of-proof issue: Debtors already repeatedly represented on the record that OpCo was massively solvent at relevant times. Noteholder Br. at 5 n.8. And while some of the section 502(b)(6) cases contain language that – unnecessarily – goes beyond the burden issue, these cases are out-of-circuit, contain no treatment of the circuit level decisions invoking the Solvent Debtor Exception, fail to acknowledge Congress's plain intent in repealing section 1124(3) in 1994, and are all limited to section 502(b)(6). None addresses section 502(b) more broadly.

Citation to these cases is odd, given the Debtors' continued reliance on *In re PPI Enterprises*, 324 F.3d 197, 207 (3d Cir. 2003), which drew a distinction between subsections 502(b)(2) and (b)(6), holding that while the latter continues to apply in a solvent debtor case, the former does not. To be unimpaired in a solvent debtor case, a creditor must receive post-petition interest. *Id*. at 206-07. In light of this distinction, cases applying 502(b)(6) in solvent debtor cases tell us nothing about whether the Solvent Debtor Exception survives with respect to claims for post-petition interest. As *In re Energy Future Holdings Corp.*, 540 B.R. 109, 123 (Bankr. D. Del.

2015) recognizes, there is "an irreconcilable conflict" between extending the logic of the *PPI* decision to section 502(b)(2) and Congress's clear intent in repealing section 1124(3).

**B.  Section 502(b)(2) of the Bankruptcy Code Does not Bar the Allowance of the Make-Whole Amount.**

Section 502(b)(2) of the Code does not bar allowance of make-whole claims notwithstanding the Debtors' flawed arguments to the contrary.  *First,* the Debtors obfuscate the distinct purposes and characteristics of the Make-Whole Amount, characterizing it as interest; *second*, they propose inapt analogies to cases relating to original interest discount ("OID") and no-call provisions, and *third*, they misconstrue the Code's *ipso facto* provisions.

**1.  The Make-Whole Amount Cannot be Interest Under Applicable Law.**

Claims against a debtor in bankruptcy are generally allowed if enforceable under state law, and not otherwise prohibited under the Code.  11 U.S.C. § 502(b); *In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011) (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)) (noting that property interests are created and defined by state law, and that unless some federal interest requires a different result, "'there is no reason why such . . . interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'")  The Code bars certain types of claim that are otherwise enforceable under state law, but does not transform the nature and characteristics of a claim.

Under New York law, liquidated damages provisions are enforceable if the amount liquidated bears a reasonable proportion to the probable loss, and the amount of actual loss was impossible or difficult to estimate when the parties entered into the contract.  *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (N.Y. 2005).  This Court held that the Make-Whole Amount constitutes an enforceable liquidated damages provision based on its analysis of the MNPA and "the weight of New York case law considering make-whole provisions to be liquidated damages

provisions." Memorandum Opinion at 11.  It noted "the difficulty in forecasting damages in this case is consistent with the difficulty seen in other cases when quantifying damages under long-term debt instruments and contrasts sharply with cases in which damages could easily have been calculated at the time an agreement was created."  Memorandum Opinion at 12.  The formula, it held, appropriately estimated the damage.  *Id.* at 13.

In an effort to skirt relevant precedent, the Debtors argue that the Make-Whole Amount can be *both* liquidated damages *and* unmatured interest.  This argument is not sustainable, as New York law makes the two concepts mutually exclusive.  In *Feldman v. Kings Highway Sav. Bank*, 102 N.Y.S.2d 306, 307 (App. Div. 1951), *aff'd*, 303 N.Y. 675 (N.Y. 1951), a prepayment premium was challenged under New York's usury statute.  The court held that the premium "was not in consideration of the making of a loan or of forbearance of money.  It was the converse, that is, for the making of a new and separate agreement, the termination of the indebtedness.  Accordingly, [the premium] *was not a payment of interest* and therefore could not be the basis of a claim of usury."  102 N.Y.S.2d at 307 (emphasis added).[6]  Just as a liquidated damages provision (like a make-whole premium) cannot be unmatured interest, unmatured interest cannot be liquidated damages.  As the court observed in *Edward Andrews Grp., Inc. v. Addressing Servs. Co.*, No. 04 Civ. 6731, 2005 U.S. Dist. LEXIS 30125, at *22 (S.D.N.Y. 2005), "where a court awards liquidated damages, it will limit the prevailing party's recovery to accrued interest because unearned, by nature, has never accumulated on the debt") (citation omitted).  *Feldman*, *Edward Andrews Grp.*, and numerous other cases decided by New York courts or under New York law show why the two

---

[6] Construing Texas interest law, the Fifth Circuit came to precisely the same conclusion.  *See Achee Holds., LLC v. Silver Hill Financial, LLC,* 342 Fed. Appx. 943, 945 (5th Cir. 2009) (Lockout fee was "not compensation for the use, forbearance, or detention of money [but] rather a charge for the option or privilege of prepayment, [therefore] under Texas law the [fee was] not interest and the usury laws [were] not violated.").

6

concepts are mutually exclusive.  Interest compensates for the use of money over time (and is always payable).  The Make-Whole Amount is the precise opposite: damage for not using money (which, depending on circumstances, may or may not occur, and therefore may or may not be payable).  When it occurs, that damage is measured by changes in the external lending markets and compensates for the administrative cost, delay, and potentially greater risk of relending.  *See Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972).  Because none of these things is time-based compensation for the use of money, the Make-Whole Amount is not interest.[7]

In short, a clause might be interest or its economic equivalent (for example, an OID provision), or it might be liquidated damages (like the Make-Whole Amount), but it cannot be both.  The Make-Whole Amount results from the parties' agreement, at the time of contracting, to use the market-endorsed method to compensate the OpCo Noteholders for unpredictable damages and costs associated with prepayment or acceleration.[8]  As highlighted many times throughout this dispute, the make-whole market formula could—depending on market factors at the time of repayment or default—result in a calculation that yields no payment due.  Accrued interest, unlike a Make-Whole Amount, can never be zero.

Debtors cite no authority suggesting that "unmatured interest" in section 502(b)(2) must be defined under federal law, rather than the applicable law (here, New York) that governs the

---

[7] Debtors cite to 4 *Collier on Bankruptcy* ¶502.03[3][a] (16th ed. 2020) to argue that the Make-Whole Amount "compensates the lender for lost interest."  Debtor Br. at 12. The citation is misleading. The treatise observes that (a) the <u>majority</u> of courts considering the issue have concluded that make-whole claims are allowable because they are liquidated damages and not unmatured interest, while (b) a <u>minority</u> of courts have taken the opposite position.  The treatise takes no position as to which view is correct.  *Id.*

[8] From the borrower's perspective, the Make-Whole Amount is also the agreed-upon option price for the exercise of a borrower's right to repay a loan prior to the applicable maturity date*.  U.S. Bank Nat. Ass'n v. S. Side House, LLC*, No 11-CV-4135 ARR, 2012 WL 273119 (E.D.N.Y. Jan. 30, 2012).

interest claim.  But even if "interest" were not defined by the law applicable to that claim, the result would be the same.  "Interest" is not defined under the Code, and thus would take its ordinary meaning: "money paid for the use of money [and/or] the rate of such payment, expressed as a percentage per unit of time".  *Interest*, *Webster's New World Dictionary* (2d coll. ed. 1970).[9]

Debtors rely on *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697 (Bankr. N.D. Ill. 2014), to argue that the Make-Whole Amount can be both liquidated damages and interest. Debtor Br. at 12.  *Doctors Hospital* – an odd case involving the triggering of a make-whole premium during the post-petition period[10] – makes its pronouncement *ex cathedra*, without explaining how compensation for the use of money can be the same as an estimate of harm for its non-use, and without persuasively addressing the contrary authority.  *See* Debtor Br. at 18-19.  The view Debtors describe as having been taken by "some bankruptcy courts" – i.e., that make-whole claims are allowable because they constitute liquidated damages instead of unmatured interest – is in fact the majority view.  4 *Collier on Bankruptcy* ¶ 502.03[3][a] n.47 (16th ed. 2020).

Debtors cite Douglas E. Baird, *Elements of Bankruptcy*, 84-85 (6th ed. 2014) ("Baird") for the assertion that the Make-Whole Amount is not a "garden variety liquidated damages clause." Debtor Br. at 1.  Baird describes a "garden-variety" liquidated damages clause by reference to the fixed fee that the debtor must pay to terminate an equipment lease early.  But the question is not whether a clause is "garden variety;" it is whether the clause is *in fact* a liquidated damages clause, that is, the parties' good-faith estimate of the cost the lender will incur through early termination of the MNPA and the borrower's non-use of the loaned funds.  Baird cites to recent cases such as

---

[9] *See also, In re Fin.Ctr. Assocs. of E. Meadow, L.P.,* 140 B.R. 829, 835 (Bankr. E.D.N.Y. 1992) (applying New York law and finding reasoning of *Parker Plaza W Ptnrs. v. UNUM Pension & Ins.,* 941 F.2d 349 (5th Cir. 1991), compelling).

[10] As a result, the make-whole claim was unmatured – unlike the Make-Whole Amount in this case, which matured upon the filing.

*In re School Specialty*, No. 13-10125 KJC, 2013 WL 1838513 (Bankr. D. Del. Apr. 22, 2013), and

*In re Trico Marine Servcs., Inc.*, 450 B.R. 474 (Bankr. D. Del. 2011), as examples of make-whole

premiums held to be liquidated damages clauses.  In a three-paragraph discussion, Baird does not

examine market-accepted formulae like the MNPA's Make-Whole Amount, recognized by

sophisticated borrowers as fair methods of discounting future harm, and decide they are something

else other than an enforceable liquidated damages clause.  It simply notes that "much depends on

the dynamics of the individual case."  *Id.* at 85.  The dynamics here are clear.

### 2.  <u>The Make-Whole Amount is Not Comparable to Original Interest Discount.</u>

The Debtors rely on *In re Pengo Industries, Inc.*, 962 F.2d 543, 546-47 (5th Cir. 1992),

which holds that OID amounts to the economic equivalent of unmatured interest.  *Pengo* provides

no guidance here as OID and the Make-Whole Amount are distinct financial concepts.  An OID

lender loans $90 and receives a note requiring the issuer to pay $100 at maturity.  The extra $10

can only be compensation for the use of the $90.  It will not be discounted.  It will not vary.  It is

a fixed sum due at maturity.  The nomenclature of OID – building the $10 into the "principal" due

at maturity – does not change the character of the $10.  Because the maturity date is fixed, OID

will always compensate at a fixed rate for the use of money over a fixed time.  Outside market

events will have no impact.  The Make-Whole Amount is utterly different.  Whether any is due

depends *entirely* on outside events, effectively requiring that the damaged lender relend the prepaid

proceeds. Unlike OID, under the agreed formula the Make-Whole Amount *always* varies, and may

never be due at all.

### 3.  **The Bankruptcy Code's *Ipso Facto* Provisions Do Not Bar Automatic** <u>**Acceleration or Payment of the Make-Whole Amount.**</u>

Section 12.1 of the MNPA provides for automatic acceleration upon a bankruptcy filing.

Debtors say that this is an unenforceable *ipso facto* clause and should be disregarded in

determining whether the Make-Whole Amount had matured.  Debtor Br. at 14.  That argument misconstrues the scope and nature of the Code's *ipso facto* provisions.

Congress was deliberate in describing which *ipso facto* provisions are unenforceable, and acceleration provisions are not among them.  Sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Code all describe circumstances not present here.  Each is intended to preserve debtors' contract rights and other property of the estate.  *See In re S. Pac. Funding Corp.*, 268 F.3d 712, 716 (9th Cir. 2001) (citing H.R. Rep. No. 95-595, 348, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6304).  Debtors here seek to escape a contract obligation, not preserve a contract right.  In *In re Anchor Resolution Corp.*, 221 B.R. 330 (Bankr. D. Del. 1998), the debtors wished to exercise contingent rights under a restructuring agreement to pay a reduced make-whole amount despite the fact that their bankruptcy filing constituted a termination event thereunder.  They argued that the automatic acceleration provision in the restructuring agreement was an unenforceable *ipso facto* clause.  *Id.* at 336.  The bankruptcy court held that the debtors' conditional right to pay a lower make-whole amount was not a property interest within the meaning of section 541(c) of the Code, and that the automatic acceleration provision was enforceable.  *Id.* at 338.  Because Debtors here have no contractual right – contingent or otherwise – to avoid paying the Make-Whole Amount under the circumstances, there is no basis to argue that Section 12.1 of the MNPA is an unenforceable *ipso facto* clause.

Debtors also cite *In re AMR Corp.*, 730 F.3d 88, 91 n.1 (2d. Cir. 2013), in support of the proposition that Section 12.1 of the MNPA is an unenforceable *ipso facto* clause. Debtor Br. at 14. In *AMR* the Second Circuit held exactly the opposite, that the automatic acceleration provision of the indenture <u>was not</u> an unenforceable *ipso facto* clause because the indenture was not an executory contract and was therefore outside the scope of section 365 of the Code.  730 F.3d at

106.  The *AMR* court specifically rejected assertions that the Code broadly prohibits *ipso facto* clauses.  730 F.3d at 107 ("The Appellant cannot identify any provision of the Bankruptcy Code, however, that provides support for such a *per se* prohibition.  Moreover, the specificity of the provisions on which [the Appellant] *does* rely [365(e)(1), 541(c)(1)(B) and 363(l)] – which demonstrate that Congress clearly knows how to limit or negate the effect of *ipso facto* clause when it wants to – counsels against the position that [the Appellant] urges here.") (emphasis in original).  The court further held that operation of the automatic acceleration clause under the indenture did not prevent property interests from becoming property of the estate.  *Id.* at 106.  Like the indenture in *AMR*, the MNPA is not an executory contract.  Debtors seek not to preserve contract rights or property interests, but to limit them.  This is not the intended purpose of the *ipso facto* prohibitions.  Thus the Make-Whole Amount was fully matured as of the petition date.

### C.  Post-Petition Interest Was Payable at the Contract Default Rate.

Congress's response to the *New Valley* decision disposes of the post-petition interest question in this case.  If it requires nothing else, the Solvent Debtor Exception requires that post-petition interest be awarded to the creditor of a solvent debtor at contract rates.  *See* discussion, *supra* at 1-3.  But even if the rule did not squarely require the imposition of the contract rate, section 1124(1) would import the contract rate as the only equitable solution in this case.  For even if "contractual" rights to interest do not reach the post-petition period, *see* Remand Opinion, 943 F.3d at 764, Congress required that Ultra leave the OpCo Noteholders' equitable rights unaltered.

### 1.  Debtors Never Confront the Inequitable Value Shift from Debt to Equity that their Framework Would Cause.

According to Debtors, Congress intended that a solvent debtor, fully able to pay all of its debts, be able to use a bankruptcy plan to (i) obtain a discount on those debts, (ii) engineer a shareholder windfall worth hundreds of millions of dollars, and (iii) do all of this at the expense

11

of creditors prevented by law from voting to reject the plan, and thereby obtaining a hearing on whether their treatment was fair and equitable.  Debtors never address two simple questions.  Why would Congress have intended such an inequitable result?  And where did it express that intention?

The only equitable point Debtors argue is that interest protects creditors from *delay*.  Debtor Br. at 23-24.  But equity is concerned with more than delay.  Windfalls granted to one stakeholder by invalidating another stakeholder's contract rights are a much greater equitable concern.  As soon as an interest *rate* is cut, value is shifted from the creditor to the shareholder.[11]  Debtors never explain why this would be fair – particularly where the debt and equity interests were held and traded by sophisticated investors.

Ultra raised capital by issuing bonds from both an operating company and a holding company.  The bonds were bought by and traded among sophisticated institutions that, in pricing their investments, recognized the structural superiority of the OpCo Senior Notes.  They understood that in periods of distress, OpCo's debts would enjoy priority over the debts of its shareholder, Holdco.  The Debtors' argument upends those market expectations, not merely by *subordinating* certain senior rights of operating company creditors, but by eliminating them altogether.  That is the effect of cutting interest rates to the Federal Judgment Rate.  Why Congress would have intended such a result is not explained.

Section 1124, requiring preservation of "legal, equitable, and contractual rights" in unaltered form, expresses an opposite intent.  Debtors would patch together Code provisions that, as they sheepishly admit, do not fit.  Debtor Br. at 22-23.  This effort would silently undo Section 1124's guarantee of equity.  *Energy Future Holdings* (cited at Debtor Br. 21-22) confirms that

---

[11] The proposition cuts both ways.  In the event – admittedly unlikely, but possible – that the Federal Judgment Rate exceeded a creditor's bargained-for rate, or a state's post-judgment rate, it would be inequitable to give the creditor *more* than what it would have received outside of bankruptcy.

Section 1129(a)(7) does *not* import Section 726(a)(5) with regard to *unimpaired* Chapter 11 creditors and "does not create a general rule establishing the appropriate rate of post-petition interest." The "fair and equitable test" should be "applied … in solvent debtor cases"— often justifying the contract rate. 540 B.R. at 124.

Most puzzling is Debtors' reliance, for the interest rate point, on Congress's repeal of Section 1124(3). Debtor Br. at 22-23. Congress's pointed legislative repeal of the *New Valley* holding was intended precisely to secure to unimpaired creditors their contract rate. The *creditors* "claimed a right to postpetition interest by reason of the Debtor's solvency. . . ." 168 B.R. at 76. The creditors were not, of course, claiming the Federal Judgment Rate, for they rested "on the solvent debtor rule established by courts under the Bankruptcy Act," which, as we have shown, imports a creditor's contract rate. *Id.*[12] Debtors' theory as to post-petition interest – that section 502(b)(2) trumps or limits the Solvent Debtor Exception – is precisely the theory that Congress rejected in 1994.

## 2. The Bankruptcy Code Does Not Limit Unimpaired Chapter 11 Creditors' Post-Petition Interest to the Federal Judgment Rate.

How do Debtors arrive at 28 U.S.C. § 1961, which goes unmentioned in Title 11? Not by any equitable route: imposition of that rate would simply shift hundreds of millions of dollars of creditor value to shareholders. So Debtors try to get to the rate by jamming square argument pegs into round Code holes. They argue first that section 726(a)(5) applies to the OpCo Noteholders through section 1129(a)(7). Debtor Br. at 20-25. Next, they argue that the phrase, "the legal rate" in Section 726(a)(5) imports the Federal Judgment Rate. *Id.* at 25-29.

---

[12] Nothing in the opinion suggests that creditors holding 19.25% coupons sought the Federal Judgment Rate, or that the bankruptcy court considered section 726 to apply, for the court reasoned that section 726 is activated in chapter 11 plan contests only for impaired classes. 168 B.R. at 79. The bankruptcy court relied on *Vanston Bondholders Committee v. Green*, 329 U.S. 156 (1946), and other cases involving the recovery of a contract interest measure.

*i. Application of Section 726(a)(5)—* All agree that according to its text, Section 726(a)(5) applies only in Chapter 7.  Debtor Br. at 21.  Close enough to round, Debtors say of their pegs, conceding the want of a textual link between section 726(a)(5) and unimpaired Chapter 11 claims. Debtor Br. at 23.  But in codifying confirmation rules, Congress was deliberate about distinguishing the impaired from the unimpaired creditor.  Section 1126(f) provides that *unimpaired* classes – but not impaired classes – are presumed to accept a plan.  Subsection 1129(a)(8) excuses *unimpaired* classes – but not impaired classes – from the requirement of an accepting vote.  Application of subsection (a)(10) depends on whether there is an *impaired* class under the plan.  And section 1129(a)(7)'s "best interest test" applies only to holders of claims in *impaired* rejecting classes.  Congress was intentional in distinguishing between how chapter 11 will treat parties entitled to vote and parties not entitled to vote.[13]

If section 1129(a)(7) *did* import section 726(a)(5) for an unimpaired class, it would *not* require that Chapter 11 creditors receive "no more and no less" than a certain interest rate, Debtor Br. at 23-24, but rather, that they receive "*not less than*" that rate.  *See* § 1129(a)(7)(A)(ii) (emphasis added).  The best-interest test only sets a floor.  *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 344 (Bankr. D. Del. 2004).  "Congress did not intend to preclude a higher rate."  *In re Nortel Networks, Inc.*, 522 B.R. 491, 511 (Bankr. D. Del. 2014) (citing *In re Dow Corning Corp.*, 244 B.R. 678, 686 (Bankr. E.D. Mich. 1999)).  As *Dow Corning* explained, "[i]f Congress had intended to supplant the contractual right to interest with [another rate], one would expect that intention to be plainly expressed."  244 B.R. at 686.

---

[13] This Court has already held that "[s]ection 726(a)(5) is not applicable to the Noteholders' post-petition claims because its only application in a chapter 11 case—through the 'best interest of creditors' test in 11 U.S.C. § 1129(a)(7)—limits impaired, not unimpaired, claims."  Memorandum Opinion at 15.

Section 1129(b) separately provides a fair and equitable standard, which is all that governs the upper bounds of the post-petition interest rate due in a Chapter 11 cases to an impaired rejecting class.  That standard "requires that a solvent debtor pay post-petition interest at the contract rate." *Nortel Networks*, 522 B.R. at 511 (citing *Dow Corning*, 244 B.R. at 695).  The Sixth Circuit later ratified this logic, holding that failing to apply the contract rate "would violate § 1129(b)'s fair and equitable standard."  *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006); *see also Coram Healthcare*, 315 B.R. at 346 (not convinced that "Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11"); Remand Opinion, 943 F. 3d at 765 ("absent compelling equitable considerations, when a debtor is solvent," the creditors contractual rights should be enforced) (citation omitted).[14]

ii. *Definition of Legal Rate*—Section 726(a)(5) does not import the Federal Judgment Rate found in 28 U.S.C. § 1961 in any event.  It neither refers to Section 1961 nor uses the term, "Federal Judgment Rate."  Nothing in the Code's text or legislative history does either.

When Congress intends for the Federal Judgment Rate to govern an interest rate, it says so. In 15 U.S.C. § 4303(a), Congress limited an antitrust plaintiff's recovery to "actual damages" and "interest calculated at the rate specified in section 1961 of Title 28 on such actual damages." Section 844a(h) of Title 21 allows the recovery of "an amount representing interest at a rate computed in accordance with section 1961 of Title 28" for controlled substance-related assessments.   Section 6082(a)(1)(B) of Title 22 grants interest on damages for trafficking confiscated property claimed by United States nationals "at the rate set forth in section 1961 of Title 28."  The way Congress applies the Federal Judgment Rate is to refer to section 1961.

---

[14] Failure to apply section 726(a)(5) would not render it a "nullity."  Debtor Br. at 24.  It applies in chapter 7 (where the solvent debtor is rare), and to objecting impaired classes in chapter 11 (which are common).

Congress used different words – "legal rate" – in section 726(a)(5) because it meant something different. Section 726 contains a waterfall. The trustee pays each tier in order, and if money remains, pays interest at the "legal rate." Congress used that term to cover the various differing rates of interest due. Subsection (a)(1)'s priority claims include domestic support obligations, *see id.* § 507(a)(1), and unpaid federal income taxes, *see id.* § 507(a)(8), while subsection (a)(2) is for general unsecured claims. A different "legal rate" of interest applies to each. *See, e.g.*, Tex. Fin. Code Ann. § 304.302 (interest on overdue support obligations); 26 U.S.C. § 6621 (special rate for income taxes); Tex. Fin. Code Ann. § 304.002 (18% interest rate payable on contract claims); *id.* §§ 304.103, 304.003(c)(2)-(3) (5% or 15% rates payable on tort claims depending on prime rates as published by Board of Governors). Applicable state and federal law prescribes various rates for the different kinds of unsecured claims to which the first four subsections of section 726(a) refer.

The definite article in section 726(a)(5) refers to "the" rate under governing law applicable to paragraphs (1), (2), (3), and (4), which will differ for each paragraph. If Congress meant for each subsection to be governed by a particular rate—rather than the rate the law ordinarily required for those sections—it would have said so, as it has done in other statutes, by referring to "the rate under Section 1961 of Title 28." The phrase, "in payment of interest at the legal rate … on any claim paid under paragraph (1), (2), (3), or (4)" allows for application of whatever rate the law applies in that situation. *In re Schoeneberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993); *In re Carter*, 220 B.R. 411, 414-15 & n.10 (Bankr. D.N.M. 1998) (noting the "great majority of the courts" "have concluded that postpetition interest should be computed at the rate provided in the agreement") (citation omitted).

Allowing a debtor to evade its contract without financial need to do so would "reward an unscrupulous and indolent debtor." *In re Fast*, 318 B.R. 183, 191-92 (Bankr. D. Colo. 2004). "[C]onsider[ing] and balanc[ing] the equities," *id.*, and avoiding providing a "windfall for the debtor" are clear policies underlying the Code. *Carter*, 220 B.R. at 416-17.

The leading decision for Debtors' reading, *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002), is unpersuasive. The court observes that the Federal Judgment Rate would "promote[] uniformity within federal law," and make for easy and judicially efficient determinations of interest rates. *Id.* at 1235-36. But it is no more difficult for a trustee to apply a claim's interest rate than it is for her to calculate the claim. Governing rates are easy to ascertain. *See Fast*, 318 B.R. at 191-92. Minimal extra effort, whatever it be, hardly justifies the deprivation of creditors' contract rights for the purpose of providing a multi-million dollar windfall to shareholders.

*Cardelucci* notes that balancing the equities between creditors and between creditors and debtor is an "overriding policy consideration in an award of interest." 285 F.3d at 1235. But the court concedes that where "there are sufficient assets to pay all claims for all interest," there are no concerns for equity between creditors. *Id.* at 1236. There are always sufficient assets to pay all claims in solvent-debtor cases, so there is never competition between creditors for limited funds. *See In re Dvorkin Holdings*, 547 B.R. 880, 897-98 (N.D. Ill. 2016). In solvent cases a cut rate will always strip value from the creditor and give it to the shareholder. *Cardelucci* has no answer for *Dvorkin Holdings's* observation that it is "fundamentally unfair to require a creditor to accept a lower interest rate than he bargained for when the bankruptcy estate has enough money to pay all unsecured creditors' claims, including interest, in full" – which is the case in all solvent-debtor cases. 547 B.R. at 898. That would explain why Congress did *not* impose the Federal Judgment Rate for all claims for post-petition interest. Doing so would have created "perverse

17

incentives," as that rate is "so low that debtors with sufficient funds may nevertheless decide to file for Chapter 11 reorganization to escape their obligations to pay interest at rates that are unfavorable in comparison." *Id.* at 898.

*Cardelucci* finds significance in the use of the definite article, *see* 285 F.3d at 1234-35, but the argument is, again, unpersuasive. "*The* legal rate … on any claim paid under paragraph (1)" means *the* rate applicable to a claim under paragraph (1), which may differ from *the* rate applicable to a claim under paragraph (2). Debtors also point to the substitution of "interest at the legal rate" for 'interest on claims allowed'." Debtor Br. at 26-27 (quoting *Cardelucci*, 285 F.3d at 1234). But an unexplained reference to "interest on claims allowed" would have led to disputes about which interest rate would apply. The reference to "legal rate" avoided that ambiguity by directing trustees to the rate that applicable law – whether the Internal Revenue Code, the judgment rate in Texas, or a contract – would apply to the claim. Had Congress made "a deliberate choice to direct courts" to the Federal Judgment Rate, it would have referred to Section 1961, as it has done in other statutes.

As Judge Clark has explained, the "majority approach" has been that "state law defines 'interest at the legal rate.'" *In re Melenyzer*, 143 B.R. 829, 831 (Bankr. W.D. Tex. 1992). *Melenzyer* cited nine other cases all holding that state law and governing contracts applied, explaining that the equities favored returning the creditor to the position it would have occupied absent bankruptcy, before benefiting the debtor with any surplus funds. *Id.* (quoting *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991)); *In re A&L Props.*, 96 B.R. 287, 289-90 (Bankr. C.D. Cal. 1988) ("[W]here a debtor has contracted for a rate of interest, and has sufficient funds to pay the bargained-for amount, the creditor is entitled to the agreed-upon rate.").

18

Section 726 does not apply here.  Both the Solvent Debtor Exception and section 1124(1) mandate the application of the contract rate of interest.

## **CONCLUSION**

The Court should affirm its prior order and enter judgment directing that the OpCo Noteholders should retain all of the payments on account of the Make-Whole Amount and the post-petition interest made pursuant to the Payment Order.

Dated:  April 28, 2020

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP
Sabin Willett (admitted *pro hac vice*)
Andrew J. Gallo (admitted *pro hac vice*)
One Federal Street, Boston MA 02110
Telephone: 617.341.7700
Facsimile: 617.341.7701
*sabin.willett@morganlewis.com*
*andrew.gallo@morganlewis.com*

AKIN, GUMP, STRAUSS, HAUER & FELD LLP

*/s/ Renée M. Dailey*
Renée M. Dailey (admitted *pro hac vice*)
Chip Fisher
Katherine L. Lindsay
65 Memorial Road, Suite C340
West Hartford, CT 06107
Telephone:  860.263.2922
Facsimile: 860.263.2932
*renee.dailey@akingump.com*
*chip.fisher@akingump.com*
*kate.lindsay@akingump.com*

*ATTORNEYS FOR THE OPCO NOTEHOLDERS*

## Certificate of Service

I certify that on April 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Renée M. Dailey
Renée M. Dailey (admitted *pro hac vice*)