# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | Case No. 16-32202 (MI) |
| Reorganized Debtors. | § | (Jointly Administered) |
|  | § |  |
|  | § |  |
| AD HOC COMMITTEE OF UNSECURED | § |  |
| CREDITORS OF ULTRA RESOURCES, INC. | § |  |
|  | § |  |
| Plaintiff, | § | Adversary Proceeding |
|  | § |  |
| v. | § | Adv. No. 16-03287 (MI) |
|  | § |  |
| ULTRA RESOURCES, INC.; ULTRA | § |  |
| PETROLEUM CORP.; AND UP ENERGY | § |  |
| CORPORATION, | § |  |
|  | § |  |
| Defendants. | § |  |
|  | § |  |

## DEBTORS' REPLY BRIEF ON REMAND

| | |
|---|---|
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| James H.M. Sprayregen, P.C. (admitted *pro hac vice*) | Paul D. Clement (admitted *pro hac vice*) |
| David R. Seligman, P.C. (admitted *pro hac vice*) | George W. Hicks, Jr. (admitted *pro hac vice*) |
| Michael B. Slade (TX Bar No. 24013521) | C. Harker Rhodes IV (admitted *pro hac vice*) |
| 300 North LaSalle | 1301 Pennsylvania Avenue, N.W. |
| Chicago, Illinois 60654 | Washington, D.C. 20004 |
| Telephone:  (312) 862-2000 | Telephone:  (202) 879-5000 |
| Facsimile:  (312) 862-2200 | Facsimile:  (202) 879-5200 |
| Email:      james.sprayregen@kirkland.com | Email:      paul.clement@kirkland.com |
|            david.seligman@kirkland.com | Email:      george.hicks@kirkland.com |
|            michael.slade@kirkland.com | Email:      harker.rhodes@kirkland.com |

*Additional Counsel Listed on Inside Cover*

---

[1]   The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number (if any), are:  Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC; Ultra Resources, Inc. (0643); Ultra Wyoming, Inc. (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158).

Christopher T. Greco (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:        christopher.greco@kirkland.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.     The Make-Whole Amount Should Be Disallowed ............................................ 3

       A.     The Make-Whole Amount Must Be Disallowed Under §502(b)(2) as the
              Economic Equivalent of Unmatured Interest ........................................... 3

       B.     There Is No Solvent-Debtor Exception to the Bankruptcy Code's
              Disallowance Provisions, Including §502(b)(2) .................................... 11

              1.     Numerous decisions demonstrate that §502(b)'s disallowance
                     provisions apply to solvent and insolvent debtors alike .......................... 12

              2.     Principles of statutory interpretation demonstrate that Congress did
                     not intend the pre-Code solvent debtor exception to limit
                     §502(b)(2) .................................................................................. 18

              3.     The SCC's other arguments for reading the Code to incorporate an
                     unwritten solvent-debtor exception to §502(b)'s disallowance
                     provisions are unpersuasive .................................................... 21

II.    The Creditors Are Entitled To Post-Petition Interest Only At The Federal
       Judgment Rate ................................................................................................. 24

       CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Comm. of Holders of Trade Claims v. PG&E Corp.*,
  2020 WL 1865135 (N.D. Cal. Apr. 14, 2020) ....................................................... 26, 29

*Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*,
  625 F.3d 185 (5th Cir. 2010) ................................................................................... 30

*Baker Botts L.L.P. v. ASARCO LLC*,
  576 U.S. 121, 135 S. Ct. 2158 (2015)...................................................................... 21

*BFP v. ADR Tr. Corp.*,
  511 U.S. 531 (1994).................................................................................................. 18

*Chamber of Commerce v. Whiting*,
  563 U.S. 582 (2011).................................................................................................. 19

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
  878 F.2d 620 (2d Cir. 1989)..................................................................................... 15

*Dean v. United States*,
  137 S. Ct. 1170 (2017).............................................................................................. 19

*Dewsnup v. Timm*,
  502 U.S. 410 (1992).................................................................................................. 18

*Elgin v. Dep't of Treas.*,
  567 U.S. 1 (2012)...................................................................................................... 19

*Gencarelli v. UPS Capital Bus. Credit*,
  501 F.3d 1 (1st Cir. 2007)........................................................................... 8, 11, 13

*Hall v. United States*,
  566 U.S. 506 (2012).................................................................................................. 21

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1 (2000)................................................................................. 18, 19, 21, 30

*In re Ancona*,
  2016 WL 828099 (Bankr. S.D.N.Y. Mar. 2, 2016) ................................................. 12

*In re Augé*,
  559 B.R. 223 (Bankr. D.N.M. 2016) ....................................................................... 12

*In re Beck*,
  128 B.R. 571 (Bankr. E.D. Okla. 1991).................................................................. 17

*In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*,
  592 F.3d 664 (5th Cir. 2009) ................................................................................... 20

*In re Cardelucci*,
  285 F.3d 1231 (9th Cir. 2002) ............................................................ 12, 14, 29, 30

ii

*In re Chateaugay Corp.*,
  961 F.2d 378 (2d Cir. 1992).................................................................................. 4

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ............................................................ 17

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*,
  791 F.2d 524 (7th Cir. 1986) ............................................................................ 16

*In re Cont'l Airlines Corp.*,
  110 B.R. 276 (Bankr. S.D. Tex. 1989) ............................................................ 16

*In re Doctors Hosp. of Hyde Park, Inc.*,
  508 B.R. 697 (Bankr. N.D. Ill. 2014) ............................................................ 5, 6

*In re Dow Corning Corp.*,
  244 B.R. 678 (Bankr. E.D. Mich 1999) .......................................................... 17

*In re Dow Corning Corp.*,
  456 F.3d 668 (6th Cir. 2006) ............................................................... 11, 14, 21

*In re Dvorkin Holdings, LLC*,
  547 B.R. 880 (N.D. Ill. 2016) ........................................................................... 17

*In re El Paso Refinery, L.P.*,
  244 B.R. 613 (Bankr. W.D. Tex. 2000) .......................................................... 24

*In re Energy Future Holdings Corp.*,
  540 B.R. 109 (Bankr. D. Del. 2015) ........................................................... 23, 28

*In re Energy Future Holdings Corp.*,
  842 F.3d 247 (3d Cir. 2016)............................................................................... 15

*In re Farley, Inc.*,
  146 B.R. 739 (Bankr. N.D. Ill. 1992) .............................................................. 12

*In re Federated Dep't Stores, Inc.*,
  131 B.R. 808 (S.D. Ohio 1991) ........................................................................ 12

*In re Flanigan*,
  374 B.R. 568 (Bankr. W.D. Pa. 2007) ............................................................ 12

*In re Kravitz*,
  2001 WL 36381905 (B.A.P. 1st Cir. Feb. 16, 2001) ..................................... 12

*In re Laymon*,
  958 F.2d 72 (5th Cir. 1992) ........................................................................ 20, 27

*In re Melenyzer*,
  143 B.R. 829 (Bankr. W.D. Tex. 1992) ........................................................... 13

*In re Mirant Corp.*,
  327 B.R. 262 (Bankr. N.D. Tex. 2005)............................................................. 17

*In re MPM Silicones, LLC*,
  874 F.3d 787 (2d Cir. 2017)........................................................................ 3

*In re Oakwood Homes Corp.*,
  449 F.3d 588 (3d Cir. 2006)........................................................................ 9

*In re Pengo Indus., Inc.*,
  962 F.2d 543 (5th Cir. 1992) ........................................................ 3, 4, 5, 11

*In re PG&E Corp.*,
  610 B.R. 308 (Bankr. N.D. Cal. 2019) .................................................. *passim*

*In re PPI Enters. (U.S.), Inc.*,
  324 F.3d 197 (3d Cir. 2003)...................................................................... 26

*In re PPI Enters. (U.S.), Inc.*,
  228 B.R. 339 (Bankr. D. Del. 1998) .......................................................... 12

*In re Premier Entm't Biloxi LLC*,
  445 B.R. 582 (Bankr. S.D. Miss. 2010) .................................................... 12

*In re Schoeneberg*,
  156 B.R. 963 (Bankr.W.D. Tex. 1993) ...................................................... 17

*In re Smith*,
  2008 WL 73318 (Bankr. W.D. Ky. Jan. 7, 2008) ...................................... 17

*In re Smith*,
  431 B.R. 607 (Bankr. E.D.N.C. 2010) ...................................................... 12

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .................................................................... 30

*In re Trico Marine Servs. Inc.*,
  450 B.R. 474 (Bankr. D. Del. 2011) ............................................................ 6

*In re Ultra Petroleum Corp.*,
  575 B.R. 361 (Bankr. S.D. Tex. 2017) ........................................................ 9

*In re Ultra Petroleum Corp.*,
  943 F.3d 758 (5th Cir. 2019) ................................................................ *passim*

*In re W. Tex. Mktg.*,
  54 F.3d 1194 (5th Cir. 1995) .................................................................... 24

*Johnson v. Norris*,
  190 F. 459 (5th Cir. 1911) ........................................................................ 20

*Reed v. Taylor*,
  923 F.3d 411 (5th Cir. 2019) .................................................................... 21

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959)...................................................................... 15

*Sexton v. Dreyfus*,
219 U.S. 339 (1911) ............................................................................................ 20

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003) ..................................................................... 10, 11

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ............................................................................................ 18

*Varsity Carpet Servs., Inc. v. Richardson* (*In re Colortex Indus., Inc.*),
19 F.3d 1371 (11th Cir. 1994) ........................................................................... 15

**Statutes**

11 U.S.C. §502 .......................................................................................... *passim*

11 U.S.C. §506 ...................................................................................................... 27

11 U.S.C. §726 .......................................................................................... *passim*

11 U.S.C. §1112 .................................................................................................... 29

11 U.S.C. §1124 .................................................................................................... 29

11 U.S.C. §1129 ........................................................................................ *passim*

**Treatises**

4 *Collier on Bankruptcy* ¶502.03 ......................................................................... 9

Douglas G. Baird, *Elements of Bankruptcy* (6th ed. 2014) ...................... 3, 6, 7, 8

**Other Authorities**

140 Cong. Rec. H10,752-01 (1994) ..................................................................... 19

Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*,
15 Am. Bankr. Inst. L. Rev. 537 (2007) ............................................................. 3

## INTRODUCTION

The Creditors first ask the Court to ignore established Fifth Circuit precedent by evaluating whether the Make-Whole Amount is unmatured interest rather than whether it serves as the economic equivalent of unmatured interest.   They then ask the Court to adopt the wholly unsupported view that an unwritten pre-Code solvent-debtor exception *sub silentio* supersedes the express statutory disallowance provisions that Congress enacted in §502(b) of the Code—a position that no court has adopted and many have rejected.  And they finally ask the Court to award post-petition interest on their allowed claims at the contract rate, when Congress has decided that the appropriate rate is the federal judgment rate.  The Court should decline all of those invitations.

To begin, the Creditors are not entitled to receive the Make-Whole Amount because their claim for that amount is disallowed by §502(b)(2).  Under settled Fifth Circuit law, §502(b)(2) encompasses any claim for the economic equivalent of unmatured interest.  Tellingly, the Creditors virtually ignore this controlling precedent and instead inundate the Court with irrelevant decisions addressing whether the Make-Whole amount literally "is" interest under different state statutes or relying on the erroneous premise that any amount characterized as liquidated damages under state law necessarily cannot be unmatured interest.  But the inquiry that actually matters, as explained in the treatise that the Fifth Circuit specifically cited on this issue (which the Creditors likewise disregard), is whether the Make-Whole Amount is a "garden-variety liquidated damages clause" designed to compensate the Creditors for the search costs involved in finding a new borrower, or whether instead it is designed to replace the future interest payments that they will no longer receive.  As the Notes themselves and the formula for calculating the Make-Whole Amount make clear, the Make-Whole Amount plainly falls into the latter category and so must be disallowed under §502(b)(2) and governing Fifth Circuit law.

The Creditors cannot evade that result by invoking an unwritten solvent-debtor exception to the disallowance provisions of §502(b) of the Code, including §502(b)(2). As they did last time, the Creditors ask this Court to depart from a "monolithic mountain of authority" repudiating their position. *In re Ultra Petroleum Corp.*, 943 F.3d 758, 760 (5th Cir. 2019). The Creditors do not cite a single case holding that the pre-Code solvent-debtor exception supersedes the disallowance provisions of §502(b), and numerous courts have rejected that proposition. Understandably so, for the Creditors' argument cannot be reconciled with customary canons of statutory interpretation, including those specifically addressing the relationship between pre-Code practice and the text of the Code. This Court should firmly reject the Creditors' unsupported and unsupportable theory.

Finally, the Creditors are entitled to post-petition interest only at the federal judgment rate. The Creditors no longer dispute that the federal judgment rate is "the legal rate" under §726(a)(5), which governs post-petition interest in solvent-debtor scenarios for Chapter 7 creditors and, through the best-interests-of-creditors test of §1129(a)(7)(A)(ii), for impaired Chapter 11 creditors. The Creditors present no convincing reason why the same rate should not equally apply to unimpaired Chapter 11 creditors, who have precisely the same equitable right to compensation for the delay caused by the bankruptcy proceedings. The Creditors do not even mention the recent *PG&E* decision that addresses this very issue and squarely rejects their position. Instead, the Creditors simply argue for post-petition interest at their contract rates—an amount that Congress specifically disallowed under §502(b)(2) and that Congress chose not to award as the proper measure of post-petition interest on an allowed claim in any other circumstances. The Court should reject that untenable argument and defer to Congress' judgment that the proper rate of post-petition interest on all unsecured claims when the debtor is solvent is the federal judgment rate.

**ARGUMENT**

I.    **The Make-Whole Amount Should Be Disallowed.**

    A.    **The Make-Whole Amount Must Be Disallowed Under §502(b)(2) as the Economic Equivalent of Unmatured Interest.**

Section 502(b)(2) disallows any claim for "unmatured interest." 11 U.S.C. §502(b)(2). As the Fifth Circuit made pellucidly clear in *In re Pengo Industries, Inc.*, 962 F.2d 543 (5th Cir. 1992), that provision does not turn on whether the amount at issue literally "is" unmatured interest; instead, §502(b)(2) looks to "economic fact" and "economic reality," asking whether the amount at issue constitutes the "economic equivalent of unmatured interest." *Id.* at 546. Under that established standard, the Make-Whole Amount here must be disallowed. Unlike other make-whole provisions, the Make-Whole Amount here is not a "garden-variety liquidated damages clause" that provides the lender a fixed amount to compensate it for the costs involved in finding a new borrower. Douglas G. Baird, *Elements of Bankruptcy* 84 (6th ed. 2014). Instead, as the Notes themselves demonstrate, the Make-Whole Amount here is designed and operates as "additional compensation to make up for the interest [the Noteholders] would not receive if the Notes were redeemed prior to their maturity date." *In re MPM Silicones, LLC*, 874 F.3d 787, 801-02 (2d Cir. 2017); *see* MNPA §§8.7, 12.1. That fact is clear from the formula for calculating the Make-Whole Amount, which subtracts the principal being accelerated or repaid in advance from the discounted value of the expected principal and interest payments—leaving an amount that "[a]s an economic matter" is "the equivalent of the unmatured interest that a lender expects to receive through the term of [the] loan." Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537, 573 (2007). The Creditors simply cannot use the Make-Whole Amount to circumvent §502(b)(2) and recover future unmatured interest "through the guise of a make-whole premium." Baird, *supra*, at 84.

The Creditors have no persuasive response.  Tellingly, they almost entirely ignore the governing legal standard—whether the amount at issue here constitutes the "economic equivalent of unmatured interest," *Pengo*, 962 F.2d at 546.  Indeed, the SCC does not cite *Pengo* at all, and the Noteholders bury the decision at the end of their argument regarding the Make-Whole Amount.  *See* Noteholders.Br.21.  Even then, the Noteholders do not dispute that *Pengo* requires courts to evaluate "economic reality" and determine whether a payment is the "economic equivalent of unmatured interest."  *Pengo*, 962 F.2d at 546; *see also In re Chateaugay Corp.*, 961 F.2d 378, 381 (2d Cir. 1992) (explaining that "interest" in §502(b)(2) encompasses "what in economic fact is interest").  Indeed, the Creditors never expressly dispute that *if* the test is whether a payment is the "economic equivalent of unmatured interest," the Make-Whole Amount here satisfies that standard.

Instead of engaging with the governing standard, the Creditors spill considerable ink arguing that the Make-Whole Amount does not literally comprise interest and is, instead, a liquidated damages provision.  Noteholders.Br.14-18; SCC.Br.23-25.  That argument fails on several levels.  First and most fundamentally, the Creditors' argument about whether the Make-Whole Amount is "interest" as states have defined that term ignores the appropriate question of whether the Make-Whole Amount is the "economic equivalent of unmatured interest" for purposes of §502(b)(2).  *Pengo*, 962 F.2d at 546.  The Creditors cite a series of cases addressing whether other make-whole provisions comprise interest under New York or Texas state law.  *See* Noteholders.Br.14-16; SCC.Br.24-25.  But as the Debtors have explained, *see* Ultra.Br.13 & n.4, those cases apply the wrong test (asking whether the make-whole provision literally "is" interest rather than whether it constitutes the economic equivalent of interest) under the wrong law (New York contract law or Texas usury law rather than the federal Bankruptcy Code).  Consequently,

they do not move the needle when it comes to determining whether the Make-Whole Amount is the economic equivalent of interest for purposes of §502(b)(2).[2]

Second, the Creditors' assertion that the Make-Whole Amount must be *either* a liquidated damages provision *or* unmatured interest—a critical premise to their argument, *see* Noteholders.Br.13; SCC.Br.23—is a "false dichotomy." *In re Doctors Hosp. of Hyde Park, Inc.*, 508 B.R. 697, 706 (Bankr. N.D. Ill. 2014). The Creditors contend that if a monetary sum "constitutes liquidated damages" under state law, the "necessary implication" is that it "cannot *also* be interest." Noteholders.Br.17. But as *Doctors Hospital* correctly recognizes, "[n]othing about the nature of liquidated damages necessarily excludes interest, or vice versa." *Id.* at 706; *see* Ultra.Br.12. To take an obvious example, if a creditor were to insist on a "liquidated damages" clause making the debtor immediately liable for all remaining unmatured interest payments upon any default, the "liquidated damages" label would not save that claim from disallowance under §502(b)(2). Otherwise, every creditor could evade §502(b)(2) with a few lines of artfully drafted contractual language. There is no reason to believe that Congress intended to allow creditors to vitiate §502(b)(2)—or, by extension, other provisions of §502(b)—in that manner, which is why the Fifth Circuit has made clear that the §502(b)(2) analysis must turn on "economic reality," not on how the amount at issue may be labeled in a loan agreement. *Pengo*, 962 F.2d at 546. As *Doctors Hospital* aptly observes, decisions supporting the contrary approach advanced by the

---

[2]   As the Noteholders acknowledge, "[c]laims that are enforceable under non-bankruptcy law are allowable in bankruptcy *unless the Code expressly disallows them*." Noteholders.Br.15 (emphasis added). The inquiry here is whether, even if the Make-Whole Amount is enforceable under non-bankruptcy law, §502(b)(2) of the Code disallows it as the "economic equivalent of unmatured interest."

Creditors—including their lead case, *In re Trico Marine Services Inc.*, 450 B.R. 474 (Bankr. D. Del. 2011)—simply are not "persuasive."  508 B.R. at 706.[3]

Third, the Creditors' broad assertion that all "make-whole provisions are enforceable liquidated damages provisions and not unmatured interest" disallowed under §502(b)(2), Noteholders.Br.14, cannot be reconciled with the fact-sensitive inquiry into the "dynamics of the individual case" that the Fifth Circuit instructed this Court to examine on remand.  *Ultra Petroleum*, 943 F.3d at 765 (quoting Baird, *supra*, at 85).  In fact, the Creditors entirely ignore the crystal-clear reasoning set forth in the treatise on which the Fifth Circuit explicitly and repeatedly relied in remanding this issue.  *See id.*  As Baird explains, there are two kinds of make-whole provisions.  One kind is a "garden-variety liquidated damages clause" that covers whatever search and transaction costs a lender "may incur … as it seeks to find someone else to use the capital on the same terms," by charging the borrower a fixed "fee for terminating the loan early."  Baird, *supra*, at 84.  Make-whole provisions in that category have nothing to do with unmatured interest and are unaffected by §502(b)(2).  The other kind of make-whole provision, however, is designed to compensate the lender not for the costs of finding a new buyer, but for the unmatured "interest that the lender would receive if the loan were kept in place."  *Id.*  As to those make-whole provisions, the "damages" being "liquidated" are *the profit expected to be earned on lost interest*

---

[3]    Along the same lines, there is no merit to the SCC's curious argument (not joined by the Noteholders) that this Court "has already determined that the Make-Whole Amount cannot be unmatured interest under section 502(b)(2)."  SCC.Br.25; *see also id.* at 23.  The SCC's only support for this contention is the Court's prior determination that the Make-Whole Amount is not an unenforceable liquidated damages provision under New York law.  *Id.* at 22.  But as explained, whether the Make-Whole Amount can be characterized as "liquidated damages" under state law does not bear on whether it must be disallowed as unmatured interest under §502(b)(2).  The SCC's assertion is also wholly at odds with the Fifth Circuit's decision (which explained that this Court "never reached" the §502(b)(2) question and specifically remanded for this Court to address it, 943 F.3d at 765), and this Court's previous decision (which never analyzed the Make-Whole Amount under §502(b)(2)).

*payments*, and "[b]ecause claims for unmatured interest are not allowed under §502(b)(2), lenders should not be able to recover them through the guise of a make-whole premium."  *Id.*

The Creditors make no attempt to address that analysis, and indeed do not even include a single citation to Baird anywhere in their opening briefs.  That is presumably because Baird (again, whose treatise was explicitly relied on by the Fifth Circuit's opinion in this very case) makes clear that §502(b)(2) applies to their claim.  While it may sometimes be difficult to tell whether a make-whole premium was designed to compensate the lender for administrative costs or for future unmatured interest payments (for instance, when the make-whole amount is set at a substantial fixed sum with no further explanation), *see id.* at 84-85, that task is overwhelmingly easy here.  Indeed, the Noteholders concede again in their opening brief that the Make-Whole Amount here is designed to compensate them for "a portion of their anticipated yield" from their expected future interest payments—*not* for the administrative costs involved in finding another buyer.  Noteholders.Br.3; *see* Ultra.Br.10.  That concession is inescapable in light of the formula for calculating the Make-Whole Amount, which is plainly designed to reflect the value of the expected future interest payments rather than the fixed costs involved in finding a new borrower.  *See* MNPA §§8.7, 12.1.  Because the Make-Whole Amount here is designed and operates to compensate the lenders for future interest payments, it is "effectively unmatured interest, and therefore disallowed under §502(b)(2)."  *Ultra Petroleum*, 943 F.3d at 765; *see* Baird, *supra*, at 84-85.

The Noteholders are thus wrong to suggest that applying §502(b)(2) here would mean that "no prepayment charge on any loan would be fully enforceable in bankruptcy," Noteholders.Br.19—an argument the SCC does not join.  As Baird explains, such provisions are enforceable when they seek to compensate the lender for the search and transaction costs it will incur to place its capital with another lender.  Baird, *supra*, at 84-85.  That also tends to explain

the Noteholders' observation that make-whole provisions that "simply require payment of a fixed percentage of the principal of the loan" are more likely to be upheld, Noteholders.Br.19—because such provisions are more likely to be designed to compensate for the fixed costs of placing that principal with a different borrower. *Cf. Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1, 3 (1st Cir. 2007) (considering prepayment penalties set at 3% of the outstanding principal balance, amounting to a total of some $200,000).[4]  A make-whole amount that simply serves to recover some or all of the lender's expected unmatured interest, however, must be disallowed under §502(b)(2).  Baird, *supra*, at 84-85.[5]

Taking a different tack, the Noteholders argue that the Make-Whole Amount cannot be disallowed as unmatured interest under §502(b)(2) because the Make-Whole Amount could be zero, while the net present value of future unmatured interest is always positive.  Noteholders.Br.3-4, 17-18.  Of course, the Noteholders are not seeking a Make-Whole Amount of zero.  In any event, the argument (also not joined by the SCC) is unpersuasive.  To be sure, the Make-Whole Amount is not set precisely equal to the net present value of the contemplated future interest payments.  *See* Ultra.Br.3; MNPA §8.7.  That fact, however, cannot possibly be enough to take the Make-Whole

---

[4]   The Noteholders' citation to *Gencarelli* for the proposition that prepayment charges "have been upheld many times" is inexplicable.  Noteholders.Br.19.  While *Gencarelli* did involve a fixed-percentage prepayment charge, it did not consider any challenge under §502(b)(2).

[5]   The Noteholders suggest that make-whole amounts are intended to compensate the lender for *both* lost yield on future interest payments *and* the administrative cost of finding a new borrower.  Noteholders.Br.19.  To be clear, §502(b)(2) disallows the Make-Whole Amount only "to the extent that" it serves as a substitute for future interest payments, not to the extent that it compensates the Creditors for their administrative costs in finding new borrowers. §502(b); Baird, *supra*, at 84-85.  But nothing in the Notes or the formula for calculating the Make-Whole Amount suggests that *any* part of the Make-Whole Amount was intended to compensate for administrative costs rather than unmatured interest, and the Noteholders do nothing to explain what portion of the extraordinary Make-Whole Amount here they believe serves that purpose.

Amount outside the scope of §502(b)(2).  Otherwise, a creditor could easily evade §502(b)(2) by drafting a "liquidated damages" clause that awards damages upon default equal to the total amount of all future interest payments minus some fixed sum, and then insisting that those "liquidated damages" cannot be disallowed under §502(b)(2) because "[a] formula that, under certain circumstances, yields no payment at all cannot be interest."  Noteholders.Br.18.  Congress never intended to give creditors that easy escape from the statutory command of §502(b)(2)—which is why the Code disallows any claim "*to the extent that* … such claim is for unmatured interest," even if the exact amount of unmatured interest sought is less than the total amount the creditor could conceivably claim.  §502(b) (emphasis added).  Merely subtracting some fixed amount from a claim for future unmatured interest—or, as here, discounting that interest at a variable rate that could theoretically reduce the Make-Whole Amount to zero—does not make it any less a claim for future unmatured interest, or any less disallowed under §502(b)(2).

The Noteholders alternatively argue that even if the Make-Whole Amount was "interest," it was not "unmatured," because the MNPA's *ipso facto* clause makes the Make-Whole Amount immediately due and payable as soon as OpCo files for bankruptcy.  Noteholders.Br.19.[6]  But as the Third Circuit and Collier have explained, "[w]hether interest is matured or unmatured on the date of bankruptcy is to be determined without reference to any ipso facto or bankruptcy clause." *In re Oakwood Homes Corp.*, 449 F.3d 588, 599 (3d Cir. 2006); *see* 4 *Collier on Bankruptcy* ¶502.03[3][b].  Accordingly, the *ipso facto* clause in the MNPA that triggers the Make-Whole Amount upon bankruptcy does not affect the §502(b)(2) analysis here.  *See* Ultra.Br.13-14.  Were

---

[6]  Recognizing the weakness of this argument, the SCC relegates it to a footnote—while suggesting that this Court has already ruled for the Creditors on this ground as well.  *See* SCC.Br.23 n.16 (citing *In re Ultra Petroleum Corp.*, 575 B.R. 361, 373 (Bankr. S.D. Tex. 2017)).  That assertion is mystifying; nothing in this Court's prior opinion even hints that the MNPA's *ipso facto* clause overrides §502(b)(2), a question the Court did not address.

it otherwise, a creditor could always sidestep Congress' command in §502(b)(2) with an *ipso facto* clause specifying that all unmatured interest will automatically mature upon any bankruptcy filing, rendering the statute a nullity.  The Noteholders respond that Congress "knew how to void *ipso facto* clauses," and "[n]o provision of the Code makes such clauses unenforceable." Noteholders.Br.21.  But the issue here is not whether the MNPA's *ipso facto* clause is void or unenforceable (or whether all such clauses are "categorically" void or unenforceable, *id.*); it is whether the clause can be used to eviscerate Congress' clear rejection of claims for unmatured interest in §502(b)(2).  The Noteholders cite no case endorsing that far-reaching principle.

The Noteholders' reliance (at 20) on *Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2003)—a case the SCC does not cite—is equally unavailing.  *Thrifty Oil* did not involve a make-whole provision at all; it involved interest rate swap contracts, under which the parties agree to pay each other the difference between a fixed and floating interest rate on a hypothetical "notional amount."  *Id.* at 1042-43.  As the Ninth Circuit explained, the "fundamental characteristic of an interest rate swap is that the counterparties never actually loan or advance the notional amount."  *Id.* at 1048.  The contract is simply a bet between the parties on the direction in which interest rates will move, and has "no connection with any underlying loan."  *Id.*  As such, the court held, damages for contract termination do not "represent interest, unmatured or otherwise."   Applying §502(b)(2) to such contracts, moreover, would undermine the "strong Congressional policy of protecting interest rate swaps," which is reflected in several other Code provisions.  *Id.* at 1050-51.  In stark contrast, the Make-Whole Amount is not a separate contractual bet on how interest rates will move, independent from an underlying loan; it is simply a substitute (whole or partial) for unpaid future interest on borrowed money. Indeed, *Thrifty Oil* cites with approval the Fifth Circuit's *Pengo* decision for the proposition that

"[i]n deciding whether a claim includes unmatured interest, federal courts generally focus on the substance of the claim, not its form." *Id.* at 1047 (citing 962 F.2d at 546). If anything, therefore, *Thrifty Oil* highlights the Creditors' refusal to engage with the applicable test, which looks to "economic reality" and asks whether the amount at issue comprises the "economic equivalent of unmatured interest." 962 F.2d at 546. Here, because the "substance" of the Creditors' claim seeks the "economic equivalent of unmatured interest," the claim must be disallowed under §502(b)(2).

### B.   There Is No Solvent-Debtor Exception to the Bankruptcy Code's Disallowance Provisions, Including §502(b)(2).

Because the Creditors cannot demonstrate, under the text of the Code and established Fifth Circuit precedent, that the Make-Whole Amount is not "unmatured interest" under §502(b)(2), they devote most of their opening briefs to arguing that this Court should simply ignore §502(b)(2) because the Debtors were solvent. But as the Debtors have explained, there is no solvent-debtor exception to the Bankruptcy Code in general, and there is certainly no solvent-debtor exception to §502(b)(2). Nothing in the text of the Code suggests that §502(b)'s disallowance provisions apply only when the debtor is insolvent, and numerous cases have explicitly reached the opposite conclusion. *See* Ultra.Br.15-16 (citing cases). By contrast, despite more than twenty pages of combined briefing on this topic, the Creditors have not cited a *single case* actually holding that the pre-Code solvent debtor exception supersedes §502(b)'s disallowance provisions—and several of their leading cases actually stand for the opposite view. *See, e.g.*, *Gencarelli*, 501 F.3d at 7 (claims in solvent-debtor cases are enforceable only "so long as they are valid under section 502"); *In re Dow Corning Corp.*, 456 F.3d 668, 680-81 (6th Cir. 2006) (recognizing in solvent-debtor case that §502(b) would disallow unreasonable attorneys' fees). This Court should disregard the Creditors' inapposite or mischaracterized decisions, follow the "monolithic mountain of authority" actually addressing this issue, *Ultra Petroleum*, 943 F.3d at 760, and hold that whatever residual force the

11

solvent-debtor exception may have in other contexts, it cannot overcome Congress' clear instruction in §502(b) of the Code to disallow certain claims.

### 1. Numerous decisions demonstrate that §502(b)'s disallowance provisions apply to solvent and insolvent debtors alike.

Section 502(b) provides that a bankruptcy court must allow a claim "except to the extent that" it falls into one of the specific categories in §502(b)(1)-(9) that Congress has decided to disallow in bankruptcy. By their plain text, those disallowance provisions make no distinction between solvent and insolvent debtors. And in accordance with that plain text, numerous courts have concluded that whether the debtor is solvent is "irrelevant" under §502(b). *In re Farley, Inc.*, 146 B.R. 739, 747-48 (Bankr. N.D. Ill. 1992); *see, e.g.*, *In re Ancona*, 2016 WL 828099, at *6 (Bankr. S.D.N.Y. Mar. 2, 2016) (courts need not "first find a debtor to be insolvent" before applying §502(b)); *In re Flanigan*, 374 B.R. 568, 575 (Bankr. W.D. Pa. 2007) (rejecting any "judicially-crafted exception" to §502(b) for solvent-debtor cases); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 817 (S.D. Ohio 1991) (courts may not "depart from" §502(b) just because "the debtor is solvent"); *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 345-46 (Bankr. D. Del. 1998) (rejecting the argument that §502(b) "should not apply in a solvent debtor case"), *aff'd*, 324 F.3d 197 (3d Cir. 2003). And in the post-petition context in particular, numerous courts have held that creditors should receive post-petition interest from a solvent debtor at "the legal rate" under §726(a)(5), rather than applying an unwritten solvent-debtor exception to award interest at whatever contract or state rate the creditor would have received outside of bankruptcy. *See, e.g.*, *In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002); *In re Kravitz*, 2001 WL 36381905, at *2-3 (B.A.P. 1st Cir. Feb. 16, 2001); *In re PG&E Corp.*, 610 B.R. 308 (Bankr. N.D. Cal. 2019); *In re Augé*, 559 B.R. 223, 228 (Bankr. D.N.M. 2016); *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 645-46 (Bankr. S.D. Miss. 2010); *In re Smith*, 431 B.R. 607, 610-11 (Bankr. E.D.N.C. 2010); *In re*

*Melenyzer*, 143 B.R. 829 (Bankr. W.D. Tex. 1992).  None of these cases can be reconciled with the Creditors' position that whenever a debtor is solvent, its creditors should retain all of their preexisting rights regardless of the Code's disallowance provisions.

Nor do any of the cases that the Creditors cite support their position.  Both the Noteholders and the SCC rely heavily on the First Circuit's decision in *Gencarelli*, quoting its language that when a debtor is solvent, "the equities strongly favor holding the debtor to his contractual obligations."  Noteholders.Br.10-11; SCC.Br.8-9.  Nothing in *Gencarelli*, however, suggests that those "equities" create an unwritten exception that could override the plain text of §502(b).  Quite the opposite: as *Gencarelli* recognizes in the very next paragraph (and throughout its opinion), even in a solvent-debtor case, a creditor's claims should be allowed only "so long as they are valid under section 502."  501 F.3d at 7; *see also id.* at 5 (§502 provides "the general rules that govern the allowance or disallowance of claims"); *id.* at 6 (claim is recoverable only if it "is found to be allowable under section 502"); *id.* at 8 (solvent debtor must pay its obligations "unless one of the section 502 exceptions applies").  Indeed, the First Circuit remanded the case with instructions for the bankruptcy court to "determine whether" the payments at issue—contractually agreed-upon prepayment penalties—were "enforceable under section 502" (specifically, §502(b)(1)).  *Id.* at 8-9.  That disposition makes no sense if a debtor's solvency overrides the §502(b) disallowance provisions.  Under the Creditors' theory, the First Circuit should have simply concluded that the solvent debtor in that case could not seek disallowance under §502(b) and instead must be held to its pre-petition contractual obligation to pay the prepayment penalties.  *Gencarelli* thus not only fails to support the Creditors' rule; it supports the opposite principle.

The Noteholders and SCC likewise misread the Sixth Circuit's *Dow Corning* decision.  *See* Noteholders.Br.10; SCC.Br.9.  Like the First Circuit in *Gencarelli*, the Sixth Circuit in *Dow*

13

*Corning* recognized that the disallowance provisions of §502(b) *were* still applicable even though the debtor there was solvent. *Dow Corning*, 456 F.3d at 680-81 (noting that §502 "requires that the bankruptcy court allow an otherwise valid claim unless one of the exceptions enumerated in subsection (b) precludes allowance"). To the extent that *Dow Corning* discusses the solvent-debtor exception, it does so only in the context of the fair-and-equitable test of §1129(b), where the text of the Code requires the court to weigh whether the plan is "fair and equitable" to "each class of claims and interests *that is impaired under*, and has not accepted, the plan." 11 U.S.C. §1129(b)(1) (emphasis added); *see Dow Corning*, 456 F.3d at 678-80 (holding that §1129(b) will normally require post-petition interest at the contract rate where the debtor is solvent). But that test does not apply here, because the Creditors here are unimpaired (as defined by the Code), and Congress has already determined that treating a creditor as unimpaired is by definition fair and equitable. *Dow Corning* thus says nothing to suggest that a solvent-debtor exception trumps the disallowance provisions of §502(b), and, like *Gencarelli*, actually indicates the opposite.

The other courts of appeals decisions separately cited by either the Noteholders or the SCC likewise either undermine their position or are inapposite.[7] The SCC (but not the Noteholders) cites the Ninth Circuit's decision in *Cardelucci* as evidence that "the solvent-debtor exception continues to be viable." SCC.Br.8-9. But *Cardelucci* squarely *contradicts* the Creditors' position that a solvent debtor must comply with all its obligations even where disallowed by the Code, for it holds that solvent debtors need only pay post-petition interest at the federal judgment rate—*not* at the rate that would apply outside of bankruptcy. 285 F.3d at 1234-36. The SCC also cites the Eleventh Circuit's decision in *Varsity Carpet Services, Inc. v. Richardson* (*In re Colortex*

---

[7]   Indeed, the fact that the Noteholders and SCC invoke different appellate decisions signals that none of those cases actually supports them.

*Industries, Inc.*), 19 F.3d 1371 (11th Cir. 1994).  *See* SCC.Br.9.  But that case likewise undercuts the Creditors' theory, because it holds that the solvent-debtor exception was "codifie[d]" in §726(a)(5), thus merely providing interest "at the legal rate" on *allowed* claims.  19 F.3d at 1376. Like the Creditors' other cases, *Colortex* does not remotely indicate that an unwritten solvent-debtor exception is a mechanism for overcoming the disallowance provisions of §502(b).  Last, the SCC contends that *In re Energy Future Holdings Corp.*, 842 F.3d 247 (3d Cir. 2016) ("*EFH II*"), held that "make-whole premiums should be enforced against a solvent debtor to the same extent that they would be under state law."  SCC.Br.22.  That is a gross mischaracterization of *EFH II*, which says nothing about the solvent-debtor exception or whether the make-whole provision at issue was disallowed by §502(b)(2).  It simply considered whether the make-whole provision was triggered by a post-petition refinancing.  The language from *EFH II* that the SCC cobbles together (from two far-apart portions of the decision) simply reflects black-letter law that the "primary objective" of contract interpretation is "to give effect to the intent of the parties," 842 F.3d at 261, and has nothing to do with any solvent-debtor exception.

For their part, the Noteholders (but not the SCC) cite the Second Circuit's decision in *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620 (2d Cir. 1989), as showing that the solvent-debtor exception continues to apply under the Code "exactly as it was applied before." Noteholders.Br.10.  But *Citibank* says nothing whatsoever about the solvent-debtor exception, or whether it supersedes §502(b)'s disallowance provisions.  In fact, it is not even a bankruptcy case—it is an appeal from a foreclosure proceeding.  878 F.2d at 621.  Its only even arguable relevance is that it cites the pre-Code case of *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959), for the (irrelevant) proposition that default interest "is not a penalty and is not unconscionable under New York law," 878 F.2d at 625—and *Ruskin* separately also happened to apply the pre-Code

solvent debtor exception (unsurprisingly, given that it was decided 25 years before the Code was enacted). None of this comes close to suggesting that the Second Circuit believes the pre-Code solvent-debtor exception supersedes the plain text of §502(b). The Noteholders also cite the Seventh Circuit's decision in *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir. 1986), *see* Noteholders.Br.6; but as both they and the SCC acknowledge, *see id.* at 7; SCC.Br.13, that case was decided under the Bankruptcy Act, and thus says nothing about whether the solvent-debtor exception precludes §502(b) disallowance under the Code.

Given the foregoing, the Creditors' repeated assertion that ruling for the Debtors "would create a circuit split," Noteholders.Br.11, 14; *accord* SCC.Br.10, is deeply flawed. In reality, the exact opposite is true: in light of *Gencarelli*, *Dow Corning*, *Cardelucci*, and *Colortex*—all of which contradict the Creditors' argument that the pre-Code solvent-debtor exception supersedes the express disallowance provisions of §502(b)—holding that the Debtors' solvency renders §502(b)(2) inapplicable would break from a "monolithic mountain of authority" to the contrary. *Ultra Petroleum*, 943 F.3d at 760. The Court should not lightly presume that the Fifth Circuit, which is "always chary to create a circuit split," especially in the bankruptcy context, *id.* at 763-64, would depart from this wall of precedent.

Nor are the bankruptcy and district court cases that the Creditors cite any more helpful to their position (and, again, the fact that they mostly choose different cases only confirms that none of those cases actually applies). *See* Noteholders.Br.11-12; SCC.Br.9-10. As for the Noteholders' cases: *In re Continental Airlines Corp.* holds only that when the debtor is solvent, creditors may recover attorneys' fees that they would be entitled recover to under state law—an unremarkable holding, because §502(b) does not disallow that claim. 110 B.R. 276, 279 (Bankr. S.D. Tex. 1989). *In re Mirant Corp.* is even further afield; the court there refused to exercise its equitable power to

recharacterize certain leases as mortgages in a solvent-debtor case (presumably because recharacterization in that circumstance would make no difference), but certainly did not hold that the debtor's solvency made §502(b) irrelevant.  327 B.R. 262, 270-71 (Bankr. N.D. Tex. 2005). Finally, while *In re Chemtura Corp.* at least considers the relevant issue, it does not conclusively decide it; it holds only that the creditors raised a sufficiently colorable argument to make a settlement fall within a "range of reasonableness."  439 B.R. 561, 603-06 (Bankr. S.D.N.Y. 2010).

The SCC has no better luck.  Every one of the cases they cite (at 9, 12) actually undermines the Creditors' position, for the only "solvent-debtor exception" those cases recognize is the statutory right to post-petition interest *on* a claim at "the legal rate" under §726(a)(5), not a right to post-petition interest *as part of* a claim when the debtor is solvent (which is disallowed by §502(b)(2)).  *See In re Dvorkin Holdings, LLC*, 547 B.R. 880, 892 (N.D. Ill. 2016); *In re Smith*, 2008 WL 73318 (Bankr. W.D. Ky. Jan. 7, 2008); *In re Dow Corning Corp.*, 244 B.R. 678, 684-85 (Bankr. E.D. Mich 1999) ("*Dow I*"); *In re Schoeneberg*, 156 B.R. 963, 969-72 (Bankr.W.D. Tex. 1993); *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991).  To be sure, those cases do hold (erroneously) that in a solvent-debtor case, "the legal rate" under §726(a)(5) is the contract rate— but the Creditors do not make that argument, presumably because they recognize that (as most courts have held) "the legal rate" means the federal judgment rate.  *See infra* pp.24-30.  By limiting the solvent-debtor exception to interest at "the legal rate" under §726(a)(5), those cases contradict the Creditors' position that the solvent-debtor exception supersedes the disallowance provisions of §502(b).  Otherwise, the creditors in each of those cases would have held claims *for* post-petition interest at the contractual rate, and would not have been seeking interest *on* their claims under §726(a)(5) at all.  *See, e.g.*, *Dow I*, 244 B.R. at 685 (explaining that §502(b)(2) "speaks … to claim *allowance*" while §726(a)(5) governs interest "*on* an allowed claim").

  **2.**  **Principles of statutory interpretation demonstrate that Congress did not intend the pre-Code solvent debtor exception to limit §502(b)(2).**

There is a good reason why no court has accepted the Creditors' argument that a debtor's solvency trumps §502(b)'s disallowance provisions, and why decisions by courts of appeals squarely contradict this proposition:  it is incorrect.  The Creditors contend that Congress must have *sub silentio* intended to incorporate an unwritten solvent-debtor exception to §502(b) into the Code because (they say) Congress provided no "clear indication" that it intended to abrogate the general solvent-debtor exception that existed pre-Code.  Noteholders.Br.8-9; SCC.Br.10-11.  But as the Supreme Court has explained, the assumption that Congress did not intend to alter pre-Code practice cannot hold where the language of the Code "is unambiguous."  *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992).  That is precisely the case here: the Code disallows any claim "to the extent that … such claim is for unmatured interest," without any further conditions.  §502(b)(2).  Congress was not required to explicitly add a superfluous "whether the debtor is solvent or insolvent" to that provision (and to all of the other disallowance provisions in §502(b)) in order to make that absolute language effective.  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41 (1989) (observing that in light of the Code's "substantial overhaul" of the bankruptcy system, "it is not appropriate or realistic to expect Congress to have explained with particularity each step it took"); *cf. BFP v. ADR Tr. Corp.*, 511 U.S. 531, 546 (1994) ("The Bankruptcy Code can of course override by implication when the implication is unambiguous.").  Where "the meaning of the Bankruptcy Code's text is itself clear, its operation is unimpeded by contrary prior practice."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 10 (2000) (ellipses omitted).  Because neither §502(b)(2) nor the other disallowance provisions is "subject to interpretation" or contains "ambiguity in the text," then "pre-Code practice"—which is a "tool

of construction, not an extratextual supplement"—cannot be employed to "overcome" the statutory language. *Id.*[8]

Equally important, other Code provisions demonstrate that when Congress wants to prescribe different rules for solvent debtors, it knows how to do so. *Cf., e.g.*, *Elgin v. Dep't of Treas.*, 567 U.S. 1, 13 (2012). Most relevant here, Congress has given explicit instructions in the Code for awarding post-petition interest when a debtor is solvent: creditors in Chapter 7 cases must receive post-petition interest on their allowed claims "at the legal rate" under §726(a)(5), and impaired creditors in Chapter 11 cases must receive at least that amount (or agree otherwise) under the best-interests-of-creditors test. §§726(a)(5), 1129(a)(7)(A)(ii); *see* Ultra.Br.17-18, 21-22. Those explicit instructions cannot be reconciled with the Creditors' view that Congress tacitly intended to adopt an unwritten solvent-debtor exception to §502(b)(2), and thereby give creditors an allowed claim for whatever post-petition interest they would have had outside of bankruptcy whenever the debtor is solvent. Because "Congress has shown that it knows how to direct" different rules for solvent-debtor scenarios, it is "particularly inappropriate" to "draw[] meaning from" §502(b)'s "silence" on the subject. *Dean v. United States*, 137 S. Ct. 1170, 1177 (2017). In fact, under the Creditors' view, §726(a)(5) would have no effect at all in Chapter 7 cases, since (according to the Creditors) the solvent-debtor exception would *already* give creditors in every

---

[8]   The Creditors' appeal to a single sentence from the legislative history, *see* Noteholders.Br.11 (citing 140 Cong. Rec. H10,752-01, H10,768 (1994) (statement of Rep. Brooks)); SCC.Br.17 (same), is unavailing. First, one lone legislator's statement cannot overcome the plain text of the Code. *See, e.g.*, *Chamber of Commerce v. Whiting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history." (citations and quotations omitted)). Second, as the SCC acknowledges, *see* SCC.Br.17, the cited statement describes the "fair and equitable" test under §1129(b), not a general solvent-debtor exception— and §1129(b) does not apply here, because the Creditors are not impaired. *See supra* p.14; *infra* pp.22-23. At most, the statement supports only the point that claims must receive *some* post-petition interest for creditors to be unimpaired, which the Debtors have never disputed.

19

case where §726(a)(5) applies the right to claim post-petition interest at whatever rate would have applied outside of bankruptcy.  Put simply, the Creditors' view of the solvent-debtor exception cannot be squared with the instructions Congress gave in §726(a)(5)—which is presumably why the Noteholders do not cite §726(a)(5) even *once* in their opening brief, and the SCC says nothing to explain how that provision fits with its view of the solvent-debtor exception.[9]

The Noteholders devote a page of their brief to *In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664 (5th Cir. 2009), and *In re Laymon*, 958 F.2d 72 (5th Cir. 1992)—two cases that the SCC does not cite at all—arguing that these decisions support applying pre-Code practice where the Code is silent.  Noteholders.Br.9.  The cases are simply inapposite here, however, because the Code is *not* silent; not only does it unambiguously provide that claims for unmatured interest must be disallowed, *see* §502(b)(2), it gives precise instructions for how to award post-petition interest *on* an allowed claim when the debtor is solvent, *see* §726(a)(5).  Those provisions leave no room to infer that Congress intended to retain any conflicting pre-Code practice of allowing post-petition interest *as part of* a claim when the debtor is solvent.

For its part, the SCC argues for a "flexible approach" to the solvent-debtor exception untethered from the statutory text, relying on decisions from more than a century ago.  SCC.Br.11-12 (discussing *Sexton v. Dreyfus*, 219 U.S. 339 (1911), and *Johnson v. Norris*, 190 F. 459 (5th Cir. 1911)).  Those decisions were a product of their time and reflect a very different approach to statutory interpretation than the one that prevails today.  As the Supreme Court and the Fifth Circuit

---

[9]   The Creditors' theory would also appear to let creditors claim post-petition interest *twice* whenever the debtor is solvent: a creditor could first obtain an allowed claim for unmatured interest (relying on the solvent-debtor exception to overcome §502(b)(2)), and then insist on additional post-petition interest at the legal rate on that allowed claim under §726(a)(5) (for Chapter 7 cases) and §1129(a)(7)(A)(ii) (for Chapter 11 cases).  That is plainly not what Congress intended or expected its statutory scheme to achieve.

have made clear in (much) more recent decisions, the proper role of courts in construing statutes is to "follow the text," not to decide what would be "desirable as a matter of policy." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 135 S. Ct. 2158, 2169 (2015); *see, e.g.*, *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019) ("[T]he foremost task of legal interpretation is divining what the law *is*, not what the judge-interpreter *wishes* it to be."). That is as true in the bankruptcy context as it is in general. *See Hall v. United States*, 566 U.S. 506, 523 (2012) ("Certainly, there may be compelling policy reasons for treating postpetition income tax liabilities as dischargeable. But if Congress intended that result, it did not so provide in the statute."); *Hartford*, 530 U.S. at 13-14 ("[T]he natural reading of the text produces the result we announce. Achieving a better policy outcome … is a task for Congress, not the courts."). Here, Congress unambiguously expressed its judgment: claims for unmatured interest are disallowed under §502(b)(2)—period. Because the "Code's text is itself clear," pre-Code practice permits no variance from that statutory command. *Hartford*, 530 U.S. at 10.[10]

### 3. The SCC's other arguments for reading the Code to incorporate an unwritten solvent-debtor exception to §502(b)'s disallowance provisions are unpersuasive.

The SCC makes three other arguments for subjecting the clear command of §502(b) to an unwritten solvent-debtor exception, none of which the Noteholders join (and one of which they explicitly reject). Those additional assertions are equally unavailing.

---

[10] For these reasons, the Creditors cannot prevail on their argument that "equitable considerations" support reading a nonexistent solvent-debtor exception into §502(b). SCC.Br.13-14; *see* Noteholders.Br.13-14, 24-27. Congress has already weighed the relevant equitable considerations in solvent-debtor cases, and chose to address them not by creating an exception to the disallowance provisions of §502(b) but by awarding creditors post-petition interest under §726(a)(5). *See* Ultra.Br.18-19. As the Noteholders themselves recognize, now that Congress has made that decision, bankruptcy courts do not have "free-floating discretion" to adjust those statutory provisions "in accordance with [their] personal views of justice and fairness." Noteholders.Br.13 (quoting *Dow Corning*, 456 F.3d at 679).

First, the SCC contends that this Court should read the solvent-debtor exception into §1124(1)'s "express requirement to honor equitable rights."  SCC.Br.14 (capitalization altered). The Noteholders specifically reject that view, explaining that "[c]ourts have not found section 1124 to be the source of the Solvent Debtor Exception."  Noteholders.Br.24.  On this point, the Noteholders have it right.  As they explain, §1124 simply "defines what constitutes 'impairment,'" *id.*; it does not create any exception to the disallowance provisions of §502(b).  On the contrary, as the Fifth Circuit has now made clear in this very case, refusing to pay a claim that is disallowed by §502(b) does *not* constitute impairment under §1124(1).  *Ultra Petroleum*, 943 F.3d at 762-65.

In fact, the SCC makes no substantive argument for reading §1124(1) to supersede the disallowance provisions of §502(b), including §502(b)(2).  Instead, the SCC simply makes the unremarkable point that given the repeal of §1124(3), it is clear that creditors have an equitable right to *some* post-petition interest when the debtor is solvent.  SCC.Br.14-16.  No dispute there; as the Debtors have already explained, the Code makes clear that creditors are indeed entitled to *some* post-petition interest when the debtor is solvent—specifically, post-petition interest at the federal judgment rate.  *See* 11 U.S.C. §§726(a)(5), 1129(a)(7)(A)(ii); Ultra.Br.20-29; *see also infra* pp.24-30.  But it would take an unsupported leap in law and logic to conclude that by repealing §1124(3), Congress intended for the disallowance provisions of §502(b) not to apply in solvent-debtor cases.  *See, e.g.*, *PG&E*, 610 B.R. at 310-11 (rejecting the argument that §1124 overrides §502(b)(2) as "simply not persuasive").

Second, the SCC suggests that applying the solvent-debtor exception to supersede the disallowance provisions of §502(b) is "consistent with" §1129(b).  SCC.Br.16 (capitalization altered).  But the SCC concedes in the very next breath that §1129(b)—and in particular, its "fair and equitable" test (including the "absolute priority" rule)—applies by its terms only to *impaired*

22

creditors, not to unimpaired ones like the Creditors here.  SCC.Br.17; *see* §1129(b)(1) (plan must be "fair and equitable" to "each class of claims or interests *that is impaired under*, and has not accepted, the plan" (emphasis added)).  That rule makes perfect sense:  Congress correctly determined that leaving a creditor unimpaired is by definition "fair and equitable," and so no further scrutiny under §1129(b) is required.  In any event, the "absolute priority" rule is met here, because the Creditors will receive the full "allowed amount" of their claims.  §1129(b)(2)(B)(i).  That provision *incorporates* the disallowance rules of §502(b); it does not create an *exception* to those rules for solvent-debtor cases.[11]

Finally, the SCC suggests that, by recognizing that creditors are entitled to *some* post-petition interest on their allowed claims when a debtor is solvent, the Debtors have "taken inconsistent positions" on the solvent-debtor exception, or even "conceded … that the solvent-debtor exception applie[s]."  SCC.Br.25 n.19; *see also id.* at 10.  That assertion is nonsense and only reinforces the error of the SCC's (and all Creditors') contention that §502(b)(2) does not apply in solvent-debtor scenarios.  As the Debtors have repeatedly and consistently explained, the Creditors' right to some post-petition interest—namely, post-petition interest at the federal judgment rate—does not stem from a pre-Code solvent-debtor exception or some sort of general solvent-debtor exception that permeates the ether of the Code.  Instead, it simply reflects that creditors have an equitable right to compensation for the delay caused by the bankruptcy

---

[11]  The SCC likewise draws no persuasive support from *In re Energy Future Holdings Corp.* ("*EFH I*"), 540 B.R. 109 (Bankr. D. Del. 2015).  That case recognizes that §1129(b) does not apply to unimpaired creditors—but then goes on to hold, with no textual basis, that the "fair and equitable" test must nevertheless be met as to unimpaired creditors, and requires post-petition interest at whatever rate the court finds equitable.  *Id.* at 123-24.  Even the Noteholders reject that "perilous" approach.  Noteholders.Br.25.  Regardless, even that extreme position would not read the solvent-debtor exception as superseding the disallowance provisions of §502(b); it would only give the court "unbounded license" to award post-petition interest *on* allowed claims at whatever rate the court chooses.  *Id.*

proceeding. *See, e.g.*, *In re El Paso Refinery, L.P.*, 244 B.R. 613, 621 (Bankr. W.D. Tex. 2000) ("It would be unfair to give any excess funds in a bankruptcy case back to the debtor … without first compensating [the] creditors for that delay.").  Recognizing that equitable right, Congress guaranteed Chapter 7 creditors post-petition interest at "the legal rate" under §726(a)(5) when the debtor is solvent, and did the same for impaired Chapter 11 creditors through §1129(a)(7)(A)(ii); unimpaired creditors in Chapter 11 proceedings have precisely the same equitable right, and so are entitled to precisely the same treatment.  *See* Ultra.Br.20-25; *infra* pp.24-30.  But that limited equitable right—which *Congress recognized in the Code itself*—comes nowhere near supporting the Creditors' far broader assertion that a solvent debtor must be "held to its prepetition contractual obligations," SCC.Br.2; *see* Noteholders.Br.7, regardless of the disallowance provisions of §502(b), which contain no indication whatsoever that Congress intended them to be a dead letter whenever a debtor is solvent.[12]

## II.    The Creditors Are Entitled To Post-Petition Interest Only At The Federal Judgment Rate

As the foregoing discussion makes clear, the Creditors are entitled to post-petition interest on their allowed claims only at the federal judgment rate.  The Creditors do not dispute that under the plain text of the Code, any attempt to recover post-petition interest *as part of* a claim is disallowed by §502(b)(2), because post-petition interest is by definition "unmatured interest."  *See, e.g.*, *In re W. Tex. Mktg.*, 54 F.3d 1194, 1197 (5th Cir. 1995).  At the same time, it is also undisputed

---

[12]    Meanwhile, the Noteholders assert that "equitable principles" require payment of the Make-Whole Amount because they might have been entitled to that amount if OpCo had repaid the Notes before confirmation or reinstated the notes under §1124 and then repaid the Notes after confirmation.  Noteholders.Br.27.  Not only does this argument rely on the very "free-floating discretion" that the Noteholders (correctly) insist should *not* be used to displace Congress' judgments in the Code, *see* n.10, *supra*, but the Noteholders' felt need to invoke hypothetical scenarios and equitable considerations confirms that, on the actual facts and under the actual statutory text here, §502(b)(2) disallows the Make-Whole Amount.

that in order to remain unimpaired, the Creditors must receive some amount of post-petition interest *on* their allowed claims, as Congress made clear in repealing §1124(3). *See* Ultra.Br.20-23. The sole remaining question is what the *rate* of post-petition interest on those allowed claims should be. And the answer is the same for the Creditors here as it is for all other creditors: Just like Chapter 7 creditors under §726(a)(5), and impaired Chapter 11 creditors under §1129(a)(7)(A)(ii), unimpaired Chapter 11 creditors are entitled to post-petition interest on their allowed claims at "the legal rate" when the debtor is solvent. Ultra.Br.20-25. And as most courts have held—and the Creditors no longer dispute—"the legal rate" for post-petition interest on a claim when the debtor is solvent is the federal judgment rate. Ultra.Br.25-29. The Creditors are not entitled to anything more than that.

Notably, the Creditors' opening briefs do not even mention the recent bankruptcy court decision on this very issue in *PG&E*—a decision that is barely four months old, is directly on point, and squarely repudiates the Creditors' position. *See* 610 B.R. at 309 (addressing "the applicable postpetition interest to be paid to four classes of allowed unsecured and unimpaired claims" under plan by "solvent debtors"). The creditors in *PG&E* made precisely the same argument that the Creditors make here: that because they would be "unimpaired under [the] plan," they were entitled to post-petition interest at their various contract rates rather than the federal judgment rate. *Id.* at 315; *see id.* at 310. In a thorough and carefully reasoned decision, the *PG&E* court unequivocally rejected that argument. It explained that the creditors could not assert claims for post-petition interest at the contract rate, because such claims are disallowed by §502(b)(2); and, citing the Fifth Circuit's decision in this very case, it explained that applying §502(b)(2) does not impair the creditors, because "impairment results from what a plan does, not from what a statute does." *Id.* at 310-11, 315-16. As a result, the creditors were only entitled to post-petition

25

interest *on* their allowed claims—and under the Code, the rate of post-petition interest on allowed claims is "the legal rate" under §726(a)(5), meaning the federal judgment rate. *Id.* at 312-13. The applicability of the federal judgment rate is not "limited to impaired claims"; instead, it "applies to all unsecured and undersecured claims" when the debtor is solvent, whether those claims are treated as impaired or unimpaired and "whether their prepetition contracts call for higher or lower rates." *Id.* at 312-13, 315. Because it is "the Bankruptcy Code itself, not any plan provision, that imposes that rate," the *PG&E* court "followed the lead" of the Fifth Circuit's decision in this case and "reject[ed] the contention" that paying creditors post-petition interest only at the federal judgment rate somehow "impairs them." *Id.* at 316.

Two weeks ago, moreover, the District Court for the Northern District of California endorsed the *PG&E* bankruptcy court's reasoning and result when it denied the creditors leave to appeal the post-petition interest order. *See Ad Hoc Comm. of Holders of Trade Claims v. PG&E Corp.*, 2020 WL 1865135 (N.D. Cal. Apr. 14, 2020) ("*PG&E II*"). Among other things, the district court held that there were no "substantial grounds for a difference of opinion" with the bankruptcy court's decision. *Id.* at *6. Like the bankruptcy court, the district court concluded that in solvent-debtor cases, an unsecured creditor is entitled to post-petition interest at the "legal rate," which "mean[s] interest at the federal statutory rate," and it rejected the argument that this rule does not "apply to unimpaired claims." *Id.* at *6-7. It also found no conflict with decisions from courts of appeals, citing the Fifth Circuit's decision in this case and the Third Circuit's decision in *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3d Cir. 2003), in rejecting the creditors' argument that their claims would "be impaired by the Plan unless postpetition interest is paid at the contractual or state statutory rate." *PG&E II* at *7-8 & n.8. This Court should reach the same conclusion as the *PG&E* bankruptcy and district courts: "while unsecured creditors are entitled to postpetition interest in a

26

solvent estate, the Bankruptcy Code requires application of the Federal Interest Rate to those claims," and "such an application does not impair these claims."  *PG&E*, 610 B.R. at 310.

Rather than address *PG&E*, the Creditors advance an array of wholly unconvincing arguments.  They once again rely primarily on an unwritten solvent-debtor exception, asserting that the Court should "hold the Debtors to their contractual obligations" and give the Creditors an allowed claim for "postpetition interest at the contract default rate," notwithstanding the plain language of §502(b)(2) disallowing that claim for unmatured interest.  SCC.Br.19-20; *see* Noteholders.Br.23.  But as already explained, not a single case has ever adopted the Creditors' theory that the solvent-debtor exception overrides the disallowance provisions of §502(b), and numerous cases reject it.  *See supra* p.11.

The Noteholders (but not the SCC) attempt to support their argument with *In re Laymon*, 958 F.2d 72 (5th Cir. 1992), which they assert addressed an "analogous question" in holding that *secured creditors* can claim interest at the contract rate under §506(b) up to the value of their security interest.  Noteholders.Br.23.  *Laymon* only reinforces that the Noteholders are wrong.  As the text of §506(b) shows (and as the Fifth Circuit recognized in *Laymon*), that provision is an exception to the general rule of §502(b)(2) that claims for unmatured interest must be disallowed. *See Laymon*, 958 F.2d at 74-75.  It states that an oversecured creditor "shall be *allowed*" post-petition interest up to the value of its security—in other words, by its plain text, it permits oversecured creditors to obtain an *allowed claim for* post-petition interest, even though such claims are normally barred by §502(b)(2).  11 U.S.C. §506(b) (emphasis added).  In that situation, the allowed claim at issue "arises from a contract," and so "the contract provides the rate of post-petition interest." *Laymon*, 958 F.2d at 75.  Here, by contrast, nothing in the Code suggests (and no court has ever held) that *unsecured* creditors should have an *allowed claim for* post-petition

interest at the contract rate when the debtor is solvent, and §502(b)(2) makes clear that they do not.  Instead, creditors are entitled only to post-petition interest *on* their claims; that right arises not from their prior contract, but from an equitable right to compensation for the delay caused by the bankruptcy proceedings, and is limited by the Code to interest at the federal judgment rate.  *See PG&E*, 610 B.R. at 316; Ultra.Br.23-29.

For its part, the SCC argues that §726(a)(5) and §1129(a)(7)(A)(ii) do not apply "[b]y their own terms" to unimpaired Chapter 11 creditors, and so cannot limit the amount of post-petition interest that unimpaired creditors are entitled to receive.  SCC.Br.18.  That argument misses the point.  No one contends that §726(a)(5) and §1129(a)(7)(A)(ii) literally apply to unimpaired Chapter 11 creditors.  Instead, those provisions simply illustrate that Congress has already determined that the equitable right to compensation for delay caused by bankruptcy proceedings is satisfied when the creditor receives post-petition interest at "the legal rate," meaning the federal judgment rate.  §726(a)(5); *see* Ultra.Br.23-25.  That equitable right applies in precisely the same way, and entitles creditors to precisely the same rate of interest on their claims, whether the bankruptcy proceeds under Chapter 7 or Chapter 11 and whether the creditors are impaired or unimpaired.  *See PG&E*, 610 B.R. at 312-13, 315-16.[13]

The SCC also asserts that even absent the solvent-debtor exception, it must receive post-petition interest at the contract rate in order for the plan to "leave unaltered [its] 'legal, equitable and contractual rights.'"  SCC.Br.26 (quoting §1124(1)).  But the Fifth Circuit has already rejected

---

[13]  For the same reason, while the Noteholders are correct to reject the view that a bankruptcy court should simply assume "unbounded license" to award post-petition interest on a creditor's allowed claims at whatever rate it deems equitable, Noteholders.Br.25 (rejecting *EFH I*, 540 B.R. at 123-24), they are wrong to conclude that the court should revert to awarding the post-petition interest at the contract rate that Congress disallowed under §502(b)(2).  Instead, the proper course is to defer to the equitable balancing that Congress conducted in the Code, and award post-petition interest on all creditors' allowed claims at the legal rate.  Ultra.Br.23-25.

that assertion.  It is the Code—in particular, §502(b)(2)—that strips away the Creditors' right to post-petition interest at the contract rate, and thus "the Code—not the plan—is doing the impairing."  *Ultra Petroleum*, 943 F.3d at 765; *see also PG&E*, 610 B.R. at 315-16; *PG&E II*, 2020 WL 1865135, at *7-8 & n.8.  Nor can the Creditors assert a freestanding equitable right to post-petition interest at the contract rate whenever a debtor is solvent, since that argument would render §726(a)(5) a nullity.  *See* Ultra.Br.24-25.  Instead, the Creditors possess an equitable right to compensation for the delay caused by the bankruptcy process, in the form of post-petition interest on their allowed claims at the federal judgment rate—the same rate that Congress deemed appropriate under §726(a)(5) and §1129(a)(7)(A)(ii).  The plan here fully respects that right.

The Creditors contend next that the broader equities warrant awarding creditors post-petition interest at their contract rates when the debtor is solvent regardless of the terms of the Code, *see* Noteholders.Br.25-26, and that failing to do so would create perverse incentives for debtors to enter bankruptcy just to shed unfavorable interest rates, Noteholders.Br.26; SCC.Br.21.  But it was for Congress to consider those equities when it enacted the Code—and Congress determined that the appropriate equitable balance was to disallow claims for post-petition interest at the contract rate and instead award post-petition interest only at "the legal rate" (meaning the federal judgment rate).  §§502(b)(2), 726(a)(5), 1129(a)(7)(A)(ii); *see Cardelucci*, 285 F.3d at 1234-36.  As for the risk that Congress' judgment might encourage debtors to seek bankruptcy solely to escape high interest rates, the Code already protects against that risk by authorizing the bankruptcy court to dismiss cases filed in bad faith.  *See* 11 U.S.C. §1112(b).  In any event, courts in numerous jurisdictions have already held that post-petition interest at "the legal rate" under §726(a)(5) and §1129(a)(7)(A)(ii) is limited to interest at the federal judgment rate, and the Creditors present nothing to suggest any sudden uptick in strategic bankruptcy filings in those

29

jurisdictions. Even if such problems were to arise, they would present "a task for Congress, not the courts," to address. *Hartford*, 530 U.S. at 13-14.

Finally, the Noteholders assert that awarding unimpaired creditors post-petition interest at the federal judgment rate would leave them worse off than if they had been impaired. *See* Noteholders.Br.26-27. On the contrary, both unimpaired and impaired creditors in Chapter 11 proceedings (like all creditors in Chapter 7 proceedings) are entitled to precisely the same rate of post-petition interest on their claims when the debtor is solvent—"the legal rate" under §726(a)(5), which is the federal judgment rate. *See* §§726(a)(5), 1129(a)(7)(A)(ii); *Cardelucci*, 285 F.3d at 1234-36; *PG&E*, 610 B.R. at 312-13, 315-16. And while the Noteholders (as unimpaired creditors) are not entitled to the benefit of the §1129(b) "fair and equitable" test, *see* Noteholders.Br.26, that is only because Congress properly determined that leaving a creditor unimpaired is by definition fair and equitable. *See supra* pp.14, 23. As for the Noteholders' passing suggestion that failing to pay interest at the contract rate would mean the plan was not proposed in good faith under §1129(a)(3), *see* Noteholders.Br.26-27, they provide no meaningful explanation and cite no caselaw in support of that argument, and so have forfeited it. *See Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 191 n.6 (5th Cir. 2010). In any event, the plan here was plainly "proposed with the legitimate and honest purpose to reorganize and [with] a reasonable hope of success," and so "the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *see also* Dkt. 1324, at 24 (finding that the plan was proposed in good faith under §1129(a)(3)).

## CONCLUSION

For the foregoing reasons, and those set forth in the Debtors' opening brief on remand, this Court should disallow the Make-Whole Amount and award the Creditors post-petition interest only at the federal judgment rate.

30

Houston, Texas

April 28, 2020

*/s/ David R. Seligman*

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)

David R. Seligman, P.C. (admitted *pro hac vice*)

Michael B. Slade (TX Bar No. 24013521)

300 North LaSalle

Chicago, Illinois 60654

Telephone:   (312) 862-2000

Facsimile:   (312) 862-2200

Email:         james.sprayregen@kirkland.com
                    david.seligman@kirkland.com
                    michael.slade@kirkland.com

Christopher T. Greco (admitted *pro hac vice*)

601 Lexington Avenue

New York, New York 10022

Telephone:   (212) 446-4800

Facsimile:   (212) 446-4900

Email:         christopher.greco@kirkland.com

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

Paul D. Clement (admitted *pro hac vice*)

George W. Hicks, Jr. (admitted *pro hac vice*)

C. Harker Rhodes IV (admitted *pro hac vice*)

1301 Pennsylvania Avenue, N.W.

Washington, D.C. 20004

Telephone:   (202) 879-5000

Facsimile:   (202) 879-5200

Email:         paul.clement@kirkland.com

Email:         george.hicks@kirkland.com

Email:         harker.rhodes@kirkland.com

### <u>CERTIFICATE OF SERVICE</u>

I certify that on April 28, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ David R. Seligman
David R. Seligman, P.C.