

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/26/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **ULTRA PETROLEUM CORP.,** *et al* | § | **CASE NO: 16-32202** |
| | § | |
| | § | **CASE NO: 16-03272** |
| | § | |
| **ULTRA RESOURCES, INC.** | § | **CASE NO: 16-32204** |
| | § | |
| **ULTRA WYOMING, INC.** | § | **CASE NO: 16-32205** |
| | § | |
| **ULTRA WYOMING LGS, LLC** | § | **CASE NO: 16-32206** |
| | § | |
| **UP ENERGY CORPORATION** | § | **CASE NO: 16-32207** |
| | § | |
| **UPL PINEDALE, LLC** | § | **CASE NO: 16-32208** |
| | § | |
| **UPL THREE RIVERS HOLDINGS, LLC** | § | **CASE NO: 16-32209** |
| | § | **Jointly Administered Order** |
| **Debtors** | § | |
| | § | **CHAPTER  11** |

### <u>MEMORANDUM OPINION</u>

The Court answers two questions:

- Does the Bankruptcy Code disallow a contractual claim for "make-whole" liquidated damages when an interest-bearing obligation is prepaid?

- Does the Bankruptcy Code permit a solvent debtor to forego contractual obligations to an unimpaired class of unsecured creditors, but still pay a distribution to its shareholders?

Ultra Petroleum argues that the Bankruptcy Code allows a solvent debtor to avoid paying unimpaired unsecured creditors a contractual liquidated damages claim and to avoid paying post-petition interest at contractual default rates.  The Bankruptcy Code permits neither.

Bankruptcy relief is intended for the honest, but unfortunate debtor.  Although no one questions Ultra's honesty, a post-petition uptick in natural gas prices made Ultra and its shareholders quite fortunate.  As a result, Ultra became massively solvent.  The question

becomes whether an honest but fortunate solvent debtor may use bankruptcy to discharge validly owed debt, while its shareholders retain value. Sensibly, the answer is "no." Ultra must pay its creditors before it pays its shareholders.

## BACKGROUND

The particulars of the Ultra Make-Whole litigation are well chronicled in the Federal and Bankruptcy Reporters. *Ultra Petroleum Corp. v. Ad Hoc Comm. Of Unsecured Creditors (In re Ultra Petroleum Corp.)*, 913 F.3d 533 (5th Cir. 2019) *withdrawn and superseded*, 943 F.3d 758 (5th Cir. 2019); *In re Ultra Petroleum Corp.*, 575 B.R. 361 (Bankr. S.D. Tex. 2017). The Court provides a brief history for clarity.

This dispute stems from Ultra's 2016 chapter 11 bankruptcy case and focuses on the amount owed to unimpaired Noteholders under Ultra's confirmed plan. Ultra Resources ("OpCo"), Ultra Petroleum Corp. ("HoldCo"), and UP Energy Corp. ("MidCo") (collectively, "Ultra") engaged in natural gas exploration and production. *Ultra*, 943 F.3d at 760. Due to a precipitous decline in natural gas prices, Ultra found itself unable to pay its debts as they came due. (*See* ECF No. 30 at 18). Accordingly, the Ultra entities filed voluntary chapter 11 petitions on April 29, 2016. (ECF No. 1). After the petition date, commodity prices rose sharply, allowing Ultra to propose and confirm a chapter 11 plan paying its creditors in full.[1] *Ultra*, 943 F.3d at 761.

Among the creditors deemed unimpaired by Ultra's plan were the Class 4 Creditors. (ECF No. 1308-01 at 25-26). Class 4 of the plan set out the treatment of the "OpCo Funded Debt Claims." (ECF No. 1308-01 at 25-26). The plan defined "OpCo Funded Debt Claims" as

---

[1] Although the rebound in commodity prices made Ultra "as rare as the proverbial rich man who manages to enter the Kingdom of Heaven," Ultra's stay beyond the Pearly Gates was short-lived. *See Ultra*, 943 F.3d at 760. Ultra filed a second voluntary chapter 11 petition on May 14, 2020. (Case No. 20-32631, ECF No. 1).

"the OpCo Note Claims and the OpCo RCF Claims." (ECF No. 1308-01 at 16). The OpCo Note Claimants held $1.46 billion in unsecured notes, issued between 2008 and 2010. *Ultra*, 943 F.3d at 760. The OpCo RCF Claimants were owed $999 million, which OpCo borrowed under a Revolving Credit Facility ("RCF") in 2011. *Id.* HoldCo and MidCo each guaranteed the OpCo Funded Debt. *Ultra*, 575 B.R. at 363.

Ultra issued the OpCo Notes pursuant to a Master Note Purchase Agreement ("MNPA"). (ECF No. 1834 at 2). The MNPA contains a number of provisions relevant to this dispute. Under the MNPA, Ultra could repay the Notes ahead of the Notes' maturity date, so long as Ultra also paid a Make-Whole Amount. (ECF No. 1215-1 at 27). The Make-Whole Amount could be calculated using a formula designed to compensate a Noteholder for deprivation of the "right to maintain its investment in the Notes free from repayment." (ECF No. 1834 at 11).

The MNPA defines the Make-Whole Amount as "an amount equal to the excess, if any, of the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of such fixed rate Note over the amount of such Called Principal . . . ." (ECF No. 1215-1 at 27). "Called Principal" is "the principal of such Note that . . . has become or is declared to be immediately due and payable pursuant to Section 12.1." (ECF No. 1215-1 at 27). "Remaining Scheduled Payments" include "all payments of such Called Principal and interest thereon that would be due after the Settlement Date," which is "the date on which such Called Principal . . . has become or is declared to be immediately due and payable pursuant to Section 12.1." (ECF No. 1215–1 at 28). The "Discounted Value" of such Remaining Scheduled Payments is comprised of "the amount obtained by discounting all Remaining Scheduled Payments with respect to such Called Principal from their respected scheduled due dates to the Settlement Date . . . . in accordance with accepted financial practice and at a discount factor . . .

equal to the Reinvestment Yield" of 0.5% over the yield to maturity of specified United States Treasury obligations. (ECF No. 1215–1 at 27).

The MNPA also contained various events of defaults, the occurrence of which accelerated the Notes and caused them to become immediately due and payable. (ECF No. 1215-1 at 38). After an event of default, the entire unpaid principal, accrued but unpaid interest, and the Make-Whole Amount came due for each Note. *Ultra*, 575 B.R. at 364. One event of default was the filing of a bankruptcy petition. *Id.* Thus, Ultra's bankruptcy filing accelerated the Notes and triggered the Make-Whole Amount. *Id.*

"Failure to pay immediately trigger[ed] interest at a default rate of either 2% above the normal rate set for the note at issue or 2% above J.P. Morgan's publicly announced prime rate, whichever [was] greater." *Ultra*, 943 F.3d at 761. While the RCF did not include a Make-Whole provision, it contained a similar acceleration clause, with a default interest rate of 2% above the contractual RCF rate. *Id.*

The proposed plan distribution to Class 4 Creditors did not include the Note Claimants' Make-Whole Amount. (*See* ECF No. 1308-01 at 25-26). Nor did the plan pay Class 4 Creditors post-petition interest at the MNPA and RCF default interest rates. (*See* ECF No. 1308-01 at 25-26). Instead, the plan only proposed to pay the Class 4 Creditors the outstanding principal under the Notes and RCF, pre-petition interest at the rate of 0.1%, and post-petition interest at the federal judgment rate. (ECF No. 1308-01 at 25-26). Despite restricting the contractual amounts due, the plan deemed Class 4 unimpaired, prohibiting Class 4 Creditors from voting on the plan. 11 U.S.C. § 1126(f).

The Class 4 Creditors objected to confirmation, citing an entitlement to the Make-Whole Amount and post-petition default interest. *Ultra*, 943 F.3d at 761. Ultra objected to the Class 4

Creditors' claims. *Id.* The Court confirmed Ultra's plan after the parties stipulated that a decision determining the amounts necessary to leave the Class 4 Creditors unimpaired could be reached after confirmation. *Id.*

On September 21, 2017, this Court issued an opinion allowing the Make-Whole Amount and post-petition interest at the default rates. *Ultra*, 575 B.R. at 361. Following a direct appeal, the Fifth Circuit reversed, holding that a creditor is not impaired when a plan incorporates the Bankruptcy Code's disallowance provisions. *Ultra*, 943 F.3d at 758. The Fifth Circuit remanded and directed this Court to consider whether the Make-Whole Amount is disallowed by the Bankruptcy Code, "the appropriate post-petition interest rate, and the applicability of the solvent-debtor exception." *Id.* at 766. The Court now determines those issues.

It is also important to place the dispute in context. The plan in this case was confirmed on March 14, 2017. (ECF No. 1324). The confirmation order reserved to the Court whether the treatment of these claims left the holders "unimpaired." The Court's sole role is to determine the amount that must be paid to leave the Class 4 Claimants unimpaired.

## JURISDICTION

The district court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. The allowance or disallowance of a proof of claim against the estate, as well as the "estimation of claims or interests for the purposes of confirming a plan under chapter 11," are core matters as defined in 28 U.S.C. § 157(b)(2)(B). This case was referred to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a).

## DISCUSSION

This Memorandum Opinion addresses two primary questions:

- Does the Bankruptcy Code disallow a contractual claim for make-whole liquidated damages when an interest-bearing obligation is prepaid?

- Does the Bankruptcy Code permit a solvent debtor to forego contractual obligations to an unimpaired class of unsecured creditors, but still pay a distribution to its shareholders?

The first question focuses on whether the amounts due under the contractual Make-Whole constitute unmatured interest. If the amounts due under the Make-Whole are unmatured interest, they would be disallowed under § 502(b)(2). Because the Fifth Circuit held that failure to pay amounts disallowed by the Bankruptcy Code does not result in impairment, the classification of the Make-Whole as unmatured interest would permit non-payment while leaving the holders of the claims "unimpaired." If the Make-Whole Amount is not unmatured interest, it is allowed under the Bankruptcy Code.

The answer to the first question is "yes." Section 502(b)(2) disallows claims for the economic equivalent of unmatured interest. The Make-Whole Amount represents liquidated damages and should not be characterized as unmatured interest, or its economic equivalent. The Make-Whole Amount is not compensation for the use or forbearance of money, and it does not accrue over time. It is not interest. The Bankruptcy Code allows the Make-Whole Amount.

The second question focuses on whether the Bankruptcy Code requires that an unimpaired unsecured creditor of a solvent debtor be paid post-petition interest at contractual rates. While the Bankruptcy Code disallows unmatured interest as part of a claim, it is ambiguous as to an unimpaired unsecured creditor's right to post-petition interest on a claim. The parties agree that the Class 4 Claimants are entitled to some post-petition interest, but dispute whether the proper amount is the federal judgment rate or the contractual default rates.

The answer to the second question, is also "yes." The solvent-debtor exception has been widely recognized, both before and after adoption of the Bankruptcy Code. The exception is rooted in the principle that the solvent debtor must pay its creditors in full before the debtor may

recover a surplus.  Congress did not silently abandon that fundamental equitable principle when it passed the Bankruptcy Code.  The solvent-debtor exception entitles the Class 4 Claimants to post-petition interest.  The proper rates of interest are the contractual default rates.  Awarding the contractual default rates is consistent with the underlying principle of the solvent-debtor exception, that creditors must be paid what they are owed under the contract before the debtor may receive a windfall.  Further, limiting the Class 4 Claimants to the federal judgment rate would treat an unimpaired class worse than an impaired class of unsecured creditors.

### a.  Make-Whole Amount is Allowed Under the Bankruptcy Code

Ultra's confirmed plan left the Note Claimants unimpaired.  The Fifth Circuit made clear that an unimpaired creditor is entitled to the full amount of his claim allowed under the Bankruptcy Code.  *See Ultra*, 943 F.3d at 765.  Ultra is obligated to distribute to the Note Claimants all amounts validly owed under state law, minus any amounts disallowed by the Bankruptcy Code.  *See id.* at 765.

Section 502 of the Bankruptcy Code sets out categories of debts which Congress disallowed in bankruptcy.  Among other categories, § 502 disallows a claim if "such claim is for unmatured interest."  11 U.S.C. § 502(b)(2).  Section 502(b)(2) also encompasses a claim to the extent that it seeks "the economic equivalent of unmatured interest."  *Tex. Commerce Bank, N.A. v. Licht (In re Pengo Indus., Inc.)*, 962 F.2d 543, 546 (5th Cir. 1992).

Although the Code does not define the term unmatured interest, interest is widely understood as consideration for the use or forbearance of another's money accruing over time.  *See Love v. State of New York*, 78 N.Y.2d 540, 544 (N.Y. 1991); *Interest*, Black's Law Dictionary, (11th ed. 2019).  The Make-Whole Amount is an enforceable liquidated damages provision which compensates the Note Claimants for any actual loss suffered due to prepayment

of the notes.  The Make-Whole Amount is not interest because it does not compensate the Note Claimants for OpCo's use or forbearance of the Note Claimants' money, it compensates the Note Claimants for OpCo's breach of a promise to use money.  Because the Make-Whole Amount is not interest, it is also not unmatured interest.  Because the Make-Whole Amount is not unmatured interest, it forms part of the Note Claimants' allowed claims.

Section 502(a) of the Bankruptcy Code states that "a claim or interest, proof of which is filed under § 501 of this title, is deemed allowed, unless a party in interest . . . objects."  Section 502(b) mandates that a claim is allowed, unless the claim (or a portion thereof) falls into one of nine disallowed categories.  *See* 11 U.S.C. § 502(b); *In re Today's Destiny, Inc.*, No. 05-90080, 2008 WL 5479109, at *2 (Bankr. S.D. Tex. Nov. 26, 2008).

Section 502(b)(2) "flows from the legal principle that 'interest *stops accruing* at the date of the filing of the petition.'"  *In re Pengo*, 962 F.2d at 546 (emphasis added) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 63, reprinted in 1978 U.S.S.C.A.N. 5787, 5849).   When determining if an amount falls within § 502(b)(2), "much depends on the dynamics of the individual case."  *Ultra*, 943 F.3d at 765.  Absent controlling federal law, a determination of a creditor's allowed claim necessarily references state law.  *E.g.*, *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946) ("[W]hat claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.").  Calculating a creditor's allowed claim based on state law "prevent[s] a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'"  *Butner v. United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis v. Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961)).  No one disputes that the MNPA is governed by New York law.  To form part of an allowed claim, the

Make-Whole Amount must be both enforceable under New York law, and not unmatured interest under § 502(b)(2).

### 1. The Make-Whole Amount is Enforceable Under New York Law

This Court previously held that the Make-Whole Amount is a valid liquidated damages clause, and not a disproportionate penalty, under New York law. *Ultra*, 575 B.R. at 369 ("Debtors fail to rebut the Noteholders' claim for the Make-Whole Amount because they fail to prove that the damages resulting from prepayment were readily ascertainable at the time the parties entered into the Note Agreement or that they were conspicuously disproportionate to foreseeable damage amounts."). The Fifth Circuit did not disturb that holding. *See Ultra*, 943 F.3d at 764.

New York courts hold that make-whole provisions are enforceable liquidated damages clauses. *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005). Liquidated damages are "[i]n effect . . . an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Ctr. v. Puritan Farms 2nd*, 41 N.Y.2d 420, 424 (N.Y. 1977). The Make-Whole Amount is enforceable under New York law.

Ultra argues that the Make-Whole Amount can be both liquidated damages under New York law and unmatured interest under the Bankruptcy Code. The Note Claimants believe that liquidated damages and unmatured interest are mutually exclusive terms in New York. Ultra correctly notes that it is the Bankruptcy Code, not New York law, which determines the scope of amounts disallowed as unmatured interest. However, because the Bankruptcy Code leaves unmatured interest undefined, the Note Claimants' reference to state law is appropriate.

The Court need not decide whether liquidated damages and unmatured interest are mutually exclusive *per se* because this Make-Whole Amount is not the economic equivalent of unmatured interest. Black's Law Dictionary defines a "liquidated-damages clause" as "[a] contractual provision that determines in advance the measure of damages if a party breaches the agreement." *Liquidated-damages clause*, Black's Law Dictionary, (11th ed. 2019). The Court need not speculate whether some hypothetical liquidated damages clause conceivably compensates a creditor for unmatured interest under section 502(b)(2). This Make-Whole does not. This Make-Whole Amount is enforceable under New York law. For the reasons that follow, it represents neither interest, unmatured interest, nor the economic equivalent of unmatured interest.

### 2. *Defining Interest*

Having determined that the Make-Whole Amount is recoverable under applicable nonbankruptcy law, the Court must determine whether the Make-Whole Amount constitutes the "economic equivalent of unmatured interest." *See Pengo*, 962 F.2d at 546. The Bankruptcy Code defines neither interest nor unmatured interest. *See* 11 U.S.C. § 101. Without Congressional instruction to the contrary, undefined words found in the Bankruptcy Code should be given their ordinary meaning. *Lamar, Archer & Cofrin LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) ("Because the Bankruptcy Code does not define the words 'statement,' 'financial condition,' or respecting,' we look to their ordinary meanings."). Further, bankruptcy courts generally interpret undefined terms in accordance with state law. *See Butner*, 440 U.S. at 54.

To decide whether the Make-Whole Amount is allowed, the Court must define the "economic equivalent of unmatured interest." *Pengo*, 962 F.2d at 546. The definition is formed in three steps. First, the Court defines interest. Second, the Court defines unmatured interest.

Third, the Court identifies the characteristics which make a debt the 'economic equivalent' of unmatured interest.

The Court begins by defining interest.  The Senior Creditors' Committee and the OpCo Noteholders provide substantially similar definitions of interest.   According to the Note Claimants, interest can be defined as consideration for the use or forbearance of another's money accruing over time.  (ECF No. 1859 at 6 ("'*Interest*' means consideration that accrues over time for the use or forbearance of another's money.") (emphasis in original)); (ECF No. 1862 at 9 ("'Interest' means consideration for the use or forbearance of another's money over a period of time.")).[2]

The Note Claimants' definition is consistent with the ordinary meaning of interest and with state law interpretations of the term.  Black's Law Dictionary defines "interest" as "[t]he compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; especially the amount owed to a lender in return for the use of borrowed money."  *Interest*, Black's Law Dictionary, (11th ed. 2019).  Webster's Dictionary notes that interest accrues as a percentage over time.  *See Interest*, Webster's New World Dictionary, (2d coll. ed. 1970) ("[M]oney paid for the use of money [and/or] the rate of such payment, expressed as a percentage per unit of time.").   New York courts similarly recognize that interest is a cost associated with the use or nonpayment of another's money.  *Love*, 78 N.Y.2d at 544 (describing interest as "the cost of having the use of another's money for a specified period"); *Becker v. Huss Co.*, 43 N.Y.2d 527, 543 (N.Y. 1978) ("[I]nterest is intended to compensate for the use or nonpayment of money.").  Applying Texas law, the Fifth Circuit has acknowledged the same general definition.  *See Achee Holds., LLC v. Silver Hill Fin., LLC*, 342

---

[2] In its supplemental brief, Ultra did not provide a specific definition of interest.  (*See generally* ECF No. 1860 at 7-12).

F. App'x 943, 944 (5th Cir. 2009) ("Specifically a fee will not be considered interest if it is not for the use, forbearance or detention of money.").

The Court adopts the Note Claimants' definition of interest.  Interest means *consideration for the use or forbearance of another's money accruing over time*.  The New York Court of Appeals, the Fifth Circuit, and Black's Law Dictionary expressly recognize the principle that interest is a cost associated with the use or forbearance of another's money.  Webster's Dictionary adds to that principle the fact that interest is normally expressed as a percentage accruing over time.  The Note Claimants' definition appropriately incorporates each element of interest.

   3.  *Defining Unmatured Interest*

If interest is consideration for the use or forbearance of another's money accruing over time, unmatured interest is interest that has not accrued or been earned as of a reference date. *See In re Sadler*, No. 14-CV-2312, 2015 WL 9474174, at *6 (N.D. Ohio Dec. 29, 2015) (noting bankruptcy court defined unmatured interest as "interest that is not yet due and payable or is not yet earned at the time of the filing of the petition").  Stated more fully, unmatured interest is *consideration for the use or forbearance of another's money, which has not accrued or been earned as of a reference date*.  In a bankruptcy case, the reference date is the order for relief. *E.g.*, *In re X-Cel, Inc.*, 75 B.R. 781, 788-89 (N.D. Ill. 1987) ("Unmatured interest is defined in this context as interest which was not yet due and payable at the time the petition was filed.").  This Court slightly refines the *X-Cel* court's definition.  "Unmatured" is more indicative of whether the interest has accrued and been earned; the due date for payment of the interest should not be considered.

The key distinction between matured and unmatured interest is whether such interest has been earned.  Interest matures when it is earned and owing to the lender.  *See In re Sadler*, 2015 WL 9474174, at \*6.  An amount is due when it is either immediately enforceable or owing.  *Due*, Black's Law Dictionary (11th ed. 2019).  Under the Bankruptcy Code, interest that has accrued as of the petition date is matured.  The lender has earned that compensation because his money was used pre-petition.

Because interest accrues, or is earned, steadily over time, some interest may be owed on a given date even though it is not immediately payable.  In other words, on any given date between contractual installments, a portion of the interest has come due and is owing, despite the fact that the next installment is not immediately payable.  Such interest is 'earned' because the borrower, looking backwards, used the lender's money.  The Bankruptcy Code allows such interest, even if it is not immediately payable as of the petition date.  Unmatured interest is prospective.  It is compensation for the future use of another's money.

The Note Claimants argue that the Make-Whole Amount matured due to acceleration of the Notes.  (ECF No. 1831 at 26).  While interest can also mature when it becomes immediately payable due to acceleration, acceleration occurred post-petition in this case.  Acceleration is "the advancing of a loan agreement's maturity date so that payment of the entire debt is due immediately.  *NML Capital v. Republic of Arg.*, 952 N.E.2d 482, 491 (N.Y. 2011) (citing Black's Law Dictionary (9th ed. 2009)).  Obligations can become due for payment through acceleration. *Id.* ("'[A]cceleration' of a repayment obligation in a note or bond changes the date of maturity from some point in the future . . . to an earlier date based on the debtor's default under the contract.").  However, whether interest is matured at the moment of filing is determined without reference to acceleration clauses triggered by a bankruptcy petition.  *See In re ICH Corp.*, 230

B.R. 88, 94 (Bankr. N.D. Tex. 1999).  The Make-Whole Amount came due because the Notes accelerated when Ultra filed its chapter 11 petition.  Because the Notes did not accelerate prior to the petition, the Make-Whole Amount's status under § 502(b)(2) is determined without reference to the acceleration clause.

### 4. *The Make-Whole Amount is not Unmatured Interest*

The Make-Whole Amount is neither interest nor unmatured interest.  The Make-Whole Amount is not consideration for the use or forbearance of the Note Claimants' money, which had not accrued or been earned as of the petition date.   Although the Make-Whole Amount is "consideration," it is not consideration for the use or forbearance of the Note Claimants' money. The Make-Whole Amount compensates the Note Claimants for the cost of reinvesting in a less favorable market.  If the market is substantially more favorable at the time of prepayment, the Make-Whole Amount could equal zero dollars.  Instead of compensating the Note Claimants for the use or forbearance of their money, the Make-Whole Amount compensates the Note Claimants for Ultra's decision not to use their money.  In an unfavorable market, that decision causes the Note Claimants to suffer damages.   The Make-Whole Amount liquidates those damages.

The Make-Whole Amount became payable because on the petition date, the Called Principal of the Notes was less than the "Discounted Value" of the principal and interest payments scheduled to come due after the petition date.  (ECF No. 1831 at 10).  Under the MNPA, "Discounted Value" was calculated by discounting the remaining payments to their net present value on the petition date, "using a discount factor equal to the applicable 'Reinvestment Yield.'"  (ECF No. 1831 at 11).  The applicable "Reinvestment Yield" was 0.5% higher than the

yield for similar U.S. Treasury securities reported two days prior to the petition date.  (ECF No. 1831 at 11).

The Make-Whole formula incorporates both the timing of prepayment and the applicable Treasury rates just prior to prepayment.  The earlier prepayment occurs, the higher the Called Principal.  At lower Treasury rates, the Discounted Value becomes higher.  On the other hand, higher Treasury rates equate to lower Discounted Values.  A Make-Whole is owed when the Discounted Value exceeds the Called Principal, and the Make-Whole equals the difference between those two sums.  The combination of the timing of prepayment and the applicable reinvestment rates approximate the damages suffered due to prepayment.

Other courts have reached the conclusion that similar make-wholes are compensate for liquidated damages.  *E.g.*, *In re Trico Marine Servs. Inc.*, 450 B.R. 474, 481 (Bankr. D. Del. 2011) ("Th[e] Court is persuaded by the soundness of the majority's interpretation of make-whole obligations, and therefore finds that the Indenture Trustee's claim on account of the Make-Whole Premium is akin to a claim for liquidated damages, not for unmatured interest."); *see, e.g.*, *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995) ("Where the contract grants the borrower the right to prepay, a prepayment premium is not compensation for the use, forbearance, or detention of money, rather it is a charge for the option or privilege of prepayment.").

The Make-Whole Amount is not unmatured interest simply because it could equal zero when reinvestment rates are high.  Nor would the Make-Whole Amount be unmatured interest merely because it might equal the unmatured interest due at the time of prepayment.  The issue is not the final sum of the Make-Whole Amount.  Rather, the issue is what the Make-Whole Amount compensates the Note Claimants for.  Like a grade school math student, answering the

problem requires showing the work.  The arithmetic here demonstrates that the Make-Whole Amount does not compensate the Note Claimants for the use or forbearance of their money.

The Make-Whole Amount does not accrue over time.  Rather, it is a one-time charge which fixes the Note Claimants' damages when it is triggered.  *See Parker Plaza W. Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349, 352 (5th Cir. 1991) (noting under Texas law "a prepayment premium is a charge for the option or privilege of prepayment . . . and, as such, the charge is not 'interest'"); *Feldman v. Kings Highway Savs. Bank*, 102 N.Y.S.2d 306, 307 (N.Y. App. Div. 2d Dep't 1951) (applying New York usury law and finding prepayment premium "was not in consideration of the making of a loan or of forbearance of money.  It was the converse, that is, for the making of a new and separate agreement, the termination of the indebtedness. Accordingly, it was not a payment of interest").  Interest accrues over time.  Even payment in kind interest, where no interest becomes due for payment until a maturity date, accrues over the life of a note for the purposes of § 502(b)(2).  *See In re Energy Future Holdings Corp.*, 540 B.R. 109, 111 (Bankr. D. Del. 2015) (characterizing portion of interest on payment in kind notes as accrued as of the petition date).

Unlike interest, the Make-Whole Amount fixes the damages sustained by the Noteholders' at the time of prepayment. While the timing of prepayment plays a significant role in calculating the damages suffered, nothing about the formula suggests the Make-Whole accrues over time.  The Note Claimants do not earn the Make-Whole Amount over the life of the Notes. Instead, time is utilized in the Make-Whole formula to determine the Called Principal and remaining payments.  Significantly, the time relevant to the Make-Whole formula is the date at which Ultra *ceased* to use or forbear the Note Claimants' money.  The Make-Whole Amount is not earned over time.

Ultra relies on the Court of Appeals for the Second Circuit's decision in *In re MPM Silicones, LLC*, as suggesting that a make-whole is unmatured interest. 874 F.3d 787, 801-02 (2d Cir. 2017) ("The make-whole premium was intended to ensure that the Senior-Lien Note holders received additional compensation to make up for the interest they would not receive if the Notes were redeemed prior to the maturity date."). However, the Second Circuit was not presented with the question of whether a make-whole is unmatured interest. *See id.* In fact, the make-whole in *MPM Silicones* was not disallowed by the Bankruptcy Code at all. *See id.* Instead, that make-whole never became due under the relevant terms of the notes. *Id.* at 803. The make-whole in *MPM Silicones* came due if the debtor opted to prepay the notes ahead of the maturity date. *Id.* Under the acceleration clause of the notes, the debtor's bankruptcy filing automatically accelerated the notes. *Id.* The maturity date became the petition date. Because the make-whole only became due if the debtors paid those notes ahead of the maturity date, the debtor's post-petition decision to redeem the notes was not a prepayment and did not trigger the make-whole. *Id.* Any statement by the Second Circuit about the characterization of the make-whole was dicta.

To illustrate whether the Make-Whole Amount is akin to unmatured interest, during the May 19, 2020 oral argument, the Court posed a brokerage fee hypothetical that envisioned the make-whole as a three-party transaction. The Court then requested further briefing regarding whether any portion of the brokerage fee constitutes unmatured interest. The hypothetical began with a loan, providing for a fixed 6% interest rate, prepaid exactly one year prior to maturity. Prepayment of the loan triggers a reinvestment fee equal to the amount that the lender would be required to pay to make a loan in the same industry as the original loan, with cash flows that match the remaining payments had the original loan not been prepaid. (ECF No. 1856 at 1). Following the borrower's prepayment, the lender locates a broker who will find a new borrower

and replace the loan with a 6% loan in exchange for a 2.25% fee.  The market interest rate at the time of prepayment is 4%.  The Court asked whether any portion of the 2.25% fee is unmatured interest.

The fee is equal to the amount the lender would have to pay to a broker in order to reinvest the prepaid funds with cash flows mirroring the remaining original loan payments.  The fee cannot be interest because it does not provide consideration for the use or forbearance of the lender's money, and it does not accrue over time.  Just like the Make-Whole Amount, the fee represents a negotiated cost to compensate the lender for making a new loan on comparable terms in a changed market.  The hypothetical is no different than the Make-Whole at issue here. Instead of a Make-Whole that directly compensates the lender for the difference in interest rates compared to the outstanding principal, the hypothetical reinvestment fee involves a third-party broker and compensates the lender for the actual cost of making a new loan.  There is no credible argument that the reinvestment fee could be considered unmatured interest under the Bankruptcy Code.  Nor is there reason to believe that the Bankruptcy Code disallows the Make-Whole Amount, despite allowing a functionally identical transaction executed through a third-party. Both the Make-Whole Amount and the reinvestment fee represent damages to the lender, not interest.

The OpCo Noteholders and the Senior Creditors Committee provided substantially similar answers to the hypothetical.  Both creditor groups recognized that the reinvestment fee was not for the use or forbearance of money.  (ECF No. 1859 at 11 ("It is a remedy imposed upon the borrower when it no longer borrows money, after having promised to do so for a fixed term."); ECF No. 1862 at 17 ("[The fee] compensates the lender for its actual damages by obligating the initial borrower to reimburse the lender for the cost of relending the funds that the

borrower had agreed to borrow for a specified period.")).   Further, the fee is unlike interest because it does not grow as a function of time.   (ECF No. 1859 at 11).   The reinvestment fee becomes due upon the closing of the replacement loan.   (ECF No. 1862 at 18).   The fee is entirely contingent on future market events.

Ultra also acknowledged that the reinvestment fee would be allowed under § 502.   (ECF No. 1860 at 15 ("That brokerage fee plainly does not qualify as unmatured interest under § 502(b)(2).")).   Ultra noted that because the hypothetical lender has not borrowed money from the broker, the fee does not qualify as unmatured interest.   (ECF No. 1860 at 15).   Rather, Ultra characterizes the fee as the transaction cost of finding a new borrower.   (*See* ECF No. 1860 at 15-16).   Ultra also raised concerns that the hypothetical would be economically impractical and would potentially subject the borrower to "unlimited liability upon prepayment."   (ECF No. 1860 at 14).   Qualms about the practicality of the hypothetical aside, Ultra's characterization of the reinvestment fee is a mere transaction cost does not distinguish the fee from the Make-Whole Amount.

The sole economic difference between the hypothetical and the Make-Whole in this case is that the Make-Whole in this case eliminates the broker.   Rather than paying the broker to find the alternative borrower, the Make-Whole recipients accept the identical amount of funds.   The compensation to the borrower represents liquidated damages stemming from prepayment, whether it is structured as a Make-Whole or a reinvestment fee.   The hypothetical illustrates an economic equivalent of the make whole, and it is apparent that neither the hypothetical nor the Make-Whole is unmatured interest.

5. *The Make-Whole Amount is not the Economic Equivalent of Unmatured Interest*

Ultra argues that the Make-Whole is the economic equivalent of unmatured interest. This is incorrect. Applying the Court's definitions, the economic equivalent of interest must be the economic equivalent of consideration for the use or forbearance of another's money accruing over time. A claim is the economic equivalent of unmatured interest if, in economic reality, it is the economic substance of unmatured interest. *Pengo*, 962 F.2d at 546. If it is the economic equivalent of interest, the claim must be disallowed regardless of the parties' labels. *See id.* The Make-Whole Amount is not an economic equivalent of unmatured interest.

Economic substance, rather than party labels, determines whether an amount is unmatured interest. *In re Chateaugay Corp.*, 109 B.R. 51, 57 (Bankr. S.D.N.Y. 1990) ("[T]he essential factor guiding this Court in making its determination . . . is the underlying economic substance of the transaction."). If a debt fits within the definition of unmatured interest, it is disallowed by § 502(b)(2), regardless of its superficial label. *See id.*

The Fifth Circuit expressly adopted that understanding in *Pengo*, 962 F.2d at 543. In *Pengo*, the Fifth Circuit held that an unamortized original issue discount ("OID") is disallowed by § 502(b)(2) because it is the economic equivalent of unmatured interest. *Id.*

OID notes are issued for less than face value. For example, an issuer might receive $90 for a note with a face value of $100. The issuer receives $90 up front, but agrees to repay $100 over the life of the note. That $10 difference would, in economic fact, be compensation "for the delay and risk involved in the ultimate repayment of monies loaned." *Id.* at 546. The difference is earned over the note's term as it amortizes, and in the event of a bankruptcy petition, unearned amounts are the economic equivalent of unmatured interest. *Id.*

In deciding that unamortized OID fell within the scope of unmatured interest, the Fifth Circuit followed an analysis similar to what this Court applies here.  First, it explained the mechanics of OID loans, noting that OID "is in the nature of additional interest," and that it amortizes over time.  *See id.* at 546 (internal quotations omitted).  Next, while the Fifth Circuit did not define unmatured interest, it stated that OID compensates a lender for "the delay and risk involved" with lending money.  *Id.*  Because the economic facts showed that unamortized OID fit within the meaning of unmatured interest, it was disallowed under § 502(b)(2).  *Id.* ("The 'unmatured interest' bankruptcy rule and the economic notion of 'original issue discount' intersect to form the legal nexus for our decision-making.").  Put simply, the Fifth Circuit compared the mechanics of OID to a common understanding of unmatured interest.  Because OID's round peg fit within unmatured interest's round hole, OID was the economic equivalent of unmatured interest.  *See id.*

The *Pengo* court also noted that both the Senate and House Reports describe OID as a form of unmatured interest disallowed under § 502(b)(2).  *Id.* (citing S. Rep No. 989, 95th Cong., 2d Sess. 62, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5848 (noting § 502 disallows "any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy"); H.R. Rep. No. 595, 95th Cong., 2d Sess. 352, *reprinted in* U.S.C.C.A.N. 5963, 6308).

Applying *Pengo* to the case at hand, the Make-Whole Amount is distinguishable from OID and is not an economic equivalent of unmatured interest.  The Make-Whole Amount does not compensate the Note Claimants for "the delay and risk involved" with lending money.  *Id.*  Rather than compensating for delay or risk, the Make-Whole Amount compensates for actual pecuniary loss.  Further, while the timing of prepayment affects damages suffered, the Make-

Whole Amount does not amortize or accrue over time. Unlike OID, the Make-Whole Amount is a square peg, one which cannot be shoved into a round hole. The Make-Whole Amount is not the economic equivalent of unmatured interest.

*In re Doctors Hospital of Hyde Park, Inc.*, 508 B.R. 697 (Bankr. N.D. Ill. 2014), which Ultra relies on, provides an unpersuasive comparison of OID and make-wholes. There, the bankruptcy court held that a make-whole (described as a "Yield Maintenance Premium") was both a liquidated damages clause and unmatured interest. *Id.* Without further explanation, *Doctors Hospital* stated that "[n]othing about the nature of liquidated damages necessarily excludes interest, or vice versa." *Id.* The court likened the make-whole to OID. *Id.* at 705 (citing *In re Chateaugay*, 961 F.2d at 380). However, that comparison was based on the understanding that "[b]oth OID and yield maintenance premiums are one-time charges to compensate the lender for lending . . . ." *Id.*

The Court respectfully disagrees with *Doctors Hospital* for two reasons. First, as discussed, this Make-Whole Amount is distinguishable from OID. Contrary to the *Doctors Hospital* court's assertion, OID is not a one-time charge. OID is amortized and, like interest, it is earned over the term of the loan. *See Pengo*, 962 F.2d at 546. The Make-Whole Amount is distinguishable from interest because it does not accrue over time. Second, while "[n]othing about the nature of liquidated damages *necessarily* excludes interest," *Doctors Hospital* fails to explain how this Make-Whole Amount could be considered interest. *See Doctors Hosp.*, 508 B.R. at 706. Beyond the false parallel between make-wholes and OID as one-time charges, *Doctors Hospital* provides no persuasive explanation why make-wholes "serve the purpose of interest in economic reality." *Id.* at 705. The law in this circuit is that § 502(b)(2) disallows amounts seeking the economic equivalent of unmatured interest. The Make-Whole Amount does

not compensate for the use or forbearance of money, and it does not accrue over time.  It is not the economic equivalent of unmatured interest.

Ultra argues that the Make-Whole Amount merely compensates the Note Claimants for a portion of the unmatured interest owed on the petition date.  In Ultra's view, the Note Claimants were owed a certain amount of unmatured interest under the Notes as of the petition date, and the Make-Whole Amount is equivalent to a slice of that unmatured pie.  Therefore, according to Ultra, the Make-Whole Amount must be disallowed.  Section 502(b)(2) disallows a claim "to the extent that" it is for unmatured interest.  Ultra is correct that any claim for unmatured interest must be disallowed, whether that claim represents the full amount of unmatured interest owed under nonbankruptcy law or only a portion thereof.  However, the Fifth Circuit noted that when analyzing whether a make-whole is unmatured interest, "much depends on the dynamics of the individual case.  *Ultra*, 943 F.3d at 765.  Resolution of those dynamics requires consideration of "multifarious, fleeting, special, narrow facts that utterly resist generalization."  *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. At Lakeridge, LLC*, 138 S. Ct. 960, 968 n.6 (2018); *see Ultra*, 943 F.3d at 765.  Ultra's view oversimplifies the Make-Whole Amount and fails to engage with the economic reality that the Make-Whole Amount does not compensate the Note Claimants for the use or forbearance of money.

As discussed, the Make-Whole Amount compensates the Note Claimants for damages based on the prepayment or acceleration of the Notes.  Absent the Make-Whole, if Ultra prepaid the Notes, the Note Claimants would be deprived of the interest expected to accrue between the date of prepayment and the original maturity date of the Notes.  That amount would undoubtedly be unmatured interest.  It also equals the maximum amount of compensable damages under the

Make-Whole.  Ultra believes that fact leads to the conclusion that the Make-Whole Amount is the economic equivalent of unmatured interest.  That conclusion is incorrect.

The Make-Whole Amount does not become the economic equivalent of unmatured interest merely because the Make-Whole formula references interest rates.  The differential between the contractual interest rate and the reinvestment interest rate is the logical measure of a noteholder's damages.  Courts recognize that reference to an interest rate differential does not transform a make-whole into unmatured interest.  *See In re Sch. Specialty, Inc.*, No. 13-10125 (KJC), 2013 WL 1838513, at *4 (Bankr. D. Del. Apr. 22, 2013) (allowing claim for make whole "calculated by discounting future interest payments using an interest rate tied to Treasury Note performance").

It is neither surprising nor dispositive that the high-water mark of damages a lender may suffer when a loan is paid off ahead of schedule is equal to the expected interest lost.  From a lender's perspective, interest is the benefit of the bargain.  However, contrary to Ultra's argument, the Make-Whole formula does not provide the Note Claimants with a portion of the full amount owed for the use or forbearance of the Note Claimants' money.  Rather, the Make-Whole builds the upper limit of unmatured interest into a formula designed to compensate the Note Claimants for actual damages.  The Make-Whole does not give the Note Claimants a slice of the unmatured interest pie.  Unmatured interest is merely an ingredient in the liquidated damage pie.

The Make-Whole formula is also not an example of clever attorneys drafting around the provisions of § 502.  The Make-Whole measures the Note Claimants potential economic loss based on the remaining principal at the time of acceleration and a comparison between the interest rates under the Notes and available reinvestment rates.  The resulting Make-Whole

Amount is not a cost for the use or forbearance of the Noteholders' money, which had not yet accrued on the petition date. Nor is it the economic equivalent of that amount. It is a principled economic estimation of the damages suffered by the Note Claimants after Ultra defaulted on the Notes.

Ultra advances a theory where the economic equivalent of unmatured interest equates to anything Ultra believes is similar to unmatured interest. The parameters of Ultra's broad view of an economic equivalent are uncertain. What is certain is that Congress disallowed claims for "unmatured interest" in bankruptcy. 11 U.S.C. § 502(b)(2). Just as a federal court cannot narrow the scope of § 502(b)(2) by allowing some forms of unmatured interest, a court cannot widen the scope by disallowing claims that are not for unmatured interest. *Pengo* teaches that unmatured interest is determined based on economic reality, not by contractual labels. 962 F.2d at 546 ("For OID constitutes a 'method of providing for and collecting what in economic fact is interest to be paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned.'"). Despite this, Ultra reads *Pengo* as expanding § 502(b)(2) to disallow unmatured interest *and* other amounts that (in its view) seem similar to unmatured interest. (*See* ECF No. 1860 at 10 (arguing unmatured interest includes "its economic substitutes")). Yet, Congress was clear that § 502(b)(2) disallows only unmatured interest.

Ultra resists defining unmatured interest because "much depends on the dynamics on the individual case." (ECF No. 1860 at 7 (quoting *Ultra*, 943 F.3d at 765)). Ultra argues that because "[t]he Make-Whole Amount was expressly intended to serve as an *economic substitute* for the Creditors' expected future interest payments," the Make-Whole Amount is the economic equivalent of unmatured interest. (ECF No. 1860 at 11 (emphasis added)). However, without a

workable definition of unmatured interest, it is impossible to determine whether a make-whole is the economic equivalent of unmatured interest.

Notably, Ultra frequently stressed that *Pengo* disallows claims for the *economic equivalent* of unmatured interest. Yet, at various points in its briefing, Ultra's reading of *Pengo* shifts. At times, Ultra suggests that *Pengo* disallows claims for the *economic substitute* of unmatured interest. (*E.g.*, ECF No. 1860 at 10 ("In short, the critical lesson of *Pengo* is that 'unmatured interest' under § 502(b)(2) must be defined to include not only amounts traditionally labeled as 'interest,' but also amounts that represent an economic substitute for traditional interest."); ECF No. 1834 at 16 ("[T]he Make-Whole Amount in the MNPA was expressly designed to serve as an economic substitute for unmatured interest . . . .")). An *equivalent* and a *substitute* are not, for lack of a better word, equivalent.

The reason for this subtle shift in terminology is clear: the Make-Whole Amount cannot be categorized as the equivalent of interest. The Make-Whole Amount does not compensate the Note Claimants for the use or forbearance of their money. It is not interest and it is not the economic equivalent of interest. Ultra attempts to avoid this issue by framing *Pengo* as disallowing substitutes for unmatured interest. Whether or not the Make-Whole Amount is a "substitute" for unmatured interest, *Pengo* says nothing about substitutes. *Pengo* disallows equivalents because an equivalent to unmatured interest is economically identical to unmatured interest. That is what Congress chose to disallow. A substitute is not an equivalent. When a restaurant diner substitutes a $10.00 slice of salmon for $10.00 of chopped grilled chicken on a Caesar salad, it is not because salmon and grilled chicken (even at the equivalent price) are the same. She does so because they are different. Section 502(b)(2) disallows claims for unmatured

interest, not amounts that parties contract to pay instead of interest.  The Make-Whole Amount is allowed under § 502 of the Bankruptcy Code.

### b.  The Solvent-Debtor Exception

The second question before the Court is whether the "solvent-debtor exception" survived the enactment of the Bankruptcy Code, and if so, whether the exception entitles the Class 4 Creditors to post-petition interest at the MNPA and RCF default rates.[3]   The answer to both questions is yes.  The parties agree that Ultra was "massively solvent" at confirmation, and that the Class 4 Claimants are entitled to receive some amount of post-petition interest.  Ultra argues that post-petition interest should be limited to the federal judgment rate.  However, "absent compelling equitable considerations, when a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights."  *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006).   For the reasons that follow, this Court upholds the Class 4 Claimants' contractual rights.

### 1.  The Historical Basis of the Solvent-Debtor Exception

Under § 502(b)(2), interest as part of a claim ceases to accrue upon the filing of a bankruptcy petition.  However, in some circumstances, creditors may demand post-petition interest on their claims.  *See* 11 U.S.C. § 506.  Historically, one such circumstance allowed unsecured creditors of a solvent debtor to receive post-petition interest on their claims.

Courts have heard disputes between solvent debtors and their creditors over the right to post-petition interest for nearly three hundred years.  Over the centuries, courts developed a solvent-debtor exception to the general bankruptcy rule that interest stops accruing on the

---

[3] Because the Make-Whole Amount is allowed under § 502 of the Bankruptcy Code, the Court does not decide whether the solvent-debtor exception also permits recovery of the Make-Whole Amount.  While the solvent-debtor exception is rooted in a court's duty to enforce creditors' contractual rights, the exception has traditionally been utilized only to award post-petition interest.  Because the Make-Whole Amount is not interest, it is unclear whether the solvent-debtor exception provides an alternative basis for the Note Claimants to recover the Make-Whole Amount.

petition date.  The rationale for the exception is as obvious as it is uncontroversial: an individual with the means to pay his debts in full should be required to do so.  *See Johnson v. Norris*, 190 F. 459, 466 (5th Cir. 1911) ("The bankrupts should pay their debts in full, principal and *interest to the time of payment*, whenever the assets of their estates are sufficient." (emphasis added)).

The solvent-debtor exception, rooted in English bankruptcy law, long predates the Bankruptcy Code.  Lorde Chancellor Hardwicke first recognized the exception in *Bromley v. Goodere*, (1743) 1 Atkyns 75.  There, certain creditors held notes with an entitlement to interest. Following a thirty-year bankruptcy proceeding, a surplus remained after the creditors were paid the full principal of the notes, as well as contractual interest up to the date of the bankruptcy.  *Id.* at 79.  Lord Chancellor Hardwicke held that, due to the surplus assets, the creditors were entitled to recover post-bankruptcy interest before any distribution could be made to the debtor's heirs. *Id.*  Subsequent English cases adopted this solvent-debtor exception.  *E.g.*, *Ex parte Mills*, 2 Vesey, Jr., 295; *Ex parte Clarke*, 4 Vesey, Jr., 676.

Congress exercised its Constitutional power to adopt uniform bankruptcy law in 1898, when it passed the Bankruptcy Act.[4]  U.S. Const. art. I. § 8, cl. 4; Bankruptcy Act of 1898, ch. 541, 30 Stat. 544.   Interpreting the Bankruptcy Act, the Supreme Court "naturally assume[d] that the fundamental principles upon which [England's bankruptcy system] was administered were adopted by [the United States] when we copied th[at] system." *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911).  One fundamental principle of English bankruptcy adopted in the Bankruptcy Act was the suspension of interest accrual as of the petition date.  *City of New York v. Saper*, 336 U.S. 328, 330-31 (1949); *see also Dreyfus*, 219 U.S. at 344 (stating "[n]o one doubts interest on unsecured debt stops" accruing on the petition date).

---

[4] Prior to passage of the Bankruptcy Act of 1898, Congress passed three short-lived bankruptcy statutes: The Bankruptcy Act of 1800, the Bankruptcy Act of 1841, and the Bankruptcy Act of 1867.  Those Acts were repealed after three, two, and eleven years, respectively.

The Bankruptcy Act expressly disallowed unmatured interest as part of a claim. Section 63 of the Bankruptcy Act dealt with claims allowance, and provided:

> Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability . . . owing at the time of the filing of the petition by or against him, whether then payable or not, with *any interest thereon which would have been recoverable at that date* . . . (5) provable debts reduced to judgments after the filing of the petition . . . *less costs incurred and interest accrued after the filing of the petition* and up to the time of the entry of such judgments.

Bankruptcy Act of 1938, ch. 575, § 63, 52 Stat. 840 (repealed) (emphasis added). Section 63 disallowed post-petition on both secured and unsecured claims. *See id.*; *In re Al Copeland Enters., Inc.*, 133 B.R. 837, 840 (Bankr. W.D. Tex. 1991).

Despite that fundamental principle, the solvent-debtor exception entitled creditors of a solvent debtor to recover post-petition interest. Courts consistently applied the solvent-debtor exception under the Bankruptcy Act. *Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266-67 (1914) ("Even in bankruptcy . . . it has been held, in the rare instances where the assets ultimately proved sufficient for the purpose, that creditors were entitled to interest accruing after adjudication."); *see also Sword Line, Inc. v. Indus. Comm'r of N.Y.*, 212 F.2d 865, 870 (2d Cir. 1954) ("[I]nterest ceases upon bankruptcy in the general and usual instances noted and unless the bankruptcy bar proves eventually nonexistent by reason of the actual solvency of the debtor.").

The Bankruptcy Act's treatment of unmatured interest was nearly identical to § 502(b)(2). Prior to Congresses' adoption of the Bankruptcy Code, courts understood that "in the case of a solvent bankrupt the bankruptcy court should be guided by the contract between the bankrupt and its creditors rather than by the distinct principles of equity jurisprudence." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 531 (7th Cir. 1986).

In *Johnson v. Norris*, the Fifth Circuit squarely held that creditors of a solvent debtor may recover post-petition interest, notwithstanding the plain text of § 63 of the Bankruptcy Act. 190 F. at 460 ("The rule in bankruptcy for the computation of interest on claims to the date of filing the petition *has no application* to a solvent estate." (emphasis added)). The trustee in *Norris* had $88,432 on hand after paying all creditors in full, including pre-petition interest. *Id.* at 461. The debtors contended that the creditors were "entitled to collect only the principal of their claims and interest to the date of the filing of the voluntary petition, and that therefore the entire surplus should be returned to the bankrupts." *Id.*

The Fifth Circuit noted that in a typical case there is no dispute that § 63 disallows post-petition interest. *Id.* ("Ordinarily no question as to subsequently accruing interest can arise, for it is a very rare occurrence that a surplus is left after paying the principal and interest to the date of the filing of the petition."). However, that general rule promoted equitable distribution of limited assets, a consideration that was inapplicable to a solvent estate. *Id.* at 462 ("It was not intended to be applied to a solvent estate. It was not in the contemplation of Congress that a solvent estate would be settled in the bankruptcy courts."). Thus, the Fifth Circuit applied the solvent-debtor exception and held that "[w]hether we are governed by the apparent intention of Congress as shown by the general purpose of the bankruptcy law, or by the general principles of equity, the result would be the same. The bankrupts should pay their debts in full, principal and interest to the time of payment, whenever the assets of the estate are sufficient." *Id.* at 466.

Multiple circuit courts followed *Norris*' lead. *E.g.*, *Littleton v. Kincaid*, 179 F.2d 848, 852 (4th Cir. 1950) ("Ordinarily interest on claims against a bankrupt estate runs to the filing of the petition in bankruptcy . . . [pursuant to] Section 63 . . . . [But] when [solvency] . . . occurs interest is payable out of this surplus to the date of payment." (citations omitted)); *Brown v. Leo*,

34 F.2d 127, 127 (2d Cir. 1929) ("[T]he time when interest stops . . . has already been fixed as a matter of law as the date of the filing of the petition . . . . But this estate will be solvent, and neither the rule nor the reason for stopping interest at the date of the filing of the petition applies to an estate which turns out to be solvent." (citations omitted)).  Some courts went further and held that there is an *obligation* to enforce the solvent-debtor exception in cases where a claim included a contractual right to post-petition interest.  *See Ruskins v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) ("[W]here there is no showing that the creditor entitled to the increased interest caused any unjust delay in the proceedings, it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for" contractual interest provision); *In re Int'l Hydro-Elec. Sys.*, 101 F. Supp. 222, 225 (D. Mass. 1951) ("Fairness requires that the debenture holders who were compelled to wait for their interest payments should receive the compensation which the indenture provided they should be paid in such an eventuality.").

    2.  *Adoption of the Bankruptcy Code did not Abrogate the Solvent-Debtor Exception*

There is no doubt that courts recognized a solvent-debtor exception to § 63 of the Bankruptcy Act.  When Congress enacted the Bankruptcy Code, Congress confirmed that section 502(b)(2) incorporated the principle that "interest stops accruing at the date of the filing of the petition."  S. Rep. No. 95-989, at 63 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 6309.  In fact, § 502(b)(2) is "closely analogous" to § 63 of the Bankruptcy Act.  *In re Dow Corning Corp.*, 244 B.R. 678, 684 (Bankr. E.D. Mich. 1999).  The primary change from pre-Code practice was the adoption of § 506(b), which allows over-secured creditors to recover post-petition interest up to the value of the collateral in all cases.  *Rake v. Wade*, 508 U.S. 464, 471 (1993).  Absent clear Congressional intent, provisions of the Bankruptcy Code did not abrogate universally recognized legal principles under the Bankruptcy Act.  *E.g.*, *Gladstone v. U.S.*

*Bancorp*, 811 F.3d 1133, 1139-40 (9th Cir. 2016). Nothing in the legislative history of the Bankruptcy Code or § 502(b)(2) suggests that Congress intended to defang the solvent-debtor exception.

Parsing legislative history is always a murky business.  However, if Congress intended to abandon the universal principle that a capable individual must fully repay his debts, Congressional silence on the issue would be curious.  The Supreme Court has made clear that it "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998); *see also Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.").  Congress gave no indication that it intended to erode the solvent debtor exception.

Equitable considerations support the solvent-debtor exception.  Limiting claims to pre-petition interest is of overwhelming consequence when creditors must share a limited pool of assets, but that limitation is without cause when the debtor can afford to pay all of its debts. *UPS Cap. Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007); *In re Chemtura Corp.*, 439 B.R. 561, 605 (Bankr. S.D.N.Y. 2010) ("With a solvent debtor, issues as to fairness amongst creditors, in sharing a limited pie, no longer apply.").  Instead, when the debtor is solvent, the equitable tug exists between unsecured creditors and the debtor's equity holders. The solvent-debtor exception ensures that the debtor does not receive a windfall at the expense of its creditors. *See In re Carter*, 220 B.R. 411, 416-17 (Bankr. D.N.M. 1998) ("[I]f the Court were to modify the originally contracted for [default] interest rate . . . , it would result in a windfall to the Debtor . . . at the [creditors'] expense.").

*Norris* recognized that rationale over one hundred years ago, and it remains persuasive to this day. Nothing in the legislative history surrounding the adoption of the Bankruptcy Code suggests that Congress intended to eliminate the solvent-debtor exception. This may be unsurprising given the *Norris* court's recognition that bankruptcy law "was not intended to be applied to a solvent estate. It was not in the contemplation of Congress that a solvent estate would be settled in the bankruptcy courts." 190 F. at 462. That observation applies as persuasively to Congresses' deliberation of the Bankruptcy Code as it did to deliberations of the Bankruptcy Act. There is no reason why Congress would allow solvent debtors to wield bankruptcy as a sword to slash valid debts. The solvent-debtor exception was "sufficiently widespread and well recognized" under the Bankruptcy Act to survive adoption of the Bankruptcy Code, absent a clear legislative intent to the contrary. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 10 (2000). No such intent was present when Congress passed the Bankruptcy Code. Elimination of the solvent-debtor exception would allow solvent debtors to realize windfalls by virtue of bankruptcy, while reneging on valid contractual debt. *Id.* Neither legal, equitable, or contractual principles favor such an outcome.

Numerous courts recognize that the solvent-debtor exception survived enactment of the Bankruptcy Code. *See, e.g.*, *In re Gencarelli*, 501 F.3d at 7 ("[T]he equities strongly favor holding the [solvent] debtor to his contractual obligations as long as those obligations are legally enforceable under applicable nonbankruptcy law."); *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) (holding solvent debtor must pay post-petition interest and remanding to determine whether contractual default rate or contractual non-default rate applied); *In re Schoeneberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993) (in a solvent debtor case the "weight of prior case law . . . convinces this Court that, when there was a prepetition contract between the

parties that provided for interest, it is that contract rate which should be applied"); *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991) ("The scale balancing the equities . . . is overwhelmingly tilted toward restoring the creditor to as near a position as the creditor would have occupied absent bankruptcy before benefitting the Debtors with surplus funds.").

Legislative history after the adoption of the Bankruptcy Code also shows that the solvent-debtor exception enjoys continued vitality. The history of § 1124 of the Bankruptcy Code indicates that Congress intended that a solvent debtor's creditors should receive post-petition interest. Section 1124 sets out the conditions that must be satisfied for a class of claims to be unimpaired in a chapter 11 plan. Before 1994, § 1124(3) stated that a claim was unimpaired where "the holder of such claim . . . receive[d] . . . cash equal to . . . the allowed amount of such claim." 11 U.S.C. § 1124(3) (1988). Congress removed that provision in direct response to a bankruptcy court's decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr. D.N.J. 1994).

In *New Valley*, the court confirmed a solvent debtor's chapter 11 plan. The plan left a class of unsecured creditors unimpaired, despite limiting the class' claims to prepetition interest while providing a recovery to a junior class. The debtor's argued that because § 1124(3) only required that unimpaired creditors receive the *allowed* amount of their claims, paying post-petition interest was not necessary. The bankruptcy court agreed and confirmed the plan.

Congress quickly rejected that result by removing § 1124(3) from the Bankruptcy Code. The House Reporter states that:

> The principal change in this section . . . relates to the award of postpetition interest. In a recent Bankruptcy Court decision in *New Valley*, unsecured creditors were denied the right to receive postpetition interest on their allowed claims even though the debtor was liquidation and reorganization solvent. The *New Valley* decision applied section 1124(3) of the Bankruptcy Code literally by asserting . . . that a class that is paid the allowed amount of its claims in cash on the effective date of a plan is unimpaired under section 1124(3), therefore is not entitled to vote, and is not entitled to receive postpetition interest . . . . In order *to*

> *preclude this unfair result in the future*, the Committee finds it appropriate to
> delete section 1124(3) from the Bankruptcy Code.

H.R. Rep No. 103-835, at 47-48 (1994), reprinted in 1994 U.S.C.C.A.N. 3340.  The repeal of §

1124(3) illustrates that, by adopting the Bankruptcy Code, Congress did not intend to eliminate

the solvent-debtor exception.  The principle that unsecured creditors of a solvent debtor are

entitled to post-petition interest continues to exist under the Bankruptcy Code.  Congress

expressly recognized that the amendment after *New Valley* was meant to "preclude" the "unfair

result" of depriving such creditors of post-petition interest "in the future."  *Id.*

The Class 4 Claimants here find themselves in an identical situation as the creditors in

*New Valley*.  Depriving the Class 4 Claimants of their bargained for interest would allow Ultra's

equity holders to realize an unjust windfall.  Congress did not intend such a result.  Moreover,

depriving the Class 4 Claimants of post-petition interest would run counter to a "monolithic

mountain of authority," developed over nearly three hundred years in both English and American

courts, holding that a solvent debtor must make its creditors whole.  *See Ultra*, 943 F.3d at 760.

Congresses' amendment to the Bankruptcy Code after the *New Valley* decision supports the

conclusion that the solvent-debtor exception remains.

### 3.  The Solvent-Debtor Exception is not Rooted in § 105(a)

This review of competing statutes, legislative history, amendments to the Code, and case

law may appear both sprawling and technical.  These are the tools available to interpret the

Bankruptcy Code.  The task is delicate.  The mechanics of the solvent-debtor exception and the

precise manner of its incorporation into the Bankruptcy Code is similarly nuanced.  However, it

is crucial to remember that the exception's reason for existence is plain: a "fortunate" debtor

must repay its creditors.

While the solvent-debtor exception survives, it must be applied within the parameters of the Bankruptcy Code.  *See Gencarelli*, 501 F.3d at 7.   A bankruptcy court is undoubtedly forbidden from exercising equitable powers "in contravention of the Code."  *Law v. Siegel*, 571 U.S. 415, 423 (2014); *see* 11 U.S.C. § 105(a).  Any explanation of the exception as a gloss to § 502(b)(2), allowing unmatured interest as part of a claim, is foreclosed by *Law v. Siegel*.  Such an understanding plainly contravenes the Bankruptcy Code.   Thus, the Court must look to other provisions of the Bankruptcy Code to understand the solvent-debtor exception's operation.

This Court is mindful of the Supreme Court's admonishment of bankruptcy courts using roving equity to disregard provisions of the Bankruptcy Code.  *Id.*   However, the Fifth Circuit has "caution[ed] against an overly literal interpretation of the Bankruptcy Code," instead encouraging interpretations based on "careful review of the statutory language, legislative history, and public policy considerations . . . ."  *CompuAdd Corp. v. Tex. Instruments Inc. (In re CompuAdd Corp.)*, 137 F.3d 880, 882 (5th Cir. 1998).  *Law v. Siegel* dealt with a bankruptcy court's use of its equitable powers to rewrite the Code based on what that court thought was fair. 517 U.S. at 423.  The solvent-debtor exception, while equitable in nature, does not lend itself to whimsical application by courts.  It is triggered when one concrete fact exists: the estate's assets exceed its liabilities.  Its application is similarly straightforward: creditors are paid the post-petition interest to which they are legally or contractually entitled.

### 4.   The Best Interest of Creditors Test is not the Source of the Exception

Ultra suggests that Congress codified some aspects of the solvent-debtor exception in § 1129(a)(7) of the Bankruptcy Code, but that suggestion lacks merit.   Ultra's vision of the solvent-debtor exception under the Bankruptcy Code is that unimpaired creditors are simply

entitled to the same post-petition interest as impaired creditors.  There is neither a textual nor historical basis for that assertion.

Section 1129(a)(7), commonly known as the best interest of creditors test, prohibits confirmation of a chapter 11 plan if a dissenting impaired class would receive less than it would in a chapter 7 liquidation.  Because an unsecured creditor in chapter 7 is entitled to receive post-petition "interest at the legal rate" before funds may be distributed to the debtor, Ultra argues that Congress incorporated the solvent-debtor exception into the best interest of creditors test.  *See* 11 U.S.C. § 726(a)(5).

One problem with Ultra's argument is that the best interest of creditors test already existed in the Bankruptcy Act.  Section 366(2) of the Bankruptcy Act provided that "[t]he court shall confirm an arrangement if satisfied that . . . it is for the best interests of the creditors." Bankruptcy Act of 1938, ch. 575, § 366, 52 Stat. 840, 911.   Section 366(2) was "broadly interpreted to require a comparison between what creditors would receive under the composition offer and what they would receive in liquidation of the estate.  Where the composition offer would pay creditors considerably less than they might reasonably expect to realize in liquidation, the composition . . . was not for the best interest of creditors."  *In re Gilchrist Co.*, 410 F. Supp. 1070, 1074 n.2 (E.D. Pa. 1976) (citations omitted).

Section 1129(a)(7) of the Bankruptcy Code restates the test found in § 366 of the Bankruptcy Act.  *See In re SM 104 Ltd.*, 160 B.R. 202, 219 (Bankr. S.D. Fla. 1993) ("Section 1129(a)(7) sets out the financial minimum that assenting creditors in an assenting class can impose on dissenting creditors within that class.  This minimum was drawn from the best interests test that came to the Bankruptcy Code from the old [Bankruptcy Act].").

Again, the solvent-debtor exception was widely recognized under the Bankruptcy Act. The best interest of creditors test also existed under the Bankruptcy Act. Section 502(b)(2) and § 1129(a)(7) of the Bankruptcy Code closely mirror their predecessor provisions in the Bankruptcy Act. Nothing in the legislative history suggests Congress intended to eliminate the solvent-debtor exception or that Congress incorporated it into § 1129(a)(7) of the Bankruptcy Code. *See In re Dow Corning*, 244 B.R. at 684 (citing H.R. Rep. No. 95-595, at 353 (1977)).

A second problem with Ultra's argument is based upon the plain text of the Bankruptcy Code. Section 1129(a)(7) expressly applies only to impaired creditors in a cramdown scenario. Nothing in the text of the Bankruptcy Code applies § 1129(a)(7) to unimpaired creditors. Nor does any provision of the Bankruptcy Code give unimpaired creditors a right to interest at the legal rate under § 726(a)(5). Instead, the Bankruptcy Code is silent regarding an unimpaired creditor's right to post-petition interest.

### 5. *The Fair and Equitable Test is not the Source of the Exception*

The Class 4 Claimants' argument that the solvent-debtor exception is rooted in the fair and equitable test under § 1129(b)(1) faces a similar issue as Ultra's argument regarding the best interest of creditors test. Section 1129(b)(1) requires a plan to be "fair and equitable" before a court may allow confirmation. 11 U.S.C. § 1129(b)(1). "'Fair and equitable' (a redundant term) should be pictured vertically, as it 'regulates priority among classes of creditors having higher and lower priorities.'" *In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020) (quoting Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 228 (1998)). Thus, a plan must be fair and equitable as between interest holders of higher and lower priorities. *Id.*

As with the best interest of creditors test, the fair and equitable test only applies "with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).  Nothing in the Bankruptcy Code applies the fair and equitable test to unimpaired classes of creditors.  For that reason, a bankruptcy court cannot apply the test to determine whether a plan that limits or denies post-petition interest to unimpaired creditors, but awards a recovery to equity holders, is fair and equitable.

6.   *The Solvent-Debtor Exception Entitles the Class 4 Claimants to Post-Petition Interest*

No single provision of the Bankruptcy Code explains the solvent-debtor exception on its own.  However, piecing these Bankruptcy Code provisions together, the solvent-debtor exception works as follows.  Section 1124 sets out what the Class 4 Claimants are entitled to receive under Ultra's plan. Section 1124 requires that the plan leaves the Claimants' "legal, equitable, and contractual rights" unaltered.  11 U.S.C. § 1124(1).  This encompasses a panoply of rights, derived from a number of different sources.  The starting points are the MNPA and RCF, without which the Class 4 Claimants would have no contractual rights, and thus, no legal or equitable rights in this bankruptcy case.  The MNPA gives the Note Claimants a contractual right to the Make-Whole Amount and interest at the default rate.  The RCF gives the RCF Claimants a right to interest at the default rate.  New York law provides the Class 4 Claimants with a legal right to those contractual rights.  The full amount of the Make-Whole Amount and interest at the default rates represent the Class 4 Claimants maximum limit that the plan would distribute.

Of course, § 502(b)(2) supersedes New York law and the parties' contract by restricting the legal right to receive unmatured interest in bankruptcy.  The Fifth Circuit made clear that any limitation on the Class 4 Claimants' claims imposed by the Bankruptcy Code does not result in impairment.  *Ultra*, 943 F.3d at 762.  In other words, § 502(b)(2) subtracts unmatured interest

from the ceiling of recovery provided by New York law, the MNPA, and the RCF.  At the very least, the Class 4 Creditors must receive their full allowed claims in order to be unimpaired.

However, the Class 4 Creditors possess two important equitable rights as well.  First, they have an equitable right, based within the Bankruptcy Code, to be treated better than similarly situated impaired creditors.  *See In re Energy Future Holdings*, 540 B.R. at 119 (quoting *In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202-203 (3d Cir. 2003)).  Impaired creditors in a solvent chapter 11 must receive at least their full allowed claim plus interest at the legal rate.  *See id.*  The Bankruptcy Code is silent as to whether unimpaired creditors have a right to post-petition interest.  This creates ambiguity because equity dictates that unimpaired creditors be treated no less favorably than impaired creditors.

Second, the Class 4 Claimants have an equitable right to be paid the full amount they are validly owed before Ultra's equity holders receive any recovery.  *See Norris*, 190 F. at 466.  This equitable right is the root of the solvent-debtor exception.  In a typical case, the right vanishes because other creditors must share a limited pot of assets.  That is not so when the debtor is solvent.  *Id.* at 462.  When the struggle is between creditors and equity holders, as opposed to creditors and creditors, the equitable right is critical.

The Bankruptcy Code's ambiguity leaves an unimpaired unsecured creditor's right to post-petition interest uncertain.  Because an unimpaired creditor has equitable rights to be treated no less favorably than an impaired creditor and to be paid in full before the debtor realizes a recovery, a plan denying post-petition interest in a solvent debtor case alters the equitable rights of an unimpaired creditor under § 1124(1).

Viewed in this light, the solvent-debtor exception is not simply a judicial gloss allowing courts to bypass § 502(b)(2).  Instead, the exception recognizes that the equitable prong of §

1124 applies differently when the debtor is solvent.  *In re Energy Future Holdings*, 540 B.R. at 111 ("The receipt of post-petition interest, thus, does not arise as part of the allowed amount of the claim but, rather, as a requirement to confirmation.").  The solvent-debtor exception has existed throughout the history of bankruptcy law and § 1124 provides a means to implement the exception within the plan confirmation framework of the Bankruptcy Code.  Because impaired creditors are expressly entitled to post-petition interest, unimpaired creditors of a solvent chapter 11 debtor, who must be no worse off than impaired creditors, should also receive post-petition interest.  Further, because creditors in a solvent case need not share limited assets, there is no equitable reason to deny unimpaired creditors post-petition interest.

### 7.  *The Class 4 Claimants Must Receive Interest at the Default Rates*

The final question is what post-petition interest rate the Class 4 Claimants are entitled to receive.  The Claimants argue that they must be paid interest at the MNPA and RCF default rates.  On the other hand, Ultra believes the Claimants must be limited to interest at the federal judgment rate.  Courts are split as to whether the reference to interest "at the legal rate" under § 726(a)(7) means the federal judgment rate or a contractual rate.  *Compare In re Cardelucci*, 285 F.3d 1231 (9th Cir. 2002), *with In re Carter*, 220 B.R. 411 (Bankr. D.N.M. 1998).

The Court need not pin down the meaning of the "legal rate" at this time because the Class 4 Claimants have a right to receive interest at the contractual default rates even if interest "at the legal" rate means the federal judgment rate.  As discussed, the Class 4 Claimants' right to post-petition interest is based on two key equitable rights.  First, the right to receive no less favorable treatment than impaired creditors.  And second, the right to have their contractual rights fully enforced.  *See In re Dow Corning*, 456 F.3d at 679 ("When a debtor is solvent, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the

parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced.").

Assuming that the legal rate under § 726(a)(7) is the federal judgment rate, the Class 4 Claimants may nevertheless recover interest at the contractual default rates.  If the legal rate is the federal judgment rate, then impaired creditors of a solvent chapter 11 debtor must receive interest at least at the federal judgment rate.  The Court cannot adopt a reading of the Bankruptcy Code which places impaired creditors in a more advantageous position than unimpaired creditors.  If the Class 4 Creditors are limited to the federal judgment rate, they are worse off than if they were impaired under Ultra's plan.  This is because even though the Class 4 Creditors would receive identical interest as a hypothetical impaired class, as an unimpaired class the Claimants were deprived of the right to vote for or against the plan.

Additionally, limiting the Class 4 Claimants to interest at the federal judgment rate contravenes the purpose of the solvent-debtor exception.  The underlying purpose of the exception, recognized for nearly three hundred years, is that a debtor must repay its debts in full when it has the means to do so.  This means that when a debtor is solvent, "a bankruptcy court's role is merely to enforce the contractual rights of the parties."  *In re Dow Corning*, 456 F.3d at 679.  Limiting post-petition interest to the federal judgment rate would not enforce the contractual rights of the parties in this case.  Instead, it would curtail the Class 4 Claimants' recovery, while allowing Ultra and its equity holders to escape bankruptcy with a windfall.

The solvent-debtor exception is based on the critical public policy consideration that a debtor cannot walk away from bankruptcy with a windfall while creditors walk away with depleted pockets.  This Court will not upset three hundred years of established law.  The Class 4 Claimants are entitled to post-petition interest at the MNPA and RCF default rates.

## CONCLUSION

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **October 26, 2020.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE